DOCUMENT #1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

LAFAYETTE DIVISION

-FILED-

JAN 1 8 2024

At _____ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LIDAN LIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 4:20-CV-00097-TLS-JPK |
| | ) |
| THE TRUSTEES OF PURDUE | ) |
| UNIVERSITY, CARL DRUMMOND, | ) |
| LACHLAN WHALEN, | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFDNANTS'**

**MOTION FOR SUMMARY JUDGMENT**

**1**          **Introduction**

Defendants' Motion for Summary Judgement has no basis in law or facts. They have misinterpreted the laws and disregarded many facts crucial to Plaintiff's claims in their Motion. Defendants argued that "Plaintiff has no evidence that Dr. Whalen or Dr. Drummond were personally involved in any harassment, discrimination or retaliation against her [Plaintiff]). This statement is a blatant disregard of the facts and evidence that support Plaintiff's claims. Plaintiff's claims are based on two civil rights laws: Title VII and Section 42 U.S.C. 1981 and documented evidence; they are neither bizarre nor irrational, as Defendants characterized them (Defs, Brief, p1). For this reason alone, Defendants' Motion should be dismissed in its entirety.

Plaintiff never accused "everyone" (Defs Brief, p1) she works with or others in any of her documented records; she only accused those who actually discriminated and retaliated against and harassed her.

### 2    2014 and 2015 Claims are Not time-Barred

Defendants argued that because of Section 1981's four years' statute of limitations, Plaintiff's 2014 (Whalen hire) and 2015 (adverse employment action) claims are "time-barred" and should be dismissed (Defs' Brief, p10). Plaintiff contests this defense. Defendants' assertion is based on the statute of limitations as a general legal principle while they have neglected how this principle is interpreted and implemented by legal professionals. Because in some cases, alleged adverse incidents do not occur in isolation; that is, they occur as a result of or they occur and cause other adverse incidents, legal professionals acknowledge that there are exceptions to the statute of limitations when it is applied to specific cases calling for these exceptions. Instead of adhering to the fixed time limitation, legal practitioners use what they call "the doctrine of continuing harm" or "the doctrine of continuing violation" as an alternative principle for these cases: "The continuing violation doctrine, often asserted by plaintiffs alleging workplace discrimination, is an exception to the statute of limitations. . .The doctrine permits an employee to recover for discriminatory acts occurring prior to the applicable limitations period where such acts were part of a continuing violation that continued into the limitations period" (**https://www.fidlonlegal.com/files/continuing_violation.pdf, p1**).

In arguing for dismissing 2014 and 2015 claims, Defendants only plaid attention to the statute of limitations as a general legal rule while they have overlooked the "exception rule" that is also being used: "Statutes of limitations are statutory mechanisms that limit the duration of a defendant's liability for all types of alleged wrongdoing. Depending upon the circumstances, the statute of limitations can be an important topic of discussion between lawyer and client. As many practitioners know, there are exceptions to the general rule that the statute of limitations runs from the time of the tort or breach though no damage occurs until a later time. One exception that practitioners often try to invoke is the continuing wrong doctrine. Under the doctrine, "where there is a series of continuing wrongs," the statute of limitations will be tolled to the last date on which a wrongful act is committed" (https://fhnylaw.com/court-explains-when-a-continuing-wrong-is-a-continuing-wrong/).

Plaintiff has demonstrated in her responses to Defendants' Statement of Material Facts and in Additional Material Facts that 2014 Whalen hire was a catalyst for 2015 adverse employment action, 2016 adverse employment action, 2019 *Clio* editor adverse action, 2021 Badia Dean appointment, and 2022 Whalen complaint against Plaintiff, as well as other adverse actions set forth in Plaintiff's Response. When Whalen was teaching part-time in Plaintiff's Dept, he was not overtly hostile to Plaintiff; he started boldly harassing Plaintiff only after Drummond hired him into Plaintiff's Dept, which led to the 2015 adverse employment action because Plaintiff complained about Whalen's harassment to Drummond (Plaintiff was wrongfully placed on leave). In this chain of continuing violation incidents, Whalen and Badia were the beneficiaries of Drummond's discriminatory actions against Plaintiff: 2014 Whalen hire was a violation of PFW's spouse hire policy; the making of this hiring contract breached Section1981 because this contract placed Plaintiff's employment at risk and subjected her to hostile harassment for years to come. The 2021 Dean hire was also a violation of Purdue University's anti-nepotism policy; the making of this contract further placed Plaintiff's employment at risk, as her harassment became bolder and bolder, indirectly reflected in 2022 Whalen complaint against Plaintiff.  If Whalen hire never occurred, Plaintiff would not have suffered ongoing discrimination, harassment, and retaliation, and there would not have been this lawsuit. Because 2014 and 2015 claims are logically linked to other claims, they cannot be excluded from other claims and from this suit. This is why the doctrine of continuing wrong is widely implemented by legal experts and accepted by the Supreme Court so that legal liability becomes a reality, not just words on paper, so that law-breakers are held responsible for their actions, so that the public is assured of the sanctity of civil rights laws, so that all, regardless of their skin colors, are treated equally under these laws.

Under this "doctrine of continuing harm," Plaintiff argues that Whalen's 2022 baseless harassment complaint against her should be included in Plaintiff's discrimination and harassment claims. Whalen, hired by Drummond, not only made baseless allegations, but he asked PFW to literally get Plaintiff fired because of his career needs, an action evincing his continuing hostility toward and threats of Plaintiff.

### 3    Racial Harassment is Not Limited to Verbal language Only

Defendants argued that because harassers did not verbally express their racial hostility toward Plaintiff; they only used non-verbal expressions such as those by body language and

facial expressions, their harassment does not amount to harassment (Defs Brief, pp 14-15). Plaintiff contests this defense, which has no legal basis and is purely subjective. Legal definitions such as the one from EEOC do not limit expressions of racial animosity to verbal language only. EEOC's definition emphasizes human "conduct," both verbal and none-verbal: "Harassment is unwelcome conduct that is based on race, color, religion, sex (including sexual orientation, gender identity, or pregnancy), national origin, older age (beginning at age 40), disability, or genetic information (including family medical history" (https://www.eeoc.gov//arassment). In this definition, EEOC does not specify that racial harassment has to be verbal; EEOC makes it clear that any human conduct can cause harassment. EEOC further sets the measure for at what point harassment becomes illegal: "Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws" (https://www.eeoc.gov//arassment ). Harassers know that harassment is unlawful, and they do not want to get caught, so they avoid using verbal means to express their racial animosity, since verbal expressions would be too obvious to be caught. Instead, harassers use non-verbal conduct such as body language and facial expressions to do the job. This is why EEOC's definition does not exclude non-verbal conduct from harassment.

Purdue University has similar definitions of harassment that do not limit harassment to verbal expressions only:

**Racial harassment:**

"Conduct that demonstrates hostility towards another person (or identifiable group of persons) on the basis of race, color, national origin or ancestry and is so severe, pervasive or objectively offensive that it has the purpose or effect of:

1. Creating an intimidating or hostile educational environment, work environment or environment for participation in a University program or activity;

2. Unreasonably interfering with a person's educational environment, work environment or environment for participation in a University program or activity; or

3. Unreasonably affecting a person's educational or work opportunities or participation in a University program or activity.

