**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| LIDAN LIN, | |
| Plaintiff, | |
| v. | CAUSE NO.: 4:20-CV-97-TLS |
| THE TRUSTEES OF PURDUE UNIVERSITY, CARL DRUMMOND, and LACHLAN WHALEN, | |
| Defendants. | |

**OPINION AND ORDER**

In February 2019, the Plaintiff Lidan Lin applied for positions as editor-in-chief of *Clio* and acting chair in the English department at Purdue University in Fort Wayne, where the Plaintiff was a tenured professor in the English Department. When she was not offered either position, the Plaintiff filed a Complaint [ECF No. 1] in this Court. She amended her Complaint five times, ultimately alleging in her Fifth Amended Complaint [ECF No. 59] that: (1) the Defendant The Trustees of Purdue University failed to hire her as acting chair based on racial (Asian) and national origin (Chinese) discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Title VII); and (2) Defendants Carl Drummond and Lachlan Whalen violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 (§ 1981) when she was not hired as the acting chair based on racial discrimination, she was not hired as editor-in-chief of *Clio* based on racial discrimination, Whalen was hired based on racial discrimination, Janet Badia was appointed Dean of the College of Liberal Arts (in May 2021) based on retaliation, and they created a hostile work environment. This matter is before the Court on Defendants' Motion

for Summary Judgment [ECF No. 121], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court GRANTS the Defendants' motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

2

## MATERIAL FACTS[1]

### A.    Purdue University in Fort Wayne

Purdue University is a public university that receives funding from the State of Indiana. Def. Ex. 2, ¶ 5, ECF No. 123-2. Defendant The Trustees of Purdue University (Purdue) is the governing body of Purdue University. *Id.* In 1964, Purdue opened a combined campus with Indiana University in Fort Wayne known as Indiana University-Purdue University Fort Wayne. *Id.* ¶ 6. On July 1, 2018, the University split into two campuses, Purdue University Fort Wayne and Indiana University Fort Wayne. *Id.* Indiana University Fort Wayne took charge of the health sciences, while other areas, including English and Linguistics, became a part of Purdue University Fort Wayne. *Id.*

### B.    Carl Drummond, Vice Chancellor for Academic Affairs

Defendant Carl Drummond began employment with Purdue on August 15, 1994, as an Assistant Professor of Geology. *Id.* ¶ 3. Drummond assumed the role of Vice Chancellor for Academic Affairs at Purdue Fort Wayne in February 2014, the position he currently holds. *Id.* ¶ 4. As Vice Chancellor for Academic Affairs, he provides academic leadership and financial management for academic affairs. *Id.*

### C.    The Plaintiff's Employment at Purdue University Fort Wayne

The Plaintiff identifies as "Asian-American/Chinese." Fifth Am. Compl. ¶ 1, ECF No. 59. She was offered and accepted the position of Assistant Professor of English for Indiana University-Purdue University Fort Wayne in 2001. Def. Ex. 2, ¶ 9. The Plaintiff received tenure on July 1, 2006. *Id.* She was promoted to full professor in 2010. Fifth Am. Compl. ¶ 2.

---

[1] The facts offered by the parties are considered only to the extent they are supported by the properly cited evidence of record.

Beginning April 20, 2018, the Plaintiff began teaching exclusively online. Def. Ex. 1, 40:6–11, ECF No. 123-1. When Indiana University-Purdue University Fort Wayne was divided into two campuses, the Plaintiff's employment continued with Purdue University Fort Wayne. Def. Ex. 2, ¶ 10. The Plaintiff remained a tenured Professor of English within the Department of English and Linguistics in the College of Arts and Sciences. *Id.* She continues to teach English Literature in the Department of English and Linguistics. *Id.*

**D.    Hiring Process for the *Clio* Editor-in-Chief Position**

On February 22, 2019, English Professor and Editor-in-Chief of *Clio: A Journal of Literature, History, and the Philosophy of History* (*Clio*), Rachel Hile, emailed full-time faculty in various departments, including English and Linguistics, to announce an opening for her editor-in-chief position. Def. Ex. 4, ¶ 8, ECF No. 123-4. *Clio* is an interdisciplinary journal focusing on literature and historiography published three times per year. *Id.* ¶ 9; Def. Ex. 2, ¶ 14. The editor-in-chief solicits and receives submissions, securing peer reviews for submissions, working with authors on revisions, finalizing articles and book reviews for the publication process, and working as needed with the managing editor to help see issues through the publication process. Def. Ex. 4, ¶ 10; Def. Ex. 2, ¶ 14. Candidates for the position needed to send a letter of interest and curriculum vitae to Hile. Def. Ex. 2, ¶ 15.

Preferences for the next editor-in-chief included that the candidate be a tenured faculty member, that the candidate's research fit the content of *Clio*, and that the candidate have previous editorial experience. Def. Ex. 4, ¶ 12. On March 6, 2019, Defendant Lachlan Whalen, a tenured Associate Professor in the Department of English and Linguistics since the Fall of 2015, applied for this editor-in-chief position. *Id.* ¶¶ 4, 13. The Plaintiff also applied for the editor-in-chief position on March 7, 2019. Def. Ex. 1, 163:14–22.

Hile and Drummond reviewed the applications of the Plaintiff and Whalen and met to discuss their qualifications and credentials. Def. Ex. 2, ¶ 16. Both Whalen and the Plaintiff were tenured faculty members, had interdisciplinary research programs that bring together literature and history, and had some editorial experience. *Id*. ¶ 17. However, Whalen had some other professional experience in addition to peer-reviewing that Hile and Drummond believed would help him communicate with the managing editor and the printer. *Id.* ¶ 18.

Specifically, Whalen had previously served as an editorial board member of *Native Directions*, a Native American-focused magazine housed at the University of North Dakota. *Id.* ¶ 18; Def. Ex. 4, ¶ 15. As an editorial board member, Whalen assisted with every aspect of the periodical, from coming up with issue themes, to soliciting, writing, and editing articles, to creating the actual layout of individual issues. Def. Ex. 4, ¶ 15. Whalen also worked with authors at all stages of the submission and revision process. *Id.* ¶ 15; Def. Ex. 2, ¶ 18. Moreover, Whalen had many years of administrative experience as Director of International Studies that Hile and Drummond believed gave him skills that would transfer in significant ways to the role of editor-in-chief, while the Plaintiff had no administrative experience. Def. Ex. 2, ¶ 18. Because of Whalen's professional and administrative experience, Drummond agreed with Hile that Whalen was more qualified to be editor-in-chief, which is why Whalen was offered the editor-in-chief position. *Id.* ¶ 19.