The University is strongly committed to providing a safe and Harassment-free environment for members of those groups that have historically been, and are still likely to be, at greatest risk of Harassment for reasons of prejudice." (https://www.purdue.edu/policies/ethics/iiic1.html).

**Harassment:**

"Conduct towards another person or identifiable group of persons that is so severe, pervasive or objectively offensive that it has the purpose or effect of:

1. Creating an intimidating or hostile educational environment, work environment or environment for participation in a University program or activity;

2. Unreasonably interfering with a person's educational environment, work environment or environment for participation in a University program or activity; or

3. Unreasonably affecting a person's educational or work opportunities or participation in a University program or activity.

Use of the term Harassment includes all forms of harassment, **including Stalking**, Racial Harassment and Sexual Harassment" (https:www//purdue.edu//policiesethics//iic1.html)

Defendants argued that Plaintiff's claim of harassment should not be based on "nebulous impressions of. . .body language" (Defs Brief, p14) and that Plaintiff needed to prove that the harassment was "racially motivated" (Defs Brief, p15). Plaintiff contests this defense. Neither EEOC's nor Purdue University's definition requires proving the intent as the only measure of harassment; they emphasize the "effect" the harassment has on a reasonable person: "the conduct [harassment] is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive" (https://www.eeoc.gov//arassment). Based on this "reasonable-person-effect" standard,  Plaintiff does not need to prove harassers' intent since their actions and the effects of these actions on Plaintiff already speak their intent.

EEOC's and Purdue University's definitions of harassment support Plaintiff's harassment claim that harassers used non-verbal conduct such as body language and facial expressions to

express their racial hostility toward Plaintiff, and they did so on a daily basis. Such harassment had intimidating and hostile effects on Plaintiff, as evidenced by her police reports and other complaints to authorities. Worthy of note is that Defendants did not deny Plaintiff's allegation that harassers used non-verbal expressions to express their racial hostility; they only denied that because these expressions are non-verbal, they do not amount to their subjective definition of harassment. Plaintiff has demonstrated in her responses to Defendants' Statement of Material Facts and in Additional Material Facts that the harassment has been ongoing, and "enduring the offensive conduct [has] becomes a condition of continued employment" (EEOC) since 2014.

Defendants further argued that the harassment of Plaintiff was not "severe or pervasive" (Brief, p15) enough to deserve liability. This defense has overlooked the fact that Plaintiff has demonstrated in her Additional Material Facts (pp2-14) and in various responses to Defendants' Statement of Material Facts that she has been subjected to a prolonged period of harassment (2014-present), and the harassment has been so severe and pervasive that she was forced to switch to online teaching completely and consider early retirement in 2018 (Additional Material Facts, p15); she sought medical and counseling help; she took medication (Additional Material Facts, p17); the harassment has caused severe emotional and mental distress and several work-related injuries (Additional Material Facts, pp15-16). Although harassers did not use verbal language to express their racial animosity, their non-verbal expressions unmistakably transmitted their message of hostility, just as Sign Language, a non-verbal language, can communicate whatever messages the users want to communicate. This is why EEOC's and Purdue University's definitions use the "conduct" and "effect" standard, instead of "verbal expressions" standard, in defining harassment.

### 4    2014 Whalen Hire was a Discriminatory Decision and a Catalyst for Later Discrimination, Retaliation, and Harassment

Defendants did not defend Whalen hire against Plaintiff's claim that this hire was not only a discrimination against Plaintiff, but it was a catalyst for later discrimination and retaliation against and harassment of Plaintiff because they deemed it "time-barred. Plaintiff contests this defense in light of the "doctrine of continuing harm." In their Declarations, neither Dr. Drummond nor Dr. Whalen mentioned the fact that Whalen was hired under PFW's spouse hire or dual-career couple accommodation policy (ExA, Disc, attachment 2, Ex1, //3-4, Blakemore email). This policy allows academic units with hiring needs to waive position posting when there

is a dual-career couple hiring need. However, this policy requires that "A department must receive a waiver from the posting and search process before creating a new temporary or permanent position"; this policy also requires that "Requests [for search posting waiver] should be initiated by the department chair or division director" (ExA, Disc, attachment1, Ex2, /3, policy). When this hire was initiated by VCAA Drummond in Fall, 2014 (see ExA, Disc, attachment 2, Ex1, /2. Blakemore email), Plaintiff's Department did not have any job opening nor needs for a position that suited Whalen.

Whalen hire violated PFW's policy because the hiring request was initiated by VCAA Drummond, not by the Department Chair, before the Department was informed of the hire. Before Whalen was hired as a tenured associate professor in 2015, Drummond arranged for Whalen to teach courses in Plaintiff's Department; as a result, Whalen taught one course in Spring and Fall of 2014. In Spring 2015, Whalen was not assigned any course. In Spring 2014, Plaintiff was told by her Department Chair that the reason why Whalen was not assigned any course in Spring 2015 was that the Department's enrollment had declined, and the Department had no needs for him (ExA, Disc, attachment 6, Ex3, Whalen schedule; ExD, Pla Dep, Ex1, p16:2-8).

Whalen hire was done differently from previous spouse hires in Plaintiff's Department in that: 1) in previous spouse hires, there was an open position and there were hiring needs; 2) hiring requests were initiated by the Department, as in the following examples:

Dr. Mary Ann Cain: for her hire, there was a job opening in her fields. Dr. Cain applied for this position, along with other applicants, and she was selected to fill this position in 1995. This hire was initiated by the Dept.

Dr. Troy Bassett: for his hire, there was a job opening that fit him in 2006. Dr. Bassett applied for this position, along with other applicants, and he was selected to fill this position in 2007. This hire was initiated by the Dept.

Dr. Glen was a tenure-track faculty in the history Dept between 2005 and 2006.  His wife Dr. Colleen was an adjunct faculty in Plaintiff's Dept. Plaintiff's Dept. made an effort to create a full-time position for Dr. Colleen, but due to PFW's hiring constraints, it did not work out. This request was initiated by the Dept, as well.

Plaintiff opposed Whalen hire in 2014 because it discriminated against her by placing her employment at risk. Both Drummond and Whalen knew that 1) Plaintiff was Chinese; 2) Plaintiff

was the only Chinese literature faculty in the Department; 3) Plaintiff was the only one in the Department whose teaching specialty areas overlapped with those of Whalen: 20th-century British/Irish literature and culture. Because Whalen hire was done so differently from other spouse hires, Plaintiff cannot think of other reasons than racial discrimination for this hire. Plaintiff expressed her objection to Dr. Drummond (ExB, Defs, DEF1000129-133, Ex1); however, she made it clear that in opposing Whalen hire, Plaintiff did not and still does not oppose PFW's policy itself or oppose spouse hires done in accordance with this policy (see ExB, Defs, DEF1000129-133, Ex1, p5).

After Whalen started teaching in Plaintiff's Dept., he taught two courses that Plaintiff normally teaches: "20[th]-century British Fiction" (Spring 2014, Spring 2016, Spring 2018) and "Studies in Irish Literature and Culture" (Spring 2017, Spring 2019, see ExA, Disc, attachment 6, Ex3, Whalen schedule). As a result, Plaintiff were unable to teach these courses; her other courses were also cancelled due to low enrollment.