### E.     Hiring for the Acting Chair Position

On February 1, 2019, Ronald Friedman, Interim Dean of the College of Arts and Sciences, sent an email intended for English Department faculty announcing that the English Department Chair, Dr. Aasand, would be taking a sabbatical, and therefore, the English Department sought an acting chairperson (acting chair) in his absence. Def. Ex. 3, ¶ 3 ECF No.

123-3. The Plaintiff refers to the "acting" chair position as an "interim" chair position. Def. Ex. 1, 105:9. However, a position is filled on an "interim" basis at Purdue when an employee in that position separates employment permanently and Purdue has not yet found a permanent replacement. Def. Ex. 2, ¶ 22. A position is filled on an "acting" basis at Purdue when an employee in that position steps away from his/her job duties temporarily. *Id.* Because Dr. Aasand was taking a temporary sabbatical, the more accurate title for the position Purdue sought to fill temporarily is acting chair. *Id.*

The acting chair was to fill the role and responsibilities of Dr. Aasand while he was on sabbatical. Def. Ex. 3, ¶ 4. In other words, the acting chair position was temporary, effective January 1, 2020, through June 30, 2020. *Id.* ¶ 5. Faculty interested in serving as the acting chair were asked to indicate their interest by emailing Friedman by February 15, 2019. *Id.* ¶ 6. The sole requirement to be qualified to apply for the acting chair position was that the candidate be a tenured member of the faculty. *Id.* ¶ 7. While not listed in the job posting, there were certain skills Friedman considered important in performing the job duties of an acting chair. *Id.* ¶ 8. For example, because the acting chair would be responsible for performing administrative tasks, administrative experience was important. *Id.* While not a requirement, Friedman explained that preference would be given to a full professor. *Id.* ¶ 9.

On February 2, 2019, the Plaintiff emailed Friedman to indicate her interest in the position. *Id.* ¶ 18. She stated, "Being a full professor, I feel obligated to step up to serve as acting chair." Pl. Ex. F, Ex. 18, p. 3, ECF No. 132-5, p. 54 of 106. On February 3, 2019, Friedman confirmed he received that email. *Id.* On February 11, 2019, the Plaintiff emailed Friedman, "I forgot to mention . . . , I held the position of 'Qian Tang Scholar' Chair Professor position from

2011-2018 at Hangzhou Normal University, China. I currently hold a Visiting Professor position at Southwest Jiaotong University, China . . . ." *Id*. p. 1–2, ECF No. 132-5, p. 52–53 of 106.

On February 12, 2019, Friedman received a request from Professor of Linguistics Shannon Bischoff asking that the English faculty be allowed to make anonymous nominations for the position. Def. Ex. 3, ¶¶ 15, 16. On February 13, 2019, Friedman extended the deadline to March 15, 2019, because there was more time to fill the position than he originally thought (he originally thought the position was for Fall 2019, but it was for Spring 2020). Pl. Ex. G, p. 16, ECF No. 132-6.[2] On February 13, 2019, the Plaintiff emailed Friedman, "I just found out you did say 'Spring 2020' in the original email. I assume the same criteria will apply—candidate must be tenured and preference is given to full professor. I assume self-nomination is accepted . . . ." *Id*. p. 5, ECF No. 132-5, p. 56 of 106. On February 13, Friedman responded, "Yes, it is spring 2020 but same criteria apply. Yes, self-nomination is acceptable. Yes, if there is more than one interested person, there will be a process whereby feedback/input is gathered by me and a recommendation is made to the VCAA." *Id*. p. 5, ECF No. 132-5, p. 56 of 106.

In the end, Dr. Debrah Huffman, Associate Professor and Director of Writing, received more than five anonymous nominations for the acting chair position and asked to be considered for the position on February 25, 2019. Def. Ex. 3, ¶ 19. Dr. Troy Bassett, Professor of English, received one anonymous nomination and, on March 15, 2019, expressed his desire to be considered for the acting chair position. *Id*. ¶ 23. The Plaintiff did not receive any anonymous

---

[2] On February 1, 2019, at 2:36 PM, Friedman sent an email to tenured faculty stating that the Chair of the English Department will be on sabbatical for Fall 2019 and the Department will be needing an acting chair in his absence and requesting that those wishing to be considered for the position to email him by February 15, 2019. Def. Ex. 3, Ex. A (DEF1000727), p. 1, ECF No. 123-3, p. 10 of 49. On February 1, 2019, at 17:36, Aasand emailed Friedman stating that his sabbatical was for Spring 2020. *Id*. On February 1, 2019 at 19:38, Friedman sent a revised email to tenured faculty stating Assand's sabbatical was for Spring 2020. Def. Ex. 3, Ex. B (DEF1000810), p. 1, ECF No. 123-3, p. 13 of 49.

nominations. *Id.* ¶ 24. At the time of applying, the Plaintiff, Bassett, and Huffman were all tenured faculty. *Id.* ¶ 27.

Upon closure of the March 15, 2019 deadline for candidate interest statements, Friedman asked the Plaintiff, Huffman, and Bassett to submit, by April 3, 2019, a short statement that included the candidate's experiences and qualifications that they felt made them suitable candidates for the position and how they saw themselves in the position. *Id.* ¶ 28. Specifically, on March 18, 2019, Friedman sent the Plaintiff an email stating that he was "asking each candidate to send [him] a short statement (1 to 3 pages, maximum)[,]" including experiences and qualifications making them a suitable candidate for the acting chair position, plans, and philosophies. Pl. Ex. F, Ex. 18, p. 4, ECF No. 132-5, p. 55 of 106. The Plaintiff, Huffman, and Bassett each submitted a statement that was shared with English Department faculty and staff. Def. Ex. 3, ¶ 29.

On May 6, 2019, Friedman solicited feedback from the English Department faculty, and on May 9, 2019, he solicited feedback from the English Department staff. *Id.* ¶¶ 30, 31. Friedman highly valued the feedback from faculty and staff because of the leadership role the acting chair would hold, requiring the ability to get along with and manage personnel in an effective and positive manner. *Id.* ¶ 32.

Feedback from faculty and staff regarding Huffman was as follows: (1) as the Director of the Writing Center, Huffman had the most administrative experience with regards to supervision, assessment, personnel evaluation, conflict management, and class scheduling; (2) Huffman had excellent rapport with staff, possessed good communication skills, and very positive interactions with English Department faculty; and (3) Huffman was the most organized and detail-oriented of the three candidates. *Id.* ¶ 34.

Feedback from faculty and staff regarding Bassett was as follows: (1) in his role as Interim Director of the English Graduate Program, Bassett had some administrative experience, but it was less than Huffman's experience; and (2) faculty and staff raised concerns about Bassett's decisiveness and responsiveness to emails. *Id.* ¶ 36.