This hire, as Plaintiff testified in her Deposition, served as a "catalyst [that incited [later adverse incidents]. . .by Drummond" against Plaintiff for years to come (ExD, Pla Dep, Ex1, pp16,17,18, 57). Because Whalen hire posed ongoing threats to Plaintiff's employment and well-being and triggered years of nightmarish harassment (see ExD, Pla Dec, Ex1, pp13-33, 58-60, 55, 57, 58, 60, 63, 65,16,17,18), Plaintiff requests that Whalen's and Drummond's employment status at PFW be reconsidered such as they and Badia being transferred to other Purdue campuses in order to remove their motives for discrimination, retaliation, and harassment directed at Plaintiff.

### 5    2015 Adverse Employment Action was a Retaliation
### for Reporting Whalen Harassment

The catalyzing effect of Whalen hire quickly evinced itself in 2015. During this time Plaintiff was severely harassed by Whalen, Badia, and their "allies." Dr. Drummond retaliated against Plaintiff for reporting harassment by Whalen and Badia in August 2015.

On August 18, 2015, Plaintiff reported harassment by Whalen et al to campus police in the hope that the University would take actions to address the harassing problems. When Officer Ruble asked Plaintiff why the harassers "targeted" her because there were many Asian people around, Plaintiff stated: "she said that she thinks it's because she's Asian. . . that they wanted her to 'quit' her job; they even "hired someone, Acrilan Whal, into her department to do her job

even though there isn't an opening. She thinks he's part of it" (ExA, Disc, attachment 10, Ex11, p2, /6). In this quote, Acrilan Whal refers to Lachlan Whalen; the name was not spelled correctly because Plaintiff did not write down his name for the police officer.  In this report, Plaintiff also told officer Ruble that harassment extended beyond campus. The police report was forwarded to Drummond and HR. On the same day, Plaintiff reported harassment by Whalen and Badia to Drummond. Drummond contacted Chair Aasand and HR and requested a meeting with them to take actions against Plaintiff before the start of the Fall semester (ExF,Pla, Ex17). The next day, Drummond had a meeting with them on August 20, 2015, who asked Chair Aasand to write a letter evaluating Plaintiff's professional performance. Aasand submitted his letter to HR on August 21, 2015 (ExB, Defs, Ex5), the same day Brownlee informed Plaintiff that PFW had placed her on leave and requested a psychological test (ExA, Disc, attachment 11, Ex12, Brownlee letter). Plaintiff was devastated by this news and felt helpless; she cried in Brownlee's office. Plaintiff was not given a chance to respond to Aasand's evaluation before the decision was made; she was denied a due process.  After the decision was made, Plaintiff wrote a response to Brownlee's letter and asked Drummond et al to correct the  mistake. Drummond and Brownlee justified their decision (ExA, Disc, attachment 12, Ex13). Plaintiff was wrongfully placed on leave for Fall 2015. Plaintiff's attorney Patrick Proctor described PFW's decision as its "retaliation" against Plaintiff for reporting harassment in his letter to PFW (ExA, Disc, attachment 14, Ex14, /2, Proctor letter). Former HR Director Brownlee was hired in April 2014, so she was relatively new to PFW. In this adverse employment action, Drummond played a key role; the retaliation came from him: this action was taken in order to protect Whalen and Badia against Plaintiff, a Chinese. Because Drummond retaliated against Plaintiff for reporting racial harassment by Whalen and Badia, a protected activity, Plaintiff requests that this mistake be corrected.

On the same day (August 21, 2015), when Plaintiff was walking back to her office in PFW LA 107 after her meeting with Brownlee, Whalen showed up near the left entrance to LA, next to Science Building, close to the police Dept. not the entrances close to Helmke library. As he walked past the Plaintiff, he deliberately twisted his body, clenched his fists, and threw hateful looks at the Plaintiff.  That was the day when Drummond and HR placed the Plaintiff on leave. This incident would have been captured by the security camera, if PFW had installed the camera in the area. However, Plaintiff has documented stalking and harassing behavior.

Plaintiff's 2015 psychological test showed that there were no problems about her ability to perform "the essential function of her job," so PFW restored her to work (ExC, PFW, Ex9).

Plaintiff argues for the inclusion of this adverse action under the doctrine of continuing harm because Plaintiff was subjected to retaliation for reporting harassment (a protected activity) by Whalen hired by Drummond. It should not be hard to see how Whalen and Plaintiff were treated differently by Drummond. Plaintiff requests reasonable compensation for the emotional distress this adverse action caused.

### 6    2016 Adverse Employment Action is Continuation of Hostile Work Environment Triggered by Whalen Hire Initiated by Drummond

The catalyzing effect of Whalen hire continued into 2016. By this time, Whalen had securely established himself at PFW and cultivated his network of allies; they harassed Plaintiff on a daily basis. The work environment was hostile and abusive. Within this climate, between May and November 2016, James Lucas, a staff member in Plaintiff's Department, made several baseless harassment complaints to PFW HR against Plaintiff, which led HR to threaten "disciplinary actions" for Plaintiff (ExC, PFW, Ex11, Helming letter). On November 10, 2016, Mr. Lucas filed a formal harassment complaint against the Plaintiff, alleging grave misconduct by Plaintiff (ExC, PFW, Ex12). PFW HR conducted an investigation (ExC, PFW, Ex13). In one allegation, Lucas alleged that Plaintiff watched him exercise in PFW Fitness Center on October 12, 2016. The investigator looked at the security camera footage and card swipe records on this date and concluded that Plaintiff was not seen on any camera footage, nor her name appeared in card swipe records or attendance list (ExB, Defs, Ex6, DEF 1000248-263, p7, /4). Despite the facts found, the investigator recommended three sanctions for Plaintiff (see ExB, Defs, Ex6, DEF 1000248-263, p16). In the investigation, multiple individuals provided testimonies (see ExB, Defs, Ex6, DEF 1000248-263, pp11-14). In the final determination, PFW gave Plaintiff six sanctions that severely threatened her employment (ExC, PFW, Ex14). Plaintiff was devastated when she received this determination letter and felt anguish and despair.

There are several perceivable ties between 2015 and 2016 adverse actions, which indicate Drummond's continued intent to force Plaintiff out:1) same people involved in both decisions (Helmsing and chair Aasand reappointed by Drummond; 2) same sanction—FFD exam; 3) Whalen being involved indicated by the coincidence of the date August 18, 2015; this was the date on which Plaintiff reported Whalen harassment to officer Ruble ; Mr. Lucas. Whalen's

friend, alleged that Plaintiff harassed him on this date in his complaint. This coincidence might seem insignificant under normal circumstances, but placed in the context of Whalen's and Drummond's joint discriminatory motives, it can be inferred that Mr. Lucas was trying to "help" Whalen by making this baseless allegation.

Plaintiff appealed this adverse decision to VP Rollock in West Lafayette, who reversed PFW's decision in March 2017 (ExA, Disc, attachment 18, Ex23). Mr. Lucas alleged other incidents that happened in September 2014, January and March 2015. VP Rollock concluded that they "are not part of a continuing pattern of behavior. . .They do not constitute "Harassment" under the Policy." VP Rollock also reached the same conclusion about Lucas's other allegations (see ExA, Disc, attachment 18, Ex23, p1, /3).