Feedback from faculty and staff regarding the Plaintiff was as follows: (1) the Plaintiff had a lack of administrative leadership roles; and (2) faculty and staff questioned and raised concerns about her organizational skills, rapport with staff, and availability. *Id.* ¶ 35. The Plaintiff also testified that she did not have administrative experience. Def. Ex. 1, 85:13–20.

Additionally, English Department faculty and staff were given a survey and asked to rank the candidates, indicating their first, second, and third preferences. Def. Ex. 3, ¶ 37. The results of the survey ranking were as follows: Huffman received 17 first preference rankings and 3 second preference rankings; Bassett received 3 first preference rankings, 13 second preference rankings, and 1 third preference ranking; Plaintiff received 0 first preference rankings, 1 second preference ranking, and 14 third preference rankings. *Id.* ¶ 38.

On June 10, 2019, Friedman made the recommendation to offer the acting chair position to Huffman. *Id.* ¶ 41. Friedman recommended Huffman for the position because he believed, based on his discussions with faculty and staff, and the results of the survey, that Huffman was the most qualified for the position. *Id.* Friedman averred that the fact that Huffman was not a full professor did not come into play because of the information and feedback received about her that made her the best candidate by a wide margin. *Id.* Drummond supported the recommendation. Def. Ex. 2, ¶ 35. This was because he believed, based on Friedman's recommendation and rationale, that Huffman was the most qualified for the position. *Id.*

On June 11, 2019, Friedman emailed faculty and staff in the English and Linguistics Department, stating, "I wish to inform you that, based upon my recommendation and the approval of VCAA Drummond, Dr. Debra Huffman has been selected to serve as the acting chairperson." Def. Ex. A, Dep. Ex. 43, p. 11 (DEF1000279), ECF No. 123-1, p. 140 of 146.

On June 15, 2019, the Plaintiff sent Drummond and Friedman an email asking that they "reconsider the English Dept. interim chair selection decision" because she "strongly believe[s] that [she] [is] the best candidate for this position, all things considered." *Id*. at 12 (DEF 100280), ECF No. 123-1, p. 141 of 146. On June 18, 2019, Drummond responded, "Interim Dean Friedman solicited input from departmental faculty and staff. There was overwhelming support for Professor Huffman and I supported his recommendation. There is nothing further to consider." *Id*.

## F.    Appointment of Janet Badia as Dean of the College of Liberal Arts

Janet Badia was appointed Dean of the College of Liberal Arts in May 2021. Def. Ex. 2, ¶ 36. The Plaintiff believes that Drummond retaliated against her for filing her EEOC charge and this lawsuit by appointing Badia as Dean. Def. Ex. 1, 114:4–9. The Plaintiff did not apply for the Dean of the College of Liberal Arts position. Def. Ex. 2, ¶ 37. After Badia was appointed, on March 31, 2021, the Curriculum Committee that Badia co-chaired did not approve the Plaintiff's proposed courses, ENGL 10201 and ENGL 44601/54901. Pl. Ex. A, Ex. 7, p. 1–2, ECF No. 132-1, p. 15–16 of 58. Nevertheless, the Plaintiff maintains her employment as a tenured full professor and continues to teach courses that she previously taught. *Id*. ¶ 38.

## G.    Actions the Plaintiff Believes Constitute Harassment

On March 15, 2017, the Vice President for Ethics and Compliance granted the Plaintiff's appeal of Vice Chancellor David Wesse's decision finding her in violation of Purdue's anti-

harassment policy based on complaints by Jamé Lucas, a staff member in the English Department, made from May through November 2016 about harassment by the Plaintiff. Pl. Ex. A, Ex. 23, p. 1, ECF No. 132-1, p. 57 of 58. The related sanctions and remedial measures imposed against the Plaintiff were nullified. *Id.*

On April 5, 2018, the campus police received a complaint about the Plaintiff causing a disturbance on campus for being in an area she was not permitted to be in. Pl. Ex. A, Ex. 20, p. 1, ECF No. 132-1, p. 42 of 58. The Plaintiff told the responding officer that she was allowed to go wherever she wants because the Purdue campus is a public place. *Id.* However, the responding officer informed the Plaintiff that was not how it works, and she needs to comply with the rules. *Id.*

On February 24, 2020, the Plaintiff received a letter denying her request for the installation of security cameras in the Liberal Arts building on campus. Pl. Ex. C, Ex. 15, p. 1, ECF No. 132-3, p. 34 of 40.

On April 26, 2022, the Plaintiff received a letter from Chancellor Ronald L. Elsenbaumer informing her that Whalen had filed a harassment complaint against her. Pl. Ex. C, Ex. 8, p. 1, ECF No. 132-3, p. 18 of 40. In the complaint, Whalen asserted that the Plaintiff has harassed him by attempting to discredit him and by damaging his reputation on campus. *Id.*, p. 3, ECF No. 132-3, p. 20 of 40. On June 20, 2022, the Purdue investigators sent a report of their findings to Chancellor Elsenbaumer. *Id.*, p. 4, ECF No. 132-3, p. 21 of 40. On July 14, 2022, Chancellor Elsenbaumer sent the Plaintiff a letter informing her that the preponderance of the evidence does not support a finding of harassment by her. *Id.*, p. 11, ECF No. 132-3, p. 28 of 40. The Chancellor also found that Whalen's complaint was neither false nor malicious. *Id.*, p. 12, ECF No 132-2, p. 29 of 40.

11

**H.     The Plaintiff's EEOC Charge**

The Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on April 2, 2020, alleging race (Asian) and national origin (Chinese) discrimination. Fifth Am. Compl. Ex. 1, ECF No. 59-1. The Plaintiff's EEOC charge concerns one employment decision made in June 2019—the hiring of Huffman, and not the Plaintiff, for the acting chair position. *Id.*

**ANALYSIS**

The Defendants move for summary judgment on each of the Plaintiff's claims in her Fifth Amended Complaint. The Court addresses the § 1981 hostile work environment and retaliation claims before turning to the remaining § 1981 and Title VII discrimination claims.

**A.     42 U.S.C. § 1981 Hostile Work Environment and Retaliation Claims**

*1.     Statute of Limitations*

To begin with, the parties dispute whether the statute of limitations bars evidence of events that occurred more than four years before this lawsuit was filed from being used to support the Plaintiff's § 1981 claims. Claims arising under the 1991 amendments to § 1981 are "governed by § 1658's 4-year statute of limitations[.]" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004)). Section 1981 claims based on conduct "that occurred after the formation of an employment contract" arise under the 1991 amendments. *Id.* at 373. Here, the Plaintiff alleges violations under § 1981 for a hostile work environment and retaliation. Thus, these § 1981 claims are subject to § 1658's 4-year statute of limitations because they are based on conduct that took place after the formation of her employment contract with Purdue in 2001. Accordingly, the Court may only consider events four years prior to when the Plaintiff filed her initial complaint in this action in support of her § 1981 claims. *See Dandy v. United Parcel Serv.,*

*Inc*., 388 F.3d 263, 269 (7th Cir. 2004) ("[The plaintiff] filed her complaint on September 14, 2001; therefore, [the court] may consider events which occurred as early as September 14, 1997, on her [§ 1981] hostile work environment and retaliation claims."). As the Plaintiff filed her Complaint in this case on December 18, 2020, any § 1981 claim based on conduct that occurred before December 18, 2016, is time-barred, unless an exception applies.