Although PFW's adverse decision was reversed, the whole process of complaint was extremely stressful and escalated the hostile work environment: she was subjected to constant concern that someone would make false complaints against her again. More importantly, the reversal decision was unable to remove the trio's, Drummond's and Whalen's/Badia's, motives of racial hostility toward Plaintiff. It can be inferred that Drummond wanted to help Whalen succeed even if it meant destroying Plaintiff, a reckless plan only a racist-minded person could have crafted. Mr. Lucas, on the other hand,  had no motives to harass Plaintiff: he was hired in August 2014; in fact, he was quite friendly with Plaintiff in the beginning.

On November 14, 2016, Mr. Lucas filed a petition for an order of protection against Plaintiff with the local Court, alleging grave misconduct by Plaintiff.  Plaintiff hired Attorney Chapel to defend her.  On December 8, 2016, Judge Degroote held a hearing and denied Lucas's petition, citing that there was no credible evidence to support the allegations (ExA, Disc, attachment 19, Ex15, Judge order). Attorney Chapel never received the Judge order in the mail; he had to go to the Court in person to get it. Plaintiff showed Judge Degroote's order to PFW in the hope that PFW would take into consideration this decision in resolving Lucas's complaint, but PFW responded saying that PFW had different standards in resolving harassment complaints, which was quite frightening to Plaintiff at the time.

Defendants did not defend PFW's 2016 decision. Plaintiff takes their silence as their admission of Plaintiff's harassment and hostile work environment claim.

**7        Acting Chair Appointment was a Discriminatory Decision (2019):**
**Plaintiff can Establish a Prima Facie Case**

Defendants defended the decision to offer the acting chair position to Dr. Huffman, instead of Plaintiff, arguing that it was not a discriminatory decision because based on the feedback Dean Friedman gathered from Dept "faculty and staff," "Dr. Huffman was more qualified [than Plaintiff] for the position (Defs, Brief, p6), This was, Defendants argued, a "legitimate business decision" (Defs Brief, p7). Plaintiff contests this defense and argues that Dr. Friedman's and Dr. Drummond's decision was a discriminatory decision because 1) Plaintiff was better qualified than Dr. Huffman because Plaintiff was a full professor while Huffman was an associate professor; the initial posting clearly stated that preference was given to full professor; 2) this decision was based on a wrong procedure that allowed them to use feedback, including voting, from Dept staff members who should not have been allowed to participate in acting chair selection process, including nominating candidates, providing feedback, and voting; therefor, the feedback is not valid, even fraudulent, and cannot be used to justify the decision. Both the Dept and PFW grant voting rights only to full-time faculty concerning faculty governance matters. In the Enchiridion, the Dept's governance document, voting rights are granted only to full-time faculty defined as "resident faculty" (ExC, PFW, Ex18, p3). The Constitution of PFW Faculty Senate also grants voting rights only to voting faculty:

> E. **The Voting Faculty** shall consist of those full-time members of the Faculty and those faculty who are on partial retirement, who are not enrolled in an undergraduate degree program at PFW nor in a graduate degree program in their home department and who:
>
>> 1.    Are tenured or hold tenure-track appointments in units subject to those powers of the Fort Wayne Faculty detailed in Section VI, below, and perform duties at least half of which consists of teaching or other creative/scholarly work; or
>>
>> 2.    Are tenured or hold tenure-track appointments with the rank of librarian, associate librarian, assistant librarian; or
>>
>> 3.    Hold the rank of assistant, associate, or full clinical professor; or
>>
>> 4.    Hold the rank of clinical instructor, instructor, or senior instructor (see **ExC, PFW, Faculty Senate Constitution, Ex1, p1**).

Enchiridion also has clear procedures for appointing Department Chair and makes it clear that only full-time faculty can nominate candidates, provide feedback, and vote in the selection of Dept chair (see ExC, PFW, Ex18, pp1-2).

By allowing Dept staff members to nominate candidates and by using feedback, including voting, from them and possibly part-time instructors in the selection of acting chair, Friedman and Drummond violated Dept's and Faculty Senate's policies. The feedback, therefore, is not a reliable and legitimate measure for the selection. In this light, Defendants' "legitimate business decision" is no longer legitimate; it is, in fact, a fraud executed to discriminate against Plaintiff so that she was not offered the position.

But why did they violate the right procedures? Because the wrong procedure favored Huffman. In the initial posting, Friedman did not mention what kind of procedure he would use; he only stated that the candidate must be a tenured faculty, and preference was given to a full professor (ExF, Pla, Ex18, p1). Friedman set the deadline for application on February 15, 2019. He asked faculty to indicate to him their interest to serve, which created the impression that he would make the decision based on the indicated interest. Email exchanges provided by Defendants revealed a few behind-the-scene activities and shed light on why Friedman later opted for the "whole Dept feedback" procedure. Because Dr. Huffman was not a full professor, she did not feel that she was qualified for the position, so  February 4, 2019 Huffman emailed Friedman and Drummond questioning the full professor preference because In her email, she used the Dept's Enchiridion policy for selecting Department Chair (not acting chair) to suggest to them that they should follow this policy that involved Dept input (ExG, Fried Dec, ExG, Ex5). However, this Dept policy is for selecting Dept Chair, not acting chair, yet regardless of this distinction, Drummond and Friedman then agreed to use this policy and Dept input in the selection.

Still, Huffman had no confidence to apply. On February 6, 2019, she emailed Friedman and Drummond again expressing her lack of confidence in applying because she was still worried about the full professor preference. She indicated that she was concerned that full professors had applied. She indicated that previous acting Chairs in the Dept were selected by the Dept, which was incorrect; previous Dept acting chairs were appointed by the Dean based on

Plaintiff's recollection. Drummond then indicated that he would like to see her application (ExB, Defs, DEF 1000 770, Ex2). Still Huffman had no confidence to apply by February 12, so Friedman decided to extend the deadline to March 15 and that he would accept anonymous nominations; he told the Dept this in his February 13 email (ExG, Fred Dec, Exs3-4, ExD).

In his Declaration, Dr. Friedman justified his extension of deadline this way: he was confused about Dr. Aasand's sabbatical semester when he sent out the initial email to the Dept and put Fall 2019 in it; upon receiving Dr. Aasand's email to correct his timing error, he corrected the error (put Spring 2020 in it) and resent the position announcement email to the Department (ExG, Fried Dec, p2, //10-12, Ex1). This testimony is incorrect because the Department never received Friedman's email with error; that is, with "Fall 2019" in it; it appears, based on his testimony, that this email with "Fall 2019" in it was only sent to Shante Howard and Chair Aasand. This is evidenced by 1) when Ms. Howard forwarded Friedman's initial email to the Department at 2:55:46 p.m. on February 1, 2019, he correctly wrote "Spring 2020" for Aasand's sabbatical semester. Howard's email shows that Friedman's email was sent to her at 2:36 p.m. on February 1, 2019. The 2:36 p.m. and 2:556 p.m. timing matches with Plaintiff's own record (ExG, Fried Dec, Exs A, B, Ex2).

Friedman also justified his extension of time by referring to other deadlines in the College (ExG, Fried Dec, p3,//13-15, Ex3) to be met, and because of these deadlines, he wanted to prioritize tasks (ExG, Fried Dec, ExD, Ex4). This testimony is questionable because first he was not confused about Dr. Aasand's sabbatical semester; second, most likely, he already knew these deadlines when he set the February 15 deadline.