2.    *Section 1981 Hostile Work Environment*

The Defendants argue that the record does not show that the Plaintiff was subjected to a hostile work environment. To prevail on her hostile work environment claim under § 1981, the Plaintiff must point to evidence indicating that she was subject to harassment that was "(1) based on race; (2) subjectively and objectively hostile; and (3) sufficiently severe *or* pervasive to interfere with an employee's ability to perform [her] assigned duties." *Dandy*, 388 F.3d at 271.[3] "To support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." *Paschall*, 28 F.4th at 814 (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011)).

In support of this claim, the Plaintiff cites twenty-seven pages of her deposition transcript without explanation. The Court's review of this testimony shows the theory of the Plaintiff's hostile work environment claim is that she believes that Whalen began stalking her on campus in 2014. *See* Def. Ex. 1, p. 13. The Plaintiff testified that she identifies stalking by Whalen as using "his body language, his facial expression[.]" *Id.* at 15. She additionally testified that Whalen "would walk with force in his body" and "look at [her]" with a "very frightening look." *Id.* at 18. The Plaintiff attributed this to Whalen "most likely planning on applying [for] . . . a tenured track

---

[3] "Claims under Title VII and § 1981 are analyzed in the same manner, and therefore case law addressing one type of claim applies to both types." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022).

position in [her] department" and that she "was perceived as a barrier to Dr. Whalen's plan." *Id.*
at 16–17. She believes Whalen's tenure plan is illegal harassment because "it created a very
intimidating environment for [her]" due to their teaching areas overlapping. *Id*. at 17–18. She
"could not think of any other reason that [Whalen] would express those feelings of hostility
towards [her], other than the fact that [she] [is] Chinese." *Id*. at 24.

     In addition, the Plaintiff contends that the following actions—that are within the statutory
period—created a hostile work environment:

- The Plaintiff appealed Vice Chancellor Wesse's decision to give her sanctions and remedial measures based on complaints made in 2016 by a staff member in the English Department about harassment by the Plaintiff, and the decision was reversed (March 2017);
- Drummond showed up at a grocery store at the same time the Plaintiff was there (August 2017, 2018, or 2019);
- Drummond showed up at the entrance to a building on campus to threaten her (March 8, 2018, October 31, 2018, and October 24, 2019);
- the campus police received an anonymous complaint about the Plaintiff (April 6, 2018);
- Whalen was made editor-in-chief of *Clio*, not the Plaintiff (2019);
- the Plaintiff was not hired as acting chair (June 2019);
- Badia sat in a seat directly in front of the Plaintiff on a flight to a convention, and during the convention the Plaintiff observed patterns of harassment by Badia (January 2020);
- the Plaintiff found she had two flat tires because of nail punctures (January 27, 2020);
- the Plaintiff's request for installation of security cameras on campus was denied (February 2020);
- Badia was appointed Dean of the College of Liberal Arts (May 2021);
- a female associate professor walked by the Plaintiff on campus with obvious anger on her face (September 9, 2021);
- Badia walked past the Plaintiff on campus with deliberately hateful/disdainful looks (December 1, 2021);
- a male associate professor deliberately threw nasty/sneering looks at the Plaintiff and two visiting scholars from China on campus (December 1, 2021);
- the Plaintiff saw a white male at the grocery store wearing a mask, so she could not tell if it was Drummond or not (December 4, 2021);
- Badia often threw hateful/disdainful looks at the Plaintiff (January to February 2022); and
- Whalen filed a complaint that the Plaintiff was harassing him (2022).

ECF Nos. 130 at 3, 6–11, 21–27, 133 at 1.

First, as for the conduct by Drummond, Badia, and the male associate professor, the Plaintiff either does not cite the record or her citation to the record does not support the proposition asserted.[4] Thus, the Court need not consider these factual allegations.

Second, even if the evidence could potentially support all the listed factual allegations, there is no evidence that any of these actions that the Plaintiff considers harassment was motivated by the Plaintiff's race. This is because the record, including the Plaintiff's testimony on her theory for the hostile environment claim, does not show that the listed "[actions] were 'inherently racial,' that they evidenced 'negative attitudes toward [Asian]-Americans,' or that they had 'racial . . . overtones.'" *Beamon*, 411 F.3d at 863–64 (quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345–46 (7th Cir. 1999)). "While it is true that harassment need not be explicitly racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Id.* (cleaned up). Rather, the Seventh Circuit has "held that the alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Id.* (cleaned up).[5]

---

[4] For example, for the factual allegations related to harassment by Badia, the Plaintiff cites Exhibit D, but there does not appear to be an Exhibit D attached to her summary judgment brief. *See* ECF No. 132. To the extent that the Plaintiff meant to cite to her declaration in Exhibit E, the declaration does not contain a statement about conduct by Badia. *See* Pl. Ex. E, Ex. 1, ECF No. 132-4. The Plaintiff further cites her deposition transcript; however, the portion cited contains no reference to Badia's conduct either. *See* Def. Ex. A, p. 63, 65. The Plaintiff merely testified that Whalen was good friends with Badia, and then she went on to testify about the conduct of Suzanne LaVere. *Id.*

[5] In her brief and without citation to law, the Plaintiff contends that she "does not need to prove harassers' intent since their actions and the effects of those actions on Plaintiff already speak their intent." Pl. Br. 5, ECF No.1 30. However, the Seventh Circuit has "held that the alleged harassment must be 'sufficiently

In this case, the Plaintiff has identified no evidence of a connection between the unfair treatment she claims to have received and the fact that she is Asian. The Plaintiff asserts that "the harassers used non-verbal conduct, such as body language and facial expressions to express their racial hostility toward the Plaintiff," but her only bases for the assertion are the facts that the "harassment had intimidating and hostile effects" on her, Whalen knew the Plaintiff was Chinese, and the investigators found no basis for Whalen's 2022 complaint. Pl. Br. 5–6, ECF No. 130; Pl. Supp. Br. 1, ECF No. 133. Although non-verbal harassment may be used to support a hostile work environment claim, the Plaintiff must still show that it "had a racial character or purpose." *Paschall*, 28 F.4th at 814. Here, the non-verbal harassment of which the Plaintiff complains "could just as readily have been perpetrated upon a white person without any alteration in its character or purpose." *Beamon*, 411 F.3d at 864. And, the Plaintiff points to no "other evidence [that] supports a reasonable inference tying the harassment to [her] protected status." *Id*. Accordingly, the Court cannot reasonably construe the actions in the evidence or even the other factual allegations that the Plaintiff cites as being motivated by hostility to the Plaintiff's race.