Therefore, Friedman's testimony that upon receiving Aasand's email, he corrected the timing error and resent the email to the Department (at 2:36 p.m. on February 1, 2019) cannot be true because Aasand's email to Friedman was sent at 19:36 p.m. on February 1, 2019 (see ExG, Fried Dec, ExA, Ex2). This means, based on this timing, that by the time Friedman received Aasand's email, Friedman already sent the email with Spring 2020 in it to Ms. Howard at 2:36 p.m., who had already forwarded the email with Spring 2020 in it to the Department at 2:55/6 p.m. The behind-the-scene email exchanges shed light on Friedman's more likely motive for extending the deadline: Huffman had not applied by February 12, 2019.

Friedman's more likely motive can be inferred by the fact that shortly after he sent out the email to the Dept on February 13, he invited Huffman for a private meeting to talk about acting chair application, and they met at 1:30 p.m. that day (ExB, Defs, DEF 1000 788-789, Ex3). At 4:13 p.m. on February 13, Friedman emailed Huffman and told her that she received five nominations, two from staff members, which was a violation of Dept's and Faculty Senate's policies. In fact, the five nominations and the extension of time happened on the same day. Friedman also showed delight at her application when Huffman applied on February 25 (ExB, Defs, DEF1000812, Ex4). Plaintiff had applied on February 2.

Two facts are undisputable here: 2) if Friedman had not extended the deadline from February 15 to March 15 2019, Huffman would not have been able to apply for this position; 2) if Drummond and Friedman had not backed down on procedure and on full professor preference, most likely Huffman would not have applied for the position. Why did they back down on these principles? Because Plaintiff was a full professor and a Chinese, an answer that can be inferred from the behind-the-scene email exchanges between Huffman, Friedman, and Drummond. Having secured Huffman's application, Friedman asked the three candidates to provide a statement that outline their experiences, philosophy/plans on March 18, 2019 (ExF, Pla, Ex18, p4); by this time, Plaintiff was the only full professor in the pool. On April 15, 2019, Friedman sent another email to the Dept saying that he would call meetings and invite Dept full and part-time faculty and staff members to provide feedback, meet with him etc (ExF, Pla, Ex18, pp6-7). On June 11, Friedman announced the selection result to the Dept (ExF, Pla, Ex18, p7). On June 15, Plaintiff emailed Friedman and Drummond requesting reconsideration of their decision (ExF, Pla, Ex18, p8); Drummond responded with "no" on June 18, 2019 ExF, Pla, Ex18, 7). Plaintiff filed an informal discrimination complaint against Friedman with HR. HR held a meeting on December 12, 2019, 1:30-4;30 p.m.) at which Plaintiff requested that Friedman reconsider his decision, but he refused (ExC, PFW, Ex19).

In his Declaration, Dr. Friedman testified that he wanted to select the most qualified candidate, and the most qualified candidate did not have to be a full professor. The feedback he received about Huffman was much better than about Plaintiff; it was the best, therefore, he recommended Huffman to Dr. Drummond (see ExG, Fried Dec, pp5-7).

Plaintiff argues that Friedman's and Drummond's decision discriminated against her because :1) Friedman's confusion of timing and extension of time was a pretext since he was not

confused about timing; 2) Friedman's use of wrong procedure is another pretext; he has been with PFW for over 20 years and is well aware of Faculty Senate's policy on voting rights (so is Drummond); he had no legitimate reasons to use a wrong procedure except for waiting for Huffman to apply; 3) his shift of preference from full professor to administrative experience is yet another pretext.

Although Defendants denied Drummond's and Friedman's discrimination against Plaintiff, their denial is based on the assumption that the feedback is a legitimate basis for making the acting chair selection and that the criteria the decision-makers used were consistent throughout the selection process. This assumption was wrong, as shown by Plaintiff's evidence. Additionally, Plaintiff does not have to show direct evidence, but to prove their discriminatory intent through other evidence, that is, by way of inferences and indirect evidence. Legal experts have suggested that because employers often carry out discrimination in covert ways, discrimination is not easy to prove: "However, as employers become increasingly sophisticated about the law, such [direct] evidence is generally unavailable to the plaintiff. Employers are careful about what they say or document when taking adverse employment action and will seldom display prejudice blatantly. As an alternative to requiring direct evidence, the Supreme Court has designed a framework through which a plaintiff is able to present indirect evidence of discriminatory intent" https://ilj.law.indiana.edu/articles/70/70_1_Smith.pdf). This means that Plaintiff does not have to present direct evidence; she can use other evidence to reveal Drummond's and Friedman's discriminatory intent—pretexts, in this case, their use of wrong procedure and customizing criteria for Huffman, both of which favored her in the end: "Although [plaintiff] must prove that [defendant] acted with the intent to discriminate, [plaintiff] is not required to prove that [defendant] acted with the particular intent to violate [plaintiff's] federal civil rights. Moreover, [plaintiff] is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be inferred from the existence of other facts" (lines 217-221, https://www.ca3.uscourts.gov/sites/ca3/files/6_Chap_6_2020_August.pdf). Analyzed in this legal light, Defendants' denial should be disregarded. Plaintiff requests that she be awarded reasonable compensation for this loss.

**8**    *Clio* **Editor-in-Chief Appointment was a Discriminatory Decision (2019):**
**Plaintiff can Establish a Prima Facie Case**

Defendants offered an exceedingly brief defense to justify Drummond's decision to offer Whalen the *Clio* journal editor-in-Chief position, arguing that "she [Plaintiff] cannot show that she was more qualified for the Editor-in Chief position nor is there any evidence that Dr. Whalen was selected because of race" (Defs, Brief, p16). Plaintiff contests this defense and argues that she was more qualified than Whalen for this position (ExF, Pla, Ex20, position announcement) because 1) she had more editorial experiences than Whalen, 2) she was a full professor while Whalen was an associate professor; 3) she had research publications in journals indexed in The Arts and Humanities Citation Index, a parameter for high quality journals while Whalen had none; 4) she had other professional achievements such as holding visiting professorships that Whalen did not have.

In his letter of interest and vitae for the editor position, Whalen listed his only editorial experience--serving on the editorial board of *Native Directions*, a Native-American focused magazine housed at the University of North Dakota from 1994 to 1999 (ExH, Whal Dec, Exs A, B, Ex1, letter, vitae). Plaintiff searched various websites, but did not find any information about this magazine nor the fact that Dr. Whalen served on its editorial board; therefore, Plaintiff does not know what kind of professional magazine it was/is. Until Whalen's said "professional editorial experience" is proven, his "qualifications" for the editor position cannot be determined. Even if Dr. Whalen can prove that *Native Directions* was a professional scholarly journal, this is his only editorial experience while Plaintiff had multiple professional editorial experiences with scholarly journals, which include serving on the editorial board of *Stirrings Still* for the Special Issue "The Fiction of J. M. Coetzee" (2006), along with distinguished Coetzee scholars, serving on the editorial board of *China-US Journal of Humanities* (formerly *Journal of Sino-American Humanity Studies*, serving as a year-round reviewer for *The International Journal of Linguistics and Literature Studies* (2014-2018), and serving as an associate editor for *The International Journal of Literary Humanities*, 2014-2016 (ExA, Disc, attachment 51, letter of interest, Ex5; ExF, Pla, Ex3). Plaintiff also had many other relevant qualifications and experiences listed in her vitae that Whalen did not have, such as:

1  Plaintiff's scholarly publications have been widely cited by peers (ExA, Disc, attachment 52, list of citations, Ex6.)