There are several other actions listed by the Plaintiff that also do not create a genuine dispute of fact on her hostile work environment claim. To the extent that the Plaintiff lists actions by her neighbors at her personal off-campus residence that she believes constitute harassment, the Court declines to address these actions because she does not explain how they support a hostile *work* environment, she does not reference legal authority that supports consideration of such actions, and she fails to provide citations to admissible evidence for most. Additionally, to the extent that the Plaintiff asks the Court to consider actions that predate December 18, 2016,

---

connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Beamon*, 411 F.3d at 863–64.

based on the continuing violation doctrine because they are "logically linked to other claims" or "a catalyst" for future adverse employment actions, neither reason suffices. *See* Pl. Br. 3.[6] This is because Plaintiff must "show . . . the use of racially charged [conduct] [occurred] during the relevant statutory period[.]" *Dandy*, 388 F.3d at 271. As discussed above, the Plaintiff has not shown racially charged conduct during the statutory period, thus "[she] is barred from relying on conduct prior to [December 18, 2016], to sustain her hostile work environment claim under the 'continuing violation' doctrine." *Id*. As a result, the Plaintiff has failed to present evidence sufficient to survive summary judgment on the § 1981 hostile work environment claim alleged in her Fifth Amended Complaint. *See Beamon*, 411 F.3d at 864.[7]

3.     *Section 1981 Retaliation*

The Defendants argue that the Plaintiff's retaliation claim is not supported by the record. To survive summary judgment on her claim of retaliation under § 1981, the Plaintiff must offer enough evidence to permit a reasonable jury to find that she suffered a "materially adverse action" because she engaged in "protected activity." *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848 (7th Cir. 2007). As to conduct within the statute of limitations period, the

---

[6] For her hostile work environment claim, the Plaintiff asks the Court to consider the following actions that predate December 18, 2016: (1) the Plaintiff's objection to the hiring of Whalen for a position in the English department (2014 and 2015); (2) a secretary has been stalking the Plaintiff (since 2014); (3) a female associate professor walked violently past her and threw angry looks at her (November 2014); (4) a female associate professor has used her body to express racial anger whenever she encountered the Plaintiff (since 2014); (5) the Plaintiff's complaint to the campus police department that she was being stalked because she was Asian (2015); (6) the Plaintiff's complaint to Drummond that Whalen was harassing her (2015); (7) Drummond walked past the Plaintiff deliberately twisting his body, clenching his fists, and throwing hateful looks at her (August 21, 2015); (8) placement of the Plaintiff on leave (Fall 2015); (9) the Plaintiff's request for campus security camera installation (2015); (10) Whalen followed the Plaintiff to a coffee shop (January 29, 2016); (11) Lucas' complaints about the Plaintiff to HR (May through November 2016); (12) the investigation of Lucas' complaints, resulting in the investigator recommending three sanctions against the Plaintiff; and (13) Lucas' petition for a protective order against the Plaintiff (November 14, 2016), and the judge's denial of Lucas' petition (December 8, 2016). ECF No. 130 at 3, 6–11, 21–27.

[7] Thus, the Court need not address the parties' additional arguments on the other elements of a hostile work environment claim.

Plaintiff argues that Drummond retaliated against her by appointing Janet Badia as Dean of the College of Liberal Arts in May 2021.[8] In reply, the Defendants argue that this action is not a materially adverse action. For the reasons set forth below, the Court agrees with the Defendants and concludes that summary judgment is appropriate on the Plaintiff's § 1981 retaliation claim.

To be considered a materially adverse action, the Plaintiff must show retaliatory actions "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006). This means that "[a]n employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016) (cleaned up). Here, the Plaintiff appears to identify the appointment of Badia as Dean in 2021 as an adverse action. However, the Plaintiff does not dispute that she did not apply or intend to apply for the Dean position at issue. Also, the Plaintiff does not explain how Badia's appointment was harmful. At most, the Plaintiff shows she was inconvenienced by Badia's appointment because, once she was Dean, Badia did not approve the Plaintiff's two proposed courses. Moreover, after Badia's appointment as Dean, the record shows that the Plaintiff maintained her employment as a tenured full professor, and the Plaintiff continues to teach courses that she previously taught. Thus, the Court concludes that the Plaintiff has not identified a materially adverse action.

To the extent that the Plaintiff contends that Badia has not approved the Plaintiff's application for travel and research funds, the Plaintiff does not support this contention with a citation to admissible evidence as is required at the summary judgment stage; thus, the Court

---

[8] To the extent that the Fifth Amended Complaint alleges a § 1981 claim against Defendant Whalen for retaliation, any such claim is abandoned because the Plaintiff did not address it in her summary judgment brief in response to the Defendants' motion on the claim.

disregards it. Also, the Plaintiff neglects to explain how the lack of such an approval is more than an inconvenience. Thus, even if the allegations of the lack of approval were supported by the record, the Plaintiff still has not shown that Badia' appointment as Dean was a materially adverse action.

Additionally, the Plaintiff contends that, under the continuing violation doctrine, the Court should consider Drummond placing her on leave during Fall 2015 for reporting harassment by Whalen and Badia to campus police in 2015 as actionable retaliation. *See* Pl. Br. 8. The Plaintiff also appears to include in her retaliation claim the hiring of Whalen in 2014 and 2015; as, according to the Plaintiff, the hiring of Whalen led to her reporting harassment by him to campus police, which led to placing her on leave and put her employment at risk—as she and Whalen teach similar courses. *See id.* However, hiring decisions and leave placement are discrete acts. *See Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004) (finding that suspension is a discrete act); *Jackson v. City of Chicago*, 552 F.3d 619, 623 (7th Cir. 2009) (explaining that hiring decisions are discrete acts). And, "[t]he Supreme Court has explained the continuing violation doctrine . . . 'preclud[es] recovery for discrete acts of . . . retaliation that occur outside the statutory time period.'" *Dandy*, 388 F.3d at 270 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). Consequently, the continuing violation doctrine precludes recovery by the Plaintiff for retaliation based on the hiring of Whalen or placing the Plaintiff on leave, for these are discrete acts, occurring before December 18, 2016, that are barred by the statute of limitations as set forth above.

Accordingly, the Plaintiff's retaliation claim fails.[9] Therefore, the Defendants are entitled to summary judgment on the Plaintiff's § 1981 retaliation claim brought in the Fifth Amended Complaint.