3  *Clio* is an interdisciplinary journal indexed in The Arts and Humanities Citation Index (A&HCI), a widely accepted parameter for high quality journals (ExF, Pla, Ex1). This Index has

a rigorous application and review process and high standards for editorial expertise (ExF, Pla, info about A&HCI journals, Ex2).

4    Plaintiff has 11 research publications in A&HCI journals (see ExF, Pla, vitae, Ex3, pp1-3), including such premiere journals as *Ariel: A Review of International Literature*, *English Studies*, *Philological Quarterly*, *Irish Studies Review*, *Journal of Beckett Studies*, *Modernism/Modernity*, *Bronte Studies*. Based on his vitae, Whalen did not have any research publications in A&HCI journals. If Whalen cannot publish in A&HCI journals, the same standards for *Clio*, how can he effectively evaluate submissions and make appropriate editorial suggestions to the contributors?

5    Whalen's publications have a narrow focus on Irish Republican prison writings, which is not congenial to *Clio*'s broadly interdisciplinary scope. By contrast, Plaintiff has published research not only in her specialty area—20th-century Irish/British literature, but in related areas such as postcolonial literature/theory, world literature, comparative literature, and Victorian literature within a broadly interdisciplinary and transcultural context. Plaintiff's ground-breaking studies of Irish writers' dialogue with Chinese culture and arts have gained international recognition. Plaintiff is also conversant with Eastern and Western philosophy, as well as with historiography.

6    Recognized standing in her fields both nationally and international evidenced by invited reviews, professional editorial service (ExF, Pla, Ex14), , invited lectures (see ExF, Pla, vitae, Ex3 6-7, 10-11).

8    Holding visiting professorships in Chinese Universities (see ExF, Pla, vitae, Ex3, p1, ExF, Pla, Ex16).

In the decision letter, Drummond admitted that both Whalen and Plaintiff met the preference criteria—tenured and have editorial experience. However, the letter stated that in addition to editorial experience, Whalen had many years' "administrative experience as Director of International Studies", which will "transfer in significant ways to the role of editor-in-chief" (ExF, Pla, Ex21). Plaintiff argues that Drummond used "administrative experience" as a pretext for his decision because this was the only experience that Whalen had and Plaintiff did not have, although she had many equivalent experiences. Administrative experience is good to have, but

not as relevant as the experiences Plaintiff had for this particular position, ones Whalen did not have. Additionally, the job posting did not say anything about "administrative experience."

As shown on pp15-16 of this Brief, Plaintiff does not have to prove Drummond's intent to discriminate by direct evidence, but by indirect evidence and inferences. The indirect evidence can be found in Drummond's 2014-15 Whalen hire and 2015 adverse action taken because of Whalen, and in 2016 adverse action that revealed ties between 2014, 2015, and 2016 adverse actions. This means that even if Plaintiff had administrative experience, Drummond would use other pretexts for denying Plaintiff the position and make it look like a legitimate business decision. Another indirect evidence is found in the fact that Drummond should not be in the position to make this decision, to begin with; he had no expertise about *Clio* (see Additional Material Facts, p1).

Plaintiff therefore disputes Drummond's evaluation of Whalen's and Plaintiff's qualifications and his reasons for offering him the position. Plaintiff requests that, in the spirit of equity, she be offered the editor position immediately. Typically, in other institutions, professional service positions like this get rotated periodically in order to give all qualified faculty an opportunity to serve the profession. Plaintiff is willing to step down in a few years and let other qualified faculty in the Dept to gain editorial experience: the Dept has many excellent scholars.

**9      Appointment of Janet Badia as Dean was a Retaliation Against Plaintiff**

Dr. Drummond's appointment of Badia, Whalen's partner, as Dean of the College of Liberal Arts in May 2021(ExC, PFW, Ex16) was a retaliation against Plaintiff for opposing Whalen hire and for reporting harassment by Whalen. This appointment violated Purdue University's anti-nepotism policy that "prohibits all persons from being employed or continuing employment in any position that places them under the Administrative Supervision of another employee with whom they have a Personal Relationship (ExI, PWL, Ex1, p2, /2,). This policy requires that any nepotism waiver be approved by the Dean, Vice Chancellor, and VP for Ethics and Compliance: "Colleges, schools and other academic units must have the approval of the Dean and the Vice Chancellor for Academic Affairs (Regional Campuses) or Vice Provost for Teaching and Learning (West Lafayette campus, see ExI, PWL, Ex1, p4, /19 ) before the request is forwarded to the VP for final approval). This policy further requires that "The request (for

waiver) must be made prior to the individual's employment and have the approvals listed in the Appendix (Dean, VCAA)" (see ExI, PWL, Ex1, p3, /9).

When Drummond made this appointment, neither Drummond nor Badia had obtained a nepotism waiver prior to her Dean appointment that began on July 1, 2021.  Plaintiff inquired about the nepotism issue with PFW HR on August 24, 2021 (ExF, Pla, Ex5). On the same day, Badia submitted a request for nepotism waiver to Drummond and VP Rollock, which had long passed the time this request was to be made (ExC, PFW, Ex4); Badia, however, did not submit her request to the Dean for approval first. On September 2, 2021, Drummond approved Badia's request (ExC, PFW, Ex5). VP Rollock approved Badia's waiver request on September 7, 2021 (ExC, PFW, Ex6). On March 10, 2023, Plaintiff submitted a request to review the waiver approval and has not received a response yet (ExF, Pla, Ex6). Drummond was well aware of this policy, which is evidenced by the fact in Fall 2014, he removed a Department Chair because of his personal and supervisory relationship with another faculty. Drummond was also well aware that Plaintiff opposed Whalen hire in 2014—2015 period and her report to him of Whalen's and Badia racial harassment of Plaintiff.

Plaintiff contends that this appointment without approval of nepotism waiver was an intentional retaliation against. This retaliation was racially motivated because he knew that Plaintiff was Chinese and that the power he gave Badia would bolster her and Whalen's morale to continue harassing Plaintiff, which is evidenced by Whalen's 2022 baseless harassment complaint against Plaintiff, in which Whalen asked PFW literally to get Plaintiff fired because he wanted to go up for full professor, a pretext he used. Although Whalen did not win his case, the fact that he even went so far as to threaten Plaintiff's employment once again spoke of his bolstered morale. The whole complaint process was extremely stressful. When Badia was chair on the College Curriculum Committee, she rejected Plaintiff's two course proposals (see Plaintiff's response to Defs' Statement of Material Facts 136).  After Badia became Dean, Drummond changed research/travel allocation policy and gave Deans the authority to approve these fundings. Plaintiff recently applied for travel and research funds from her, but she has not approved. Allowing Badia to continue as Dean would send a wrong message to the University that racial retaliation, nepotism, harassment are tolerated and even encouraged, and that University policies are just words on paper without binding effects on those in power positions;

therefore, Plaintiff requests that she be removed from Dean position immediately; University policies are for everyone.