**B.      42 U.S.C. § 1981 and Title VII Discrimination Claims**

*1.      Scope of the EEOC Charge and Title VII Discrimination Claim*

The Defendants argue that, based on the scope of the Plaintiff's EEOC charge, the Plaintiff's Title VII discrimination claim against Purdue only includes a claim for discrimination based on the failure to hire the Plaintiff as acting chair of the English Department.[10] "There are several prerequisites for bringing a Title VII claim. A plaintiff must file a charge with the EEOC detailing the alleged discriminatory conduct within the time allowed by statute, and the EEOC must issue a right-to-sue letter." *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005). "In addition, claims brought in judicial proceedings must be within the scope of the charges filed with the EEOC; [a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Id.* (cleaned up).

"[I]f certain claims are not included in an EEOC charge, a plaintiff can still bring them if they are like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Moore v. Vital Prods., Inc*., 641 F.3d 253, 256 (7th Cir. 2011) (cleaned up).

---

[9] Since the Plaintiff has not shown an adverse action within the statute of limitations, the Court need not address the parties' other arguments on the Plaintiff's retaliation claim.

[10] In her summary judgment response brief, the Plaintiff does not respond to this argument on the scope of her EEOC charge. Thus, she waives any such argument.

"To be 'like or reasonably related,' the relevant claim and the EEOC charge 'must, at minimum, describe the same conduct and implicate the same individuals.'" *Id*. at 257.

Here, the Plaintiff's EEOC charge states:

> I have been employed by Purdue University for 19 years. I am a tenured full professor in the English Department. In February 2019, I applied for the Interim Chair position for the English Department. I, along with two other tenured associate professors applied for the position. In the posting for the position it stated that tenured full professors would be given preference but [I] was not. On or about June 2019 a decision was made and the position was awarded to tenured Associate Professor, Deborah Huffman (white). I believe that I have been discriminated against based on my race (Asian) and National Origin (Chinese) which are both violations of Title VII of the Civil Rights Act of 1964 as amended.

ECF No. 59-1.[11]

The Plaintiff's claim for discrimination based on the failure of Purdue to hire her for the acting chair position is indeed within the scope of her EEOC charge. And, her "allegation can only be understood to refer to" Purdue's failure to hire her for the acting chair position in June 2019 because of her race and national origin. *Chaidez v. Ford Motor Co*., 937 F.3d 998, 1006 (7th Cir. 2019). Accordingly, the Plaintiff's discrimination claim based on Purdue's failure to hire her for the acting chair position is the only Title VII claim within the scope of the EEOC charge before the Court. To the extent that the Plaintiff may be bringing Title VII claims for retaliation, a hostile work environment, or discrimination based on hiring Whalen in 2014 and 2015, being put on leave for Fall 2015, being given sanctions and remedial measures based on complaints made in 2016 by Jamé Lucas, or not being hired as editor-in-chief of *Clio*, such claims fall outside the scope of the Plaintiff's EEOC charges thus are not considered by the Court.

---

[11] The Plaintiff refers to the "acting" chair position as the "interim" chair position.

2.    *Discrimination Claims Under Title VII and § 1981*

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

To succeed on her Title VII discrimination claim, the Plaintiff must prove "(1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Because courts analyze claims of discrimination under § 1981 and Title VII similarly, the Court considers below the Plaintiff's discrimination claims under § 1981 and Title VII. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019) ("[Courts] apply the same standard to discrimination claims under § 1981, Title VII, and the [ADEA].").[12]

The Plaintiff appears to rely on the *McDonell Douglas* burden-shifting framework to survive summary judgment on her discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the Plaintiff must establish a prima facie case of employment discrimination by showing the following: "(1) [she] is a member of a

---

[12] The main difference is that "discrimination claims under Title VII simply require that [the protected characteristic] be a motivating factor in the defendant's challenged employment decision," whereas discrimination claims under § 1981 require the plaintiff to show the protected characteristic "was a but-for cause of [her] injury." *Id.* (cleaned up). However, the difference is not material here because, as set forth in the Court's analysis, there is no evidence of causation.

protected class; (2) [she] applied for and was qualified for an open position; (3) despite [her] qualifications, [she] was rejected for the position; and (4) a similarly situated person outside [her] protected class was hired for the position instead, or the position remained open." *Sweatt v. Union Pac. R.R. Co*., 796 F.3d 701, 709 (7th Cir. 2015).

If the Plaintiff meets each element of her prima facie case, the burden then shifts to the Defendants "to offer a nondiscriminatory justification for the challenged employment action." *Groves v. S. Bend Cmty. Sch. Corp*., 51 F.4th 766, 770 (7th Cir. 2022). The burden then shifts back to the Plaintiff to show the Defendants' "proffered nondiscriminatory reason amounted to pretext for discrimination." *Id.* Nevertheless, for her discrimination claim to reach a jury, the Plaintiff has "to identify evidence indicating that the statutorily protected factor[s]"—that her race of Asian and her national origin of Chinese—"caused" Purdue and/or Drummond not to hire her. *See Xiong v. Bd. of Regents of Univ. of Wis. Sys*., 62 F.4th 350, 354 (7th Cir. 2023).

In her response brief, the Plaintiff identifies three discrimination claims: Purdue and Drummond not hiring her as acting chair of the English Department (Title VII and § 1981), Drummond not hiring her as editor-in-chief of *Clio* (§ 1981), and Drummond's hiring of Whalen in 2014 and 2015 (§ 1981). As for the last basis, as argued by the Defendants, the discrimination claim based on Whalen's hiring is untimely as outside the statutory period for § 1981 claims, which began to run on December 18, 2016. The Plaintiff nevertheless contends that this evidence should be considered under the continuing violation doctrine, reasoning that Whalen's hiring served as a catalyst for later discrimination. However, as discussed above, a hiring decision is a discrete act. *See Jackson*, 552 F.3d at 623. And, "the continuing violation doctrine . . .