**10          Plaintiff was Subjected to Ongoing Harassment, Hostile Work**

**Environment, Stalking, Intimidation: 2014-present**

Prior to 2014, Plaintiff had normal work relation with co-workers at PFW and neighbors. Starting from 2014, when Whalen was planning on applying for the job in Plaintiff's Dept, things rapidly changed, and the environment became hostile. She was frequently harassed and stalked on and off campus in similar manners: harassers use human conduct such as body language, facial expressions, intimidating presence, and stalking to express their racial animosity, which indicates that the harassment was linked. These sudden changes indicate the cause-and-effect ties between Whalen hire and the harassment. Most harassers on and off campus did not know the truth about Whalen hire and were misled by the trio because Plaintiff did not even know some of them. In this sense, the misled harassers are not to blame, though they should learn a good lesson from this experience. Plaintiff testified in her Deposition on such ongoing harassment (ExD, Pla Dec, pp13-33, 58-60, 55, 57, 58, 60, 63, 65).

Harassers also mess with her office and computer equipment, make anonymous complaints to campus authorities, slander Plaintiff. Harassers would use normal activities to cover up their harassment so they would not get caught, activities. Plaintiff was/is not saying that everyone on campus harassed her; by harassers, she only refers to those who actually harassed her. They carry out harassment under the cover of "normal activities." Plaintiff requests that the following named PFW harassers be given disciplinary sanctions. Because such harassment is so frequent that it is impossible to document all of them; the following are some documented examples:

Janet Badia (ExD, Pla Dec, pp63-65)

Example #1:

On December 1, 2021, Wednesday, the Plaintiff went to campus to discuss work-related matters with two visiting scholars from China in her Dept. Around 2:30 p.m. the two visiting scholars came to the Plaintiff's office (LA 107) for a visit. The Plaintiff showed them around in 1st floor, LA hallway, and introduced them to some staff members.

Around 4:20-4:40 p.m., when Plaintiff was walking in LA hallway, Badia walked around the corner with angry strides from the College office and walked past the Plaintiff near LA Room 160. She deliberately threw hateful/disdainful looks at the Plaintiff, as she routinely does when she sees Plaintiff. Visiting scholars come to PFW because they respect and trust the institution; Badia's behavior was damaging to PFW's reputation worldwide.

This incident would have been captured by the security camera, if PFW had installed the camera in LA, as the Plaintiff had requested in 2015, 2020.

Example #2:

Between January and February 2022, Badia frequently threw hateful/disdainful looks at the Plaintiff when the Plaintiff was walking in LA hallway.

Example #3:

In early January 2020, the Plaintiff flew to Seattle, Washington, USA, to attend the Modern Language Association Convention (ExA, Disc, attachment 20, Ex16, MLA registration receipt). In the morning of January 8 2020, when Plaintiff arrived at Fort Wayne International airport, she found Badia there, who was also flying to Seattle to attend the same Convention. On their next flight from Chicago to Seattle, Badia ended up sitting in the row right before Plaintiff on the plane.

During the Convention, Plaintiff saw Badia a few times here and there, but Plaintiff observed similar patterns of harassment during the Convention, as she observed elsewhere and documented these patterns in her documentations.

This incident would have nothing abnormal under normal circumstances; we run into colleagues everywhere, including professional conferences; however, when placed in the context of 2014, 2015, 2016 adverse actions and in the context of Badia's and her allies' ongoing harassment disguised as "normal activities," this incident needs to be scrutinized in a different light.

Lachlan Whalen

Like Badia, Whalen frequently harasses Plaintiff.

Example #1:

On August 21, 2015, Plaintiff had a meeting with former HR director Ms. Brownlee around 3 p.m. in her office in KT. When Plaintiff was walking back to her office in LA 107, Whalen showed up near the left entrance to LA, next to Science Building, close to the police

Dept. not the entrances close to Helmke library. As he walked past her, he deliberately twisted his body, clenched his fists, and threw hateful looks at her.  That was the day when Drummond and PFW HR placed Plaintiff on leave. This incident would have been captured by the security camera, if PFW had installed  cameras nearby, as Plaintiff had requested in 2015, 2020.

Example 2:

On January 29, 2016, the Plaintiff drove to campus around 2:00 p.m.; campus was quiet; the construction outside Helmke stopped.  A little later, Plaintiff went to Walb Student Union to get coffee; Whalen followed her to the coffee place; when Plaintiff saw him, he quickly disappeared.

Example #3:

On September 26, 2018, when Plaintiff was walking to the Dept meeting (12:00-1:15 p.m.) in LA 136, Whalen deliberately threw hostile looks at her near LA136 door.

Drummond:

Example #1:  Chancellor's Chats

According to Plaintiff' s records, she attended PFW Chancellor Elsenbaumer's Chats on March 8, 2018, October 31, 2018, and October 24, 2019. Her records indicate that Drummond showed up in the entrance area to Kettle Hall Room 178 to threaten her, where the Chats were held, when the Plaintiff was walking into KT178 (ExA, Disc, Ex17, Chats schedules, pp2, 3, 4).

Example #2: foul play

On January 27, 2020, Monday, the Plaintiff was scheduled to present her questions to the Faculty Senate about Drummond's problems with diversity (ExA, Disc, attachment 22, Ex22). In the morning, the Plaintiff found two of her car's rear tires flat.  The Plaintiff got a ride to campus and presented her questions to the Senate.  The Plaintiff had parked her car on campus on January 24, 2020, Friday.  The Plaintiff took her car to a tire shop, and the technician found one nail in each of the two tires (ExA, Disc, attachment 23, Ex18, 2 nails). Having two tires simultaneously stung by nails does not happen very often in general; in fact, it had never happened before to Plaintiff. Plaintiff took the usual route to campus on Friday, the last time she used her car, and there was no road construction on this route that she could recall.  Placed in the context of the Senate meeting and Drummond's ongoing harassment of Plaintiff, this incident's "foul play" connected to Drummond cannot be ruled out.

Ann Livschiz:  associate professor and associate chair of history Dept in the College of Liberal Arts.

Example #1:

On September 9, 2021, the Plaintiff was on campus; around 4:40-4:50 p.m. the Plaintiff saw Livschiz walk by with obvious anger on her face directed at the Plaintiff in LA hallway, near the Plaintiff's office (LA 107).

Example #2:

In November 2014, when Plaintiff was talking to a former co-worker in LA basement, Livschiz came down and walked violently past them; she threw angry looks at Plaintiff and her co-worker, as she walked past them.

Suzanne LaVere: tenured associate professor in History Dept. (ExD, Pla Dec, pp63-65)

Since 2014, Suzanne LaVere frequently used body language to express her racial anger whenever she encountered the Plaintiff in LA hallway or elsewhere on campus. She would violently turn her head aside to express what seemed like hatred.  Because she did this so often, it was impossible to document all her actions. Plaintiff had wondered why she would do this since they used to have normal work relation.

LaVere's harassment actions would have been captured by the security camera, if PFW had installed the camera in LA, as the Plaintiff had requested in 2015, 2020. Plaintiff feels sorry for her having to do those things.


Damian Fleming: tenured associate professor in the Plaintiff's Dept


Fleming's harassment was so frequent that it is impossible to document all of them. Worthy of note is that Plaintiff had normal work relation with him until 2014ish.

Example:

On December 1, 2021, Wednesday, the Plaintiff was on campus for work. Around 2:30 p.m. two visiting scholars from China to the Plaintiff's Dept came to her office (LA 107) for a visit. As Plaintiff was showing them around in LA hallway, Fleming lurked around them in the hallway; he deliberately threw nasty/sneering looks at them; his face looked stone cold.


Plaintiff filed police reports about Fleming's harassment (ExC, PFW, Ex17).