23

preclud[es] recovery for discrete acts of discrimination . . . that occur outside the statutory time period." *Dandy*, 388 F.3d at 270 (cleaned up).[13]

The Defendants contend that summary judgment should be granted on the Plaintiff's remaining two discrimination claims under Title VII and § 1981 because she has, among other things, (1) failed to establish a prima facia case of discrimination due to her race or national origin under the *McDonnell Douglas* burden-shifting framework, (2) failed to demonstrate nondiscriminatory reasons for Purdue and Drummond not hiring her as acting chair of the English Department and Drummond not hiring her as editor-in-chief of *Clio* were pretextual, and (3) otherwise failed to show that a reasonable jury could find the evidence as a whole supports her claims of discrimination based on race or national origin. As set forth below, the Plaintiff has failed to demonstrate that the nondiscriminatory reasons for Purdue and Drummond not hiring her were a pretext for discrimination based on her race or national origin and has otherwise failed to point to evidence that as a whole shows unlawful discrimination. Thus, the Court need not consider the Defendants' remaining arguments on the prima facie case. The Court first addresses the Plaintiff's discrimination claim based on the Defendants' failure to hire her for the acting chair position and then addresses her discrimination claim based on Drummond's failure to hire her as the editor-in-chief of *Clio*.

a.    Acting Chair Position—Title VII Claim Against Purdue and § 1981 Claim Against Drummond

Assuming, without deciding, that the Plaintiff has established a prima facie case of discrimination based on Purdue not hiring her for the position of acting chair of the English

---

[13] Therefore, the Court need not address the Plaintiff's arguments on how Whalen's hire put her employment at risk, Purdue's spouse hire accommodation policy, or how Whalen's "hire was done so differently from other spouse hires, [the] Plaintiff cannot think of other reasons than racial discrimination for this hire." Pl. Br. 8–9.

Department, the Defendants are still entitled to summary judgment because they have presented legitimate, nondiscriminatory reasons for not hiring the Plaintiff and the Plaintiff has not pointed to evidence showing that those reasons were pretext for unlawful discrimination. The legitimate, nondiscriminatory reasons the Defendants presented for not hiring the Plaintiff for the acting chair position include the following: (1) in a survey of faculty and staff, the Plaintiff received the following ranking preferences compared to the other two candidates: 0 (firsts), 1 (second), and 14 (thirds); (2) she lacked administrative leadership roles; and (3) questions and concerns were raised with regard to the Plaintiff's organizational skills, rapport with staff, and availability. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived.[14] Accordingly, the Court concludes that the Defendants have met their burden of producing nondiscriminatory justifications for not hiring the Plaintiff for the acting chair position. The burden now shifts to the Plaintiff to establish pretext.

In assessing pretext, courts do not "evaluate whether the employer's proffered justification was accurate or even whether it was unfair. [The] sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Id.* (cleaned up); *see Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) ("[P]retext does not exist if the decisionmaker honestly believed the nondiscriminatory reason."). "[T]he only

---

[14] *See Xiong*, 62 F.4th at 354 (finding the plaintiff forfeited his arguments on pretext that were not raised before the district court); *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020) (determining that the plaintiff waived argument on evidence in the record supporting an inference of an improper motive when he did not raise the issue before the district court); *Coleman v. Hardy*, 690 F.3d 811, 819 (7th Cir. 2012) ("[I]f the argument itself was not adequately developed [before the district court], it is . . . waived.").

question is whether the [defendant] *honestly believed* it had [] non-discriminatory reason[s] for [the plaintiff's] [adverse employment action]." *Brooks*, 39 F.4th at 436 (emphasis added).

Additionally, when, as here, the defendants raise more than one reason for an employee plaintiff's termination, the plaintiff "[has] to raise an issue as to pretext for each proffered [reason] to withstand summary judgment." *Simpson v. Beaver Dam Cmty. Hosps., Inc*., 780 F.3d 784, 798 (7th Cir. 2015). Otherwise, the plaintiff must show that the defendants' reasons "are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Fischer v. Avanade, Inc*., 519 F.3d 393, 404 (7th Cir. 2008) (cleaned up).

The Plaintiff argues that the Defendants' legitimate, nondiscriminatory reasons are pretextual because Friedman did the following in hiring the acting chair: (1) extended the application deadline because he did not want the Plaintiff to be the acting chair, lying about his reason for the extension; (2) stated a preference for a full professor but hired an associate professor; and (3) did not use a legitimate procedure when he invited feedback on the candidates from faculty and staff. The Court finds that these actions do not establish pretext.

As to her first argument, although the facts when viewed in the light most favorable to the Plaintiff support a reasonable inference that Friedman extended the deadline so Huffman could also apply for the acting chair position, the Plaintiff does not point to any facts supporting the reasonable inference that Friedman did not want the Plaintiff to be acting chair or extended the deadline because of animus for the Plaintiff's race or national origin. *See Chatman v. Bd. of Educ. of City of Chi*., 5 F.4th 738, 747 (7th Cir. 2021) ("Yet, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext *for the prohibited animus*." (emphasis added) (cleaned up)). As to her second argument, the Plaintiff cites no legal

authority that suggests that an employer's failure to hire an employee with a stated preference is evidence of pretext when the hired employee does not have the preference but has other relevant qualifications that the plaintiff does not. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). For her third argument, the Plaintiff cites a Purdue policy that defines "voting faculty" and another policy that applies to hiring a new department chair and addresses voting.[15] However, she cites no evidence that hiring for an acting chair position or eliciting feedback are governed by this policy. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 507 (7th Cir. 2014) (holding that the plaintiff's pretext argument failed when the defendant did not violate its own policy by terminating her employment without a prior warning). Thus, the Court concludes that the Plaintiff has not pointed to evidence showing that the Defendants' legitimate, nondiscriminatory reasons were a pretext for discrimination.

Even if the Plaintiff had offered evidence to dispute the Defendants' reasons, the Plaintiff does not say how or even try to show that Friedman or Drummond, the decisionmakers for hiring the acting chair, did not honestly believe the stated reasons for not hiring her and thus waives any such argument. Therefore, the Plaintiff has not shown pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in the reasons stated by Purdue, Friedman, and Drummond "that a reasonable person could find them unworthy of credence and hence infer that [Purdue or Drummond] did not act for the asserted non-

---

[15] The Purdue policy provides, "Voting Faculty shall consist of those full-time member of the faculty . . ." Pl. Ex. C, Ex. 1, p. 1, ECF No. 132-3, p. 2 of 40. Another Purdue policy provides rules for the "Appointment of New Chair" when "the incumbent Chair succumbs, resigns, or is unwilling to serve an additional term[,]" which also includes rules for voting. Pl. Ex. C, Ex. 18, p. 1, ECF No. 132-3, p. 37 of 40.

discriminatory reasons." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (quoting

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Furthermore, even if the Plaintiff had shown that the Defendants' legitimate reasons were

lies, the Plaintiff points to no specific examples, whether verbal or non-verbal, from which a jury

might infer her Asian race or Chinese ethnicity motivated the Defendants not to hire her.

"[I]dentifying an inconsistency (or even a lie) is not necessarily sufficient to prove that the

employer's rationale was pretext for discrimination." *Groves*, 51 F.4th at 770. "What ultimately

matters is causation: the plaintiff must point to evidence that would allow a jury to find a

connection between the statutorily protected factor (here, race [and national origin]) and the

adverse action. . . ." *Id*. (cleaned up). "Right to it, the controlling question is whether a

reasonable jury could find prohibited discrimination." (cleaned up).