Karen Burtnette: former secretary of PFW College of Arts and Sciences

Ms. Burtnette was brought to PFW by Drummond as his secretary from outside the University when he became Dean of the College of Arts and Sciences in 2009.  Since 2014, she started stalking Plaintiff on and off campus. Plaintiff had good work relationship with all previous staff members in her College until Ms. Burtnette came.

**Off-campus Harassment by Co-workers: 2014-present**

Harassers use similar tactics to harass Plaintiff off campus, including public places: they use "normal activities" to cover up harassment.  There are so many of these incidents that it is impossible to document all of them:

Drummond:

Example #1:  Kroger

According to the Plaintiff's records, Drummond showed up in Kroger store (6002 St Joe Center Rd, Fort Wayne, IN 46835) to stalk and harass the Plaintiff, when the Plaintiff shopped there on one of the days: August 21, 2017, August 20, 2018, or August 26, 2019.  It was Monday; the Plaintiff attended Convocation on campus, then on her way home, she stopped by Kroger to pick up grocery.  Plaintiff saw Drummond walk in through the front entrance the time was between 12:30-3:00 p.m.

Example #2: Kroger

According to Plaintiff's records, Plaintiff saw a white male looking like Drummond in Kroger store (6002 St Joe Center Rd, Fort Wayne, IN 46835) on December 4, 2021, around 4:20 p.m..  Because the white male was wearing a mask, she could not tell whether he was Drummond or not (ExA, Disc, attachment 25, Ex19, Kroger receipt).

For other representative examples, see Additional Material Facts p10).

**Other Forms of On-campus Harassment: Anonymous Complaints**

Harassers also use anonymous complaints to harass Plaintiff. On April 6, 2018, campus police again received an anonymous phone complaint about the Plaintiff being seen in Kettler Hall 3rd floor area.  Two officers came to speak with Plaintiff in her office.  The Plaintiff admitted being in the said area, but denied any wrong doing since these areas were accessible to her as a faculty member. Plaintiff later requested this police report (ExA, Disc. Attachment 31, Ex20, KT police report) via Public Records Request venue.  PFW denied her request.  Plaintiff

filed a formal complaint with Indiana Public Access Counselor's Office. Counselor Luke Britt reviewed her complaint and PFW's response and issued his legal advice in Plaintiff's favor in June 2018 (ExA, Disc, attachment32, Ex21, Counselor Britt decision). PFW eventually released the police report.

### 11    Hostile Work Environment Continues:

### 2020 Adverse Action: Security Camera Request Denied

Severe harassment prompted Plaintiff to request that security cameras be installed in LA building, where her office is, so that harassers would be caught on cameras. In February 2020, Plaintiff once again requested to campus police the installation of security cameras in the building where she teaches because of being severely harassed in that building by Defendant Whalen and his friends. Plaintiff believed that security cameras would help deter harassers from harassing her and defend herself. Plaintiff's request was once again denied by PFW, which further encouraged her harassers to carry on harassment without fear of deterrent (ExC, PFW, Ex15, denial email).

Plaintiff had requested security cameras several times prior to 2020, through her attorney in 2015, her request to HR in or around 2016. All these requests were denied. These denials have encouraged her harassers to carry out harassment without fear of being caught.

### 12    Off-campus Harassment by Neighbors

Plaintiff had good relations with her neighbors in general until 2014, when she noticed that some of them used similar tactics to harass her: they use "normal activities" to cover up harassment. In the beginning, Plaintiff was bewildered why they were harassing her because they had no motives, but the similar tactics they used—use "normal activities" as covers-- led her to detect the ties between the trio (Whalen, Drummond, Badia) and off-campus harassers

John Robert Price family: residence: 7126 Sandyridge Place, Fort Wayne, IN 46835 Example #1:

John R. Price is a science teacher at Bluffton High School. The Price family lives across from Plaintiff's house. Plaintiff had normal relation with them until 2014-2015ish; for example, Plaintiff hired Mr. Price to mow her yard for a while. They frequently harass Plaintiff by spying on her, following her to public places, using dogs to threaten her etc. The following are just a few examples:

On August 20, 2021, around 4:10ish p.m. Plaintiff drove out of her garage to go to Menards store in Maysville Rd.  As soon she drove out of her garage, she saw John Price drive out in his gray pick-up truck.  He first followed the Plaintiff to the intersection of Harmon and Sandyridge, turned left on Harmony, then turned left again on Shady Lane. When the Plaintiff drove on Clubhouse Drive, Price drove into Clubhouse Drive from Lahmeyer Rd.  As he was driving past Plaintiff, he deliberately turned his head and threw hostile looks at the Plaintiff, as he often did. Plaintiff complained about Price's behavior to the Association Board (ExF, Pla, Ex8, email to Board).  Plaintiff also reported Price's problems to Fort Wayne police Dept. Example #2: Kroger incident

On October 23, 2016, Price followed Plaintiff in his car to Kroger store (6002 St. Joe Rd. Fort Wayne 46835).  When Plaintiff got out of her car, Price walked over and yelled at her fiercely.  When the Plaintiff drove back from Kroger, she saw Price stand on her driveway with threatening look on his face, which greatly frightened the Plaintiff.  Plaintiff entered her house and called Fort Wayne police immediately and reported this incident (ExF, Pla, Ex9, police report).

The Price family used to park their vehicles outside Plaintiff's house, even though city rules and Association bylaws prohibit parking on the city streets for over 24 hours; however, they are no longer doing this (for more examples, see Additional Material Facts, pp12-15).

**13     Switching to Online Teaching Due to Hostile Work Environment**

Hostile work environment forced Plaintiff to switch to online teaching 100% in Fall 2018 to avoid harassment; she has been teaching online since then.

**14     Early Retirement Due to Hostile Work Environment**

Hostile work environment also forced Plaintiff to consider early retirement in Fall 2018. She discussed this initiative with PFW, but because of various constraints, it did not work out, which left her to further harassment and retaliation.

**15     Work-related Injuries**

Plaintiff suffered several work-related injuries due to stressful and hostile work environment: 2014 injury, 2015 injury, 2018 injury, 2020 injury (ExD, Pla Dec, p185; ExF, Pla, Ex11; see also Additional Material Facts pp15-16).

Plaintiff had not suffered any such serious falls as those in 2014, 2018, 2020 prior to 2014.

### 16    Work-related Anxiety, Depression, and Other Medical Conditions

Highly stressful and hostile work and social environment also caused Plaintiff severe medical problems such as anxiety and depression. This lawsuit has been going on for over three years, and it has taken a toll on her life. As a pro se Plaintiff, she has to fight a battle against a powerful institution, and the state actors and their key allies get defended for free The mere thought of this fact is enough to make a reasonable person sick. PFW has made it impossible for Plaintiff to continue employment in a hostile environment, although she originally planned to retire at 70 or later. For records of medical and counseling treatment (ExF, Pla, Ex19).

### 17                    Conclusion

Plaintiff's discrimination, retaliation, and harassment claims against the Defendants are supported both by laws and facts; therefore, their Motion for Summary Judgement should be dismissed in its entirety.

To the extent the state actors and their key ally Badia intentionally discriminated and retaliated against and harassed Plaintiff and recklessly disregarded her federally protected civil rights, Plaintiff seeks punitive damages. Plaintiff prays for judgment against the Defendants for compensatory damages, punitive damages (against the individually-named Defendants and their key ally Badia), reasonable attorney's fees and costs, and for all other just and proper relief in the premises.