In this case, a reasonable jury could not find prohibited discrimination. Rather than

identifying evidence from which a reasonable factfinder could conclude that Purdue, Friedman,

or Drummond did not hire the Plaintiff for the acting chair position because she was Asian or

Chinese, the Plaintiff contends that "Drummond and Friedman . . . backed down on procedure

and on full professor preference" "[b]ecause Plaintiff was a full professor and Chinese," which

"can be inferred from the behind-the-scene email exchanges between Huffman, Friedman, and

Drummond." Pl. Br. 15 (citing Pl. Ex. F, Ex. 18, p. 1–6, ECF No. 132-5, p. 52–57 of 106).

However, the Plaintiff does not point to facts or details in the email communication that show

Drummond and Friedman decided not to hire the Plaintiff because she is Asian or Chinese. A

review of the referenced series of emails shows most are to or from Friedman or Drummond, are

about the interim chair position, and involve these topics: the selection process, the selection

results, and reconsideration of the selection results. But there is no indication in any of the emails

that the hiring decision for the position had anything to do with the Plaintiff's race or national origin. Thus, the emails cannot support the Plaintiff's Title VII and § 1981 discrimination claims.

At most, the record contains the Plaintiff's personal belief that she was not hired for the interim chair position due to her race or national origin. Contrary to the Plaintiff's assertion, "these personal beliefs are insufficient to give rise to a genuine factual dispute over whether [the Plaintiff] was the victim of race . . . discrimination." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (cleaned up). Accordingly, the Plaintiff has failed to establish pretext. As a result, Purdue is entitled to summary judgment on her Title VII discrimination claim, and Whalen and Drummond are entitled to summary judgment on her § 1981 discrimination claim. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments on whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901 ("[The court] need not address any of the plaintiffs' arguments with respect to whether they have established a prima facie case because, even if [the court] assume[s] that the plaintiffs have met this burden, [the court] still must hold that they have failed to produce sufficient evidence of pretext."). Therefore, the Court grants summary judgment in favor of Purdue on the Plaintiff's Title VII discrimination claim and in favor of Drummond and Whalen on the Plaintiff's § 1981 discrimination claim based on the Defendants' failure to hire her for the acting chair position.

b.    Editor-in-Chief of *Clio*—§ 1981 Discrimination Claim Against Defendant Drummond and Defendant Whalen

Assuming, without deciding, that the Plaintiff has established a prima facie case, Defendants Drummond and Whalen are still entitled to summary judgment on the Plaintiff's § 1981 discrimination claim against them. To begin with, in her response brief, the Plaintiff only alleges discriminatory conduct within the limitations period on behalf of Defendant Drummond

29

for not hiring her as editor-in-chief. As discussed above, she does not allege any discriminatory conduct by Whalen within the limitations period. Thus, the Plaintiff's claim for discrimination against Defendant Whalen under § 1981 fails.

Defendant Drummond has presented legitimate, nondiscriminatory reasons for not hiring the Plaintiff as editor-in-chief of *Clio*, and the Plaintiff has not pointed to evidence showing that those reasons were a pretext for unlawful discrimination. The legitimate, nondiscriminatory reasons Drummond presented for not hiring the Plaintiff as editor-in-chief are that she (1) she lacked administrative experience; and (2) she had less editorial experience and peer review experience than the candidate selected for the position. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived.[16] Accordingly, the Court concludes that Defendant Drummond has met his burden of producing nondiscriminatory justifications for not appointing the Plaintiff as editor-in-chief of *Clio*. The burden then shifts to the Plaintiff to establish pretext.

The Plaintiff argues that Drummond's legitimate, nondiscriminatory reasons are pretextual because Drummond should not have been in the position to make the decision on the *Clio* editor-in-chief for the reason that he has no experience.[17] However, the Plaintiff does not point to facts or details establishing animus for the Plaintiff's race was the reason that Drummond was given the authority to make the decision on the *Clio* editor-in-chief. *See Chatman*, 5 F.4th at 747. Therefore, the Court concludes that the Plaintiff has not pointed to evidence showing that Drummond's legitimate, nondiscriminatory reasons were a pretext for unlawful discrimination.

---

[16] *See Xiong*, 62 F.4th at 354; *Tyburski*, 964 F.3d at 600; *Coleman*, 690 F.3d at 819.
[17] To the extent that the Plaintiff also references conduct in 2014–2016 occurring before December 18, 2016, consideration of these events as evidence of pretext is barred by the statute of limitations as set forth above.

Even if the Plaintiff had offered evidence showing Drummond had no experience, the Plaintiff does not say how or even try to show that Drummond, one of the decisionmakers for appointing the *Clio* editor-in-chief, did not honestly believe the stated reasons for not appointing her and thus waives any such argument.[18] Thus, the Plaintiff has not shown pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in Drummond's stated reasons "that a reasonable person could find them unworthy of credence and hence infer that [Drummond] did not act for the asserted non-discriminatory reasons." *Bates*, 726 F.3d at 956 (quoting *Boumehdi*, 489 F.3d at 792).

At most, the record contains the Plaintiff's personal belief that she was not hired as editor-in-chief because of her race. Again, contrary to the Plaintiff's assertion, "these personal beliefs are insufficient to give rise to a genuine factual dispute over whether [the Plaintiff] was the victim of race . . . discrimination." *Abrego*, 907 F.3d at 1014. Accordingly, the Plaintiff has failed to establish pretext, and Defendants Drummond and Whalen are entitled to summary judgment on her § 1981 discrimination claim. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments on whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901. Accordingly, the Court grants summary judgment in favor of Defendants Drummond and Whalen on the Plaintiff's § 1981 discrimination claim.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendants' Motion for Summary Judgment [ECF No. 121], and DENIES as moot the Plaintiff's Motion to Expedite

---

[18] Because the Plaintiff does not mention Rachel Hile, another decisionmaker for the editor-in-chief position, and there is no indication that any racial or national origin animus was involved in Hile's decision, the Court need not address her role in the decision making process.

Summary Judgment Ruling [ECF No. 142]. The Court DIRECTS the Clerk of Court to enter

judgment:

1.      in favor of The Defendant Trustees of Purdue University and against the Plaintiff Lidan
        Lin on her claim for discrimination under Title VII;

2.      in favor of Defendants Carl Drummond and Lachlan Whalen and against the Plaintiff
        Lidan Lin on her claims under § 1981 for discrimination, retaliation, and hostile work
        environment.

The Plaintiff takes nothing by her Fifth Amended Complaint. The Clerk of Court is directed to

close this case.

        SO ORDERED on April 17, 2024.

                                 s/ Theresa L. Springmann
                                JUDGE THERESA L. SPRINGMANN
                                UNITED STATES DISTRICT COURT