APPEAL,BRIGHT−LN,PROTO,TERMED

# U.S. District Court Northern District of Indiana [LIVE]
## USDC Northern Indiana (Lafayette)
## CIVIL DOCKET FOR CASE #: <u>4:20−cv−00097−TLS</u>

| | |
|---|---|
| Lin v. Drummond et al | Date Filed: 12/18/2020 |
| Assigned to: Judge Theresa L Springmann | Date Terminated: 04/17/2024 |
| Cause: 42:1983 Civil Rights (Employment Discrimination) | Jury Demand: Plaintiff |
| | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Federal Question |

| | |
|---|---|
| Discovery Deadline: | Settlement Conference: |
| Dispositive Motion Deadline: | Final Pretrial Conference: |
| Expert Discovery Deadline: | Trial Date: |

**Mediator**

**Anthony M Stites**

**Plaintiff**

**Lidan Lin**                    represented by    **Lidan Lin**
11355 Affinity Ct
#190
San Diego, CA 92131
260−249−0497
PRO SE

**Christopher C Myers**
Myers Smith Wallace LLP
809 S Calhoun St Ste 400
Fort Wayne, IN 46802
260−424−0600
Fax: 260−424−0712
Email: cmyers@myers−law.com
*TERMINATED: 10/26/2022*

V.

**Defendant**

**Carl Drummond**                represented by    **Kathleen M Anderson**
Barnes & Thornburg LLP − FW/IN
888 S Harrison St Ste 600
Fort Wayne, IN 46802
260−425−4657
Fax: 260−424−8316
Email: kathleen.anderson@btlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carolina Flores**

Barnes & Thornburg LLP − FW/IN
888 S Harrison St Ste 600
Fort Wayne, IN 46802
260−425−4639
Fax: 260−424−8316
Email: carolina.flores@btlaw.com
*TERMINATED: 05/03/2021*

**Justine L Farris−Niehaus**
Barnes & Thornburg LLP − Ind/IN
11 S Meridian St
Indianapolis, IN 46204−3535
317−236−1313
Fax: 317−231−7433
Email: Justine.Farris@btlaw.com
*TERMINATED: 05/22/2023*

**Defendant**

**Lachlan Whalen**                    represented by    **Kathleen M Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carolina Flores**
(See above for address)
*TERMINATED: 05/03/2021*

**Justine L Farris−Niehaus**
(See above for address)
*TERMINATED: 05/22/2023*

**Defendant**

**Purdue University**                  represented by    **Kathleen M Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carolina Flores**
(See above for address)
*TERMINATED: 05/03/2021*

**Justine L Farris−Niehaus**
(See above for address)
*TERMINATED: 05/22/2023*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/2024 | 164 | Appellant's BRIEF by Lidan Lin. (ash) (Entered: 06/25/2024) |
| 06/25/2024 | 163 | Docketing Statement re: 162 Notice of Appeal filed by Lidan Lin. (ash) (Entered: 06/25/2024) |

| | | |
|---|---|---|
| 06/25/2024 | 162 | NOTICE OF APPEAL as to 145 Opinion and Order and 146 Clerks Judgment by Lidan Lin. (ash) (Entered: 06/25/2024) |
| 06/25/2024 | 161 | REQUEST for Access to the Court's Electronic Docketing System by Plaintiff Lidan Lin. (ash) (Entered: 06/25/2024) |
| 06/25/2024 | 160 | NOTICE of Change of Address by Lidan Lin from 7205 Sandyridge Place Fort Wayne, IN 46835 to 11355 Affinity Ct #190 San Diego, CA 92131 (ash) (Entered: 06/25/2024) |
| 06/12/2024 | 159 | OPINION AND ORDER: The Court DENIES the relief requested in the Plaintiff's Amended Motion to Alter and Amend Judgment to Grant Plaintiff's Motions 153 . The Court DENIES as moot the Plaintiff's Motion to Alter and Amend Judgment and Orders 152 based on her filing of 153 . Signed by Judge Theresa L Springmann on 6/12/24. (Copy mailed to pro se party). (nhc) (Entered: 06/12/2024) |
| 05/30/2024 | 158 | Pursuant to * 147 Bill of Costs filed by Carl Drummond, Lachlan Whalen, Purdue University and 157 Opinion and Order,, Terminate Motions, *, Costs are hereby taxed in the amount of $ *4,564.20* against *Lidan Lin*. (jdb) (Entered: 05/30/2024) |
| 05/29/2024 | 157 | OPINION AND ORDER: The Court hereby OVERRULES the Plaintiff's Amended Opposition to the Defendants' Bill of Costs 154 and GRANTS the Defendants' Bill of Costs 147 . The Court OVERRULES as moot the Plaintiff's Opposition to the Defendants' Bill of Costs 152 . Signed by Judge Theresa L Springmann on 05/29/2024. (Copy mailed to pro se party) (jdb) (Entered: 05/30/2024) |
| 05/28/2024 | 156 | Plaintiff's REPLY to Response to Motion re 152 MOTION, 153 MOTION filed by Lidan Lin. (sej) (Entered: 05/28/2024) |
| 05/23/2024 | 155 | RESPONSE to Motion re 152 MOTION, 153 MOTION *(Defendants' Opposition to Plaintiff's Motion to Alter and Amend Judgment and Orders)* filed by Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 05/23/2024) |
| 05/16/2024 | 154 | AMENDED OPPOSITION to Defendants' 147 Bill of Costs by Lidan Lin. (sej) (Entered: 05/17/2024) |
| 05/16/2024 | 153 | AMENDED MOTION to Alter and Amend Judgment and to Grant Plaintiff's Motions by Plaintiff Lidan Lin. (Attachments: # 1 Appendix)(sej) (Entered: 05/17/2024) |
| 05/14/2024 | 152 | MOTION to Alter and Amend Judgment and Orders by Plaintiff Lidan Lin. (sej) (Entered: 05/14/2024) |
| 05/14/2024 | 151 | RESPONSE in Opposition to Defendants' 147 Bill of Costs by Lidan Lin. (sej) (Entered: 05/14/2024) |
| 05/01/2024 | 150 | Pursuant to * 147 Bill of Costs filed by Carl Drummond, Lachlan Whalen, Purdue University *, costs in the amount of $ *4,564.20* will be taxed by the Clerk on *5/15/2024*. (Copy mailed to Lidan Lin) (ash) Modified on 5/1/2024 to add routing (ash). (Entered: 05/01/2024) |
| 04/30/2024 | 148 | BRIEF re 147 Bill of Costs . (Anderson, Kathleen) (Entered: 04/30/2024) |
| 04/30/2024 | 147 | BILL OF COSTS by Carl Drummond, Purdue University, Lachlan Whalen. (Attachments: # 1 Declaration of Kathleen Anderson, # 2 Exhibit A − Invoices, # 3 Exhibit B − Invoices)(Anderson, Kathleen) (Entered: 04/30/2024) |

| 04/29/2024 | 149 | PROOF OF SERVICE Executed 04/26/2024 as to 145 Opinion and Order, 146 Clerks Judgment. (jdb) (Entered: 04/30/2024) |
| 04/17/2024 | 146 | CLERK'S ENTRY OF JUDGMENT. (Copy mailed to pro se party, certified mail, #7099 3400 0003 4513 3715) (jdb) Modified on 4/17/2024 to add certified mail routing (nhc). (Entered: 04/17/2024) |
| 04/17/2024 | 145 | OPINION AND ORDER: The Court hereby GRANTS the Defendants' Motion for Summary Judgment 121 , and DENIES as moot the Plaintiff's Motion to Expedite Summary Judgment Ruling 142 . The Court DIRECTS the Clerk of Court to enter judgment in favor of The Defendant Trustees of Purdue University and against the Plaintiff Lidan Lin on her claim for discrimination under Title VII; in favor of Defendants Carl Drummond and Lachlan Whalen and against the Plaintiff Lidan Lin on her claims under § 1981 for discrimination, retaliation, and hostile work environment. The Plaintiff takes nothing by her Fifth Amended Complaint. The Clerk of Court is directed to close this case. Signed by Judge Theresa L Springmann on 04/17/2024. (Copy mailed to pro se party, certified mail, #7099 3400 0003 4513 3715) (jdb) Modified on 4/17/2024 to add certified mail routing (nhc). (Entered: 04/17/2024) |
| 04/17/2024 | 144 | OPINION AND ORDER: The Court hereby DENIES the Plaintiff's Amended Motion to Seal Document 140 and DIRECTS the Clerk of Court to UNSEAL the document filed under seal 129 . Signed by Judge Theresa L Springmann on 04/17/2024. (Copy mailed to pro se party) (jdb) (Entered: 04/17/2024) |
| 04/17/2024 | 143 | ORDER: The Court hereby DENIES the Plaintiff's motion 141 . Signed by Judge Theresa L Springmann on 04/17/2024. (Copy mailed to pro se party) (jdb) (Entered: 04/17/2024) |
| 04/09/2024 | 142 | MOTION to Expedite Summary Judgment Ruling by Plaintiff Lidan Lin. (sej) (Entered: 04/09/2024) |
| 04/09/2024 | 141 | MOTION to Sanction Defendant Whalen and to Discipline Defense Attorneys by Plaintiff Lidan Lin. (sej) (Entered: 04/09/2024) |
| 04/05/2024 | 140 | Amended MOTION to Seal Documents by Plaintiff Lidan Lin. (sej) (Entered: 04/08/2024) |
| 03/19/2024 | 139 | OPINION AND ORDER: The Court DENIES without prejudice the Plaintiff's Motion to Seal Documents 128 . The Court SETS a deadline of 4/5/2024, for the motion to be refiled. If the motion is not filed by the deadline, the Court will order the documents 129 unsealed. Signed by Judge Theresa L Springmann on 3/19/2024. (Copy mailed to pro se party)(ash) (Entered: 03/20/2024) |
| 02/07/2024 | 138 | Reply to Plaintiff's Response to 131 STATEMENT *(Defendants' Reply to Plaintiff's Responses to Local Rule 56−1 Statement of Material Facts and Responses to Additional Material Facts Provided by Plaintiff)* re 131 Response/Reply filed by Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) Modified on 2/8/2024 to reflect title of document (jdb). (Entered: 02/07/2024) |
| 02/07/2024 | 137 | REPLY to Response to Motion re 121 MOTION for Summary Judgment filed by Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 02/07/2024) |
| 02/02/2024 | 136 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court, being duly advised, GRANTS the 135 Motion for Extension of Time to File Reply. Defendant's Reply to |

| | | |
|---|---|---|
| | | their motion for summary judgment to be filed by 2/7/2024(copy mailed to pro se party) (jss) (Entered: 02/02/2024) |
| 02/01/2024 | 135 | MOTION for Extension of Time to File Response/Reply as to 130 Response to Motion, 131 Response/Reply by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 02/01/2024) |
| 01/30/2024 | 134 | SUPPLEMENT to 128 MOTION to Seal Documents filed by Lidan Lin. (sej) (Entered: 01/30/2024) |
| 01/23/2024 | 133 | SUPPLEMENT to 130 Response to Defendants 121 MOTION for Summary Judgment, (incorrectly) titled as Notice of Changes to Dkt 131 filed by Lidan Lin. (ash) Modified on 1/30/2024 to update (mrm). (Entered: 01/24/2024) |
| 01/18/2024 | 132 | APPENDIX of Evidence in Opposition to Defendant's 121 MOTION for Summary Judgment by Lidan Lin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit E, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I)(sej) (Entered: 01/19/2024) |
| 01/18/2024 | 131 | RESPONSE to Defendants' Statement of Material Facts (ECF 122 −1) by Lidan Lin. (Attachments: # 1 Cover Letter)(sej) (Entered: 01/19/2024) |
| 01/18/2024 | 130 | RESPONSE to Defendants 121 MOTION for Summary Judgment filed by Lidan Lin. (Attachments: # 1 Cover Letter)(sej) (Entered: 01/19/2024) |
| 01/18/2024 | 129 | ***UNSEALED per 144 Opinion and Order*** Sealed Document re 128 MOTION to Seal. (sej) Modified on 4/17/2024 to unseal(jdb). (Entered: 01/19/2024) |
| 01/18/2024 | 128 | MOTION to Seal Documents by Plaintiff Lidan Lin. (sej) (Entered: 01/19/2024) |
| 01/05/2024 | 127 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court, being duly advised, GRANTS Plaintiff's 126 Motion for Extension of Time to File Response to Motion for Summary Judgment. Response to be filed by 1/18/2024 (Copy mailed to pro se party)(jss) (Entered: 01/05/2024) |
| 01/04/2024 | 126 | MOTION for Reseeting the Deadline for Filing Plaintiff's Response to Defendant's Motion for Summary Judgment 121 by Plaintiff Lidan Lin. (ash) (Entered: 01/04/2024) |
| 12/27/2023 | 125 | NOTICE of Change of Address by Lidan Lin from 11355 Affinity Ct. #190, San Diego, CA 92131 to 7205 Sandyridge Place, Fort Wayne, IN 46835. (Attachments: # 1 Envelope)(sej) (Entered: 12/28/2023) |
| 12/12/2023 | 124 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court, noting that there has been no objection filed, GRANTS the 120 Motion for Extension of Time to File Dispositive Motions. Dispositive motions to be filed by 12/11/2023 (jss) (Entered: 12/12/2023) |
| 12/11/2023 | 123 | APPENDIX to 122 Brief in Support, 121 MOTION for Summary Judgment by Carl Drummond, Purdue University, Lachlan Whalen. (Attachments: # 1 Exhibit 1 − Plaintiff's Deposition Excerpts and Exhibits, # 2 Exhibit 2 − Declaration of Carl Drummond, # 3 Exhibit 3 − Declaration of Ronald Friedman, # 4 Exhibit 4 − Declaration of Lachlan Whalen, # 5 Exhibit 5 − Declaration of Kathleen Anderson)(Anderson, Kathleen) (Entered: 12/11/2023) |
| 12/11/2023 | 122 | BRIEF in Support of 121 MOTION for Summary Judgment filed by Lachlan Whalen, Purdue University, Carl Drummond. (Attachments: # 1 Local Rule 56−1 |

| | | |
|---|---|---|
| | | Statement of Material Facts, # 2 Notice Pro Se Litigant − Summary Judgment Motion)(Anderson, Kathleen) (Entered: 12/11/2023) |
| 12/11/2023 | 121 | MOTION for Summary Judgment by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 12/11/2023) |
| 11/28/2023 | 120 | MOTION for Extension of Time to File *Dispositive Motions* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 11/28/2023) |
| 10/05/2023 | 119 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court, being duly advised, GRANTS the 118 Motion for Resetting Deadline for Filing Dispositive Motions. Dispositive motions to be filed by 11/30/2023. (copy mailed to pro se party) (jss) (Entered: 10/05/2023) |
| 09/20/2023 | 118 | MOTION for Reseeting the Deadline for Filing the Dispositive Motions by Plaintiff Lidan Lin. (Attachments: # 1 Cover Letter, # 2 Exhibit, # 3 Envelope)(sej) (Entered: 09/20/2023) |
| 06/09/2023 | 117 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court being duly advised GRANTS 111 MOTION filed by Lidan Lin. Dispositive motions to be filed by 10/30/2023. (Copy mailed to pro se party)(rs) (Entered: 06/09/2023) |
| 06/07/2023 | 116 | Plaintiff Lin address updated per DE 112 filing. (sej) (Entered: 06/07/2023) |
| 06/01/2023 | 115 | OPINION AND ORDER: The Court hereby DENIES the Plaintiff's Motion for Sealing Documents #111 and #112 114 and DIRECTS the Clerk of Court to UNSEAL the two documents filed under seal 111 , 112 . Signed by Judge Theresa L Springmann on 06/01/2023. (Copy mailed to pro se party) (jdb) (Entered: 06/01/2023) |
| 05/26/2023 | | ***Deadlines/Hearings terminated. Motions Deadline (Non−Disp.) terminated per Motion filing DE 114 (sej) (Entered: 05/26/2023) |
| 05/26/2023 | 114 | MOTION to Seal by Plaintiff Lidan Lin. (sej) (Entered: 05/26/2023) |
| 05/23/2023 | 113 | OPINION AND ORDER: The Court hereby DENIES without prejudice the Plaintiffs Motion for Making Confidential Two Documents 110 . The Court SETS a deadline of 05/30/2023, for the motion to be refiled. If the motion is not filed by the deadline, the Court will order both documents 111 , 112 unsealed. Signed by Judge Theresa L Springmann on 05/23/2023. (Copy mailed to pro se party)(sej) (Entered: 05/23/2023) |
| 05/22/2023 | 109 | ORDER FOR JUDGE THERESA L SPRINGMANN: The court being duly advised GRANTS 108 Motion to Withdraw as Attorney. The appearance of Attorney Justine L Farris−Niehaus is WITHDRAWN. (Copy mailed to pro se party)(rs) (Entered: 05/22/2023) |
| 05/19/2023 | 112 | Sealed Document by Plaintiff Lidan Lin. (sej) (Entered: 05/22/2023) |
| 05/19/2023 | 111 | SEALED MOTION by Plaintiff Lidan Lin. (sej) (Entered: 05/22/2023) |
| 05/19/2023 | 110 | MOTION to Seal by Plaintiff Lidan Lin. (sej) (Entered: 05/22/2023) |
| 05/18/2023 | 108 | MOTION to Withdraw as Attorney by Defendant Purdue University. (Farris−Niehaus, Justine) (Entered: 05/18/2023) |
| 04/26/2023 | 107 | |

| | | |
|---|---|---|
| | | ORDER FOR JUDGE THERESA L SPRINGMANN: Dispositive motions to be filed by 6/26/2023 and to be briefed in accordance with Local District Rules. In the alternative, parties may jointly request trial date by written notice on or before 5/26/2023. (Copy mailed to pro se party) Modified on 4/26/2023 (rs). (Entered: 04/26/2023) |
| 04/26/2023 | | Magistrate Judge Joshua P Kolar no longer assigned to case. (rs) (Entered: 04/26/2023) |
| 04/26/2023 | 106 | ORDER FOR JUDGE THERESA L SPRINGMANN: Discovery now complete, the court WITHDRAWS the referral to Magistrate Judge Kolar. (Copy mailed to pro se party)(rs) (Entered: 04/26/2023) |
| 03/13/2023 | 105 | NOTICE by Lidan Lin *Withdrawal of Attorney Fee/Cost Lien* (Attachments: # 1 Exhibit A)(Myers, Christopher) (Entered: 03/13/2023) |
| 03/09/2023 | 104 | NOTICE by Lidan Lin *of Attorney Fee Lien* (Myers, Christopher) (Entered: 03/09/2023) |
| 03/01/2023 | 103 | ORDER: The Court DENIES Plaintiff's amended motion to compel discovery responses 97 and Plaintiff's amended motion seeking discovery sanctions 98 . Signed by Magistrate Judge Joshua P Kolar on 3/1/23. (Copy mailed to pro se party). (nhc) (Entered: 03/01/2023) |
| 01/23/2023 | 102 | REPLY Brief to Defendant's 100 Response to Motion re 97 MOTION to Compel filed by Lidan Lin. (Attachments: # 1 Appendix 4, # 2 Appendix 3, # 3 Appendix 1, # 4 Appendix 5)(sej) (Entered: 01/24/2023) |
| 01/23/2023 | 101 | REPLY Brief to Defendant's 100 Response to Motion re 98 MOTION for Sanction filed by Lidan Lin. (Attachments: # 1 Appendix 1)(sej) (Entered: 01/24/2023) |
| 01/19/2023 | 100 | RESPONSE to Motion re 97 MOTION to Compel, 98 MOTION for Sanctions filed by Carl Drummond, Purdue University, Lachlan Whalen. (Farris−Niehaus, Justine) (Entered: 01/19/2023) |
| 01/12/2023 | 99 | ORDER: In view of Plaintiff's Amended Motions [ 97 , 98 ], Plaintiff's prior motions [ 91 , 92 ] are DENIED AS MOOT. Defendants may file any response to the amended motions by 1/19/2023. If no response is filed, the Court will construe Defendants' prior response 95 as their response to the amended motions. Approved by Magistrate Judge Joshua P Kolar on 1/12/2023. Text entry order. cc: Lin (tc) (Entered: 01/12/2023) |
| 01/05/2023 | 98 | Amended MOTION to Sanction by Plaintiff Lidan Lin. (sej) (Entered: 01/05/2023) |
| 01/05/2023 | 97 | Amended MOTION to Compel by Plaintiff Lidan Lin. (sej) (Entered: 01/05/2023) |
| 11/17/2022 | | ***Deadline terminated. (tc) (Entered: 11/17/2022) |
| 11/17/2022 | 96 | ORDER: Finding good cause for the requested extension, the Court GRANTS 94 Motion to Extend Dispositive Motion Deadline. The dispositive motion deadline is VACATED, to be reset after resolution of the pending motions. Approved by Magistrate Judge Joshua P Kolar on 11/17/2022. Text entry order. (Copy mailed to pro se party)(tc) (Entered: 11/17/2022) |
| 11/17/2022 | 95 | RESPONSE to Motion re 91 MOTION to Compel, 92 MOTION for Sanctions *Related to Stipulated Protective Order* filed by Carl Drummond, Purdue University, Lachlan Whalen. (Attachments: # 1 Exhibit A)(Anderson, Kathleen) (Entered: |

| | | |
|---|---|---|
| | | 11/17/2022) |
| 11/16/2022 | 94 | MOTION to extend dispositive motion deadline *until after Briefing on Plaintiff's Motion to Compel and Motion for Sanctions* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 11/16/2022) |
| 11/09/2022 | 93 | ORDER FOR JUDGE THERESA L SPRINGMANN: The case is referred to Magistrate Judge Kolar to rule on pending non dispositve motions and any other non dispositve motions that are filed. (Copy mailed to pro se party)(rs) (Entered: 11/09/2022) |
| 11/09/2022 | | Magistrate Judge Joshua P Kolar added. (rs) (Entered: 11/09/2022) |
| 11/03/2022 | 92 | MOTION to Sanction Defendant Whalen for Violating the Court's Protective Order by Plaintiff Lidan Lin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (sej) (Entered: 11/07/2022) |
| 11/03/2022 | 91 | MOTION to Compel Discovery Responses and to Santion Defendants for Failure to Make Disclosures and to Cooperate in Discovery by Plaintiff Lidan Lin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(sej) (Entered: 11/07/2022) |
| 11/03/2022 | 90 | NOTICE: Because the discovery period in this case has now concluded and there are no pending non−dispositive motions, the referral to Magistrate Judge Joshua P Kolar is now terminated. All further matters will now be handled by Judge Theresa L Springmann unless otherwise directed. This entry constitutes the court's order on this matter and shall carry the same weight and authority as a written order signed by the judge. cc: Pro se Pltf (tc) (Entered: 11/03/2022) |
| 10/31/2022 | 89 | TELEPHONIC STATUS CONFERENCE held on 10/31/2022, before Magistrate Judge Joshua P Kolar. Pla appeared pro se. Dfts appeared by attys Kathleen Anderson, Justine Farris−Niehaus. The Court advises parties all substantive communications with the Court should be made through filings on the docket. Email communications through the Chamber's email address should include opposing counsel/parties and should not be used for substantive matters. Additionally, the Court RECONFIRMS that there is no motion pending at this time. cc: Pro se Pltf (Tape #ATT HOST.) (tc) (Entered: 10/31/2022) |
| 10/27/2022 | 88 | ORDER: Telephonic Status Conference set for 10/31/2022 at 01:45 PM (Central time) before Magistrate Judge Joshua P Kolar. Parties are instructed to dial 877−336−1280 and enter access code 3293676# when prompted to join the conference. Approved by Magistrate Judge Joshua P Kolar on 10/27/2022. Text entry order. (Copy mailed to pro se party)(tc) (Entered: 10/27/2022) |
| 10/26/2022 | 87 | TELEPHONIC STATUS CONFERENCE held on 10/26/2022, before Magistrate Judge Joshua P Kolar. Pla appeared w/atty Christopher Myers. Dfts appeared by attys Justine Farris−Niehaus, Kathleen Anderson. Discussion held as to 81 Motion to Withdraw. Court proceeds ex parte/sealed. Open court resumes. The Court finds there has been a breakdown in the atty/client relationship. Finding good cause show, the 81 Motion to Withdraw is GRANTED. The appearance of Attorney Christopher Myers on behalf of Pltf Lidan Lin is WITHDRAWN. Clerk of Court DIRECTED to show Pltf Lidan Lin as proceeding pro se. The 83 Motion to Seal is GRANTED. Parties to meet and confer as to any discovery disputes that may remain. The Court indicates DE 86 is not construed as a motion at this time. cc: Pro se pltf along w/copy of docket (Tape #FTR GOLD.) (tc) (Entered: 10/26/2022) |

| | | |
|---|---|---|
| 10/18/2022 | 86 | NOTICE by Lidan Lin *of Filing of Motion to Compel by Lidan Lin* (Attachments: # 1 Exhibit Motion to Compel)(Myers, Christopher) (Entered: 10/18/2022) |
| 10/17/2022 | 85 | MINUTE ORDER: Telephonic Status Conference re 81 Motion to Withdraw set for 10/26/2022 at 10:00 AM (Central time) before Magistrate Judge Joshua P Kolar. Counsel and Plaintiff Lidan Lin to participate in this conference. Attorney Christopher Myers is directed to inform Plaintiff Lidan Lin of the conference and provide her with a copy of the entry. Approved by Magistrate Judge Joshua P Kolar on 10/17/2022. Text entry order. (tc) (Entered: 10/17/2022) |
| 10/11/2022 | 84 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court refers the case to Magistrate Judge Kolar, for purposes of resolving all pending motions and other non dispositive matters including resetting the dispositive motions deadline if necessary. (rs) (Entered: 10/11/2022) |
| 10/11/2022 | | Magistrate Judge Joshua P Kolar added. (rs) (Entered: 10/11/2022) |
| 10/10/2022 | 83 | MOTION to Seal by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 10/10/2022) |
| 10/10/2022 | 82 | Sealed Document re 81 MOTION to Withdraw as Attorney . (Myers, Christopher) (Entered: 10/10/2022) |
| 10/10/2022 | 81 | MOTION to Withdraw as Attorney by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 10/10/2022) |
| 09/06/2022 | 80 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court being duly advised GRANTS 79 Motion for Extension of Time to Complete Discovery. Discovery to be completed by 10/6/2022. Any further request to extend this deadline will be viewed with disfavor and will require a hearing. Dispositive motions to be filed by 11/21/2022. (rs) (Entered: 09/06/2022) |
| 09/02/2022 | 79 | MOTION for Extension of Time to Complete Discovery by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 09/02/2022) |
| 09/01/2022 | 78 | NOTICE: Because the discovery period in this case has now concluded and there are no pending non−dispositive motions, the referral to Magistrate Judge Joshua P Kolar is now terminated. All further matters will now be handled by Judge Theresa L Springmann unless otherwise directed. This entry constitutes the court's order on this matter and shall carry the same weight and authority as a written order signed by the judge. (tc) (Entered: 09/01/2022) |
| 07/06/2022 | 77 | ORDER: Finding good cause shown and noting the agreement of the parties, the Court GRANTS 76 Joint Motion for Extension of Discovery Deadline. The deadline to complete discovery is extended to 8/31/2022, for the limited purposes described in the motion. Any further requests to extend discovery may require a hearing. Approved by Magistrate Judge Joshua P Kolar on 7/6/2022. Text entry order. (tc) (Entered: 07/06/2022) |
| 07/01/2022 | 76 | Joint MOTION for Extension of Time to Complete Discovery *Deadline for Certain Defined Limited Discovery Activity* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 07/01/2022) |
| 06/27/2022 | 75 | SETTLEMENT CONFERENCE held via Zoom on 6/27/2022, before Magistrate Judge Joshua P Kolar. Pla appeared by atty Christopher Myers. Dft appeared by atty Kathleen Anderson w/Trent Klengerman. Settlement not reached. (tc) (Entered: 06/27/2022) |

| 06/16/2022 | 74 | In Person SETTLEMENT CONFERENCE held on 6/16/22 before Magistrate Judge Joshua P Kolar. Pla appeared by atty Christopher Myers. Dft appeared by atty Kathleen Anderson w/Trent Klengerman. Discussions held. The Court sets a Settlement Conference for 6/27/22 at 11:30 AM (Central Time) via Zoom before Magistrate Judge Joshua P Kolar. Pla and a representative of Dfts with settlement authority must appear at the settlement conference. (nal) (Entered: 06/17/2022) |
|---|---|---|
| 05/31/2022 | 73 | ORDER: The Court, finding good cause shown and noting the agreement of the parties, GRANTS 72 Agreed Joint Motion For Further Extension of Deadline For Additional Limited Discovery. The June 3, 2022 limited discovery deadline I EXTENDED to 7/1/2022. Approved by Magistrate Judge Joshua P Kolar on 5/31/2022. Text entry order. (tc) (Entered: 05/31/2022) |
| 05/31/2022 | 72 | Joint MOTION for Extension of Time to Complete Discovery *(Additional Limited Discovery)* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 05/31/2022) |
| 05/05/2022 | 71 | ORDER FOR SETTLEMENT CONFERENCE: In Person Settlement Conference set for 6/16/2022 09:15 AM (Eastern time) in US District Court − Lafayette before Magistrate Judge Joshua P Kolar. At least 5 days in advance of the conference, each party shall provide the court with a brief Confidential Settlement Memorandum pdf format to Kolar_Chambers@innd.uscourts.gov. Signed by Magistrate Judge Joshua P Kolar on 5/5/2022. (tc) (Entered: 05/05/2022) |
| 05/05/2022 | 70 | TELEPHONIC STATUS CONFERENCE held on 5/5/2022, before Magistrate Judge Joshua P Kolar. The granting 65 Joint Motion for Judicial Settlement Conference is GRANTED. In Person Settlement Conference set for 6/16/2022 09:15 AM (Eastern time) in US District Court − Lafayette before Magistrate Judge Joshua P Kolar. Written order to follow. (tc) (Entered: 05/05/2022) |
| 04/20/2022 | 69 | ORDER: Finding good cause shown and noting the parties' agreement, the Court GRANTS 68 Agreed Motion for Extension of Discovery Deadline. The discovery deadline is EXTENDED to 6/3/2022 for the limited purposes described in the motion. Dispositive motion deadline to be set by the presiding judge at a later time. Approved by Magistrate Judge Joshua P Kolar on 4/20/2022. Text entry order. (tc) (Entered: 04/20/2022) |
| 04/19/2022 | 68 | MOTION for Extension of Time to Complete Discovery *(Agreed Motion for 45 Day Limited Scope Extension of Discovery Deadline)* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 04/19/2022) |
| 04/15/2022 | 67 | MINUTE ORDER, Telephonic Status Conference set for 5/5/2022 01:00 PM (CENTRAL TIME) in US District Court − Hammond before Magistrate Judge Joshua P Kolar. Parties are instructed to dial 877−336−1280 and enter access code 3293676# when prompted to join the conference. Test entry only.Approved by Magistrate Judge Joshua P Kolar on 4/15/2022. (rs) (Entered: 04/15/2022) |
| 04/15/2022 | 66 | ORDER FOR JUDGE THERESA L SPRINGMANN: The case is referred to Magistrate Judge Kolar to conduct a settlement conference. (rs) (Entered: 04/15/2022) |
| 04/14/2022 | 65 | Joint MOTION for Judicial Settlement Conference by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 04/14/2022) |
| 02/25/2022 | 64 | |

|  |  | STIPULATED PROTECTIVE ORDER GRANTING 63 MOTION for Protective Order *(Stipulated Protective Order)* filed by Carl Drummond, Lachlan Whalen, Purdue University. Signed by Magistrate Judge Joshua P Kolar on 02/25/2022. (jdb) (Entered: 02/25/2022) |
|---|---|---|
| 02/24/2022 | 63 | MOTION for Protective Order *(Stipulated Protective Order)* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Farris−Niehaus, Justine) (Entered: 02/24/2022) |
| 12/22/2021 | 62 | ORDER: Finding good cause shown and noting the parties' agreement, the Court GRANTS 61 Joint Motion for Extension of Discovery Deadline and ORDERS that all discovery is to be completed by 4/19/2022. Approved by Magistrate Judge Joshua P Kolar on 12/22/2021. Text entry order. (tc) (Entered: 12/22/2021) |
| 12/21/2021 | 61 | Joint MOTION for Extension of Time to Complete Discovery by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Farris−Niehaus, Justine) (Entered: 12/21/2021) |
| 11/05/2021 | 60 | ANSWER to 59 Amended Complaint by Carl Drummond, Purdue University, Lachlan Whalen.(Anderson, Kathleen) (Entered: 11/05/2021) |
| 10/18/2021 | 59 | AMENDED COMPLAINT against All Defendants, filed by Lidan Lin. (Attachments: # 1 Exhibit A − Charge of Discrimination, # 2 Exhibit B − Statement of Complaint, # 3 Exhibit C − Notice of Rights)(Myers, Christopher) (Entered: 10/18/2021) |
| 10/18/2021 | 58 | ORDER: Having reviewed the motion, finding grounds to grant leave to amend the complaint pursuant to Fed. R. Civ. P. 15(a)(2), and noting the lack of objection, the Court GRANTS 56 Motion for Leave to File Amended Complaint, and ORDERS Plaintiff to file the Amended Complaint upon receipt of this order. The Court DENIES AS MOOT the motion 53 to strike the prior complaint. Approved by Magistrate Judge Joshua P Kolar on 10/18/2021. Text entry order. (tc) (Entered: 10/18/2021) |
| 09/29/2021 | 57 | MINUTE ORDER: The Court SETS the deadline for any Defendant to file a notice of intent to object to 56 Motion to File Fifth Amended Complaint to 10/5/2021. If any defendant intends to object, the basis for objection need not be presented until that defendant files its response within the timeframe required by N.D. Ind. L.R. 7−1. The Court further notes that if no notice of intent to object is filed, the Court intends to grant the motion. Approved by Magistrate Judge Joshua P Kolar on 9/29/2021. Text entry order. (tc) (Entered: 09/29/2021) |
| 09/28/2021 | 56 | MOTION to Amend/Correct 50 Amended Complaint by Plaintiff Lidan Lin. (Attachments: # 1 Exhibit Fifth Amended Complaint, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Myers, Christopher) (Entered: 09/28/2021) |
| 09/14/2021 | 55 | ANSWER to 50 Amended Complaint by Carl Drummond, Purdue University, Lachlan Whalen.(Anderson, Kathleen) (Entered: 09/14/2021) |
| 09/14/2021 | 54 | BRIEF in Support of 53 RULE 12(f) MOTION to Strike 50 Amended Complaint filed by Lachlan Whalen, Purdue University, Carl Drummond. (Farris−Niehaus, Justine) (Entered: 09/14/2021) |
| 09/14/2021 | 53 | RULE 12(f) MOTION to Strike 50 Amended Complaint by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Farris−Niehaus, Justine) (Entered: 09/14/2021) |

| | | |
|---|---|---|
| 09/09/2021 | 52 | ORDER: Finding good cause shown and noting the parties' agreement, the Court GRANTS 51 Defendants' Agreed Motion to Extend the Deadline for their Response to Fourth Amended Complaint, and EXTENDS Defendants' deadline to respond to the operative complaint to 9/14/2021. Approved by Magistrate Judge Joshua P Kolar on 9/9/2021. Text entry order. (tc) (Entered: 09/09/2021) |
| 09/07/2021 | 51 | MOTION for Extension of Time to File Answer re 50 Amended Complaint *(Defendants' Agreed Motion to Extend the Deadline for Their Response to Plaintiff's Fourth Amended Complaint)* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 09/07/2021) |
| 08/23/2021 | 50 | AMENDED COMPLAINT against All Defendants, filed by Lidan Lin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Myers, Christopher) (Entered: 08/23/2021) |
| 08/23/2021 | 49 | ORDER: Noting the lack of objection, and in the interest of justice pursuant to Federal Rule of Civil Procedure 15(a)(2), the Court hereby GRANTS 47 Motion to File Fourth Amended Complaint and ORDERS Plaintiff to file the Amended Complaint upon receipt of this order. Approved by Magistrate Judge Joshua P Kolar on 8/23/2021. Text entry order. (tc) (Entered: 08/23/2021) |
| 07/22/2021 | 48 | ORDER: The Court SETS the deadline for any Defendant to file a notice of intent to object to 47 Motion to File Fourth Amended Complaint to 7/29/2021. If any defendant intends to object, the basis for objection need not be presented until that defendant files its response within the timeframe required by N.D. Ind. L.R. 7−1. The Court further notes that if no notice of intent to object is filed, the Court intends to grant the motion. Approved by Magistrate Judge Joshua P Kolar on 7/22/2021. (rs) (Entered: 07/22/2021) |
| 07/21/2021 | 47 | MOTION to Amend/Correct 45 Amended Complaint by Plaintiff Lidan Lin. (Attachments: # 1 Exhibit 4th Amended Complaint, # 2 Exhibit Charge of Discrimination, # 3 Exhibit State of the Case, # 4 Exhibit Notice of rights)(Myers, Christopher) (Entered: 07/21/2021) |
| 07/13/2021 | 46 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court DENIES as MOOT 17 MOTION to Dismiss Plaintiff's Amended Complaint. (rs) (Entered: 07/13/2021) |
| 07/12/2021 | 45 | AMENDED COMPLAINT against All Defendants, filed by Lidan Lin. (Attachments: # 1 Exhibit A − Charge of Discrimination, # 2 Exhibit B − Statement of Complaint, # 3 Exhibit C − Notice of Rights)(Myers, Christopher) (Entered: 07/12/2021) |
| 07/01/2021 | 44 | RULE 16 PRELIMINARY PRETRIAL CONFERENCE held on 7/1/2021, before Magistrate Judge Joshua P Kolar. Pla appeared w/atty Christopher Myers. Dfts appeared by atty Kathleen Anderson. The Court DENIES AS MOOT 38 Motion to File Second Amended Complaint. The Court, noting agreement of the parties, GRANTS 43 Motion to File Third Amended Complaint. Plaintiff to file the Third Amended Complaint as a separate entry upon receipt of this order. The Report filed as DE 42 is ADOPTED as follows: Initial Disclosures to be exchanged by 7/27/2021. All discovery to be completed by 1/19/2022. Plaintiff expert witness disclosures and reports to be delivered to the defendant by 9/15/2021. Defendant expert witness disclosures and reports to be delivered to the plaintiff by 9/27/2021. The last date to seek leave of court to join additional parties and to amend the pleadings for Pltf is 7/21/2021; for Dfts is 7/28/2021. Parties anticipate the case should be ready for a 3−4 day jury trial by August 2022. Anthony M. Stites appointed as mediator. Results of |

|  |  | the mediation shall be filed with the court no later than 10 days before the final pretrial conference. All other agreements of the parties concerning discovery are adopted. Magistrate Consent forms due by 7/22/2021. All other dates/ddls to be set by presiding judge at a later time. (Tape #ATT HOST.) (tc) (Entered: 07/01/2021) |
| 07/01/2021 | 43 | MOTION to Amend/Correct 1 Pro Se Complaint by Plaintiff Lidan Lin. (Attachments: # 1 Exhibit 1 − Third Amended Complaint, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Myers, Christopher) (Entered: 07/01/2021) |
| 06/29/2021 | 42 | REPORT of Rule 26(f) Planning Meeting. (Anderson, Kathleen) (Entered: 06/29/2021) |
| 06/24/2021 | 41 | ORDER: Finding good cause shown and noting the parties' agreement, the Court GRANTS 40 Agreed Motion to Extend the Deadline to Respond to Plaintiff's Motion to Amend Complaint. Defendants' response to the 38 motion to amend the complaint is EXTENDED to 6/29/21. Approved by Magistrate Judge Joshua P Kolar on 6/24/2021. Text entry order. (tc) (Entered: 06/24/2021) |
| 06/22/2021 | 40 | MOTION for Extension of Time to File *Response to Plaintiff's Motion to file Second Amended Complaint by Five Business Days* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 06/22/2021) |
| 06/09/2021 | 39 | TELEPHONIC STATUS CONFERENCE held on 6/9/2021, before Magistrate Judge Joshua P Kolar. Pla appeared by atty Christopher Myers. Dfts appeared by atty Kathleen Anderson. Plaintiff requests additional time to submit a joint proposed discovery plan, no objection from Defense. By agreement, Telephonic Rule 16 Preliminary Pretrial Conference set for 7/1/2021 at 01:00 PM (Central time) before Magistrate Judge Joshua P Kolar. Parties are instructed to dial 877−336−1280 and enter access code 3293676# when prompted to join the conference. A joint proposed Discovery Plan to be filed no later than 48 hours prior to the pretrial conference. (Tape #ATT HOST.) (tc) (Entered: 06/09/2021) |
| 06/08/2021 | 38 | MOTION to Amend/Correct 12 Pro Se Complaint by Plaintiff Lidan Lin. (Attachments: # 1 Exhibit Second Amended Complaint, # 2 Exhibit Charge of Discrimination, # 3 Exhibit Statement of Complaint, # 4 Exhibit Notice of Rights)(Myers, Christopher) (Entered: 06/08/2021) |
| 06/02/2021 | 37 | ORDER: The Court, finding good cause shown, GRANTS 36 Unopposed Motion for Extension of Time to Respond and EXTENDS Plaintif's deadline to respond to Defendants' Motion to Dismiss 17 to 6/8/2021. Approved by Magistrate Judge Joshua P Kolar on 6/2/2021. Text entry order. (tc) (Entered: 06/02/2021) |
| 06/01/2021 | 36 | MOTION for Extension of Time to File Response/Reply as to 17 MOTION to Dismiss *Plaintiff's Amended Complaint* by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 06/01/2021) |
| 05/18/2021 | 35 | ORDER: The Court, finding good cause shown and noting that the Court is in receipt of a communication from Defendants stating that they do not object, GRANTS 34 Motion for Extension of Time to Respond to Defendant's Motion to Dismiss. Plaintiff Lidan Lin's time to respond to [DE 17] Defendants' Motion to Dismiss Plaintiff's Complaint is EXTENDED to 6/1/2021. Approved by Magistrate Judge Joshua P Kolar on 5/18/2021. Text entry order. (tc) (Entered: 05/18/2021) |
| 05/18/2021 | 34 | MOTION for Extension of Time to File Response/Reply as to 17 MOTION to Dismiss *Plaintiff's Amended Complaint* by Plaintiff Lidan Lin. (Myers, Christopher) |

| | | |
|---|---|---|
| | | (Entered: 05/18/2021) |
| 05/17/2021 | 33 | ORDER: The Court DENIES AS MOOT 30 Motion for Continuance of Preliminary Pretrial Conference. The Court notes that the Rule 16 Preliminary Pretrial Conference has already been reset to 6/9/2021. Approved by Magistrate Judge Joshua P Kolar on 5/17/2021. Text entry order. (tc) (Entered: 05/17/2021) |
| 05/17/2021 | 32 | ORDER: The Court DENIES WITHOUT PREJUDICE 31 Motion for Extension of Time to Respond to Defendant's Motion to Dismiss. Pursuant to N.D. Ind. L.R. 6−1(a)(2), motions for extensions of time must state the requested deadline. Approved by Magistrate Judge Joshua P Kolar on 5/17/2021. Text entry order. (tc) (Entered: 05/17/2021) |
| 05/14/2021 | 31 | MOTION for Extension of Time to File Response/Reply as to 17 MOTION to Dismiss *Plaintiff's Amended Complaint* by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 05/14/2021) |
| 05/14/2021 | 30 | MOTION to Continue *Preliminary Pretrial Conference* by Plaintiff Lidan Lin. (Myers, Christopher) (Entered: 05/14/2021) |
| 05/14/2021 | 29 | NOTICE of Appearance by Christopher C Myers on behalf of Lidan Lin (Myers, Christopher) (Entered: 05/14/2021) |
| 05/12/2021 | 28 | ORDER: The Court is in receipt of a communication from Defendants noting that they do not object to Plaintiff Lidan Lin's [DE 26] Motion to Continue Pre−Trial Conference. Accordingly, finding good cause shown and noting that Defendants do not object, the Court GRANTS Plaintiff Lidan Lin's [DE 26] Motion to Continue Pretrial conference. The Telephonic Rule 16 Preliminary Pretrial Conference set for 5/20/2021 is RESET to 6/9/2021 at 11:30 AM in US District Court − Hammond before Magistrate Judge Joshua P Kolar. Parties are instructed to dial 877−336−1280 and enter access code 3293676# when prompted to join the conference. Approved by Magistrate Judge Joshua P Kolar on 5/12/2021. Text entry order. (Copy mailed to pro se party)(tc) (Entered: 05/12/2021) |
| 05/05/2021 | 27 | MINUTE ORDER: The Court SETS the deadline for Defendants Carl Drummond, Lachlan Whalen, and Purdue University to file a notice of intent to object to Plaintiff Lidan Lin's [DE 26] Motion to Continue Pre−Trial Conference to 5/12/2021. The Court notes that, if Defendants intend to object, the basis for objection need not be presented until Defendants file their response within the timeframe required by N.D. Ind. L.R. 7−1. The Court further notes that if no notice of intent to object is filed, the Court intends to grant Plaintiff's [DE 26] Motion to Continue Pre−Trial Conference. Approved by Magistrate Judge Joshua P Kolar on 5/5/2021. Text entry order. (Copy mailed to pro se party)(tc) (Entered: 05/05/2021) |
| 05/03/2021 | 26 | MOTION (in letter form) to Continue Pre−Trial Conference by Plaintiff Lidan Lin. (Attachments: # 1 Envelope)(rmf) (Entered: 05/04/2021) |
| 05/03/2021 | 25 | ORDER: The Court GRANTS 23 Motion to Withdraw Appearance. The appearance of Attorney Carolina Flores on behalf of Plaintiff Defendants Carl Drummond, the Trustees of Purdue University, and Lachlan Whalen is WITHDRAWN. Approved by Magistrate Judge Joshua P Kolar on 5/3/2021. Text entry order. (tc) (Entered: 05/03/2021) |
| 05/03/2021 | 24 | PROOF OF SERVICE Executed (unsigned) as to 15 Order on Motion for Extension of Time to Answer. (lhc) (Entered: 05/03/2021) |

| | | |
|---|---|---|
| 04/29/2021 | 23 | MOTION to Withdraw as Attorney *Carolina Flores* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Flores, Carolina) (Entered: 04/29/2021) |
| 04/29/2021 | 22 | SCHEDULED AS RULE 16 PRELIMINARY PRETRIAL CONFERENCE (not held) on 4/29/2021, before Magistrate Judge Joshua P Kolar. Pla failed to appear. Dfts appeared by atty Kathleen Anderson. The Court received an email (attached to this entry) from an individual not named in this case requesting to reset this matter. Without objection, the Rule 16 Preliminary Pretrial Conference is reset to 5/20/2021 at 11:00 AM (Central time) in US District Court − Hammond before Magistrate Judge Joshua P Kolar. Parties are instructed to dial 877−336−1280 and enter access code 3293676# when prompted to join the conference. Future failures to appear will result in the issuance of a rule to show cause. cc: Pro se pltf (Tape #ATT HOST.) (tc) (Entered: 04/29/2021) |
| 04/28/2021 | 21 | ORDER FOR JUDGE THERESA L SPRINGMANN: The Court VACATES the Telephonic Status/Scheduling Conference set for 5/12/2021. The conference set in error. (rs) (Entered: 04/28/2021) |
| 04/28/2021 | 20 | ORDER FOR JUDGE THERESA L SPRINGMANN, Telephonic Status/Scheduling Conference set for 5/12/2021 11:00 AM (CENTRAL TIME) in US District Court − Hammond before Judge Theresa L Springmann. Participants to call AT&T main number 888−675−2535, Enter Access Code: 9145512#, to join the conference. (rs) (Entered: 04/28/2021) |
| 04/27/2021 | 19 | *Defendants'* ANSWER to Complaint by Carl Drummond, Purdue University, Lachlan Whalen.(Anderson, Kathleen) (Entered: 04/27/2021) |
| 04/27/2021 | 18 | BRIEF in Support of 17 MOTION to Dismiss *Plaintiff's Amended Complaint* filed by Lachlan Whalen, Purdue University, Carl Drummond. (Anderson, Kathleen) (Entered: 04/27/2021) |
| 04/27/2021 | 17 | MOTION to Dismiss *Plaintiff's Amended Complaint* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 04/27/2021) |
| 04/23/2021 | 16 | REPORT by Carl Drummond, Purdue University, Lachlan Whalen *DEFENDANTS' PROPOSAL: REPORT OF PARTIES' PLANNING MEETING*. (Anderson, Kathleen) (Entered: 04/23/2021) |
| 04/22/2021 | 15 | ORDER: The Court hereby GRANTS Defendants' Motion to Extend the Deadline for their Answer or Other Response to Plaintiff's Amended Complaint 14 . The deadline for Defendants to answer or otherwise respond to the Complaint is EXTENDED to 4/27/2021. Signed by Magistrate Judge Joshua P Kolar on 4/22/2021. (Copy mailed to pro se party, 1st class and cert mail 7019 2970 0000 0354 7671)(bas) Modified on 4/22/2021 to add cert mail routing # (lhc). (Entered: 04/22/2021) |
| 04/21/2021 | 14 | MOTION for Extension of Time to File Answer re 12 Pro Se Complaint by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 04/21/2021) |
| 04/20/2021 | 13 | PROOF OF SERVICE Executed as to Lidan Lin 7 Order on Motion for Extension of Time to Answer,. (mlc) (Entered: 04/20/2021) |
| 04/07/2021 | 12 | AMENDED PRO SE COMPLAINT (titled Amended Statement of Complaint) against Carl Drummond, Purdue University, Lachlan Whalen, filed by Lidan Lin.(mlc) (Entered: 04/08/2021) |

| 04/07/2021 | 11 | NOTICE of Appearance by Justine L Farris−Niehaus on behalf of All Defendants (Farris−Niehaus, Justine) (Entered: 04/07/2021) |
|---|---|---|
| 04/06/2021 | 10 | MAGISTRATE JUDGE CONSENT FORMS sent to all parties. (Copy mailed to pro se party) (tc) (Entered: 04/06/2021) |
| 04/06/2021 | 9 | ORDER: Telephonic Rule 16 Preliminary Pretrial Conference set for 4/29/2021 10:30 AM (Central time) in US District Court − Hammond before Magistrate Judge Joshua P Kolar. Parties are instructed to dial 877−336−1280 and enter access code 3293676# when prompted to join the conference. A proposed Discovery Plan under Federal Rule of Civil Procedure 26(f) to be filed no later than five (5) business days prior to the pretrial conference. Signed by Magistrate Judge Joshua P Kolar on 4/6/2021. (Copy mailed to pro se party)(tc) (Entered: 04/06/2021) |
| 03/29/2021 | 8 | MINUTE ORDER: Each party and each attorney in this case shall take reasonable steps to preserve electronically stored information (ESI) that is relevant to any claim or defense in this case, whether or not the information is admissible at trial. This requirement relates back to the point in time when the party or attorney reasonably anticipated litigation about these matters. Text entry order. By Magistrate Judge Joshua P Kolar on 3/29/2021. (Copy mailed to pro se party)(tc) (Entered: 03/29/2021) |
| 03/23/2021 | 7 | ORDER GRANTING 5 Motion for Extension of Time to Answer. Carl Drummond answer due 4/13/2021; Purdue University answer due 4/13/2021; Lachlan Whalen answer due 4/13/2021. Signed by Magistrate Judge Joshua P Kolar on 3/23/21. (Copy mailed to pro se party by reg and cert mail 7018 0360 0001 4183 8262)(mlc) (Entered: 03/23/2021) |
| 03/22/2021 | 6 | AGREED NOTICE to extend time to file answer filed by Carl Drummond, Purdue University, Lachlan Whalen ; answer due by April 13, 2021. (Anderson, Kathleen) (Entered: 03/22/2021) |
| 03/19/2021 | 5 | MOTION for Extension of Time to File Answer *or Other Response to Plaintiff's Complaint* by Defendants Carl Drummond, Purdue University, Lachlan Whalen. (Anderson, Kathleen) (Entered: 03/19/2021) |
| 03/19/2021 | 4 | NOTICE of Appearance by Carolina Flores on behalf of All Defendants (Flores, Carolina) (Entered: 03/19/2021) |
| 03/19/2021 | 3 | NOTICE of Appearance by Kathleen M Anderson on behalf of All Defendants (Anderson, Kathleen) (Entered: 03/19/2021) |
| 12/21/2020 | 2 | Summons Issued as to Carl Drummond, Lachlan Whalen. **NOTE:The attached document is accessible by court personnel only. Summons forms that were electronically submitted to the court for issuance will be returned to counsel via e−mail.** (mlc) (Entered: 12/21/2020) |
| 12/18/2020 | 1 | PRO SE COMPLAINT against Carl Drummond, Lachlan Whalen (Filing fee $ 402.00.) Receipt #INN4000469, filed by Lidan Lin. (cc: pro se plaintiff copy of file marked complaint with summons) (mlc) Modified on 1/4/2021 to add routing (mlc). (Entered: 12/21/2020) |

Case #: to be assigned

United States Court of Appeals

For the Seventh Circuit



-FILED-

JUN 25 2024

At _____ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

---

Lidan Lin, Plaintiff-Appellate, *pro se*

v.

Trustees of Purdue University

   Carl N. Drummond

   Lachlan Whalen

   Defendants

Appeal From The United States District Court

For the Northern District of Indiana

Case #: Case #: 4:20-CV-00097-TLS-JPK

Senior Judge Theresa L. Springmann

### Notice of Appeal

I, Lidan Lin, appeal to the United States Court of Appeals for the Seventh Circuit for the final judgment (Dkt145) entered on April 17, 2024.

Respectfully submitted,

*Lidan Lin*

Lidan Lin (appellant, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

llin3000@yahoo.com

June 25, 2024

Case #:  to be assigned

United States Court of Appeals

For the Seventh Circuit

-FILED-

JUN 25 2024

At _____ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

---

Lidan Lin, Plaintiff-Appellate, *pro se*

v.

Trustees of Purdue University

   Carl N. Drummond

   Lachlan Whalen

   Defendants

Appeal From The United States District Court

For the Northern District of Indiana

Case #: Case #:  4:20-CV-00097-TLS-JPK

Senior Judge Theresa L. Springmann

## Docketing Statement

Date of final Judgment and Order (Dkt145): April 17, 2024

Date of filling appeal: June 25, 2024.

Case for appeal: 4:20-CV-00097-TLS-JPK

Respectfully submitted,

*Lidan Lin*

Lidan Lin

Appellant, *pro se*

Case #: to be assigned

United States Court of Appeals

For the Seventh Circuit



-FILED-

JUN 25 2024

At _____ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

Lidan Lin, Plaintiff-Appellate, *pro se*

v.

Trustees of Purdue University

    Carl N. Drummond

    Lachlan Whalen

    Defendants

Appeal From The United States District Court

For the Northern District of Indiana

Case #: 4:20-CV-00097-TLS-JPK

Senior Judge Theresa L. Springmann

Brief and Other Requited Materials

## Appellant's Brief

**1**                 **Table of Contents**

| Contents | Page |
|---|---|
| Disclosure statement | 1-2 |
| Table of authorities | 1-2 |
| Jurisdictional statement | 2 |
| Statement of the issues | 2-3 |
| Summary of argument | 3-4 |
| Argument | 4-6 |
|     A   Standard of review | |
| Oral argument | 6 |
| Newly discovered evidence | 6 |
| Conclusion | 6-7 |
| Appendix | 7−8 |
| Proof of service | 9 |

**2**                 **Disclosure Statement**

Federal Rule 26,1 and Circuit Rule 26, 1 do not require pro se appellants to provide a disclosure statement.

**3**                                    **Table of Authorities**

**Statutes:**

- 42 US Code, 1981, and 1981a.
- 42 U.S.C. 2000e-5(g)
- Title VII of the Civil Rights Act of 1964, as amended.
- "The Civil Rights Act of 1866"
- The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991.
- 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202.
- Fed Rule of App Pro 28.
- Fed and App Rule 26,1.

**Cases:**

Federal Rules and Appellate Rules do not require appellants to provide citations from "case laws" in support of their appeals. This appellant believes that her case and her appeal are well-supported by federal statues, facts, evidence, inferences, and analysis and, therefore, do not need additional support from case laws, each of which is used for a specific case situation and will not automatically apply for other case situations; in other words, there are no cases that are exactly the same; the facts, evidence, inferences, and analysis in the relevant legal and factual contexts speak for themselves.

**4**                                    **Jurisdictional Statement**

F.R.A.P. 3 grants the right to litigants to appeal their cases to a higher court in the designated Court of Appeals (see also Cir R 28 (a), Fed. R. App R 28 (a). The appellant's case was ruled by the Northern District of Indiana, which is within the jurisdiction of the Seventh Circuit Court of Appeals. This appeal is filed on June 25, 2024; it appeals the final Judgment and Order (Dkt159) that denied the appellant's request to amend and alter the final Judgment and Order (Dkt145) and two interlocutory orders (Dkt143, Dkt144), as well as Order 157 (Dkt157) that denied her request to waive the Bill of Costs.

**5**                                    **Statement of the Issues**

On April 17, 2024 the district court granted defendants' Motion for Summary Judgment (Dkt145) against the Plaintiff; on the same day, the court denied the appellant's Motion to Seal (Dkt144) and Motion to Sanction (Dkt143). In response, the appellant filed Motion to Amend and Alter the final Judgment and interlocutory Orders 143, 144 (Dkt154) , which the court denied on June 12, 2024 (Dkt159). On May 29, 2024, the court denied the appellant's Opposition to Bill of Cost (Dkt157). After reviewing these court Orders, the appellant has concluded that these Orders are biased and resulted from the court's misinterpretation of laws, negligence of the facts, evidence, inferences, and analysis presented by the appellant, and from its abuse of discretion.

Rule 3 of The Federal Rules of Appellate Procedure (FRAP) permits parties to appeal the final Judgment by a district court to a higher court. Because the appellant's case was ruled by the Northern District Court of Indiana, the designated higher court is the Seventh Circuit Court of Appeals.

**6**                    **Summary of Argument**

In adjudicating the appellant's case, the district court has misinterpreted laws, neglected facts, evidence, inferences, analysis presented by the appellant and abused its discretion in weighing these facts and evidence. In doing so, the court unreasonably raised the bars for proof of guilt, making the appellant's proof of discrimination, harassment, and retaliation almost impossible to be acceptable (Dkt145, Dkt159, Dkt157). However, the court was more lenient toward the appellees, glossing over their misapplication of laws and factual errors. For example, in the appellees' MSJ Brief, the defense asserted: "Plaintiff. . .makes bizarre and seemingly irrational allegations regarding whom she works and others. . .Plaintiff has testified that everyone, including her neighbors. . . are out to get her" (Dkt 122, p1, paragraph 1). These statements are not true; the appellant never accused "everyone", but only those who actually discriminated, harassed, and retaliated against her; each of her allegations is well-supported by evidence, facts, and inferences. In fact, the entire defense rests on these factual and conceptual errors. Similarly, in defending Drummond's and Friedman's decision to offer acting chair position to Dr. Huffman, the defense cited a case law in support of its defense that employers literally can do whatever they want—they are beyond any legal bindings: "The court rejected the Plaintiff's argument and granted summary judgment for the defendant, explaining 'unfortunately for plaintiff, employers enjoy unfettered discretion to choose among qualified candidates and to

decide which types of credentials are of the most importance for a particular job'" (Dkt122, p5, paragraph2). Although the cited case has a "preferred skill" scenario, it is different from the appellant's situation such as Drummond and Friedman did not use the employer's "unfettered discretion" in making the appointment decision; instead, they used the Dept's feedback and voting result in making the decision. The feedback and voting procedure, as the appellant has shown, is illegitimate and a violation of the Dept's and Faculty Senate's policies on voting faculty and on appointing academic leaders (Dkt131, pp12-16); these violations were racially motivated and coupled with their racially motivated favoritism and manipulation of selection procedure, intended to exclude the appellant from being selected as acting chair. Further, the concept of employers' "unfettered discretion" itself cannot be justified because "discretion" in any employment-related decision has to be reasonable used in accordance with relevant employer policies and laws. This is just one of many examples of the defense's questionable use of legal authorities. The defense used these questionable citations to argue that the appellant cannot prove the 'racial character" in all alleged discrimination incidents. Aided by these questionable "legal authorities", the defense asserted that the appellant has "no evidence" to support her claims (Dkt 122, p2, paragraph 2), which is not true. The trial court used the same "insufficient evidence" theory, lack of racial motive theory, and lack of legal authority theory (citations from case laws) in justifying its final judgment, asserting that the appellant did not meet the burden of proof (did not cite from case laws) (Dkt145 pp15-17, 31). The appellant addressed these judicial errors in detail in her Amended Motion to Amend and Alter (Dkt154). To save time and effort, please refer to Dkt154 for detailed argument and supporting evidence (Appendix 2). The district court's substantial errors make it necessary for the Appellate Court to conduct a *de novo* review of this case while paying special attention to the Motions, Briefs, Responses, and Orders included in the Appendix.

**7**                                    **Argument**

**Standard of review:**

F.R.A.P. 3 grants the right to litigants to appeal their cases to a higher court in the designated Court of Appeals (see also Cir R 28 (a), Fed. R. App R 28 (a). Under this provision, the appellant is entitled to request a review, including a *de novo* review, by the Appellate Court of the final judgment by a lower court.

In addition, under *Fed Rule 59 (e)*, a party may file a motion to alter or amend a judgment no later than 28 days after the entry of the judgment. Motions to amend or alter the judgment should be granted when there exists "a manifest error of law or fact, so as to enable the court to correct its own errors and thus avoid unnecessary appellate procedures." *Meghani v. Shell Oil Co.*, 2000 U.S. Dis. LEXIS 17402 *2, (S.D. Tex. Aug. 24, 2000) (citing *Divane v. Krull Elec. Co., Inc.,* 194 F.3d 845, 848 (7th Cir. 1999) (internal citations omitted)); *see also Kyle v. Texas*, 2006 WL 3691204 (W.D. Tex. Oct. 31, 2006) (granting a motion to reconsider under *Fed Rule 59 (e)*, and reversing the court's previous denial of a motion to remand based on a manifest error of law).

The court has discretionary authority to alter and amend its prior decision (*See Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 276 (5th Cir. 2000). *The Fed Rule 60 (a)* further provides that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice." Under *Fed Rule 60 (b)*, the Court may relieve a party from a final judgment or order if a mistake was made or any other reason that justifies relief.

The Appellate Court has the authority to review, amend, reverse a lower court's final judgment and order in accordance with relevant laws and procedures (F.R.A.P. 3).

The district court's final Judgment (Dkt145/Dkt159) is not fair; it has misinterpreted laws, neglected facts, evidence, inferences, analysis presented by the appellant and abused its discretionary authority in weighing these facts and evidence. In doing so, the court unreasonably raised the bar for proof of guilt, making the appellant's proof of discrimination, harassment, and retaliation almost impossible to achieve (Dkt145, Dkt159, Dkt157). However, the court was more lenient toward the defendants, glossing over their misapplication of laws and blatant factual errors. In rejecting the appellant's request to amend the final judgment, the court asserted that there was no "newly discovered evidence" to justify a review; the truth is the appellant did

provide such "new information" (Dkt154, p16) about the continuation of harassment and Whalen's "editorial experience" (Dkt154, pp7- 8). The appellant addressed these judicial errors and prejudice in detail in her Amended Motion to Amend and Alter (Dkt154). The court's substantial errors make it necessary for the Appellate Court to conduct a *de novo* review of this case while paying special attention to the Motions, Briefs, Responses, and Orders included in the Appendix.

8                           **Request for Oral Argument**

Pursuant to F.R.A.P. 34, the appellant respectfully requests an oral argument.

9              **New Evidence Related to Appellant's Claims**

After the district court entered its Order 145 in defendants' favor on April 17, 2024, the appellant continues to experience harassment by state actors Drummond and Whalen and their allies; the following are representative examples (from appellant's records):

Janet Badia:

On May 9, 2024, Thursday, I stopped by the chase bank on Stellhorn to do something; I noticed that a co-worker show up shortly I entered the bank; this co-worker was relatively new to PFW and was misled by state actors and Badia; then I went to campus to do some work around 1:30 p.m; between 2:30-4 p.m.. As I was walking in LA hallway to pick up prints in LA141, Badia and allies stalked me in the hallway, using her/their body language as usual to express her/their hostility.

Neighbor John Price:

Price continues to use his presence to harass me; on a couple of recent occasions, he deliberately made loud noises such as dropping heavy items as I passed his house (across from mine) as if to frighten me; he used to drive his truck to stalk me.

My perception is that the harassers seem encouraged by the district court's ruling.

Whalen:

I did more checking around regarding Whalen's "editorial experience" after I raised the issue in Dkt 154, but I still did not find any information about it; I request that defense provide proof of this qualification of his; until then, this "qualification" should be treated as a possible "fraud," racially motivated to discriminate against me, and be suspended.

## 10                    Conclusion

The fundamental principles of laws serve one purpose: get to the truth and enact justice. For the reasons set forth above and in Dkt154, the appellant respectfully requests that the Court enact the restorative justice in order to make the victim (appellate) whole that includes:

1   the Court enter Judgment against the defendants-appellees for compensatory damages and compensatory and punitive damages (against the individually-named appellees and their key ally Badia), reasonable attorney's fees and costs, and for all other just and proper equitable relief in the premises.

2   state actors and their key ally Badia be given appropriate sanction, including but not limited to being transferred off campus, as well as restructuring of OAA and COLA leadership by PFW leadership.

3   the appellant be granted *Clio* journal editorship (and Dr. Roberts be granted directorship of International Studies, a position she previously held).

4   the Court or employer issue a statement that the 2015 FFD exam decision was a mistake and the appellant was wronged by this decision.

5   the Court grant Motion to Sanction (DKT141 and Motion to Seal (DKT140).

## 11                    Appendix

1   Opinion and Order (Dkt159, denying Plaintiff's Motion to Amend)

2   Plaintiff's Amended Motion to Amend and Alter Order 145 (Dkt154)

3   Opinion and Order (Dkt145, granting MSJ)

4   Plaintiff's Reply to Defendants' Opposition to Amend Order (Dkt 156)

5   Opinion and Order (Dkt157, denying Plaintiff's Opposition to Bill of costs)

6   Plaintiff's Opposition to Bill of Costs (Dkt152)

7   Plaintiff's Response Brief in Opposition to Defendants' MSJ (Dkt130)

8   Opinion and Order (Dkt143, denying Motion to Sanction)

9   Plaintiff's Motion to Sanction (Dkt141)

10   Opinion and Order (Dkt144, denying Plaintiff's Motion to Seal)

11   Plaintiff's Motion to Seal (Dkt140)

Respectfully submitted,

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

**Proof of Service**


The undersigned hereby certifies that a true and correct copy of the above was served by the Clerk's Office (1300 S. Harrison St. Fort Wayne, 46802) to the 7th Circuit Court and served electronically to the defendants-appellees' counsels of record on June 25, 2024.

Respectfully submitted,

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

June 25, 2024

DKT 159   Appendix 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION AT LAFAYETTE

LIDAN LIN,

            Plaintiff,

               v.                            CAUSE NO.: 4:20-CV-97-TLS

THE TRUSTEES OF PURDUE
UNIVERSITY, CARL DRUMMOND, and
LACHLAN WHALEN,

            Defendants.

## OPINION AND ORDER

This matter is before the Court on pro se Plaintiff's Amended Motion to Alter and Amend Judgment to Grant Plaintiff's Motions [ECF No. 153], filed on May 16, 2024, which asks the Court to reconsider its April 17, 2024 Opinion and Order [ECF No. 145] granting the Defendants' Motion for Summary Judgment [ECF No. 121] in favor of Defendant The Trustees of Purdue University and against the Plaintiff on her claim for discrimination under Title VII, and in favor of Defendants Carl Drummond and Lachlan Whalen and against the Plaintiff on her claims under § 1981 for discrimination, retaliation, and hostile work environment. The Defendants filed a response [ECF No. 155] on May 23, 2024, and the Plaintiff filed a reply [ECF No. 156] on May 28, 2024. For the reasons set forth below, the Court denies the motion.

The Plaintiff identifies Federal Rules of Civil Procedure 59(e), 60(a), and 60(b) as the basis for this motion for reconsideration. But the Court construes the motion as brought pursuant to Rule 59(e) because she appears to have made arguments for reconsideration based on what she refers to as errors of law and facts. *See Obriecht v. Raemisch*, 517 F.3d 489, 493 (7th Cir. 2008) ("[I]t is the substance, rather than the form, of a post-judgment motion that determines the rule

under which it should be analyzed."). However, the motion is untimely because the Plaintiff did not file it within 28 days of judgment. *See* Fed. R. Civ. P. 59(e).[1]

Even if the motion was timely, "Rule 59(e) allows a court to alter or amend a judgment only if the [plaintiff] can demonstrate a manifest error of law or present newly discovered evidence." *Obriecht*, 517 F.3d at 494. "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). "To support a motion for reconsideration based on newly discovered evidence, the moving party must show not only that this evidence was newly discovered or unknown to it until after the [decision], but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion]." *Id.* at 1269 (cleaned up).

In this case, the Plaintiff has not justified reconsideration of the Court's order granting the Defendants' motion for summary judgment. The Plaintiff does not identify any controlling precedent that the Court disregarded, misapplied, or failed to recognize in its analysis of the facts she used in her summary judgment response brief. Notably, the Plaintiff does not cite any controlling precedent related to her discrimination, hostile environment, or retaliation claims. Nor does she identify any new evidence that could not have been discovered during the

---

[1] The record indicates that the Clerk of Court entered the judgment in this case on April 17, 2024, and the Plaintiff filed this motion 29 days later, on May 16, 2024. *See* ECF Nos. 146, 153. Although in her reply, the Plaintiff cites to Federal Rule of Federal Procedure 15(a)(1)(A) to show that her motion is timely, she cites to a rule applicable to pleadings, not motions. *See* Fed. R. Civ. P. 15(a)(1)(A). Thus, the Court finds her argument unavailing.

pendency of the motion for summary judgment. Therefore, the Plaintiff has not provided a basis for reconsideration of the Court's order granting the Defendants' motion for summary judgment.[2]

The Plaintiff also includes requests for reconsideration of two interlocutory orders [ECF Nos. 143, 144]. However, "[m]otions must be filed separately." N.D. Ind. L.R. 7-1(a). As the requests for reconsideration of the two interlocutory orders are separate motions, the Plaintiff has not met the requirements of Local Rule 7-1(a). As a result, the Court denies the Plaintiff's requests for reconsideration of the interlocutory orders.

Accordingly, the Court hereby DENIES the relief requested in the Plaintiff's Amended Motion to Alter and Amend Judgment to Grant Plaintiff's Motions [ECF No. 153]. The Court DENIES as moot the Plaintiff's Motion to Alter and Amend Judgment and Orders [ECF No. 152] based on her filing of ECF No. 153.

SO ORDERED on June 12, 2024.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[2] To the extent that the Plaintiff asserts for the first time in her reply that fraud is a basis for reconsideration, the Court need not address it because she does not develop the argument or cite to any pertinent legal authority in support. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

3

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

LAFAYETTE DIVISION

| | |
|---|---|
| LIDAN LIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CAUSE NO.:  4:20-CV-00097-TLS-JPK |
| | ) |
| THE TRUSTEES OF PURDUE | ) |
| UNIVERSITY, CARL DRUMMOND, | ) |
| LACHLAN WHALEN, | ) |
| | ) |
| Defendants. | ) |

**Amended Motion to Alter and Amend Judgment and to Grant Plaintiff's Motions**

**(amended parts are in pp7-8, 12, 16, 17-18)**

Pursuant to *The Federal Rules of Civil Procedure* 59 (e, *Fed Rule 59 (e)* hereafter), the

pro se Plaintiff (Asian/Chinese) respectfully requests that the Court review, alter, and amend the

Order and Judgement (DKT145). This Order and Judgment dismissed all the Plaintiff's claims

(discrimination, retaliation, and harassment claims) in Defendants' favor. The Plaintiff also

respectfully requests that the Court review, alter, and amend the two interlocutory Orders (DKT

143, DKT144) that denied her two Motions in Defendants' favor (Motion to Seal and Motion to

Sanction). The Court's Judgement was entered on April 17, 2024; the interlocutory Order DKT140 was issued on April 5, 2024, and the interlocutory Order DKT141 was issued on April 9, 2024.

## FACTS

This lawsuit is brought pursuant to 42 U.S.C. Code, 1981, and 1981a, Title VII of the Civil Rights Act of 1964, as amended. The jurisdiction of this Court is invoked by the Plaintiff pursuant to 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202. Specifically, this lawsuit is brought pursuant to the "The Civil Rights Act of 1866," 42 U.S.C. Code. § 1981, and 1981a, The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991. Equitable and other relief is sought under 42 U.S.C. 2000e-5(g), Title VII, and other sources.

The Plaintiff filed this suit on December 18, 2020, in the Northern District Court of Indiana.

## ARGUMENT

I.  **Standard of Review:**

Under *Fed Rule 59 (e)*, a party may file a motion to alter or amend a judgment no later than 28 days after the entry of the judgment. Motions to amend or alter the judgment should be granted when there exists "a manifest error of law or fact, so as to enable the court to correct its own errors and thus avoid unnecessary appellate procedures." *Meghani v. Shell Oil Co.*, 2000 U.S. Dis. LEXIS 17402 *2, (S.D. Tex. Aug. 24, 2000) (citing *Divane v. Krull Elec. Co., Inc.,* 194 F.3d 845, 848 (7th Cir. 1999) (internal citations omitted)); *see also Kyle v. Texas*, 2006 WL 3691204 (W.D. Tex. Oct. 31, 2006) (granting a motion to reconsider under *Fed Rule 59 (e)*, and reversing the court's previous denial of a motion to remand based on a manifest error of law).

A court has discretionary authority to alter and amend its prior decision (*See Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 276 (5th Cir. 2000). *The Fed Rule 60 (a)* further provides that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice." Under *Fed Rule 60 (b)*, the Court may relieve a party from a final judgment or order if a mistake was made or any other reason that justifies relief.

**II.    Errors of Laws and Facts:**

The Court's Order (DKT145) granting Summary Judgment in Defendants' favor and its two interlocutory Orders (DKT144, DKT143) that denied the Plaintiff's Motion to Seal and Motion to Sanction in Defendants' favor are based on the Court's misinterpretation of laws and facts, as well as its negligence of crucial facts supporting the Plaintiff's claims. As *The Federal Rules* indicate, in adjudicating each case, the Court's task is deciding whether there is genuine dispute of material facts and whether laws are broken by a party. In adjudicating the Defendants' Motion for Summary Judgment, the Court has erred on its interpretation of laws. For example, the Plaintiff has established a prima farcie case for her discrimination claim and documented numerous pretexts, even frauds, used by the decision-makers. These prima farcie cases, supported by a preponderance of the evidence, have met or surpassed the standards of discrimination based on race set by Title VII and Section 42 1981. Yet, the Court did not find any of Plaintiff's evidence, including pretexts and inferences, "fishy" enough to support her discrimination claim. The Court held that all the decision-makers' stated non-discriminatory and "business reasons" are legitimate.

The Plaintiff contends that the Court has erred on interpreting the laws reasonably. Neither Title VII nor Section 42 1981 requires the Plaintiff to prove "intentional discrimination" by direct evidence only in order to prevail. Both laws allow the Plaintiff to use indirect and circumstantial evidence to prove "discrimination intent." Although Section 42 1981 requires proof of international discrimination, it allows proof through a prima facie scenario in "making and enforcing contracts;" in other words, this law requires proof of intentional discrimination through a concrete action. This is why legal experts and practitioners have relied on circumstantial and indirect evidence in proving discrimination intent/motive. Although the Court did not reject Plaintiff's indirect and circumstantial evidence outright, it held the standards of proof unreasonably high; as a result, the Court discredited all the evidence, deeming it "insufficient" in proving that the decision-makers' business-reasons were not legitimate reasons, but racially motivated pretexts in favor of the non-protected class of members. In using the "insufficient evidence" theory, the Court did not take into consideration the fact that discrimination in work places is always tacit and carried out under cover. No one will say aloud or write discriminatory words, but their actions, especially patterned actions, toward a member of a protected class speak their discriminatory minds. In addition, the Court failed to admit the patterned discriminatory behavior of the state actors and their key ally and overlooked the Plaintiff's logical and coherent evidence throughout the Order (DKT145).  In the following sections, the Plaintiff addresses each of these errors.

**II.1    The Court's Order and Judgment (DKT 145) Misinterpreted "Discrimination Intent" and Neglected Evidence and Facts in Discrimination Claim**

Although the Court does not object to Plaintiff using the *McDonnell Douglas* burden-shifting framework that allows circumstantial, indirect evidence, and inferences to prove

"discrimination intent" required by Title VII and Section 42 1981, its standards of measuring

such evidence and inferences are far beyond what this framework requires. This framework is

adopted because discrimination intent is inside someone's head not observable from the outside;

however, this intent can always be proved indirectly or inferred by someone's actions and to

whom these actions are directed and in what context these actions take place. The Court admitted

that Plaintiff met the four elements required by a prima farcie case (Order 145, p22-23);

however, in analyzing these elements, the Court agreed with Defendants and rejected all the

evidence the Plaintiff presented. The ruling judge stated that the totality of Plaintiff's evidence is

insufficient to prove decision-makers' discrimination intent or their actions' racial character: "As

set forth below, the Plaintiff has failed to demonstrate that the nondiscriminatory reasons for

Purdue and Drummond not hiring her (to be acting chair and *Clio* editor) were a pretext for

discrimination based on her race or national origin and has otherwise failed to point to evidence

that as a whole shows unlawful discrimination" (Order 145, p24, paragraph 2).

 The Plaintiff contends this "insufficient evidence" opinion and argues that the Plaintiff

provided more than sufficient evidence in support of her discrimination claim in her Response

Brief, Response to Defendants' Material Facts, Additional Material Facts, and 79ish exhibits of

evidence. This is why the Plaintiff requires a review of the Court's Order and Judgment.

Specifically, regarding the acting chair hire, although Plaintiff established a prima farcie case

supported by a preponderance of the evidence that show the decision-makers' racially-motivated

pretexts maneuvered to achieve the discriminatory outcome: hiring a candidate less qualified

than Plaintiff. These maneuvers include violating University and Dept policies and fraudulent

lying. The Plaintiff's evidence reveals how such violations and lies logically and materially link

to decision-makers' "discriminatory intent" (DKT 130, Plaintiff's Response Brief, pp 12-16).

After reading the evidence in these pages, a reasonable person would have seen the decision-makers' pretexts, yet the Court cannot see any of these pretexts: "The Court finds these actions do not establish pretexts" (Order 145, p26, paragraph 3). By these actions, the Court refers to decision-makers' violations of policies, fraudulent hiring process, and lies (Order 145, p26, paragraph 3). The Court further asserts: "the Plaintiff does not point to any facts supporting the reasonable inference that Friedman did not want the Plaintiff to be acting chair or extended deadline because of animus for the Plaintiff's race or national origin" (Order 145, p26, paragraph 4) despite the 5-page evidence the Plaintiff provided. Ironically, the Court did apply "the reasonable-person standard" in support of its analysis, but it arrived at the same conclusion that none of the pretexts identified by the Plaintiff shows "such weaknesses, implausibilities, inconsistencies, or contradictions" in the reasons stated by Purdue, Friedman, and Drummond" (Order 145 paragraph 2). It is as though the Court was saying that one has to tape-record someone say "I intent to discriminate against you because you are Chinese" (Order 145, p28, paragraphs 2, 3). But in a higher institution, who would be so stupid to say such things to get caught? In the end, the reasonable-person standard the Court purportedly uses is not a reasonable-person standard, but an unreasonable-person standard to the extent that discrimination is always carried out in disguise with few exceptions. Based on this unreasonable standard, the Court accepted all the "business reasons" stated by Defendants as legitimate. In support of its conclusion, the Court described the Plaintiff's discrimination charge as reflecting her "personal belief that she was not hired . . .due to her race or national origin" (Order 145, p29, paragraph 2).

Regarding the discrimination claim in the *Clio* editor hiring, the same errors on laws and facts are found in the Court's analysis of the *Clio* journal editor hire. Despite a preponderance of

the evidence, pretexts, and inferences presented by the Plaintiff (Plaintiff's Response Brief pp17-19), the Court does not accept any of these pieces of evidence: "The Plaintiff argues that Drummond's legitimate, non-discriminatory reasons are pretextual because Drummond should not have been in the position to make the decision on the *Clio* editor-in-chief for the reason that he has no experience. However, the Plaintiff does not point to facts or details establishing animus for the Plaintiff's race was the reason that Drummond was given the authority to make the decision on the *Clio* editor-in-chief" (Order 145, p30, paragraph 3). Here, the Court neglected three crucial facts presented by the Plaintiff: 1) there is no proof of Whalen's editorial experience required by the job description, except what he put in his vitae; neither did he provide any proof in this litigation**; the *Clio* editor job posting requires "previous editorial experience," by this it means previous professional editorial experience because *Clio* is a professional journal indexed in The Arts and Humanities Citation Index, a bench mark for A+ journals. The Plaintiff raised the proof issue in her Response Brief (DKT130): "Plaintiff searched various websites, but did not find any information about this magazine nor the fact that Dr. Whalen served on its editorial board" and addressed the proof issue and Whalen's qualifications issue in detail (DKT130, p17-19);** 2) while Drummond admitted that both Whalen and Plaintiff met the criteria stated in the job description, Drummond used extra qualifications that only Whalen had and Plaintiff did not have to justify hiring Whalen; in other words, Drummond did not use any of the extra qualifications Plaintiff had and Whalen did not have; 3) Drummond's hiring decision betrays his patterned discrimination against Plaintiff from hiring Whalen into Plaintiff's Dept against University's spousal hire policy in 2014 (DKT130, Plaintiff's Response Brief p6-8)  through putting Plaintiff on leave in 2015 (DKT130, p8-10) because she complained to campus police about Whalen's stalking her, 2016 adverse

employment decision (DKT130, p10-11) to *Clio* editor job. In this long trajectory, Drummond

enacted the same discriminatory treatment of Plaintiff. Yet, the Court did not accept any of the

logical and material connections between this chain of causal adverse employment actions,

connections Plaintiff emphasized. **Because Whalen's violation of the Court's Protective**

**Order, which the Plaintiff addressed in detail in her Motion to Sanction (DKT141), and his**

**internal complaint against Plaintiff filed in April 2022, which the Plaintiff addressed in**

**detail in her Response Brief (DKT130, p28, paragraphs 2-3), are indicative of his**

**fraudulent conduct targeting the Plaintiff, the Plaintiff requests that the Court ask**

**Defendants to provide proof of Whalen's said "editorial experience" he put in his vitae**

**submitted for the *Clio* editor position (Whalen's friend and co-worker Kate White used**

**fraudulent information for her pre-tenure third-year review, as well; she also stalked**

**Plaintiff on and off campus).**

**II.2    The Court's Order and Judgment (DKT 145) Misinterpreted "Discrimination**

**Intent" and Neglected Evidence and Facts in Hostile Work Environment Claim**

In weighing the Plaintiff's preponderance of the evidence for her hostile work

environment claim, the Court also misinterpreted discrimination intent and arrived at the same

problematic "insufficient evidence" opinion. The Plaintiff presented a large amount of well-

documented evidence of on- and off-campus racial harassment (DKT130 pp21-28), including

work-related **severe injuries due to stressful and hostile work environment (2014 injury,**

**2015 injury, 2018 injury, 2020 injury (ExD, Pla Dec, p185; ExF, Pla, Ex11; see also**

**Additional Material Facts pp15-16)** and health issues. The Court summarized most of these

harassment incidents in a long list on page 14 (Order 145), but it did not accept any of these

harassing incidents as evidence of racial harassment. Although the Court accepts "non-verbal

harassment" to be "used to support a hostile work environment claim", it insists that "the

Plaintiff must still show that it 'had a racial character or purpose" (Order 16, paragraph 1). As

the Plaintiff explained in II and II.1, discrimination intent or purpose or character can only be

9

inferred by the three elements, unless someone says out loud "I intend to discriminate against you" : 1) actions taken and by whom, 2) to whom the actions are directed, and 3) in what context the actions take place. This is why EEOC's and Purdue University's definitions of harassment accept both "motive" and "effect" as standards of measure, not just "motive;" EEOC also uses the "reasonable person" measure in conjunction with "motive" measure--if a reasonable person finds his/her work environment hostile and offensive, it is sufficient to support a hostile work environment claim: "Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive (DKT130, p4, paragraph 1). Is the Plaintiff a reasonable person? The answer is yes because she has not complained against anyone for harassment before 2013-2014 her entire life; she is known to be a friendly person. Despite the Plaintiff's well-documented evidence showing the "effects" and establishing the connections between these three elements—harassment by co-worker/neighbors (Drummond, Whalen, Badia, Price et al) toward the Plaintiff (Asian/Chinese), on-and off campus, from 2014 (triggered by Whalen hire) to the present. But the Court did not see these connections: "And, the Plaintiff points to no "other evidence (that) supports a reasonable inference tying the harassment to (her) protected status" . . .the Plaintiff also do not create a genuine dispute of fact on her hostile work environment" (Order 145 paragraph 1-2). Neither does the Court see the inherent connections between the discrimination, retaliation, and harassment carried out by the same people (Drummond, Whalen, Badia et al). The Plaintiff argues that these connections are the crucial contexts for all the claims in this case to unlock the mystery of "discrimination intent" and to counter the Court's "insufficient evidence" opinion. This opinion is based on the Court's misinterpretation of the *McDonnell Douglas* burden-shifting framework that allows the Plaintiff to use circumstantial, indirect evidence, and inferences to prove "discrimination intent". The Plaintiff has sufficiently met this burden of proof in this case: the facts, pictures, dates/times speak for themselves. In order to help her gain additional evidence of harassment, the Plaintiff requested installation of surveillance cameras in the building where her office is and elsewhere on campus, but Purdue Fort Wayne (PFW) rejected her request several times (DKT130, p26, ExC, PFW, Ex15, denial email). This rejection clearly shows PFW's intentional cover up in support of  harassers against Plaintiff (Asian/Chinese). Viewed in

this context, the Court's "insufficient evidence" opinion, measured by the *McDonnell Douglas* burden-shifting framework, is unreasonable and unjustifiable.

**II.3    The Court's Order and Judgement (DKT145) Misinterpreted the Statute of Limitation and Excluded 2014 Discrimination Action and 2015 Retaliation Action from this Case and Overlooked Evidence of Materially Adverse Action in Each Retaliation Incident**

The Court supported Defendants' exclusion of 2014 discrimination incident and 2015 retaliation incident, citing the statute of limitation (4 years) as the basis. The Plaintiff argued that because adverse actions that happened in 2014 (Whalen hire) and 2015 (Drummond retaliation) are part of Drummond's continuing pattern of discriminatory and retaliatory treatment of the Plaintiff, an exception should be made to Section 42 1981's 4 years' statute of limitation. This exception is acceptable under the continuing violation doctrine: "The continuing violation doctrine, often asserted by plaintiffs alleging workplace discrimination, is an exception to the statute of limitations. . .The doctrine permits an employee to recover for discriminatory acts occurring prior to the applicable limitations period where such acts were part of a continuing violation that continued into the limitations period"

**(https://www.fidlonlegal.com/files/continuing_violation.pdf, p1).** This doctrine allows incidents that happened outside the statutory time period to be considered as part of a continuing course of actions. The Plaintiff has sufficient evidence showing that Drummond's actions and ties in 2014, 2015, 2019, 2021 are logically and materially linked and betray a pattern of his discriminatory and retaliatory treatment of Plaintiff: because Plaintiff opposed Whalen hire in 2014, Whalen started harassing her; Plaintiff reported his harassment to campus police, and Drummond retaliated against her by putting her on leave; when Whalen and Plaintiff applied for *Clio* editor job, Drummond retaliated against her by offering the job to Whalen despite

Plaintiff's better qualifications; when Janet Badia, Whalen's partner, applied for the Dean job,

Drummond went so far to violate University spousal hire policy again in order to offer her the

job; after Badia became Dean, her stalking and harassing Plaintiff became bolder and worse; she

used her Dean power to intimidate and harass the Plaintiff. Despite Plaintiff's evidence, the

Court insists that 2014 and 2015 incidents must be excluded from the case because of the statute

of limitation (Order 145, p19, paragraph 2).

     The Court also supported Defendants' argument that "the Plaintiff's retaliation claim is not

supported by the record" because she did not show that she suffered a "materially adverse

action" in each retaliation incident (Order 145, p17, paragraph 2). In the case of Dean hire, the

Court stated that because the Plaintiff did not apply for the Dean job and continued her

employment, there is not materially adverse action taken by Drummond. However, the Court did

not address the materially adverse effects on the Plaintiff caused by Drummond's action--Dean

hire. These effects include 1) Badia's stalking of Plaintiff became bolder, 2) her staff's stalking

of Plaintiff became worse; 3) Badia used dean power to create hurdles on the Curriculum

Committee (she is ex-officio) when the Plaintiff submitted a proposal for College curriculum

changes; the proposal was rejected multiple times, 4) Badia delayed approving Plaintiff's travel

grant; 5) Whalen's (Badia's partner) stalking/harassing of Plaintiff became bolder (he recklessly

filed a harassment complaint against Plaintiff in April 2022), 6) Badia's and Whalen's friends'

stalking of Plaintiff became bolder and worse (DKT130, pp20, 21-22). These effects caused by

Drummond's action are adverse and harmful. The Plaintiff still feels the devastation caused by

Whalen's reckless complaint and shared her devastation with co-workers. In each of the other

retaliation incidents, there is a materially adverse action taken by Drummond against Plaintiff: he

wrongfully placed Plaintiff on leave in 2015 for reporting harassment by Whalen to campus

police; he offered *Clio* editor job to Whalen in 2019; he offered acting chair position to a less qualified candidate in 2019, to name a few.  Drummond took these retaliatory actions because the Plaintiff engaged in "protected activities": opposing Whalen hire in 2014 (her faculty right), reporting harassment to campus police (University policy tells her to do this), spoke about Drummond's problems of neglecting diversity in Faculty Senate (2019, her faculty right). In short, the Plaintiff has met the burden of proof required by Title VII and Section 42 1981: Plaintiff engaged in protected activities, as a result, materially adverse actions were taken against her. Although the Court accepted this cause-and-effect standard, it overlooked the majority of Plaintiff's retaliation evidence and used the statute of limitation to exclude 2015 retaliation and reached the conclusion that "there is no "materially adverse action" in each of the retaliation incidents.

**A notable negligence by the Court is not mentioning the fraudulent part in Dean hire targeting the Plaintiff: Drummond appointed Badia to be Dean without the nepotism waiver required by Purdue University (she and her partner Whalen have a personal relationship and because of this she cannot be Whalen's supervisor (DKT130, p19-21). Neither did the Court mention the fraudulent part of Whalen hire (DKT130, pp6-8) and the possible fraud involving *Clio* editor hire (Whalen's "editorial experience"), and the fraud involving acting chair hire (DKT130, pp12-16)—all these frauds targeted the Plaintiff (Asian/Chinese). The Court's silence on these pretextual fraudulent maneuvers and the connection between these maneuvers is troubling.**

**II.4    The Court's Interlocutory Order (DKT 143) Overlooked the Legal and Factual Evidence the Plaintiff Provided**

The Plaintiff's Motion to sanction Defendant Whalen and to Discipline defense counsels (Justine Farris et al) for violating the Court's Protective Order (DKT64) laid out the specific legal ground in support of the Motion: N. D. Ind Local Rule 83-5, Bar Admission, sets professional standards for attorney practice (p58). N.D. Ind. L.R. 83-6.1 sets the scope and methods for Attorney Discipline concerning attorney misconduct. Civil Rule 83-6.2. N.D. Ind. L.R. 83-6.2 defines the Grounds for Discipline (p62) and the Court's Authority to exercise disciplinary actions on the accursed:

 "The court may discipline an attorney who:

**(1)** engages in misconduct, even if the misconduct occurs outside an attorney-client relationship;

**(2)** is convicted of a serious crime; or

**(3)** is disciplined by any other court in the United States or its territories, commonwealths, or possessions.

**(b) "Misconduct" Defined.** "Misconduct" means a violation of the standards of professional conduct identified in N.D. Ind. L.R. 83-5(e).

The Seventh Circuit Court of Appeals also sets standards for attorneys' professional conduct requiring that "A Lawyer's conduct **should be characterized at all times by personal courtesy and professional integrity** in the fullest sense of those terms" (p1).

The Plaintiff also provided specific evidence showing exactly how Whalen and defense counsels collectively violated the Protective Order: Whalen used a "confidential" document disclosed in the Discovery in his 2022 internal harassment Complaint against the Plaintiff.  The Protective Order specifically bars using "confidential" materials disclosed in the Discovery for non-litigation related matters (DKT65, p4, paragraph 2).  In addition, this Order requires parties to respect the confidentiality of original materials by designating them as "confidential" (DKT64, p2, paragraph 2). First, defense consuls failed to designate document DEF1000129-133 as "confidential"; this document was originally marked "confidential" by PFW. Second, Whalen

14

used this "confidential" document for a non-litigation related matter—his internal complaint against the Plaintiff.

Plaintiff's Motion to sanction Whalen and to discipline defense counsels (DKT141) presented in detail the legal ground and the evidence of breach of law. The Plaintiff did not cite support from case laws because she did not feel it necessary; the violation case she presented is black and white clear. Although the Court accepted the legal ground and the evidence, it overlooked the fact that the legal ground and the evidence are sufficient to support Plaintiff's Motion. Instead, the Court insisted on the Plaintiff not citing case laws or not making a legal argument (Order 143, p1). This means that the Court has no other legitimate reasons for denying the Motion other than stating the lack of citations of case laws. As the Plaintiff's Motion narrative (DKT141) shows, everything is crystal clear; there is no need to go over board to cite additional support. The Plaintiff respectfully asks the Court to grant Plaintiff's Motion (DKT141) and issue appropriate sanctions against Whalen and defense counsels (Justin Farris et al).

## II.5    The Court's Interlocutory Order (DKT 144) Violated the Federal Health Privacy Law (HIPAA, 1996) and the Court's Protective Order

The Plaintiff filed Amended Motion to Seal (DKT140) that asked the Court to seal a number of documents containing non-public and confidential information protected by the Federal Health Privacy Law 1996 and by the Court's Protective Order (DKT64). First, the documents protected by the Health Privacy Law 1996 are Plaintiff's health records (Exhibits F7, 10, 19). Under this Law, a person's health information cannot be used or shared without this person's written permission. For example, without this person's authorization, the provider generally cannot give health  information to an employer (https://tinyurl.com/mchutypm). The

Plaintiff specifically mentioned these health records in her Motion to Seal (DKT144, p2, paragraph 3). Second, the Motion to Seal asked the Court to seal a number of documents protected by the Court's Protective Order. Although the Protective Order does not authorize filing of documents under seal, it refers to parties to N.D. Ind. L.R. 5-5, which further refers to Ind. Code 5-14-3-5.5, which give the Court the discretion in sealing confidential documents by weighing the benefits and harm of sealing or not sealing. In the Motion to Seal, the Plaintiff explained why sealing these health-related records and the documents that were originally maintained as "confidential" or otherwise contain personnel-related information should be sealed since the benefits of sealing them outweigh the harm. Although Plaintiff did not cite the Federal Health Law 1996 in the Motion because she thought that the Court would know this law, but she did cite a Supreme Court ruling that supported her Motion (DKT140, p2, paragraph 2). Unfortunately, the Court's Order (DKT144) denied Plaintiff's Motion to Seal in its entirety, including protected information by HIPAA and the Court's own Protective Order. The Plaintiff contends that the Court's denial of the Motion to Seal is not justifiable and asks the Court to correct this mistake—grant the Motion to Seal in its entirety.

**II.6    The Court's Order and Judgment (DKT145) Overlooked Connections between At-Work and Off-Work Harassment**

In Plaintiff's harassment claim, she presented representative evidence showing that her neighbors' harassment is part of the harassing network (DKT130, p26-27). The Plaintiff used "timing" (on and off-campus harassing started at the same time) and the similarities of harassing tactics used by this representative neighbor and on-campus harassers (Drummond, Whalen, Badia etc)—stalking on and off campus, throwing hateful looks, walking in anger etc., as well as the fact that this neighbor is an adjunct instructor at Purdue Fort Wayne in Academic Affairs

16

headed by Drummond **(see Appendix),** and a high school teacher, a friend of Drummond's wife Natalie Drummond, who used to be a public school teacher in Fort Wayne (this neighbor told me). These ties are facts, yet, the Court argues that this neighbor's off-work harassment does not "support a hostile work environment." The Court also used statute of limitation to exclude harassment outside the statutory period ( Order 145, p16, paragraph 2).  Since the Plaintiff has addressed the statute of limitation issue, she will only contest the Court's opinion on the off-work harassment. Legal experts have accepted connections between at-work and off-work harassment in support of a hostile work environment claim: **"**While employers cannot police all employee conduct outside the workplace, employee interactions outside of work can – and do – impact the work environment. Indeed, under certain circumstances, inappropriate conduct by an employee outside the workplace may still subject an employer to liability **(https://tinyurl.com/4t46p9pd).** The Plaintiff also presented other co-workers' off-campus stalking: Drummond showed up at Kroger store while Plaintiff was shopping there (DKT130, p25).  As for the harassment that happened within the statutory period, the Court arrived at the same "insufficient evidence" opinion that Plaintiff's evidence does not show racial motive (Order145, p17, paragraph1), which the Plaintiff has contested in the sections about "discrimination intent."

### III.   New Information--Continuation of Racial Harassment Following the Court's Order and Judgment (DKT145)

After the Court entered its Order 145 in Defendants' favor, the Plaintiff continued to experience racial harassment by Badia, Whalen, Drummond, and others, as well as neighbor Price; they continue to use same harassing tactics described earlier in this Motion. This is another reason the Plaintiff asks the Court to review, alter, and amend its Order and Judgment.

### 3    Conclusion

The fundamental principles of laws serve one purpose: get to the truth and enact justice. For the reasons set forth above, the Plaintiff respectfully requests that the Court enact the restorative justice in order to make the victim (Plaintiff) whole that includes:

1    the Court enter Judgment against the Defendants for compensatory damages (against Defendants) and compensatory and punitive damages (against the individually-named Defendants and their key ally Badia), reasonable attorney's fees and costs, and for all other just and proper equitable relief in the premises.

2    the Court grant Plaintiff's Motion to Sanction (DKT141 and Motion to Seal (DKT140).

3    the Court grant the *Clio* journal editorship to the Plaintiff.

4    the Court make arrangement for the state actors and their key ally Badia to be

transferred off Purdue Fort Wayne and be given appropriate sanction.

### 4    Prayer

WHEREFORE, the Plaintiff respectfully requests that this Amended Motion be granted and Judgement be entered in her favor.

Respectfully submitted,

*Lidan Lin*

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

## CERTIFICATE OF SERVICE

The undersigned hereby swears and affirms that a true and correct copy of the above was

served by the Clerk's Office (1300 S. Harrison St. Fort Wayne, 46802) to the Court and served

electronically to Purdue's counsels of record on April 16, 2024.


Lidan Lin (Plaintiff, pro se)

*Lidan Lin*
7205 Sandyridge Place

Fort Wayne, IN 46835

llin3000@yahoo.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

LIDAN LIN,

          Plaintiff,

          v.                    CAUSE NO.: 4:20-CV-97-TLS

THE TRUSTEES OF PURDUE
UNIVERSITY, CARL DRUMMOND, and
LACHLAN WHALEN,

          Defendants.

### OPINION AND ORDER

In February 2019, the Plaintiff Lidan Lin applied for positions as editor-in-chief of *Clio* and acting chair in the English department at Purdue University in Fort Wayne, where the Plaintiff was a tenured professor in the English Department. When she was not offered either position, the Plaintiff filed a Complaint [ECF No. 1] in this Court. She amended her Complaint five times, ultimately alleging in her Fifth Amended Complaint [ECF No. 59] that: (1) the Defendant The Trustees of Purdue University failed to hire her as acting chair based on racial (Asian) and national origin (Chinese) discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Title VII); and (2) Defendants Carl Drummond and Lachlan Whalen violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 (§ 1981) when she was not hired as the acting chair based on racial discrimination, she was not hired as editor-in-chief of *Clio* based on racial discrimination, Whalen was hired based on racial discrimination, Janet Badia was appointed Dean of the College of Liberal Arts (in May 2021) based on retaliation, and they created a hostile work environment. This matter is before the Court on Defendants' Motion

for Summary Judgment [ECF No. 121], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court GRANTS the Defendants' motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

2

**MATERIAL FACTS**[1]

### A.    Purdue University in Fort Wayne

Purdue University is a public university that receives funding from the State of Indiana. Def. Ex. 2, ¶ 5, ECF No. 123-2. Defendant The Trustees of Purdue University (Purdue) is the governing body of Purdue University. *Id.* In 1964, Purdue opened a combined campus with Indiana University in Fort Wayne known as Indiana University-Purdue University Fort Wayne. *Id.* ¶ 6. On July 1, 2018, the University split into two campuses, Purdue University Fort Wayne and Indiana University Fort Wayne. *Id.* Indiana University Fort Wayne took charge of the health sciences, while other areas, including English and Linguistics, became a part of Purdue University Fort Wayne. *Id.*

### B.    Carl Drummond, Vice Chancellor for Academic Affairs

Defendant Carl Drummond began employment with Purdue on August 15, 1994, as an Assistant Professor of Geology. *Id.* ¶ 3. Drummond assumed the role of Vice Chancellor for Academic Affairs at Purdue Fort Wayne in February 2014, the position he currently holds. *Id.* ¶ 4. As Vice Chancellor for Academic Affairs, he provides academic leadership and financial management for academic affairs. *Id.*

### C.    The Plaintiff's Employment at Purdue University Fort Wayne

The Plaintiff identifies as "Asian-American/Chinese." Fifth Am. Compl. ¶ 1, ECF No. 59. She was offered and accepted the position of Assistant Professor of English for Indiana University-Purdue University Fort Wayne in 2001. Def. Ex. 2, ¶ 9. The Plaintiff received tenure on July 1, 2006. *Id.* She was promoted to full professor in 2010. Fifth Am. Compl. ¶ 2.

---

[1] The facts offered by the parties are considered only to the extent they are supported by the properly cited evidence of record.

3

Beginning April 20, 2018, the Plaintiff began teaching exclusively online. Def. Ex. 1, 40:6–11, ECF No. 123-1. When Indiana University-Purdue University Fort Wayne was divided into two campuses, the Plaintiff's employment continued with Purdue University Fort Wayne. Def. Ex. 2, ¶ 10. The Plaintiff remained a tenured Professor of English within the Department of English and Linguistics in the College of Arts and Sciences. *Id.* She continues to teach English Literature in the Department of English and Linguistics. *Id.*

### D.    Hiring Process for the *Clio* Editor-in-Chief Position

On February 22, 2019, English Professor and Editor-in-Chief of *Clio: A Journal of Literature, History, and the Philosophy of History* (*Clio*), Rachel Hile, emailed full-time faculty in various departments, including English and Linguistics, to announce an opening for her editor-in-chief position. Def. Ex. 4, ¶ 8, ECF No. 123-4. *Clio* is an interdisciplinary journal focusing on literature and historiography published three times per year. *Id.* ¶ 9; Def. Ex. 2, ¶ 14. The editor-in-chief solicits and receives submissions, securing peer reviews for submissions, working with authors on revisions, finalizing articles and book reviews for the publication process, and working as needed with the managing editor to help see issues through the publication process. Def. Ex. 4, ¶ 10; Def. Ex. 2, ¶ 14. Candidates for the position needed to send a letter of interest and curriculum vitae to Hile. Def. Ex. 2, ¶ 15.

Preferences for the next editor-in-chief included that the candidate be a tenured faculty member, that the candidate's research fit the content of *Clio*, and that the candidate have previous editorial experience. Def. Ex. 4, ¶ 12. On March 6, 2019, Defendant Lachlan Whalen, a tenured Associate Professor in the Department of English and Linguistics since the Fall of 2015, applied for this editor-in-chief position. *Id.* ¶¶ 4, 13. The Plaintiff also applied for the editor-in-chief position on March 7, 2019. Def. Ex. 1, 163:14–22.

4

Hile and Drummond reviewed the applications of the Plaintiff and Whalen and met to discuss their qualifications and credentials. Def. Ex. 2, ¶ 16. Both Whalen and the Plaintiff were tenured faculty members, had interdisciplinary research programs that bring together literature and history, and had some editorial experience. *Id.* ¶ 17. However, Whalen had some other professional experience in addition to peer-reviewing that Hile and Drummond believed would help him communicate with the managing editor and the printer. *Id.* ¶ 18.

Specifically, Whalen had previously served as an editorial board member of *Native Directions*, a Native American-focused magazine housed at the University of North Dakota. *Id.* ¶ 18; Def. Ex. 4, ¶ 15. As an editorial board member, Whalen assisted with every aspect of the periodical, from coming up with issue themes, to soliciting, writing, and editing articles, to creating the actual layout of individual issues. Def. Ex. 4, ¶ 15. Whalen also worked with authors at all stages of the submission and revision process. *Id.* ¶ 15; Def. Ex. 2, ¶ 18. Moreover, Whalen had many years of administrative experience as Director of International Studies that Hile and Drummond believed gave him skills that would transfer in significant ways to the role of editor-in-chief, while the Plaintiff had no administrative experience. Def. Ex. 2, ¶ 18. Because of Whalen's professional and administrative experience, Drummond agreed with Hile that Whalen was more qualified to be editor-in-chief, which is why Whalen was offered the editor-in-chief position. *Id.* ¶ 19.

**E.    Hiring for the Acting Chair Position**

On February 1, 2019, Ronald Friedman, Interim Dean of the College of Arts and Sciences, sent an email intended for English Department faculty announcing that the English Department Chair, Dr. Aasand, would be taking a sabbatical, and therefore, the English Department sought an acting chairperson (acting chair) in his absence. Def. Ex. 3, ¶ 3 ECF No.

5

123-3. The Plaintiff refers to the "acting" chair position as an "interim" chair position. Def. Ex. 1, 105:9. However, a position is filled on an "interim" basis at Purdue when an employee in that position separates employment permanently and Purdue has not yet found a permanent replacement. Def. Ex. 2, ¶ 22. A position is filled on an "acting" basis at Purdue when an employee in that position steps away from his/her job duties temporarily. *Id.* Because Dr. Aasand was taking a temporary sabbatical, the more accurate title for the position Purdue sought to fill temporarily is acting chair. *Id.*

The acting chair was to fill the role and responsibilities of Dr. Aasand while he was on sabbatical. Def. Ex. 3, ¶ 4. In other words, the acting chair position was temporary, effective January 1, 2020, through June 30, 2020. *Id.* ¶ 5. Faculty interested in serving as the acting chair were asked to indicate their interest by emailing Friedman by February 15, 2019. *Id.* ¶ 6. The sole requirement to be qualified to apply for the acting chair position was that the candidate be a tenured member of the faculty. *Id.* ¶ 7. While not listed in the job posting, there were certain skills Friedman considered important in performing the job duties of an acting chair. *Id.* ¶ 8. For example, because the acting chair would be responsible for performing administrative tasks, administrative experience was important. *Id.* While not a requirement, Friedman explained that preference would be given to a full professor. *Id.* ¶ 9.

On February 2, 2019, the Plaintiff emailed Friedman to indicate her interest in the position. *Id.* ¶ 18. She stated, "Being a full professor, I feel obligated to step up to serve as acting chair." Pl. Ex. F, Ex. 18, p. 3, ECF No. 132-5, p. 54 of 106. On February 3, 2019, Friedman confirmed he received that email. *Id.* On February 11, 2019, the Plaintiff emailed Friedman, "I forgot to mention . . . , I held the position of 'Qian Tang Scholar' Chair Professor position from

6

2011-2018 at Hangzhou Normal University, China. I currently hold a Visiting Professor position at Southwest Jiaotong University, China . . . ." *Id.* p. 1–2, ECF No. 132-5, p. 52–53 of 106.

On February 12, 2019, Friedman received a request from Professor of Linguistics Shannon Bischoff asking that the English faculty be allowed to make anonymous nominations for the position. Def. Ex. 3, ¶¶ 15, 16. On February 13, 2019, Friedman extended the deadline to March 15, 2019, because there was more time to fill the position than he originally thought (he originally thought the position was for Fall 2019, but it was for Spring 2020). Pl. Ex. G, p. 16, ECF No. 132-6.[2] On February 13, 2019, the Plaintiff emailed Friedman, "I just found out you did say 'Spring 2020' in the original email. I assume the same criteria will apply—candidate must be tenured and preference is given to full professor. I assume self-nomination is accepted . . . ." *Id.* p. 5, ECF No. 132-5, p. 56 of 106. On February 13, Friedman responded, "Yes, it is spring 2020 but same criteria apply. Yes, self-nomination is acceptable. Yes, if there is more than one interested person, there will be a process whereby feedback/input is gathered by me and a recommendation is made to the VCAA." *Id.* p. 5, ECF No. 132-5, p. 56 of 106.

In the end, Dr. Debrah Huffman, Associate Professor and Director of Writing, received more than five anonymous nominations for the acting chair position and asked to be considered for the position on February 25, 2019. Def. Ex. 3, ¶ 19. Dr. Troy Bassett, Professor of English, received one anonymous nomination and, on March 15, 2019, expressed his desire to be considered for the acting chair position. *Id.* ¶ 23. The Plaintiff did not receive any anonymous

---

[2] On February 1, 2019, at 2:36 PM, Friedman sent an email to tenured faculty stating that the Chair of the English Department will be on sabbatical for Fall 2019 and the Department will be needing an acting chair in his absence and requesting that those wishing to be considered for the position to email him by February 15, 2019. Def. Ex. 3, Ex. A (DEF1000727), p. 1, ECF No. 123-3, p. 10 of 49. On February 1, 2019, at 17:36, Aasand emailed Friedman stating that his sabbatical was for Spring 2020. *Id.* On February 1, 2019 at 19:38, Friedman sent a revised email to tenured faculty stating Assand's sabbatical was for Spring 2020. Def. Ex. 3, Ex. B (DEF1000810), p. 1, ECF No. 123-3, p. 13 of 49.

nominations. *Id.* ¶ 24. At the time of applying, the Plaintiff, Bassett, and Huffman were all tenured faculty. *Id.* ¶ 27.

Upon closure of the March 15, 2019 deadline for candidate interest statements, Friedman asked the Plaintiff, Huffman, and Bassett to submit, by April 3, 2019, a short statement that included the candidate's experiences and qualifications that they felt made them suitable candidates for the position and how they saw themselves in the position. *Id.* ¶ 28. Specifically, on March 18, 2019, Friedman sent the Plaintiff an email stating that he was "asking each candidate to send [him] a short statement (1 to 3 pages, maximum)[,]" including experiences and qualifications making them a suitable candidate for the acting chair position, plans, and philosophies. Pl. Ex. F, Ex. 18, p. 4, ECF No. 132-5, p. 55 of 106. The Plaintiff, Huffman, and Bassett each submitted a statement that was shared with English Department faculty and staff. Def. Ex. 3, ¶ 29.

On May 6, 2019, Friedman solicited feedback from the English Department faculty, and on May 9, 2019, he solicited feedback from the English Department staff. *Id.* ¶¶ 30, 31. Friedman highly valued the feedback from faculty and staff because of the leadership role the acting chair would hold, requiring the ability to get along with and manage personnel in an effective and positive manner. *Id.* ¶ 32.

Feedback from faculty and staff regarding Huffman was as follows: (1) as the Director of the Writing Center, Huffman had the most administrative experience with regards to supervision, assessment, personnel evaluation, conflict management, and class scheduling; (2) Huffman had excellent rapport with staff, possessed good communication skills, and very positive interactions with English Department faculty; and (3) Huffman was the most organized and detail-oriented of the three candidates. *Id.* ¶ 34.

8

Feedback from faculty and staff regarding Bassett was as follows: (1) in his role as Interim Director of the English Graduate Program, Bassett had some administrative experience, but it was less than Huffman's experience; and (2) faculty and staff raised concerns about Bassett's decisiveness and responsiveness to emails. *Id.* ¶ 36.

Feedback from faculty and staff regarding the Plaintiff was as follows: (1) the Plaintiff had a lack of administrative leadership roles; and (2) faculty and staff questioned and raised concerns about her organizational skills, rapport with staff, and availability. *Id.* ¶ 35. The Plaintiff also testified that she did not have administrative experience. Def. Ex. 1, 85:13–20.

Additionally, English Department faculty and staff were given a survey and asked to rank the candidates, indicating their first, second, and third preferences. Def. Ex. 3, ¶ 37. The results of the survey ranking were as follows: Huffman received 17 first preference rankings and 3 second preference rankings; Bassett received 3 first preference rankings, 13 second preference rankings, and 1 third preference ranking; Plaintiff received 0 first preference rankings, 1 second preference ranking, and 14 third preference rankings. *Id.* ¶ 38.

On June 10, 2019, Friedman made the recommendation to offer the acting chair position to Huffman. *Id.* ¶ 41. Friedman recommended Huffman for the position because he believed, based on his discussions with faculty and staff, and the results of the survey, that Huffman was the most qualified for the position. *Id.* Friedman averred that the fact that Huffman was not a full professor did not come into play because of the information and feedback received about her that made her the best candidate by a wide margin. *Id.* Drummond supported the recommendation. Def. Ex. 2, ¶ 35. This was because he believed, based on Friedman's recommendation and rationale, that Huffman was the most qualified for the position. *Id.*

9

On June 11, 2019, Friedman emailed faculty and staff in the English and Linguistics Department, stating, "I wish to inform you that, based upon my recommendation and the approval of VCAA Drummond, Dr. Debra Huffman has been selected to serve as the acting chairperson." Def. Ex. A, Dep. Ex. 43, p. 11 (DEF1000279), ECF No. 123-1, p. 140 of 146.

On June 15, 2019, the Plaintiff sent Drummond and Friedman an email asking that they "reconsider the English Dept. interim chair selection decision" because she "strongly believe[s] that [she] [is] the best candidate for this position, all things considered." *Id.* at 12 (DEF 100280), ECF No. 123-1, p. 141 of 146. On June 18, 2019, Drummond responded, "Interim Dean Friedman solicited input from departmental faculty and staff. There was overwhelming support for Professor Huffman and I supported his recommendation. There is nothing further to consider." *Id.*

### F.     Appointment of Janet Badia as Dean of the College of Liberal Arts

Janet Badia was appointed Dean of the College of Liberal Arts in May 2021. Def. Ex. 2, ¶ 36. The Plaintiff believes that Drummond retaliated against her for filing her EEOC charge and this lawsuit by appointing Badia as Dean. Def. Ex. 1, 114:4–9. The Plaintiff did not apply for the Dean of the College of Liberal Arts position. Def. Ex. 2, ¶ 37. After Badia was appointed, on March 31, 2021, the Curriculum Committee that Badia co-chaired did not approve the Plaintiff's proposed courses, ENGL 10201 and ENGL 44601/54901. Pl. Ex. A, Ex. 7, p. 1–2, ECF No. 132-1, p. 15–16 of 58. Nevertheless, the Plaintiff maintains her employment as a tenured full professor and continues to teach courses that she previously taught. *Id.* ¶ 38.

### G.     Actions the Plaintiff Believes Constitute Harassment

On March 15, 2017, the Vice President for Ethics and Compliance granted the Plaintiff's appeal of Vice Chancellor David Wesse's decision finding her in violation of Purdue's anti-

harassment policy based on complaints by Jamé Lucas, a staff member in the English Department, made from May through November 2016 about harassment by the Plaintiff. Pl. Ex. A, Ex. 23, p. 1, ECF No. 132-1, p. 57 of 58. The related sanctions and remedial measures imposed against the Plaintiff were nullified. *Id.*

On April 5, 2018, the campus police received a complaint about the Plaintiff causing a disturbance on campus for being in an area she was not permitted to be in. Pl. Ex. A, Ex. 20, p. 1, ECF No. 132-1, p. 42 of 58. The Plaintiff told the responding officer that she was allowed to go wherever she wants because the Purdue campus is a public place. *Id.* However, the responding officer informed the Plaintiff that was not how it works, and she needs to comply with the rules. *Id.*

On February 24, 2020, the Plaintiff received a letter denying her request for the installation of security cameras in the Liberal Arts building on campus. Pl. Ex. C, Ex. 15, p. 1, ECF No. 132-3, p. 34 of 40.

On April 26, 2022, the Plaintiff received a letter from Chancellor Ronald L. Elsenbaumer informing her that Whalen had filed a harassment complaint against her. Pl. Ex. C, Ex. 8, p. 1, ECF No. 132-3, p. 18 of 40. In the complaint, Whalen asserted that the Plaintiff has harassed him by attempting to discredit him and by damaging his reputation on campus. *Id.*, p. 3, ECF No. 132-3, p. 20 of 40. On June 20, 2022, the Purdue investigators sent a report of their findings to Chancellor Elsenbaumer. *Id.*, p. 4, ECF No. 132-3, p. 21 of 40. On July 14, 2022, Chancellor Elsenbaumer sent the Plaintiff a letter informing her that the preponderance of the evidence does not support a finding of harassment by her. *Id.*, p. 11, ECF No. 132-3, p. 28 of 40. The Chancellor also found that Whalen's complaint was neither false nor malicious. *Id.*, p. 12, ECF No 132-2, p. 29 of 40.

11

**H.    The Plaintiff's EEOC Charge**

The Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on April 2, 2020, alleging race (Asian) and national origin (Chinese) discrimination. Fifth Am. Compl. Ex. 1, ECF No. 59-1. The Plaintiff's EEOC charge concerns one employment decision made in June 2019—the hiring of Huffman, and not the Plaintiff, for the acting chair position. *Id.*

## ANALYSIS

The Defendants move for summary judgment on each of the Plaintiff's claims in her Fifth Amended Complaint. The Court addresses the § 1981 hostile work environment and retaliation claims before turning to the remaining § 1981 and Title VII discrimination claims.

**A.    42 U.S.C. § 1981 Hostile Work Environment and Retaliation Claims**

*1.    Statute of Limitations*

To begin with, the parties dispute whether the statute of limitations bars evidence of events that occurred more than four years before this lawsuit was filed from being used to support the Plaintiff's § 1981 claims. Claims arising under the 1991 amendments to § 1981 are "governed by § 1658's 4-year statute of limitations[.]" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004)). Section 1981 claims based on conduct "that occurred after the formation of an employment contract" arise under the 1991 amendments. *Id.* at 373. Here, the Plaintiff alleges violations under § 1981 for a hostile work environment and retaliation. Thus, these § 1981 claims are subject to § 1658's 4-year statute of limitations because they are based on conduct that took place after the formation of her employment contract with Purdue in 2001. Accordingly, the Court may only consider events four years prior to when the Plaintiff filed her initial complaint in this action in support of her § 1981 claims. *See Dandy v. United Parcel Serv.,*

12

*Inc.*, 388 F.3d 263, 269 (7th Cir. 2004) ("[The plaintiff] filed her complaint on September 14,

2001; therefore, [the court] may consider events which occurred as early as September 14, 1997,

on her [§ 1981] hostile work environment and retaliation claims."). As the Plaintiff filed her

Complaint in this case on December 18, 2020, any § 1981 claim based on conduct that occurred

before December 18, 2016, is time-barred, unless an exception applies.

2.    *Section 1981 Hostile Work Environment*

The Defendants argue that the record does not show that the Plaintiff was subjected to a

hostile work environment. To prevail on her hostile work environment claim under § 1981, the

Plaintiff must point to evidence indicating that she was subject to harassment that was "(1) based

on race; (2) subjectively and objectively hostile; and (3) sufficiently severe *or* pervasive to

interfere with an employee's ability to perform [her] assigned duties." *Dandy*, 388 F.3d at 271.[3]

"To support a hostile work environment claim, the plaintiff need not show that the complained-

of conduct was explicitly racial, but must show it had a racial character or purpose." *Paschall*, 28

F.4th at 814 (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011)).

In support of this claim, the Plaintiff cites twenty-seven pages of her deposition transcript

without explanation. The Court's review of this testimony shows the theory of the Plaintiff's

hostile work environment claim is that she believes that Whalen began stalking her on campus in

2014. *See* Def. Ex. 1, p. 13. The Plaintiff testified that she identifies stalking by Whalen as using

"his body language, his facial expression[.]" *Id.* at 15. She additionally testified that Whalen

"would walk with force in his body" and "look at [her]" with a "very frightening look." *Id.* at 18.

The Plaintiff attributed this to Whalen "most likely planning on applying [for] . . . a tenured track

---

[3] "Claims under Title VII and § 1981 are analyzed in the same manner, and therefore case law addressing
one type of claim applies to both types." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir.
2022).

position in [her] department" and that she "was perceived as a barrier to Dr. Whalen's plan." *Id.*
at 16–17. She believes Whalen's tenure plan is illegal harassment because "it created a very
intimidating environment for [her]" due to their teaching areas overlapping. *Id.* at 17–18. She
"could not think of any other reason that [Whalen] would express those feelings of hostility
towards [her], other than the fact that [she] [is] Chinese." *Id.* at 24.

In addition, the Plaintiff contends that the following actions—that are within the statutory
period—created a hostile work environment:

- The Plaintiff appealed Vice Chancellor Wesse's decision to give her sanctions
  and remedial measures based on complaints made in 2016 by a staff member in
  the English Department about harassment by the Plaintiff, and the decision was
  reversed (March 2017);
- Drummond showed up at a grocery store at the same time the Plaintiff was there
  (August 2017, 2018, or 2019);
- Drummond showed up at the entrance to a building on campus to threaten her
  (March 8, 2018, October 31, 2018, and October 24, 2019);
- the campus police received an anonymous complaint about the Plaintiff (April 6,
  2018);
- Whalen was made editor-in-chief of *Clio*, not the Plaintiff (2019);
- the Plaintiff was not hired as acting chair (June 2019);
- Badia sat in a seat directly in front of the Plaintiff on a flight to a convention, and
  during the convention the Plaintiff observed patterns of harassment by Badia
  (January 2020);
- the Plaintiff found she had two flat tires because of nail punctures (January 27,
  2020);
- the Plaintiff's request for installation of security cameras on campus was denied
  (February 2020);
- Badia was appointed Dean of the College of Liberal Arts (May 2021);
- a female associate professor walked by the Plaintiff on campus with obvious
  anger on her face (September 9, 2021);
- Badia walked past the Plaintiff on campus with deliberately hateful/disdainful
  looks (December 1, 2021);
- a male associate professor deliberately threw nasty/sneering looks at the Plaintiff
  and two visiting scholars from China on campus (December 1, 2021);
- the Plaintiff saw a white male at the grocery store wearing a mask, so she could
  not tell if it was Drummond or not (December 4, 2021);
- Badia often threw hateful/disdainful looks at the Plaintiff (January to February
  2022); and
- Whalen filed a complaint that the Plaintiff was harassing him (2022).

14

ECF Nos. 130 at 3, 6–11, 21–27, 133 at 1.

First, as for the conduct by Drummond, Badia, and the male associate professor, the Plaintiff either does not cite the record or her citation to the record does not support the proposition asserted.[4] Thus, the Court need not consider these factual allegations.

Second, even if the evidence could potentially support all the listed factual allegations, there is no evidence that any of these actions that the Plaintiff considers harassment was motivated by the Plaintiff's race. This is because the record, including the Plaintiff's testimony on her theory for the hostile environment claim, does not show that the listed "[actions] were 'inherently racial,' that they evidenced 'negative attitudes toward [Asian]-Americans,' or that they had 'racial . . . overtones.'" *Beamon*, 411 F.3d at 863–64 (quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345–46 (7th Cir. 1999)). "While it is true that harassment need not be explicitly racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Id.* (cleaned up). Rather, the Seventh Circuit has "held that the alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Id.* (cleaned up).[5]

---

[4] For example, for the factual allegations related to harassment by Badia, the Plaintiff cites Exhibit D, but there does not appear to be an Exhibit D attached to her summary judgment brief. *See* ECF No. 132. To the extent that the Plaintiff meant to cite to her declaration in Exhibit E, the declaration does not contain a statement about conduct by Badia. *See* Pl. Ex. E, Ex. 1, ECF No. 132-4. The Plaintiff further cites her deposition transcript; however, the portion cited contains no reference to Badia's conduct either. *See* Def. Ex. A, p. 63, 65. The Plaintiff merely testified that Whalen was good friends with Badia, and then she went on to testify about the conduct of Suzanne LaVere. *Id.*

[5] In her brief and without citation to law, the Plaintiff contends that she "does not need to prove harassers' intent since their actions and the effects of those actions on Plaintiff already speak their intent." Pl. Br. 5, ECF No.1 30. However, the Seventh Circuit has "held that the alleged harassment must be 'sufficiently

In this case, the Plaintiff has identified no evidence of a connection between the unfair treatment she claims to have received and the fact that she is Asian. The Plaintiff asserts that "the harassers used non-verbal conduct, such as body language and facial expressions to express their racial hostility toward the Plaintiff," but her only bases for the assertion are the facts that the "harassment had intimidating and hostile effects" on her, Whalen knew the Plaintiff was Chinese, and the investigators found no basis for Whalen's 2022 complaint. Pl. Br. 5–6, ECF No. 130; Pl. Supp. Br. 1, ECF No. 133.  Although non-verbal harassment may be used to support a hostile work environment claim, the Plaintiff must still show that it "had a racial character or purpose." *Paschall*, 28 F.4th at 814. Here, the non-verbal harassment of which the Plaintiff complains "could just as readily have been perpetrated upon a white person without any alteration in its character or purpose." *Beamon*, 411 F.3d at 864. And, the Plaintiff points to no "other evidence [that] supports a reasonable inference tying the harassment to [her] protected status." *Id.* Accordingly, the Court cannot reasonably construe the actions in the evidence or even the other factual allegations that the Plaintiff cites as being motivated by hostility to the Plaintiff's race.

There are several other actions listed by the Plaintiff that also do not create a genuine dispute of fact on her hostile work environment claim. To the extent that the Plaintiff lists actions by her neighbors at her personal off-campus residence that she believes constitute harassment, the Court declines to address these actions because she does not explain how they support a hostile *work* environment, she does not reference legal authority that supports consideration of such actions, and she fails to provide citations to admissible evidence for most. Additionally, to the extent that the Plaintiff asks the Court to consider actions that predate December 18, 2016,

---

connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Beamon*, 411 F.3d at 863–64.

based on the continuing violation doctrine because they are "logically linked to other claims" or

"a catalyst" for future adverse employment actions, neither reason suffices. *See* Pl. Br. 3.[6] This is

because Plaintiff must "show . . . the use of racially charged [conduct] [occurred] during the

relevant statutory period[.]" *Dandy*, 388 F.3d at 271. As discussed above, the Plaintiff has not

shown racially charged conduct during the statutory period, thus "[she] is barred from relying on

conduct prior to [December 18, 2016], to sustain her hostile work environment claim under the

'continuing violation' doctrine." *Id.* As a result, the Plaintiff has failed to present evidence

sufficient to survive summary judgment on the § 1981 hostile work environment claim alleged in

her Fifth Amended Complaint. *See Beamon*, 411 F.3d at 864.[7]

*3.    Section 1981 Retaliation*

The Defendants argue that the Plaintiff's retaliation claim is not supported by the record.

To survive summary judgment on her claim of retaliation under § 1981, the Plaintiff must offer

enough evidence to permit a reasonable jury to find that she suffered a "materially adverse

action" because she engaged in "protected activity." *Pantoja v. Am. NTN Bearing Mfg. Corp.*,

495 F.3d 840, 848 (7th Cir. 2007). As to conduct within the statute of limitations period, the

---

[6] For her hostile work environment claim, the Plaintiff asks the Court to consider the following actions
that predate December 18, 2016: (1) the Plaintiff's objection to the hiring of Whalen for a position in the
English department (2014 and 2015); (2) a secretary has been stalking the Plaintiff (since 2014); (3) a
female associate professor walked violently past her and threw angry looks at her (November 2014); (4) a
female associate professor has used her body to express racial anger whenever she encountered the
Plaintiff (since 2014); (5) the Plaintiff's complaint to the campus police department that she was being
stalked because she was Asian (2015); (6) the Plaintiff's complaint to Drummond that Whalen was
harassing her (2015); (7) Drummond walked past the Plaintiff deliberately twisting his body, clenching
his fists, and throwing hateful looks at her (August 21, 2015); (8) placement of the Plaintiff on leave (Fall
2015); (9) the Plaintiff's request for campus security camera installation (2015); (10) Whalen followed
the Plaintiff to a coffee shop (January 29, 2016); (11) Lucas' complaints about the Plaintiff to HR (May
through November 2016); (12) the investigation of Lucas' complaints, resulting in the investigator
recommending three sanctions against the Plaintiff (2015); and (13) Lucas' petition for a protective order against
the Plaintiff (November 14, 2016), and the judge's denial of Lucas' petition (December 8, 2016). ECF
No. 130 at 3, 6–11, 21–27.
[7] Thus, the Court need not address the parties' additional arguments on the other elements of a hostile
work environment claim.

17

Plaintiff argues that Drummond retaliated against her by appointing Janet Badia as Dean of the College of Liberal Arts in May 2021.[8] In reply, the Defendants argue that this action is not a materially adverse action. For the reasons set forth below, the Court agrees with the Defendants and concludes that summary judgment is appropriate on the Plaintiff's § 1981 retaliation claim.

To be considered a materially adverse action, the Plaintiff must show retaliatory actions "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006). This means that "[a]n employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016) (cleaned up). Here, the Plaintiff appears to identify the appointment of Badia as Dean in 2021 as an adverse action. However, the Plaintiff does not dispute that she did not apply or intend to apply for the Dean position at issue. Also, the Plaintiff does not explain how Badia's appointment was harmful. At most, the Plaintiff shows she was inconvenienced by Badia's appointment because, once she was Dean, Badia did not approve the Plaintiff's two proposed courses. Moreover, after Badia's appointment as Dean, the record shows that the Plaintiff maintained her employment as a tenured full professor, and the Plaintiff continues to teach courses that she previously taught. Thus, the Court concludes that the Plaintiff has not identified a materially adverse action.

To the extent that the Plaintiff contends that Badia has not approved the Plaintiff's application for travel and research funds, the Plaintiff does not support this contention with a citation to admissible evidence as is required at the summary judgment stage; thus, the Court

---

[8] To the extent that the Fifth Amended Complaint alleges a § 1981 claim against Defendant Whalen for retaliation, any such claim is abandoned because the Plaintiff did not address it in her summary judgment brief in response to the Defendants' motion on the claim.

disregards it. Also, the Plaintiff neglects to explain how the lack of such an approval is more than an inconvenience. Thus, even if the allegations of the lack of approval were supported by the record, the Plaintiff still has not shown that Badia' appointment as Dean was a materially adverse action.

Additionally, the Plaintiff contends that, under the continuing violation doctrine, the Court should consider Drummond placing her on leave during Fall 2015 for reporting harassment by Whalen and Badia to campus police in 2015 as actionable retaliation. *See* Pl. Br. 8. The Plaintiff also appears to include in her retaliation claim the hiring of Whalen in 2014 and 2015; as, according to the Plaintiff, the hiring of Whalen led to her reporting harassment by him to campus police, which led to placing her on leave and put her employment at risk—as she and Whalen teach similar courses. *See id.* However, hiring decisions and leave placement are discrete acts. *See Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004) (finding that suspension is a discrete act); *Jackson v. City of Chicago*, 552 F.3d 619, 623 (7th Cir. 2009) (explaining that hiring decisions are discrete acts). And, "[t]he Supreme Court has explained the continuing violation doctrine . . . 'preclud[es] recovery for discrete acts of . . . retaliation that occur outside the statutory time period.'" *Dandy*, 388 F.3d at 270 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). Consequently, the continuing violation doctrine precludes recovery by the Plaintiff for retaliation based on the hiring of Whalen or placing the Plaintiff on leave, for these are discrete acts, occurring before December 18, 2016, that are barred by the statute of limitations as set forth above.

Accordingly, the Plaintiff's retaliation claim fails.[9] Therefore, the Defendants are entitled to summary judgment on the Plaintiff's § 1981 retaliation claim brought in the Fifth Amended Complaint.

**B.    42 U.S.C. § 1981 and Title VII Discrimination Claims**

1.    *Scope of the EEOC Charge and Title VII Discrimination Claim*

The Defendants argue that, based on the scope of the Plaintiff's EEOC charge, the Plaintiff's Title VII discrimination claim against Purdue only includes a claim for discrimination based on the failure to hire the Plaintiff as acting chair of the English Department.[10] "There are several prerequisites for bringing a Title VII claim. A plaintiff must file a charge with the EEOC detailing the alleged discriminatory conduct within the time allowed by statute, and the EEOC must issue a right-to-sue letter." *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005). "In addition, claims brought in judicial proceedings must be within the scope of the charges filed with the EEOC; [a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Id.* (cleaned up).

"[I]f certain claims are not included in an EEOC charge, a plaintiff can still bring them if they are like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011) (cleaned up).

---

[9] Since the Plaintiff has not shown an adverse action within the statute of limitations, the Court need not address the parties' other arguments on the Plaintiff's retaliation claim.

[10] In her summary judgment response brief, the Plaintiff does not respond to this argument on the scope of her EEOC charge. Thus, she waives any such argument.

"To be 'like or reasonably related,' the relevant claim and the EEOC charge 'must, at minimum,

describe the same conduct and implicate the same individuals.'" *Id.* at 257.

> Here, the Plaintiff's EEOC charge states:
>
> I have been employed by Purdue University for 19 years. I am a tenured full
> professor in the English Department. In February 2019, I applied for the Interim
> Chair position for the English Department. I, along with two other tenured
> associate professors applied for the position. In the posting for the position it
> stated that tenured full professors would be given preference but [I] was not. On
> or about June 2019 a decision was made and the position was awarded to tenured
> Associate Professor, Deborah Huffman (white). I believe that I have been
> discriminated against based on my race (Asian) and National Origin (Chinese)
> which are both violations of Title VII of the Civil Rights Act of 1964 as amended.

ECF No. 59-1.[11]

The Plaintiff's claim for discrimination based on the failure of Purdue to hire her for the

acting chair position is indeed within the scope of her EEOC charge. And, her "allegation can

only be understood to refer to" Purdue's failure to hire her for the acting chair position in June

2019 because of her race and national origin. *Chaidez v. Ford Motor Co*., 937 F.3d 998, 1006

(7th Cir. 2019). Accordingly, the Plaintiff's discrimination claim based on Purdue's failure to

hire her for the acting chair position is the only Title VII claim within the scope of the EEOC

charge before the Court. To the extent that the Plaintiff may be bringing Title VII claims for

retaliation, a hostile work environment, or discrimination based on hiring Whalen in 2014 and

2015, being put on leave for Fall 2015, being given sanctions and remedial measures based on

complaints made in 2016 by Jamé Lucas, or not being hired as editor-in-chief of *Clio*, such

claims fall outside the scope of the Plaintiff's EEOC charges thus are not considered by the

Court.

---

[11] The Plaintiff refers to the "acting" chair position as the "interim" chair position.

2.    *Discrimination Claims Under Title VII and § 1981*

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

To succeed on her Title VII discrimination claim, the Plaintiff must prove "(1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Because courts analyze claims of discrimination under § 1981 and Title VII similarly, the Court considers below the Plaintiff's discrimination claims under § 1981 and Title VII. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019) ("[Courts] apply the same standard to discrimination claims under § 1981, Title VII, and the [ADEA].").[12]

The Plaintiff appears to rely on the *McDonell Douglas* burden-shifting framework to survive summary judgment on her discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the Plaintiff must establish a prima facie case of employment discrimination by showing the following: "(1) [she] is a member of a

---

[12] The main difference is that "discrimination claims under Title VII simply require that [the protected characteristic] be a motivating factor in the defendant's challenged employment decision," whereas discrimination claims under § 1981 require the plaintiff to show the protected characteristic "was a but-for cause of [her] injury." *Id.* (cleaned up). However, the difference is not material here because, as set forth in the Court's analysis, there is no evidence of causation.

22

protected class; (2) [she] applied for and was qualified for an open position; (3) despite [her] qualifications, [she] was rejected for the position; and (4) a similarly situated person outside [her] protected class was hired for the position instead, or the position remained open." *Sweatt v. Union Pac. R.R. Co*., 796 F.3d 701, 709 (7th Cir. 2015).

If the Plaintiff meets each element of her prima facie case, the burden then shifts to the Defendants "to offer a nondiscriminatory justification for the challenged employment action." *Groves v. S. Bend Cmty. Sch. Corp*., 51 F.4th 766, 770 (7th Cir. 2022). The burden then shifts back to the Plaintiff to show the Defendants' "proffered nondiscriminatory reason amounted to pretext for discrimination." *Id*. Nevertheless, for her discrimination claim to reach a jury, the Plaintiff has "to identify evidence indicating that the statutorily protected factor[s]"—that her race of Asian and her national origin of Chinese—"caused" Purdue and/or Drummond not to hire her. *See Xiong v. Bd. of Regents of Univ. of Wis. Sys*., 62 F.4th 350, 354 (7th Cir. 2023).

In her response brief, the Plaintiff identifies three discrimination claims: Purdue and Drummond not hiring her as acting chair of the English Department (Title VII and § 1981), Drummond not hiring her as editor-in-chief of *Clio* (§ 1981), and Drummond's hiring of Whalen in 2014 and 2015 (§ 1981). As for the last basis, as argued by the Defendants, the discrimination claim based on Whalen's hiring is untimely as outside the statutory period for § 1981 claims, which began to run on December 18, 2016. The Plaintiff nevertheless contends that this evidence should be considered under the continuing violation doctrine, reasoning that Whalen's hiring served as a catalyst for later discrimination. However, as discussed above, a hiring decision is a discrete act. *See Jackson*, 552 F.3d at 623. And, "the continuing violation doctrine . . .

23

preclud[es] recovery for discrete acts of discrimination . . . that occur outside the statutory time period." *Dandy*, 388 F.3d at 270 (cleaned up).[13]

The Defendants contend that summary judgment should be granted on the Plaintiff's remaining two discrimination claims under Title VII and § 1981 because she has, among other things, (1) failed to establish a prima facia case of discrimination due to her race or national origin under the *McDonnell Douglas* burden-shifting framework, (2) failed to demonstrate nondiscriminatory reasons for Purdue and Drummond not hiring her as acting chair of the English Department and Drummond not hiring her as editor-in-chief of *Clio* were pretextual, and (3) otherwise failed to show that a reasonable jury could find the evidence as a whole supports her claims of discrimination based on race or national origin. As set forth below, the Plaintiff has failed to demonstrate that the nondiscriminatory reasons for Purdue and Drummond not hiring her were a pretext for discrimination based on her race or national origin and has otherwise failed to point to evidence that as a whole shows unlawful discrimination. Thus, the Court need not consider the Defendants' remaining arguments on the prima facie case. The Court first addresses the Plaintiff's discrimination claim based on the Defendants' failure to hire her for the acting chair position and then addresses her discrimination claim based on Drummond's failure to hire her as the editor-in-chief of *Clio*.

a.    Acting Chair Position—Title VII Claim Against Purdue and § 1981 Claim Against Drummond

Assuming, without deciding, that the Plaintiff has established a prima facie case of discrimination based on Purdue not hiring her for the position of acting chair of the English

---

[13] Therefore, the Court need not address the Plaintiff's arguments on how Whalen's hire put her employment at risk, Purdue's spouse hire accommodation policy, or how Whalen's "hire was done so differently from other spouse hires, [the] Plaintiff cannot think of other reasons than racial discrimination for this hire." Pl. Br. 8–9.

Department, the Defendants are still entitled to summary judgment because they have presented legitimate, nondiscriminatory reasons for not hiring the Plaintiff and the Plaintiff has not pointed to evidence showing that those reasons were pretext for unlawful discrimination. The legitimate, nondiscriminatory reasons the Defendants presented for not hiring the Plaintiff for the acting chair position include the following: (1) in a survey of faculty and staff, the Plaintiff received the following ranking preferences compared to the other two candidates: 0 (firsts), 1 (second), and 14 (thirds); (2) she lacked administrative leadership roles; and (3) questions and concerns were raised with regard to the Plaintiff's organizational skills, rapport with staff, and availability. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived.[14] Accordingly, the Court concludes that the Defendants have met their burden of producing nondiscriminatory justifications for not hiring the Plaintiff for the acting chair position. The burden now shifts to the Plaintiff to establish pretext.

In assessing pretext, courts do not "evaluate whether the employer's proffered justification was accurate or even whether it was unfair. [The] sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Id.* (cleaned up); *see Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) ("[P]retext does not exist if the decisionmaker honestly believed the nondiscriminatory reason."). "[T]he only

---

[14] *See Xiong*, 62 F.4th at 354 (finding the plaintiff forfeited his arguments on pretext that were not raised before the district court); *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020) (determining that the plaintiff waived argument on evidence in the record supporting an inference of an improper motive when he did not raise the issue before the district court); *Coleman v. Hardy*, 690 F.3d 811, 819 (7th Cir. 2012) ("[I]f the argument itself was not adequately developed [before the district court], it is . . . waived.").

question is whether the [defendant] *honestly believed* it had [] non-discriminatory reason[s] for [the plaintiff's] [adverse employment action]." *Brooks*, 39 F.4th at 436 (emphasis added).

Additionally, when, as here, the defendants raise more than one reason for an employee plaintiff's termination, the plaintiff "[has] to raise an issue as to pretext for each proffered [reason] to withstand summary judgment." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015). Otherwise, the plaintiff must show that the defendants' reasons "are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 404 (7th Cir. 2008) (cleaned up).

The Plaintiff argues that the Defendants' legitimate, nondiscriminatory reasons are pretextual because Friedman did the following in hiring the acting chair: (1) extended the application deadline because he did not want the Plaintiff to be the acting chair, lying about his reason for the extension; (2) stated a preference for a full professor but hired an associate professor; and (3) did not use a legitimate procedure when he invited feedback on the candidates from faculty and staff. The Court finds that these actions do not establish pretext.

As to her first argument, although the facts when viewed in the light most favorable to the Plaintiff support a reasonable inference that Friedman extended the deadline so Huffman could also apply for the acting chair position, the Plaintiff does not point to any facts supporting the reasonable inference that Friedman did not want the Plaintiff to be acting chair or extended the deadline because of animus for the Plaintiff's race or national origin. *See Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021) ("Yet, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext *for the prohibited animus*." (emphasis added) (cleaned up)). As to her second argument, the Plaintiff cites no legal

26

authority that suggests that an employer's failure to hire an employee with a stated preference is evidence of pretext when the hired employee does not have the preference but has other relevant qualifications that the plaintiff does not. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). For her third argument, the Plaintiff cites a Purdue policy that defines "voting faculty" and another policy that applies to hiring a new department chair and addresses voting.[15] However, she cites no evidence that hiring for an acting chair position or eliciting feedback are governed by this policy. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 507 (7th Cir. 2014) (holding that the plaintiff's pretext argument failed when the defendant did not violate its own policy by terminating her employment without a prior warning). Thus, the Court concludes that the Plaintiff has not pointed to evidence showing that the Defendants' legitimate, nondiscriminatory reasons were a pretext for discrimination.

Even if the Plaintiff had offered evidence to dispute the Defendants' reasons, the Plaintiff does not say how or even try to show that Friedman or Drummond, the decisionmakers for hiring the acting chair, did not honestly believe the stated reasons for not hiring her and thus waives any such argument. Therefore, the Plaintiff has not shown pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in the reasons stated by Purdue, Friedman, and Drummond "that a reasonable person could find them unworthy of credence and hence infer that [Purdue or Drummond] did not act for the asserted non-

---

[15] The Purdue policy provides, "Voting Faculty shall consist of those full-time member of the faculty . . ." Pl. Ex. C, Ex. 1, p. 1, ECF No. 132-3, p. 2 of 40. Another Purdue policy provides rules for the "Appointment of New Chair" when "the incumbent Chair succumbs, resigns, or is unwilling to serve an additional term[,]" which also includes rules for voting. Pl. Ex. C, Ex. 18, p. 1, ECF No. 132-3, p. 37 of 40.

27

discriminatory reasons." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Furthermore, even if the Plaintiff had shown that the Defendants' legitimate reasons were lies, the Plaintiff points to no specific examples, whether verbal or non-verbal, from which a jury might infer her Asian race or Chinese ethnicity motivated the Defendants not to hire her. "[I]dentifying an inconsistency (or even a lie) is not necessarily sufficient to prove that the employer's rationale was pretext for discrimination." *Groves*, 51 F.4th at 770. "What ultimately matters is causation: the plaintiff must point to evidence that would allow a jury to find a connection between the statutorily protected factor (here, race [and national origin]) and the adverse action. . . ." *Id.* (cleaned up). "Right to it, the controlling question is whether a reasonable jury could find prohibited discrimination." (cleaned up).

In this case, a reasonable jury could not find prohibited discrimination. Rather than identifying evidence from which a reasonable factfinder could conclude that Purdue, Friedman, or Drummond did not hire the Plaintiff for the acting chair position because she was Asian or Chinese, the Plaintiff contends that "Drummond and Friedman . . . backed down on procedure and on full professor preference" "[b]ecause Plaintiff was a full professor and Chinese," which "can be inferred from the behind-the-scene email exchanges between Huffman, Friedman, and Drummond." Pl. Br. 15 (citing Pl. Ex. F, Ex. 18, p. 1–6, ECF No. 132-5, p. 52–57 of 106). However, the Plaintiff does not point to facts or details in the email communication that show Drummond and Friedman decided not to hire the Plaintiff because she is Asian or Chinese. A review of the referenced series of emails shows most are to or from Friedman or Drummond, are about the interim chair position, and involve these topics: the selection process, the selection results, and reconsideration of the selection results. But there is no indication in any of the emails

28

that the hiring decision for the position had anything to do with the Plaintiff's race or national origin. Thus, the emails cannot support the Plaintiff's Title VII and § 1981 discrimination claims.

At most, the record contains the Plaintiff's personal belief that she was not hired for the interim chair position due to her race or national origin. Contrary to the Plaintiff's assertion, "these personal beliefs are insufficient to give rise to a genuine factual dispute over whether [the Plaintiff] was the victim of race . . . discrimination." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (cleaned up). Accordingly, the Plaintiff has failed to establish pretext. As a result, Purdue is entitled to summary judgment on her Title VII discrimination claim, and Whalen and Drummond are entitled to summary judgment on her § 1981 discrimination claim. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments on whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901 ("[The court] need not address any of the plaintiffs' arguments with respect to whether they have established a prima facie case because, even if [the court] assume[s] that the plaintiffs have met this burden, [the court] still must hold that they have failed to produce sufficient evidence of pretext."). Therefore, the Court grants summary judgment in favor of Purdue on the Plaintiff's Title VII discrimination claim and in favor of Drummond and Whalen on the Plaintiff's § 1981 discrimination claim based on the Defendants' failure to hire her for the acting chair position.

b.    Editor-in-Chief of *Clio*—§ 1981 Discrimination Claim Against Defendant Drummond and Defendant Whalen

Assuming, without deciding, that the Plaintiff has established a prima facie case, Defendants Drummond and Whalen are still entitled to summary judgment on the Plaintiff's § 1981 discrimination claim against them. To begin with, in her response brief, the Plaintiff only alleges discriminatory conduct within the limitations period on behalf of Defendant Drummond

29

for not hiring her as editor-in-chief. As discussed above, she does not allege any discriminatory conduct by Whalen within the limitations period. Thus, the Plaintiff's claim for discrimination against Defendant Whalen under § 1981 fails.

Defendant Drummond has presented legitimate, nondiscriminatory reasons for not hiring the Plaintiff as editor-in-chief of *Clio*, and the Plaintiff has not pointed to evidence showing that those reasons were a pretext for unlawful discrimination. The legitimate, nondiscriminatory reasons Drummond presented for not hiring the Plaintiff as editor-in-chief are that she (1) she lacked administrative experience; and (2) she had less editorial experience and peer review experience than the candidate selected for the position. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived.[16] Accordingly, the Court concludes that Defendant Drummond has met his burden of producing nondiscriminatory justifications for not appointing the Plaintiff as editor-in-chief of *Clio*. The burden then shifts to the Plaintiff to establish pretext.

The Plaintiff argues that Drummond's legitimate, nondiscriminatory reasons are pretextual because Drummond should not have been in the position to make the decision on the *Clio* editor-in-chief for the reason that he has no experience.[17] However, the Plaintiff does not point to facts or details establishing animus for the Plaintiff's race was the reason that Drummond was given the authority to make the decision on the *Clio* editor-in-chief. *See Chatman*, 5 F.4th at 747. Therefore, the Court concludes that the Plaintiff has not pointed to evidence showing that Drummond's legitimate, nondiscriminatory reasons were a pretext for unlawful discrimination.

---

[16] *See Xiong*, 62 F.4th at 354; *Tyburski*, 964 F.3d at 600; *Coleman*, 690 F.3d at 819.
[17] To the extent that the Plaintiff also references conduct in 2014–2016 occurring before December 18, 2016, consideration of these events as evidence of pretext is barred by the statute of limitations as set forth above.

30

Even if the Plaintiff had offered evidence showing Drummond had no experience, the Plaintiff does not say how or even try to show that Drummond, one of the decisionmakers for appointing the *Clio* editor-in-chief, did not honestly believe the stated reasons for not appointing her and thus waives any such argument.[18] Thus, the Plaintiff has not shown pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in Drummond's stated reasons "that a reasonable person could find them unworthy of credence and hence infer that [Drummond] did not act for the asserted non-discriminatory reasons." *Bates*, 726 F.3d at 956 (quoting *Boumehdi*, 489 F.3d at 792).

At most, the record contains the Plaintiff's personal belief that she was not hired as editor-in-chief because of her race. Again, contrary to the Plaintiff's assertion, "these personal beliefs are insufficient to give rise to a genuine factual dispute over whether [the Plaintiff] was the victim of race . . . discrimination." *Abrego*, 907 F.3d at 1014. Accordingly, the Plaintiff has failed to establish pretext, and Defendants Drummond and Whalen are entitled to summary judgment on her § 1981 discrimination claim. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments on whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901. Accordingly, the Court grants summary judgment in favor of Defendants Drummond and Whalen on the Plaintiff's § 1981 discrimination claim.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendants' Motion for Summary Judgment [ECF No. 121], and DENIES as moot the Plaintiff's Motion to Expedite

---

[18] Because the Plaintiff does not mention Rachel Hile, another decisionmaker for the editor-in-chief position, and there is no indication that any racial or national origin animus was involved in Hile's decision, the Court need not address her role in the decision making process.

31

Summary Judgment Ruling [ECF No. 142]. The Court DIRECTS the Clerk of Court to enter

judgment:

1.    in favor of The Defendant Trustees of Purdue University and against the Plaintiff Lidan
      Lin on her claim for discrimination under Title VII;

2.    in favor of Defendants Carl Drummond and Lachlan Whalen and against the Plaintiff
      Lidan Lin on her claims under § 1981 for discrimination, retaliation, and hostile work
      environment.

The Plaintiff takes nothing by her Fifth Amended Complaint. The Clerk of Court is directed to

close this case.

        SO ORDERED on April 17, 2024.

                                            s/ Theresa L. Springmann
                                          JUDGE THERESA L. SPRINGMANN
                                          UNITED STATES DISTRICT COURT

1

*Appendix 4*

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF INDIANA

## LAFAYETTE DIVISION

LIDAN LIN,                      )

                                )

          Plaintiff,            )

                                )

v.                              )    CAUSE NO.: 4:20-CV-00097-TLS-JPK

                                )

THE TRUSTEES OF PURDUE          )

UNIVERSITY, CARL DRUMMOND,      )

LACHLAN WHALEN,                 )

                                )

          Defendants.           )

-FILED-

MAY 28 2024

At _____ M

Chanda J. Berla, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

**Plaintiff's Response to Defendants' Opposition to Plaintiff's**

**Motion to Alter and Amend Judgment and Orders (Dkt 145, 144, 143)**

   Defendants' Opposition to the Plaintiff's Motion to Alter and Amend Judgment and Orders (Dkt 145, 144, 143) has no legal or factual basis and should be denied in its entirety for the following reasons:

1    Defendants asserted that the Plaintiff's Amended Motion to Alter and Amend Judgment and Order (Dkt154) was filed "untimely and should be ignored as untimely per the requirements of Fed. R. Civ. P. 59 9 (e)" ("Opposition" p1, paragraph 3). While *Fed Rule* 59 (e) does not set

USDC IN/ND case 4:20-cv-00097-TLS document 158 filed 05/28/24 page 2 of 6
2

rules for amending served pleadings, *Fed Rule* 15 (a) (1) (A) does, which allows a party to amend the pleading within 21 days after serving the pleading:

**Rule 15. Amended and Supplemental Pleadings**

(a) AMENDMENTS BEFORE TRIAL.

(1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it. . .

The Plaintiff's Amended Motion was court-stamped on May 16, 2024 and docketed on May 17, 2024, which was within 21 days from May 14, 2024, the day Plaintiff filed her Motion to Alter and Amend. Based on the above rule, Defendants' objection to Plaintiff's Amended Motion has no legal basis; therefore Plaintiff's Amended Motion should be accepted as timely. Defendants' negligence of *Fed Rule* 15 seems to betray their disregard for the law and desperation to beat down Plaintiff. This is not the first time Defendants do this (undermining Plaintiff against facts because she cannot afford to hire an attorney). For example, in their Brief in Support of their Motion for Summary Judgment, defense counsels misrepresented their clients by distorting the facts and wrote: "Plaintiff. . .makes bizarre and seemingly irrational allegations regarding whom she works and others. . .Plaintiff has testified that everyone, including her neighbors. . . are out to get her" (Dkt 122, p1, paragraph 1). These statements are not true; the Plaintiff never accused "everyone", but only those who actually discriminated, harassed, and retaliated against her; each of her allegations is well-supported by evidence, facts, and inferences. Plaintiff refuted Defendants' false statements in her Response Brief (Dkt131). There are many such false statements throughout their Motion for Summary Judgment (Dkt 122), which questions the credibility of defense counsels' representation.  This credibility issue came up again in defense

counsels' mishandling of "confidential" materials disclosed in the Discovery: they shared a

"confidential" document (DEF1000129 -133) with Defendant Whalen who then used this

document for a non-litigation-related matter (his internal complaint against Plaintiff filed in April

2022). Whalen's action is a violation of the Court's Protective Order (Dkt 64), which bars using

Discovery materials for non-litigation-related matters. Defense counsels' action is also a

violation of the Protective Order because they did not mark the said document as "confidential"

required by this Order, when the original/native document was marked and maintained as a

"confidential" document by PFW.  The Plaintiff asked the Court to sanction Whalen and defense

counsels for violating the Court's Protective Order in her Motion to Sanction (Dkt 141). The

Court denied this Motion; in response to this denial, Plaintiff filed her Motion (Dkt 154) asking

the Court to review its denial decision and grant her Motion (Dkt 154).

2     The Plaintiff stands by her Amended Motion to Alter and Amend Judgment and Orders

(Dkt 154) and disagrees with Defendants on viewing the Court's Judgment and Orders (145, 144,

143) because:

3     Defendants' flimsy defense of the Court's Judgment and Orders in the "Opposition"  (p2,

paragraphs 1, 2, 3) provides neither a viable legal basis nor measured justification. *Fed Rule* 61

(b) clearly sets the grounds for a party (the Plaintiff) to seek relief from a final judgment:

**Rule 61** FEDERAL RULES OF CIVIL PROCEDURE 84
on motion or on its own, with or without notice. But after an appeal
has been docketed in the appellate court and while it is pending,
such a mistake may be corrected only with the appellate
court's leave.
(b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR
PROCEEDING. On motion and just terms, the court may relieve a
party or its legal representative from a final judgment, order, or
proceeding for the following reasons:
(1) **mistake, inadvertence, surprise, or excusable neglect;**
(2) **newly discovered evidence that, with reasonable diligence,
could not have been discovered in time to move for a**

USDC IN/ND case 4:20-cv-00097-TLS document 158 filed 05/28/24 page 4 of 6

new trial under Rule 59(b);

(3) **fraud** (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) **any other reason** that justifies relief.

The Plaintiff has addressed the relevant "grounds," including pretextual "frauds" and "mistakes," as well as "newly discovered evidence" in her Amended Motion to Alter and Amened (Dkt 154).

4    Furthermore, in reviewing a final Judgment or an Order on Summary Judgment, the Court is expected to follow the Standard of Review: in ruling on a motion for summary judgment, a trial court "must view all the facts and draw all reasonable inferences in the light most favorable to the non-moving party" (citation omitted).

WHEREFORE, the Plaintiff requests that 1) her Amended Motion to Alter and Amend (Dkt 154) be accepted to replace Dkt 151; 2) Dkt 154 be reviewed, altered, and amended, as required by the Plaintiff; 3) the relevant information to Dkt 154 presented in this "Response" be used in reviewing, altering, and amending the Court's Judgment and Orders (Dkt 145, 144, 143); 4) Defendants' "Opposition" be denied in its entirety; 5) the Court's review of Dkt 154 be expedited because of Plaintiff's international professional activities in the coming months. *whalen's "editorial experience" addressed in Dkt 154 in Clio Journal Section b.e treated as a "fraud" until his editorial experience is proven by evidence.*

Respectfully submitted,

*Lidan Lin*

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

USDC IN/ND case 4:20-cv-00097-TLS   document 164   filed 05/28/24   page 5 of 6

5

## CERTIFICATE OF SERVICE

The undersigned hereby swears and affirms that a true and correct copy of the above was served by the Clerk's Office (1300 S. Harrison St. Fort Wayne, 46802) to the Court and served electronically to Purdue's counsels of record by the Plaintiff on April 28, 2024.

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

llin3000@yahoo.com

USDC IN/ND case 4:20-cv-00097-TLS document 156 filed 05/28/24 Page 6 of 6

*Appendix 5*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

LIDAN LIN,

Plaintiff,

v.

CAUSE NO.: 4:20-CV-97-TLS

THE TRUSTEES OF PURDUE
UNIVERSITY, CARL DRUMMOND, and
LACHLAN WHALEN,
Defendants.

### OPINION AND ORDER

This matter is before the Court on the Plaintiff's Amended Opposition to the Defendants'

Bill of Costs [ECF No. 154], filed on May 16, 2024, objecting to the Defendants' Bill of Costs

[ECF No. 147]. For the reasons stated below, the Court overrules the Plaintiff's objections.

### BACKGROUND

In February 2019, the Plaintiff Lidan Lin applied for positions as editor-in-chief of *Clio*

and acting chair in the English department at Purdue University in Fort Wayne, where the

Plaintiff was a tenured professor in the English Department. When she was not offered either

position, the Plaintiff filed a Complaint [ECF No. 1] in this Court. She amended her Complaint

five times, ultimately alleging in her Fifth Amended Complaint [ECF No. 59] that (1) the

Defendant The Trustees of Purdue University failed to hire her as acting chair based on racial

(Asian) and national origin (Chinese) discrimination in violation of Title VII of the 1964 Civil

Rights Act, 42 U.S.C. § 2000e, et seq. (Title VII) and (2) Defendants Carl Drummond and

Lachlan Whalen violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 (§ 1981) when she was

not hired as the acting chair based on racial discrimination, she was not hired as editor-in-chief

of *Clio* based on racial discrimination, Whalen was hired based on racial discrimination, Janet

Badia was appointed Dean of the College of Liberal Arts (in May 2021) based on retaliation, and they created a hostile work environment.

On December 11, 2023, the Defendants filed a Motion for Summary Judgment [ECF No. 121], arguing that the Plaintiff's claims fail as a matter of law. The Plaintiff filed a response [ECF No. 130] on January 18, 2024, and the Defendants filed a reply [ECF No. 137] on February 7, 2024. On April 17, 2024, the Court granted the Defendants' request for summary judgment. Op. & Ord., ECF No. 145. Afterward, the Clerk of Court entered judgment against the Plaintiff and in favor of the Defendants. ECF No. 146.

On April 30, 2024, the Defendants filed a Bill of Costs seeking $4,564.20. ECF No. 147. Of that amount, $4,431.20 is fees for printed or electronically recorded transcripts and $133.00 is fees for copies. *Id.* To their Bill of Costs the Defendants attached the declaration of Kathleen M. Anderson, an attorney for the Defendants, stating "pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct." ECF No. 147-1. The Defendants also attached multiple invoices with itemizations of the costs. Def. Ex. A, ECF No. 147-2; Def. Ex. B, ECF No. 147-3.

On May 14, 2024, the Plaintiff filed her objections. *See* Pl. Obj., ECF No. 151. On May 16, 2014, the Plaintiff filed her amended objections. *See* Pl. Am. Obj., ECF No. 154. The bases for the Plaintiff's objections include: (1) the Court Order ruling on the Defendants' Motion for Summary Judgment is appealable; (2) the Plaintiff has filed a Motion to Amend that Order; (3) the Plaintiff believes that the Court Order ruling on the Defendants' Motion for Summary Judgment needs to be amended; (4) the Defendants' financial resources outweigh the Plaintiff's; and (5) the Defendants' counsel indicated that the Defendants would waive their costs.

The Defendants have not filed a reply, and the time to do so has passed.

2

USDC IN/ND case 4:20-cv-00097-TLS    document 165    filed 06/25/24    page 89 of 172

Case 4:20-cv-00097-TLS    Document 164    Filed 06/25/24    Page 71 of 118
USDC IN/ND case 4:20-cv-00097-TLS    document 157    filed 05/29/24    page 3 of 4

## ANALYSIS

Federal Rule of Civil Procedure 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1); *see* 28 U.S.C. § 1920 (listing recoverable costs). "Rule 54(d)(1) provides a presumption that costs are awarded to the prevailing party, and the burden is on the non-prevailing party to overcome this presumption." *Rivera v. City of Chicago*, 469 F.3d 631, 636 (7th Cir. 2006). Here, the Court granted the Defendants' Motion for Summary Judgment, directing the Clerk of Court to enter judgment in favor of the Defendants and against the Plaintiff. Thus, the Defendants are the prevailing party; accordingly, there is a presumption that their costs are awarded unless the Plaintiff meets her burden to overcome it.

Allowable costs include

(1) Fees of the clerk and marshal;
(2) *Fees for printed or electronically recorded transcripts necessarily obtained for use in the case*;
(3) Fees and disbursements for printing and witnesses;
(4) *Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case*;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920 (emphasis added); *see Crawford Fitting Co. v. J. T. Gibbons, Inc*., 482 U.S. 437, 441–42 (1987) ("Section 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d)."). The Seventh Circuit has "recognized only two situations in which the denial of costs might be warranted: the first involves misconduct of the party seeking costs, and the second involves a pragmatic exercise of discretion to deny or reduce a costs order if the losing party is indigent." *Mother & Father v. Cassid*y, 338 F.3d 704, 708 (7th Cir. 2003).

USDC IN/ND case 4:20-cv-00097-TLS    document 165    filed 06/25/24    page 90 of 172

Case 4:20-cv-00097-TLS    Document 164    Filed 06/25/24    Page 72 of 118
USDC IN/ND case 4:20-cv-00097-TLS    document 157    filed 05/29/24    page 4 of 4

Here, the Plaintiff has not met her burden to overcome the presumption that the Defendants' costs are recoverable. The bases for the Defendants' Bill of Costs are fees for printed or electronically recorded transcripts and for copies used in this case, which are expressly allowable costs. *See* 28 U.S.C. § 1920. The Court has also reviewed the Defendants' costs, including their invoices and itemizations, and concludes that the costs are reasonable. *See Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000) ("Taxing costs against a losing party requires [an] inquir[y] . . . [into] whether the amount assessed . . . was reasonable.").

Although the Plaintiff raises five conclusory bases for her objections—without citation to any legal authority or other support, the Plaintiff does not object to the Defendants' costs based on misconduct by the Defendants or based on her indigency let alone point to evidence contained in the record of either. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). Thus, the Plaintiff has not met her burden to overcome the presumption that costs are awarded to the prevailing party. According, the Court overrules the Plaintiff's objections.

## CONCLUSION

For the reasons stated above, the Court hereby OVERRULES the Plaintiff's Amended Opposition to the Defendants' Bill of Costs [ECF No. 154] and GRANTS the Defendants' Bill of Costs [ECF No. 147]. The Court OVERRULES as moot the Plaintiff's Opposition to the Defendants' Bill of Costs [ECF No. 152].

SO ORDERED on May 29, 2024.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

*Appendix 6*

1

Dkt152

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

LAFAYETTE DIVISION

| | |
|---|---|
| LIDAN LIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 4:20-CV-00097-TLS-JPK |
| | ) |
| THE TRUSTEES OF PURDUE | ) |
| UNIVERSITY, CARL DRUMMOND, | ) |
| LACHLAN WHALEN, | ) |
| | ) |
| Defendants. | ) |

**Plaintiff's Opposition to Defendants' Bill of Costs**

The pro se Plaintiff files her opposition to Defendants' Bill of Costs filed on April 30, 2024 and requests that the Court either waives these costs or put them on hold for the following reasons:

1    The Court's ruling on April 17, 2024 (DKT145) reflects its decision on Defendants' Motion for Summary Judgement; however, this ruling is not final because the laws allow the Plaintiff to take further legal actions, including appeal, regarding this ruling.

2    The Plaintiff has filed her Motion to Amend the Court's Order and judgement made on April 17, 2024 .

3    The Plaintiff believes that the Court's ruling on April 17, 2024 needs to be amended and altered. The fundamental principles of laws serve one purpose: get to the truth and enact justice.

5    Defendants outweigh Plaintiff in terms of financial resources unproportionally; there is no reason why they should request Plaintiff paying the costs for seeking justice in the Court when she has exhausted all internal venues.

6    The Plaintiff has conferred with Defense Counsel Ms. Anderson about waiving costs; she was receptive of discussing this issue; however, she made it clear that waiving costs is conditional; that is, defendants will waive costs if Plaintiff gives up her right of appeal.

For the reasons stated above, the Plaintiff prays for justice and relief.

Respectfully submitted,

*Lidan Lin*

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

## CERTIFICATE OF SERVICE

The undersigned hereby swears and affirms that a true and correct copy of the above was served by the Clerk's Office (1300 S. Harrison St. Fort Wayne, 46802) to the Court and served electronically to Purdue's counsels of record on May 14, 2024.

Lidan Lin (Plaintiff, pro se)

*Lidan Lin*

7205 Sandyridge Place

Fort Wayne, IN 46835

llin3000@yahoo.com

1

*Appendix 7*

**Dkt130**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

LAFAYETTE DIVISION

| | |
|---|---|
| LIDAN LIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.:  4:20-CV-00097-TLS-JPK |
| | ) |
| THE TRUSTEES OF PURDUE | ) |
| UNIVERSITY, CARL DRUMMOND, | ) |
| LACHLAN WHALEN, | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFDNANTS'**

**MOTION FOR SUMMARY JUDGMENT**

**1**                          **Introduction**

Defendants' Motion for Summary Judgement has no basis in law or facts. They have misinterpreted the laws and disregarded many facts crucial to Plaintiff's claims in their Motion. Defendants argued that "Plaintiff has no evidence that Dr. Whalen or Dr. Drummond were personally involved in any harassment, discrimination or retaliation against her [Plaintiff]). This statement is a blatant disregard of the facts and evidence that support Plaintiff's claims. Plaintiff's claims are based on two civil rights laws: Title VII and Section 42 U.S.C. 1981 and documented evidence; they are neither bizarre nor irrational, as Defendants characterized them (Defs, Brief, p1). For this reason alone, Defendants' Motion should be dismissed in its entirety.

1

2

Plaintiff never accused "everyone" (Defs Brief, p1) she works with or others in any of her documented records; she only accused those who actually discriminated and retaliated against and harassed her.

### 2      2014 and 2015 Claims are Not Time-Barred

Defendants argued that because of Section 1981's four years' statute of limitations, Plaintiff's 2014 (Whalen hire) and 2015 (adverse employment action) claims are "time-barred" and should be dismissed (Defs' Brief, p10). Plaintiff contests this defense.  Defendants' assertion is based on the statute of limitations as a general legal principle while they have neglected how this principle is interpreted and implemented by legal professionals. Because in some cases, alleged adverse incidents do not occur in isolation; that is, they occur as a result of or they occur and cause other adverse incidents, legal professionals acknowledge that there are exceptions to the statute of limitations when it is applied to specific cases calling for these exceptions. Instead of adhering to the fixed time limitation, legal practitioners use what they call "the doctrine of continuing harm" or "the doctrine of continuing violation" as an alternative principle for these cases: "The continuing violation doctrine, often asserted by plaintiffs alleging workplace discrimination, is an exception to the statute of limitations. . .The doctrine permits an employee to recover for discriminatory acts occurring prior to the applicable limitations period where such acts were part of a continuing violation that continued into the limitations period" **(https://www.fidlonlegal.com/files/continuing_violation.pdf, p1).**

In arguing for dismissing 2014 and 2015 claims, Defendants only plaid attention to the statute of limitations as a general legal rule while they have overlooked the "exception rule" that is also being used: "Statutes of limitations are statutory mechanisms that limit the duration of a defendant's liability for all types of alleged wrongdoing. Depending upon the circumstances, the statute of limitations can be an important topic of discussion between lawyer and client. As many practitioners know, there are exceptions to the general rule that the statute of limitations runs from the time of the tort or breach though no damage occurs until a later time. One exception that practitioners often try to invoke is the continuing wrong doctrine. Under the doctrine, "where there is a series of continuing wrongs," the statute of limitations will be tolled to the last date on which a wrongful act is committed" (https://fhnylaw.com/court-explains-when-a-continuing-wrong-is-a-continuing-wrong/).

2

Plaintiff has demonstrated in her responses to Defendants' Statement of Material Facts and in Additional Material Facts that 2014 Whalen hire was a catalyst for 2015 adverse employment action, 2016 adverse employment action, 2019 *Clio* editor adverse action, 2021 Badia Dean appointment, and 2022 Whalen complaint against Plaintiff, as well as other adverse actions set forth in Plaintiff's Response. When Whalen was teaching part-time in Plaintiff's Dept, he was not overtly hostile to Plaintiff; he started boldly harassing Plaintiff only after Drummond hired him into Plaintiff's Dept, which led to the 2015 adverse employment action because Plaintiff complained about Whalen's harassment to Drummond (Plaintiff was wrongfully placed on leave). In this chain of continuing violation incidents, Whalen and Badia were the beneficiaries of Drummond's discriminatory actions against Plaintiff: 2014 Whalen hire was a violation of PFW's spouse hire policy; the making of this hiring contract breached Section1981 because this contract placed Plaintiff's employment at risk and subjected her to hostile harassment for years to come. The 2021 Dean hire was also a violation of Purdue University's anti-nepotism policy; the making of this contract further placed Plaintiff's employment at risk, as her harassment became bolder and bolder, indirectly reflected in 2022 Whalen complaint against Plaintiff.  If Whalen hire never occurred, Plaintiff would not have suffered ongoing discrimination, harassment, and retaliation, and there would not have been this lawsuit. Because 2014 and 2015 claims are logically linked to other claims, they cannot be excluded from other claims and from this suit. This is why the doctrine of continuing wrong is widely implemented by legal experts and accepted by the Supreme Court so that legal liability becomes a reality, not just words on paper, so that law-breakers are held responsible for their actions, so that the public is assured of the sanctity of civil rights laws, so that all, regardless of their skin colors, are treated equally under these laws.

Under this "doctrine of continuing harm," Plaintiff argues that Whalen's 2022 baseless harassment complaint against her should be included in Plaintiff's claims. Whalen's action (hired by Drummond) retaliated against Plaintiff for opposing his hire and for reporting his racial harassment; he not only made baseless allegations, but he asked PFW to literally get Plaintiff fired because of his career needs, an action that clearly evinced his continuing hostility toward and threats of Plaintiff.

### 3    Racial Harassment is Not Limited to Verbal Language Only

Defendants argued that because harassers did not verbally express their racial hostility toward Plaintiff; they only used non-verbal expressions such as those by body language and facial expressions, their harassment does not amount to harassment (Defs Brief, pp 14-15). Plaintiff contests this defense, which has no legal basis and is purely subjective. Legal definitions such as the one from EEOC do not limit expressions of racial animosity to verbal language only. EEOC's definition emphasizes human "conduct," both verbal and none-verbal: "Harassment is unwelcome conduct that is based on race, color, religion, sex (including sexual orientation, gender identity, or pregnancy), national origin, older age (beginning at age 40), disability, or genetic information (including family medical history" (https://www.eeoc.gov//arassment). In this definition, EEOC does not specify that racial harassment has to be verbal; EEOC makes it clear that any human conduct can cause harassment. EEOC further sets the measure for at what point harassment becomes illegal: "Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws" (https://www.eeoc.gov//arassment ). Harassers know that harassment is unlawful, and they do not want to get caught, so they avoid using verbal means to express their racial animosity, since verbal expressions would be too obvious to be caught. Instead, harassers use non-verbal conduct such as body language and facial expressions to do the job. This is why EEOC's definition does not exclude non-verbal conduct from harassment.

Purdue University has similar definitions of harassment that do not limit harassment to verbal expressions only:

**Racial harassment:**

"Conduct that demonstrates hostility towards another person (or identifiable group of persons) on the basis of race, color, national origin or ancestry and is so severe, pervasive or objectively offensive that it has the purpose or effect of:

1. Creating an intimidating or hostile educational environment, work environment or environment for participation in a University program or activity;

2. Unreasonably interfering with a person's educational environment, work environment or environment for participation in a University program or activity; or

3. Unreasonably affecting a person's educational or work opportunities or participation in a University program or activity.

The University is strongly committed to providing a safe and Harassment-free environment for members of those groups that have historically been, and are still likely to be, at greatest risk of Harassment for reasons of prejudice." (https://www.purdue.edu/policies/ethics/iiic1.html).

**Harassment:**

"Conduct towards another person or identifiable group of persons that is so severe, pervasive or objectively offensive that it has the purpose or effect of:

1. Creating an intimidating or hostile educational environment, work environment or environment for participation in a University program or activity;

2. Unreasonably interfering with a person's educational environment, work environment or environment for participation in a University program or activity; or

3. Unreasonably affecting a person's educational or work opportunities or participation in a University program or activity.

Use of the term Harassment includes all forms of harassment, **including Stalking**, Racial Harassment and Sexual Harassment" (https:www//purdue.edu//policiesethics//iic1.html)

Defendants argued that Plaintiff's claim of harassment should not be based on "nebulous impressions of. . .body language" (Defs Brief, p14) and that Plaintiff needed to prove that the harassment was "racially motivated" (Defs Brief, p15). Plaintiff contests this defense. Neither EEOC's nor Purdue University's definition requires proving the intent as the only measure of harassment; they emphasize the "effect" the harassment has on a reasonable person: "the conduct [harassment] is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive" (https://www.eeoc.gov//arassment). Based on this "reasonable-person-effect" standard,  Plaintiff does not need to prove harassers' intent since their actions and the effects of these actions on Plaintiff already speak their intent.

EEOC's and Purdue University's definitions of harassment support Plaintiff's harassment claim that harassers used non-verbal conduct such as body language and facial expressions to express their racial hostility toward Plaintiff, and they did so on a daily basis. Such harassment had intimidating and hostile effects on Plaintiff, as evidenced by her police reports and other complaints to authorities. Worthy of note is that Defendants did not deny Plaintiff's allegation that harassers used non-verbal expressions to express their racial hostility; they only denied that because these expressions are non-verbal, they do not amount to their subjective definition of harassment. Plaintiff has demonstrated in her responses to Defendants' Statement of Material Facts and in Additional Material Facts that the harassment has been ongoing, and "enduring the offensive conduct [has] becomes a condition of continued employment" (EEOC) since 2014.

Defendants further argued that the harassment of Plaintiff was not "severe or pervasive" (Brief, p15) enough to deserve liability. This defense has overlooked the fact that Plaintiff has demonstrated in her Additional Material Facts (pp2-14) and in various responses to Defendants' Statement of Material Facts that she has been subjected to a prolonged period of harassment (2014-present), and the harassment has been so severe and pervasive that she was forced to switch to online teaching completely and consider early retirement in 2018 (Additional Material Facts, p15); she sought medical and counseling help; she took medication (Additional Material Facts, p17); the harassment has caused severe emotional and mental distress and several work-related injuries (Additional Material Facts, pp15-16). Although harassers did not use verbal language to express their racial animosity, their non-verbal expressions unmistakably transmitted their message of hostility, just as Sign Language, a non-verbal language, can communicate whatever messages the users want to communicate. This is why EEOC's and Purdue University's definitions use the "conduct" and "effect" standard, instead of "verbal expressions" standard, in defining harassment.

### 4    2014 Whalen Hire was a Discriminatory Decision and a Catalyst for Later Discrimination, Retaliation, and Harassment

Defendants did not defend Whalen hire against Plaintiff's claim that this hire was not only a discrimination against Plaintiff, but it was a catalyst for later discrimination and retaliation against and harassment of Plaintiff because they deemed it "time-barred. Plaintiff contests this defense in light of the "doctrine of continuing harm." In their Declarations, neither Dr. Drummond nor Dr. Whalen mentioned the fact that Whalen was hired under PFW's spouse hire

or dual-career couple accommodation policy (ExA, Disc, attachment 2, Ex1, //3-4, Blakemore email). This policy allows academic units with hiring needs to waive position posting when there is a dual-career couple hiring need. However, this policy requires that "A department must receive a waiver from the posting and search process before creating a new temporary or permanent position"; this policy also requires that "Requests [for search posting waiver] should be initiated by the department chair or division director" (ExA, Disc, attachment1, Ex2, /3, policy). When this hire was initiated by VCAA Drummond in Fall, 2014 (see ExA, Disc, attachment 2, Ex1, /2. Blakemore email), Plaintiff's Department did not have any job opening nor needs for a position that suited Whalen.

Whalen hire violated PFW's policy because the hiring request was initiated by VCAA Drummond, not by the Department Chair, before the Department was informed of the hire. Before Whalen was hired as a tenured associate professor in 2015, Drummond arranged for Whalen to teach courses in Plaintiff's Department; as a result, Whalen taught one course in Spring and Fall of 2014. In Spring 2015, Whalen was not assigned any course. In Spring 2014, Plaintiff was told by her Department Chair that the reason why Whalen was not assigned any course in Spring 2015 was that the Department's enrollment had declined, and the Department had no needs for him (ExA, Disc, attachment 6, Ex3, Whalen schedule; ExD, Pla Dep, Ex1, p16:2-8).

Whalen hire was done differently from previous spouse hires in Plaintiff's Department in that: 1) in previous spouse hires, there was an open position and there were hiring needs; 2) hiring requests were initiated by the Department, as in the following examples:

Dr. Mary Ann Cain: for her hire, there was a job opening in her fields. Dr. Cain applied for this position, along with other applicants, and she was selected to fill this position in 1995. This hire was initiated by the Dept.

Dr. Troy Bassett: for his hire, there was a job opening that fit him in 2006. Dr. Bassett applied for this position, along with other applicants, and he was selected to fill this position in 2007. This hire was initiated by the Dept.

Dr. Glen was a tenure-track faculty in the history Dept between 2005 and 2006. His wife Dr. Colleen was an adjunct faculty in Plaintiff's Dept. Plaintiff's Dept. made an effort to create a full-time position for Dr. Colleen, but due to PFW's hiring constraints, it did not work out. This request was initiated by the Dept, as well.

8

Plaintiff opposed Whalen hire in 2014 because it discriminated against her by placing her employment at risk. Both Drummond and Whalen knew that 1) Plaintiff was Chinese; 2) Plaintiff was the only Chinese literature faculty in the Department; 3) Plaintiff was the only one in the Department whose teaching specialty areas overlapped with those of Whalen: 20th-century British/Irish literature and culture. Because Whalen hire was done so differently from other spouse hires, Plaintiff cannot think of other reasons than racial discrimination for this hire. Plaintiff expressed her objection to Dr. Drummond (ExB, Defs, DEF1000129-133, Ex1); however, she made it clear that in opposing Whalen hire, Plaintiff did not and still does not oppose PFW's policy itself or oppose spouse hires done in accordance with this policy (see ExB, Defs, DEF1000129-133, Ex1, p5).

After Whalen started teaching in Plaintiff's Dept., he taught two courses that Plaintiff normally teaches: "20[th]-century British Fiction" (Spring 2014, Spring 2016, Spring 2018) and "Studies in Irish Literature and Culture" (Spring 2017, Spring 2019, see ExA, Disc, attachment 6, Ex3, Whalen schedule). As a result, Plaintiff were unable to teach these courses; her other courses were also cancelled due to low enrollment.

This hire, as Plaintiff testified in her Deposition, served as a "catalyst [that incited [later adverse incidents]. . .by Drummond" against Plaintiff for years to come (ExD, Pla Dep, Ex1, pp16,17,18, 57). Because Whalen hire posed ongoing threats to Plaintiff's employment and well-being and triggered years of nightmarish harassment (see ExD, Pla Dec, Ex1, pp13-33, 58-60, 55, 57, 58, 60, 63, 65,16,17,18), Plaintiff requests that Whalen's and Drummond's employment status at PFW be reconsidered such as they and Badia being transferred to other Purdue campuses in order to remove their motives for discrimination, retaliation, and harassment directed at Plaintiff.

### 5    2015 Adverse Employment Action was a Retaliation for Reporting Whalen's Racial Harassment

The catalyzing effect of Whalen hire quickly evinced itself in 2015. During this time Plaintiff was severely harassed by Whalen, Badia, and their "allies." Dr. Drummond retaliated against Plaintiff for reporting harassment by Whalen and Badia in August 2015.

On August 18, 2015, Plaintiff reported harassment by Whalen et al to campus police in the hope that the University would take actions to address the harassing problems. When Officer Ruble asked Plaintiff why the harassers "targeted" her because there were many Asian people

around, Plaintiff stated: "she said that she thinks it's because she's Asian. . . that they wanted her to 'quit' her job; they even "hired someone, Acrilan Whal, into her department to do her job even though there isn't an opening. She thinks he's part of it" (ExA, Disc, attachment 10, Ex11, p2, /6). In this quote, Acrilan Whal refers to Lachlan Whalen; the name was not spelled correctly because Plaintiff did not write down his name for the police officer.  In this report, Plaintiff also told officer Ruble that harassment extended beyond campus. The police report was forwarded to Drummond and HR. On the same day, Plaintiff reported harassment by Whalen and Badia to Drummond. Drummond contacted Chair Aasand and HR and requested a meeting with them to take actions against Plaintiff before the start of the Fall semester (ExF,Pla, Ex17). The next day, Drummond had a meeting with them on August 20, 2015, who asked Chair Aasand to write a letter evaluating Plaintiff's professional performance. Aasand submitted his letter to HR on August 21, 2015 (ExB, Defs, Ex5), the same day Brownlee informed Plaintiff that PFW had placed her on leave and requested a psychological test (ExA, Disc, attachment 11, Ex12, Brownlee letter). Plaintiff was devastated by this news and felt helpless; she cried in Brownlee's office. Plaintiff was not given a chance to respond to Aasand's evaluation before the decision was made; she was denied a due process.  After the decision was made, Plaintiff wrote a response to Brownlee's letter and asked Drummond et al to correct the  mistake. Drummond and Brownlee justified their decision (ExA, Disc, attachment 12, Ex13). Plaintiff was wrongfully placed on leave for Fall 2015. Plaintiff's attorney Patrick Proctor described PFW's decision as its "retaliation" against Plaintiff for reporting harassment in his letter to PFW (ExA, Disc, attachment 14, Ex14, /2, Proctor letter). Former HR Director Brownlee was hired in April 2014, so she was relatively new to PFW. In this adverse employment action, Drummond played a key role; the retaliation came from him: this action was taken in order to protect Whalen and Badia against Plaintiff, a Chinese. Because Drummond retaliated against Plaintiff for reporting racial harassment by Whalen and Badia, a protected activity, Plaintiff requests that this mistake be corrected.

On the same day (August 21, 2015), when Plaintiff was walking back to her office in PFW LA 107 after her meeting with Brownlee, Whalen showed up near the left entrance to LA, next to Science Building, close to the police Dept. not the entrances close to Helmke library. As he walked past the Plaintiff, he deliberately twisted his body, clenched his fists, and threw hateful looks at the Plaintiff.  That was the day when Drummond and HR placed the Plaintiff on

10

leave. This incident would have been captured by the security camera, if PFW had installed the camera in the area. However, Plaintiff has documented stalking and harassing behavior. Plaintiff's 2015 psychological test showed that there were no problems about her ability to perform "the essential function of her job," so PFW restored her to work (ExC, PFW, Ex9).

Plaintiff argues for the inclusion of this adverse action under the doctrine of continuing harm because Plaintiff was subjected to retaliation for reporting harassment (a protected activity) by Whalen hired by Drummond. It should not be hard to see how Whalen and Plaintiff were treated differently by Drummond. Plaintiff requests reasonable compensation for the emotional distress this adverse action caused.

6    **2016 Adverse Employment Action is Continuation of Hostile Work Environment Triggered by Whalen Hire Initiated by Drummond**

The catalyzing effect of Whalen hire continued into 2016. By this time, Whalen had securely established himself at PFW and cultivated his network of allies; they harassed Plaintiff on a daily basis. The work environment was hostile and abusive. Within this climate, between May and November 2016, James Lucas, a staff member in Plaintiff's Department, made several baseless harassment complaints to PFW HR against Plaintiff, which led HR to threaten "disciplinary actions" for Plaintiff (ExC, PFW, Ex11, Helming letter).  On November 10, 2016, Mr. Lucas filed a formal harassment complaint against the Plaintiff, alleging grave misconduct by Plaintiff (ExC, PFW, Ex12).  PFW HR conducted an investigation (ExC, PFW, Ex13). In one allegation, Lucas alleged that Plaintiff watched him exercise in PFW Fitness Center on October 12, 2016. The investigator looked at the security camera footage and card swipe records on this date and concluded that Plaintiff was not seen on any camera footage, nor her name appeared in card swipe records or attendance list (ExB, Defs, Ex6, DEF 1000248-263, p7, /4). Despite the facts found, the investigator recommended three sanctions for Plaintiff (see ExB, Defs, Ex6, DEF 1000248-263, p16). In the investigation, multiple individuals provided testimonies (see ExB, Defs, Ex6, DEF 1000248-263, pp11-14). In the final determination, PFW gave Plaintiff six sanctions that severely threatened her employment (ExC, PFW, Ex14). Plaintiff was devastated when she received this determination letter and felt anguish and despair.

There are several perceivable ties between 2015 and 2016 adverse actions, which indicate Drummond's continued intent to force Plaintiff out:1) same people involved in both decisions (Helmsing and chair Aasand reappointed by Drummond; 2) same sanction—FFD exam; 3)

Whalen being involved indicated by the coincidence of the date August 18, 2015; this was the date on which Plaintiff reported Whalen harassment to officer Ruble ; Mr. Lucas. Whalen's friend, alleged that Plaintiff harassed him on this date in his complaint. This coincidence might seem insignificant under normal circumstances, but placed in the context of Whalen's and Drummond's joint discriminatory motives, it can be inferred that Mr. Lucas was trying to "help" Whalen by making this baseless allegation.

Plaintiff appealed this adverse decision to VP Rollock in West Lafayette, who reversed PFW's decision in March 2017 (ExA, Disc, attachment 18, Ex23). Mr. Lucas alleged other incidents that happened in September 2014, January and March 2015. VP Rollock concluded that they "are not part of a continuing pattern of behavior. . .They do not constitute "Harassment" under the Policy." VP Rollock also reached the same conclusion about Lucas's other allegations (see ExA, Disc, attachment 18, Ex23, p1, /3).

Although PFW's adverse decision was reversed, the whole process of complaint was extremely stressful and escalated the hostile work environment: she was subjected to constant concern that someone would make false complaints against her again. More importantly, the reversal decision was unable to remove the trio's, Drummond's and Whalen's/Badia's, motives of racial hostility toward Plaintiff. It can be inferred that Drummond wanted to help Whalen succeed even if it meant destroying Plaintiff, a reckless plan only a racist-minded person could have crafted. Mr. Lucas, on the other hand,  had no motives to harass Plaintiff: he was hired in August 2014; in fact, he was quite friendly with Plaintiff in the beginning.

On November 14, 2016, Mr. Lucas filed a petition for an order of protection against Plaintiff with the local Court, alleging grave misconduct by Plaintiff.  Plaintiff hired Attorney Chapel to defend her.  On December 8, 2016, Judge Degroote held a hearing and denied Lucas's petition, citing that there was no credible evidence to support the allegations (ExA, Disc, attachment 19, Ex15, Judge order). Attorney Chapel never received the Judge order in the mail; he had to go to the Court in person to get it. Plaintiff showed Judge Degroote's order to PFW in the hope that PFW would take into consideration this decision in resolving Lucas's complaint, but PFW responded saying that PFW had different standards in resolving harassment complaints, which was quite frightening to Plaintiff at the time.

Defendants did not defend PFW's 2016 decision. Plaintiff takes their silence as their acceptance of Plaintiff's harassment and hostile work environment claim.

11

12

**7        Acting Chair Appointment was a Discriminatory Decision (2019):**
**Plaintiff can Establish a Prima Facie Case**

Defendants defended the decision to offer the acting chair position to Dr. Huffman, instead of Plaintiff, arguing that it was not a discriminatory decision because based on the feedback Dean Friedman gathered from Dept "faculty and staff," "Dr. Huffman was more qualified [than Plaintiff] for the position (Defs, Brief, p6), This was, Defendants argued, a "legitimate business decision" (Defs Brief, p7). Plaintiff contests this defense and argues that Dr. Friedman's and Dr. Drummond's decision was a discriminatory decision because 1) Plaintiff was better qualified than Dr. Huffman because Plaintiff was a full professor while Huffman was an associate professor; the initial posting clearly stated that preference was given to full professor; 2) this decision was based on a wrong procedure that allowed them to use feedback, including voting, from Dept staff members who should not have been allowed to participate in acting chair selection process, including nominating candidates, providing feedback, and voting; therefor, the feedback is not valid, even fraudulent, and cannot be used to justify the decision. Both the Dept and PFW grant voting rights only to full-time faculty concerning faculty governance matters. In the Enchiridion, the Dept's governance document, voting rights are granted only to full-time faculty defined as "resident faculty" (ExC, PFW, Ex18, p3). The Constitution of PFW Faculty Senate also grants voting rights only to voting faculty:

E. **The Voting Faculty** shall consist of those full-time members of the Faculty and those faculty who are on partial retirement, who are not enrolled in an undergraduate degree program at PFW nor in a graduate degree program in their home department and who:

1.    Are tenured or hold tenure-track appointments in units subject to those powers of the Fort Wayne Faculty detailed in Section VI, below, and perform duties at least half of which consists of teaching or other creative/scholarly work; or

2.    Are tenured or hold tenure-track appointments with the rank of librarian, associate librarian, assistant librarian; or

3.    Hold the rank of assistant, associate, or full clinical professor; or

12

    4.    Hold the rank of clinical instructor, instructor, or senior instructor (see **ExC, PFW, Faculty Senate Constitution, Ex1, p1)**.

Enchiridion also has clear procedures for appointing Department Chair and makes it clear that only full-time faculty can nominate candidates, provide feedback, and vote in the selection of Dept chair (see ExC, PFW, Ex18, pp1-2).

    By allowing Dept staff members to nominate candidates and by using feedback, including voting, from them and possibly part-time instructors in the selection of acting chair, Friedman and Drummond violated Dept's and Faculty Senate's policies. The feedback, therefore, is not a reliable and legitimate measure for the selection. In this light, Defendants' "legitimate business decision" is no longer legitimate; it is, in fact, a fraud executed to discriminate against Plaintiff so that she was not offered the position.

    But why did they violate the right procedures? Because the wrong procedure favored Huffman. In the initial posting, Friedman did not mention what kind of procedure he would use; he only stated that the candidate must be a tenured faculty, and preference was given to a full professor (ExF, Pla, Ex18, p1). Friedman set the deadline for application on February 15, 2019. He asked faculty to indicate to him their interest to serve, which created the impression that he would make the decision based on the indicated interest. Email exchanges provided by Defendants revealed a few behind-the-scene activities and shed light on why Friedman later opted for the "whole Dept feedback" procedure. Because Dr. Huffman was not a full professor, she did not feel that she was qualified for the position, so  February 4, 2019 Huffman emailed Friedman and Drummond questioning the full professor preference because In her email, she used the Dept's Enchiridion policy for selecting Department Chair (not acting chair) to suggest to them that they should follow this policy that involved Dept input (ExG, Fried Dec, ExG, Ex5). However, this Dept policy is for selecting Dept Chair, not acting chair, yet regardless of this distinction, Drummond and Friedman then agreed to use this policy and Dept input in the selection.

    Still, Huffman had no confidence to apply. On February 6, 2019, she emailed Friedman and Drummond again expressing her lack of confidence in applying because she was still worried about the full professor preference. She indicated that she was concerned that full

14

professors had applied. She indicated that previous acting Chairs in the Dept were selected by the Dept, which was incorrect; previous Dept acting chairs were appointed by the Dean based on Plaintiff's recollection. Drummond then indicated that he would like to see her application (ExB, Defs, DEF 1000 770, Ex2). Still Huffman had no confidence to apply by February 12, so Friedman decided to extend the deadline to March 15 and that he would accept anonymous nominations; he told the Dept this in his February 13 email (ExG, Fred Dec, Exs3-4, ExD).

In his Declaration, Dr. Friedman justified his extension of deadline this way: he was confused about Dr. Aasand's sabbatical semester when he sent out the initial email to the Dept and put Fall 2019 in it; upon receiving Dr. Aasand's email to correct his timing error, he corrected the error (put Spring 2020 in it) and resent the position announcement email to the Department (ExG, Fried Dec, p2, //10-12, Ex1). This testimony is incorrect because the Department never received Friedman's email with error; that is, with "Fall 2019" in it; it appears, based on his testimony, that this email with "Fall 2019" in it was only sent to  Shante Howard and Chair Aasand. This is evidenced by 1) when Ms. Howard forwarded Friedman's initial email to the Department at 2:55:46 p.m. on February 1, 2019, he correctly wrote "Spring 2020" for Aasand's sabbatical semester.  Howard's email shows that Friedman's email was sent to her at 2:36 p.m. on February 1, 2019. The 2:36 p.m. and 2:556 p.m. timing matches with Plaintiff's own record (ExG, Fried Dec, Exs A, B, Ex2).

Friedman also justified his extension of time by referring to other deadlines in the College (ExG, Fried Dec, p3,//13-15, Ex3) to be met, and because of these deadlines, he wanted to prioritize tasks (ExG, Fried Dec, ExD, Ex4). This testimony is questionable because first he was not confused about Dr. Aasand's sabbatical semester; second, most likely, he already knew these deadlines when he set the February 15 deadline.

Therefore, Friedman's testimony that upon receiving Aasand's email, he corrected the timing error and resent the email to the Department (at 2:36 p.m. on February 1, 2019) cannot be true because Aasand's email to Friedman was sent at 19:36 p.m. on February 1, 2019 (see ExG, Fried Dec, ExA, Ex2). This means, based on this timing, that by the time Friedman received Aasand's email, Friedman already sent the email with Spring 2020 in it to Ms. Howard at 2:36 p.m., who had already forwarded the email with Spring 2020 in it to the Department at 2:55/6

14

p.m. The behind-the-scene email exchanges shed light on Friedman's more likely motive for extending the deadline: Huffman had not applied by February 12, 2019.

Friedman's more likely motive can be inferred by the fact that shortly after he sent out the email to the Dept on February 13, he invited Huffman for a private meeting to talk about acting chair application, and they met at 1:30 p.m. that day (ExB, Defs, DEF 1000 788-789, Ex3). At 4:13 p.m. on February 13, Friedman emailed Huffman and told her that she received five nominations, two from staff members, which was a violation of Dept's and Faculty Senate's policies. In fact, the five nominations and the extension of time happened on the same day. Friedman also showed delight at her application when Huffman applied on February 25 (ExB, Defs, DEF1000812, Ex4). Plaintiff had applied on February 2.

Two facts are undisputable here: 2) if Friedman had not extended the deadline from February 15 to March 15 2019, Huffman would not have been able to apply for this position; 2) if Drummond and Friedman had not backed down on procedure and on full professor preference, most likely Huffman would not have applied for the position. Why did they back down on these principles? Because Plaintiff was a full professor and a Chinese, an answer that can be inferred from the behind-the-scene email exchanges between Huffman, Friedman, and Drummond. Having secured Huffman's application, Friedman asked the three candidates to provide a statement that outline their experiences, philosophy/plans on March 18, 2019 (ExF, Pla, Ex18, p4); by this time, Plaintiff was the only full professor in the pool. On April 15, 2019, Friedman sent another email to the Dept saying that he would call meetings and invite Dept full and part-time faculty and staff members to provide feedback, meet with him etc (ExF, Pla, Ex18, pp6-7). On June 11, Friedman announced the selection result to the Dept (ExF, Pla, Ex18, p7). On June 15, Plaintiff emailed Friedman and Drummond requesting reconsideration of their decision (ExF, Pla, Ex18, p8); Drummond responded with "no" on June 18, 2019 ExF, Pla, Ex18, 7). Plaintiff filed an informal discrimination complaint against Friedman with HR. HR held a meeting on December 12, 2019, 1:30-4;30 p.m.) at which Plaintiff requested that Friedman reconsider his decision, but he refused (ExC, PFW, Ex19).

In his Declaration, Dr. Friedman testified that he wanted to select the most qualified candidate, and the most qualified candidate did not have to be a full professor. The feedback he received about Huffman was much better than about Plaintiff; it was the best, therefore, he recommended Huffman to Dr. Drummond (see ExG, Fried Dec, pp5-7).

16

Plaintiff argues that Friedman's and Drummond's decision discriminated against her because :1) Friedman's confusion of timing and extension of time was a pretext since he was not confused about timing; 2) Friedman's use of wrong procedure is another pretext; he has been with PFW for over 20 years and is well aware of Faculty Senate's policy on voting rights (so is Drummond); he had no legitimate reasons to use a wrong procedure except for waiting for Huffman to apply; 3) his shift of preference from full professor to administrative experience is yet another pretext.

Although Defendants denied Drummond's and Friedman's discrimination against Plaintiff, their denial is based on the assumption that the feedback is a legitimate basis for making the acting chair selection and that the criteria the decision-makers used were consistent throughout the selection process. This assumption was wrong, as shown by Plaintiff's evidence. Additionally, Plaintiff does not have to show direct evidence, but to prove their discriminatory intent through other evidence, that is, by way of inferences and indirect evidence. Legal experts have suggested that because employers often carry out discrimination in covert ways, discrimination is not easy to prove: "However, as employers become increasingly sophisticated about the law, such [direct] evidence is generally unavailable to the plaintiff. Employers are careful about what they say or document when taking adverse employment action and will seldom display prejudice blatantly. As an alternative to requiring direct evidence, the Supreme Court has designed a framework through which a plaintiff is able to present indirect evidence of discriminatory intent" https://ilj.law.indiana.edu/articles/70/70_1_Smith.pdf). This means that Plaintiff does not have to present direct evidence; she can use other evidence to reveal Drummond's and Friedman's discriminatory intent—pretexts, in this case, their use of wrong procedure and customizing criteria for Huffman, both of which favored her in the end: "Although [plaintiff] must prove that [defendant] acted with the intent to discriminate, [plaintiff] is not required to prove that [defendant] acted with the particular intent to violate [plaintiff's] federal civil rights. Moreover, [plaintiff] is not required to produce direct evidence of intent, such as statements admitting discrimination. Intentional discrimination may be inferred from the existence of other facts" (lines 217-221, https://www.ca3.uscourts.gov/sites/ca3/files/6_Chap_6_2020_August.pdf). Analyzed in this legal light, Defendants' denial should be disregarded. Plaintiff requests that she be awarded reasonable compensation for this loss.

16

### 8    *Clio* Editor-in-Chief Appointment was a Discriminatory Decision (2019): Plaintiff can Establish a Prima Facie Case

Defendants offered an exceedingly brief defense to justify Drummond's decision to offer Whalen the *Clio* journal editor-in-Chief position, arguing that "she [Plaintiff] cannot show that she was more qualified for the Editor-in Chief position nor is there any evidence that Dr. Whalen was selected because of race" (Defs, Brief, p16). Plaintiff contests this defense and argues that she was more qualified than Whalen for this position (ExF, Pla, Ex20, position announcement) because 1) she had more editorial experiences than Whalen, 2) she was a full professor while Whalen was an associate professor; 3) she had research publications in journals indexed in The Arts and Humanities Citation Index, a parameter for high quality journals while Whalen had none; 4) she had other professional achievements such as holding visiting professorships that Whalen did not have.

In his letter of interest and vitae for the editor position, Whalen listed his only editorial experience--serving on the editorial board of *Native Directions*, a Native-American focused magazine housed at the University of North Dakota from 1994 to 1999 (ExH, Whal Dec, Exs A, B, Ex1, letter, vitae). Plaintiff searched various websites, but did not find any information about this magazine nor the fact that Dr. Whalen served on its editorial board; therefore, Plaintiff does not know what kind of professional magazine it was/is. Until Whalen's said "professional editorial experience" is proven, his "qualifications" for the editor position cannot be determined. Even if Dr. Whalen can prove that *Native Directions* was a professional scholarly journal, this is his only editorial experience while Plaintiff had multiple professional editorial experiences with scholarly journals, which include serving on the editorial board of *Stirrings Still* for the Special Issue "The Fiction of J. M. Coetzee" (2006), along with distinguished Coetzee scholars, serving on the editorial board of *China-US Journal of Humanities* (formerly *Journal of Sino-American Humanity Studies*, serving as a year-round reviewer for *The International Journal of Linguistics and Literature Studies* (2014-2018), and serving as an associate editor for *The International Journal of Literary Humanities*, 2014-2016 (ExA, Disc, attachment 51, letter of interest, Ex5; ExF, Pla, Ex3). Plaintiff also had many other relevant qualifications and experiences listed in her vitae that Whalen did not have, such as:

1   Plaintiff's scholarly publications have been widely cited by peers (ExA, Disc, attachment 52, list of citations, Ex6.)

3   *Clio* is an interdisciplinary journal indexed in The Arts and Humanities Citation Index (A&HCI), a widely accepted parameter for high quality journals (ExF, Pla, Ex1). This Index has a rigorous application and review process and high standards for editorial expertise (ExF, Pla, info about A&HCI journals, Ex2).

4   Plaintiff has 11 research publications in A&HCI journals (see ExF, Pla, vitae, Ex3, pp1-3), including such premiere journals as *Ariel: A Review of International Literature*, *English Studies*, *Philological Quarterly*, *Irish Studies Review*, *Journal of Beckett Studies*, *Modernism/Modernity*, *Bronte Studies*. Based on his vitae, Whalen did not have any research publications in A&HCI journals. If Whalen cannot publish in A&HCI journals, the same standards for *Clio*, how can he effectively evaluate submissions and make appropriate editorial suggestions to the contributors?

5   Whalen's publications have a narrow focus on Irish Republican prison writings, which is not congenial to *Clio*'s broadly interdisciplinary scope. By contrast, Plaintiff has published research not only in her specialty area—20th-century Irish/British literature, but in related areas such as postcolonial literature/theory, world literature, comparative literature, and Victorian literature within a broadly interdisciplinary and transcultural context. Plaintiff's ground-breaking studies of Irish writers' dialogue with Chinese culture and arts have gained international recognition. Plaintiff is also conversant with Eastern and Western philosophy, as well as with historiography.

6   Recognized standing in her fields both nationally and  international evidenced by invited reviews, professional editorial service (ExF, Pla, Ex14), , invited lectures (see ExF, Pla, vitae, Ex3 6-7, 10-11).

8   Holding visiting professorships in Chinese Universities (see ExF, Pla, vitae, Ex3, p1, ExF, Pla, Ex16).

In the decision letter, Drummond admitted that both Whalen and Plaintiff met the preference criteria—tenured and have editorial experience. However, the letter stated that in addition to editorial experience, Whalen had many years' "administrative experience as Director of International Studies", which will "transfer in significant ways to the role of editor-in-chief" (ExF, Pla, Ex21). Plaintiff argues that Drummond used "administrative experience" as a pretext for his decision because this was the only experience that Whalen had and Plaintiff did not have,

although she had many equivalent experiences. Administrative experience is good to have, but not as relevant as the experiences Plaintiff had for this particular position, ones Whalen did not have. Additionally, the job posting did not say anything about "administrative experience."

As shown on pp15-16 of this Brief, Plaintiff does not have to prove Drummond's intent to discriminate by direct evidence, but by indirect evidence and inferences. The indirect evidence can be found in Drummond's 2014-15 Whalen hire and 2015 adverse action taken because of Whalen, and in 2016 adverse action that revealed ties between 2014, 2015, and 2016 adverse actions. This means that even if Plaintiff had administrative experience, Drummond would use other pretexts for denying Plaintiff the position and make it look like a legitimate business decision. Another indirect evidence is found in the fact that Drummond should not be in the position to make this decision, to begin with; he had no expertise about *Clio* (see Additional Material Facts, p1).

Plaintiff requests that, in the spirit of equity, she be offered the editor position immediately. Typically, in other institutions, professional service positions like this get rotated periodically in order to give all qualified faculty an opportunity to serve the profession. Plaintiff is willing to step down in a few years and let other qualified faculty in the Dept to gain editorial experience: the Dept has many excellent scholars. Plaintiff further requests that *Clio* be returned to Plaintiff's Dept, where it was historically managed (see Additional Material Facts p1, /2) .

**9    Appointment of Janet Badia as Dean was a Retaliation Against Plaintiff**

Dr. Drummond's appointment of Badia, Whalen's partner, as Dean of the College of Liberal Arts in May 2021(ExC, PFW, Ex16) was a retaliation against Plaintiff for opposing Whalen hire and for reporting harassment by Whalen. This appointment violated Purdue University's anti-nepotism policy that "prohibits all persons from being employed or continuing employment in any position that places them under the Administrative Supervision of another employee with whom they have a Personal Relationship (ExI, PWL, Ex1, p2, /2,). This policy requires that any nepotism waiver be approved by the Dean, Vice Chancellor, and VP for Ethics and Compliance: "Colleges, schools and other academic units must have the approval of the Dean and the Vice Chancellor for Academic Affairs (Regional Campuses) or Vice Provost for Teaching and Learning (West Lafayette campus, see ExI, PWL, Ex1, p4, /19 ) before the request is forwarded to the VP for final approval). This policy further requires that "The request (for

waiver) must be made prior to the individual's employment and have the approvals listed in the Appendix (Dean, VCAA)" (see ExI, PWL, Ex1, p3, /9).

When Drummond made this appointment, neither Drummond nor Badia had obtained a nepotism waiver prior to her Dean appointment that began on July 1, 2021. Plaintiff inquired about the nepotism issue with PFW HR on August 24, 2021 (ExF, Pla, Ex5). On the same day, Badia submitted a request for nepotism waiver to Drummond and VP Rollock, which had long passed the time this request was to be made (ExC, PFW, Ex4); Badia, however, did not submit her request to the Dean for approval first. On September 2, 2021, Drummond approved Badia's request (ExC, PFW, Ex5). VP Rollock approved Badia's waiver request on September 7, 2021 (ExC, PFW, Ex6). On March 10, 2023, Plaintiff submitted a request to review the waiver approval and has not received a response yet (ExF, Pla, Ex6). Drummond was well aware of this policy, which is evidenced by the fact in Fall 2014, he removed a Department Chair because of his personal and supervisory relationship with another faculty. Drummond was also well aware that Plaintiff opposed Whalen hire in 2014—2015 period and her report to him of Whalen's and Badia racial harassment of Plaintiff.

Plaintiff contends that this appointment without approval of nepotism waiver was an intentional retaliation against. This retaliation was racially motivated because he knew that Plaintiff was Chinese and that the power he gave Badia would bolster her and Whalen's morale to continue harassing Plaintiff, which is evidenced by Whalen's 2022 baseless harassment complaint against Plaintiff, in which Whalen asked PFW literally to get Plaintiff fired because he wanted to go up for full professor, a pretext he used. Although Whalen did not win his case, the fact that he even went so far as to threaten Plaintiff's employment once again spoke of his bolstered morale. The whole complaint process was extremely stressful. When Badia was chair on the College Curriculum Committee, she rejected Plaintiff's two course proposals (see Plaintiff's response to Defs' Statement of Material Facts 136). After Badia became Dean, Drummond changed research/travel allocation policy and gave Deans the authority to approve these fundings. Plaintiff recently applied for travel and research funds from her, but she has not approved. Allowing Badia to continue as Dean would send a wrong message to the University that racial retaliation, nepotism, harassment are tolerated and even encouraged, and that University policies are just words on paper without binding effects on those in power positions;

21

therefore, Plaintiff requests that she be removed from Dean position immediately; University policies are for everyone.

### 10      Plaintiff was Subjected to Ongoing Harassment, Hostile Work Environment, Stalking, Intimidation: 2014-present

Prior to 2014, Plaintiff had normal work relation with co-workers at PFW and neighbors. Starting from 2014, when Whalen was planning on applying for the job in Plaintiff's Dept, things rapidly changed, and the environment became hostile. She was frequently harassed and stalked on and off campus in similar manners: harassers use human conduct such as body language, facial expressions, intimidating presence, and stalking to express their racial animosity, which indicates that the harassment was linked. These sudden changes indicate the cause-and-effect ties between Whalen hire and the harassment. Most harassers on and off campus did not know the truth about Whalen hire and were misled by the trio because Plaintiff did not even know some of them. In this sense, the misled harassers are not to blame, though they should learn a good lesson from this experience. Plaintiff testified in her Deposition on such ongoing harassment (ExD, Pla Dec, pp13-33, 58-60, 55, 57, 58, 60, 63, 65).

Harassers also mess with her office and computer equipment, make anonymous complaints to campus authorities, slander Plaintiff. Harassers would use normal activities to cover up their harassment so they would not get caught. Plaintiff was/is not saying that everyone on campus harassed her; by harassers, she only refers to those who actually harassed her. They carry out harassment under the cover of "normal activities."  Plaintiff requests that the following named PFW harassers be given disciplinary sanctions. Because such harassment is so frequent that it is impossible to document all of them; the following are some documented examples:

Janet Badia (ExD, Pla Dec, pp63-65)

Example #1:

On December 1, 2021, Wednesday, the Plaintiff went to campus to discuss work-related matters with two visiting scholars from China in her Dept. Around 2:30 p.m. the two visiting scholars came to the Plaintiff's office (LA 107) for a visit. The Plaintiff showed them around in 1st floor, LA hallway, and introduced them to some staff members.

Around 4:20-4:40 p.m., when Plaintiff was walking in LA hallway, Badia walked around the corner with angry strides from the College office and walked past the Plaintiff near LA Room

21

22

160.  She deliberately threw hateful/disdainful looks at the Plaintiff, as she routinely does when she sees Plaintiff. Visiting scholars come to PFW because they respect and trust the institution; Badia's behavior was damaging to PFW's reputation worldwide.

This incident would have been captured by the security camera, if PFW had installed the camera in LA, as the Plaintiff had requested in 2015, 2020.

Example #2:

Between January and February 2022, Badia frequently threw hateful/disdainful looks at the Plaintiff when the Plaintiff was walking in LA hallway.

Example #3:

In early January 2020, the Plaintiff flew to Seattle, Washington, USA, to attend the Modern Language Association Convention (ExA, Disc, attachment 20, Ex16,  MLA registration receipt).  In the morning of January 8 2020, when Plaintiff arrived at Fort Wayne International airport, she found Badia there, who was also flying to Seattle to attend the same Convention.  On their next flight from Chicago to Seattle, Badia ended up sitting in the row right before Plaintiff on the plane.

During the Convention, Plaintiff saw Badia a few times here and there, but Plaintiff observed similar patterns of harassment during the Convention, as she observed elsewhere and documented these patterns in her documentations.

This incident would have nothing abnormal under normal circumstances; we run into colleagues everywhere, including professional conferences; however, when placed in the context of 2014, 2015, 2016 adverse actions and in the context of Badia's and her allies' ongoing harassment disguised as "normal activities," this incident needs to be scrutinized in a different light.

Lachlan Whalen

Like Badia, Whalen frequently harasses Plaintiff.

Example #1:

On August 21, 2015, Plaintiff had a meeting with former HR director Ms. Brownlee around 3 p.m. in her office in KT.  When Plaintiff was walking back to her office in LA 107, Whalen showed up near the left entrance to LA, next to Science Building, close to the police Dept. not the entrances close to Helmke library. As he walked past her, he deliberately twisted his body, clenched his fists, and threw hateful looks at her.  That was the day when Drummond

22

and PFW HR placed Plaintiff on leave. This incident would have been captured by the security camera, if PFW had installed cameras nearby, as Plaintiff had requested in 2015, 2020.

Example 2:

On January 29, 2016, the Plaintiff drove to campus around 2:00 p.m.; campus was quiet; the construction outside Helmke stopped. A little later, Plaintiff went to Walb Student Union to get coffee; Whalen followed her to the coffee place; when Plaintiff saw him, he quickly disappeared.

Example #3:

On September 26, 2018, when Plaintiff was walking to the Dept meeting (12:00-1:15 p.m.) in LA 136, Whalen deliberately threw hostile looks at her near LA136 door.

Drummond:

Example #1:  Chancellor's Chats

According to Plaintiff's records, she attended PFW Chancellor Elsenbaumer's Chats on March 8, 2018, October 31, 2018, and October 24, 2019. Her records indicate that Drummond showed up in the entrance area to Kettle Hall Room 178 to threaten her, where the Chats were held, when the Plaintiff was walking into KT178 (ExA, Disc, Ex17, Chats schedules, pp2, 3, 4).

Example #2: foul play

On January 27, 2020, Monday, the Plaintiff was scheduled to present her questions to the Faculty Senate about Drummond's problems with diversity (ExA, Disc, attachment 22, Ex22). In the morning, the Plaintiff found two of her car's rear tires flat. The Plaintiff got a ride to campus and presented her questions to the Senate. The Plaintiff had parked her car on campus on January 24, 2020, Friday. The Plaintiff took her car to a tire shop, and the technician found one nail in each of the two tires (ExA, Disc, attachment 23, Ex18, 2 nails). Having two tires simultaneously stung by nails does not happen very often in general; in fact, it had never happened before to Plaintiff. Plaintiff took the usual route to campus on Friday, the last time she used her car, and there was no road construction on this route that she could recall. Placed in the context of the Senate meeting and Drummond's ongoing harassment of Plaintiff, this incident's "foul play" connected to Drummond cannot be ruled out.

Ann Livschiz:  associate professor and associate chair of history Dept in the College of Liberal Arts.

Example #1:

24

On September 9, 2021, the Plaintiff was on campus; around 4:40-4:50 p.m. the Plaintiff saw Livschiz walk by with obvious anger on her face directed at the Plaintiff in LA hallway, near the Plaintiff's office (LA 107).

Example #2:

In November 2014, when Plaintiff was talking to a former co-worker in LA basement, Livschiz came down and walked violently past them; she threw angry looks at Plaintiff and her co-worker, as she walked past them.

Suzanne LaVere: tenured associate professor in History Dept. (ExD, Pla Dec, pp63-65)

Since 2014, Suzanne LaVere frequently used body language to express her racial anger whenever she encountered the Plaintiff in LA hallway or elsewhere on campus. She would violently turn her head aside to express what seemed like hatred. Because she did this so often, it was impossible to document all her actions. Plaintiff had wondered why she would do this since they used to have normal work relation.

LaVere's harassment actions would have been captured by the security camera, if PFW had installed the camera in LA, as the Plaintiff had requested in 2015, 2020. Plaintiff feels sorry for her having to do those things.

Damian Fleming: tenured associate professor in the Plaintiff's Dept

Fleming's harassment was so frequent that it is impossible to document all of them. Worthy of note is that Plaintiff had normal work relation with him until 2014ish.

Example:

On December 1, 2021, Wednesday, the Plaintiff was on campus for work. Around 2:30 p.m. two visiting scholars from China to the Plaintiff's Dept came to her office (LA 107) for a visit. As Plaintiff was showing them around in LA hallway, Fleming lurked around them in the hallway; he deliberately threw nasty/sneering looks at them; his face looked stone cold.

Plaintiff filed police reports about Fleming's harassment (ExC, PFW, Ex17).

Karen Burtnette: former secretary of PFW College of Arts and Sciences

24

Ms. Burtnette was brought to PFW by Drummond as his secretary from outside the University when he became Dean of the College of Arts and Sciences in 2009.  Since 2014, she started stalking Plaintiff on and off campus. Plaintiff had good work relationship with all previous staff members in her College until Ms. Burtnette came.

### Off-campus Harassment by Co-workers: 2014-present

Harassers use similar tactics to harass Plaintiff off campus, including public places: they use "normal activities" to cover up harassment.  There are so many of these incidents that it is impossible to document all of them:

Drummond:

Example #1:  Kroger

According to the Plaintiff's records, Drummond showed up in Kroger store (6002 St Joe Center Rd, Fort Wayne, IN 46835) to stalk and harass the Plaintiff, when the Plaintiff shopped there on one of the days: August 21, 2017, August 20, 2018, or August 26, 2019.  It was Monday; the Plaintiff attended Convocation on campus, then on her way home, she stopped by Kroger to pick up grocery.  Plaintiff saw Drummond walk in through the front entrance the time was between 12:30-3:00 p.m.

Example #2: Kroger

According to Plaintiff's records, Plaintiff saw a white male looking like Drummond in Kroger store (6002 St Joe Center Rd, Fort Wayne, IN 46835) on December 4, 2021, around 4:20 p.m..  Because the white male was wearing a mask, she could not tell whether he was Drummond or not (ExA, Disc, attachment 25, Ex19, Kroger receipt).

For other representative examples, see Additional Material Facts p10).

### Other Forms of On-campus Harassment: Anonymous Complaints

Harassers also use anonymous complaints to harass Plaintiff. On April 6, 2018, campus police again received an anonymous phone complaint about the Plaintiff being seen in Kettler Hall 3rd floor area.  Two officers came to speak with Plaintiff in her office.  The Plaintiff admitted being in the said area, but denied any wrong doing since these areas were accessible to her as a faculty member. Plaintiff later requested this police report (ExA, Disc. Attachment 31, Ex20, KT police report) via Public Records Request venue.  PFW denied her request.  Plaintiff filed a formal complaint with Indiana Public Access Counselor's Office.  Counselor Luke Britt reviewed her complaint and PFW's response and issued his legal advice in Plaintiff's favor in

June 2018 (ExA, Disc, attachment32, Ex21, Counselor Britt decision). PFW eventually released the police report.

### 11                     Hostile Work Environment Continues:
### 2020 Adverse Action: Security Camera Request Denied

Severe harassment prompted Plaintiff to request that security cameras be installed in LA building, where her office is, so that harassers would be caught on cameras. In February 2020, Plaintiff once again requested to campus police the installation of security cameras in the building where she teaches because of being severely harassed in that building by Defendant Whalen and his friends.  Plaintiff believed that security cameras would help deter harassers from harassing her and defend herself.  Plaintiff's request was once again denied by PFW, which further encouraged her harassers to carry on harassment without fear of deterrent (ExC, PFW, Ex15, denial email).

Plaintiff had requested security cameras several times prior to 2020, through her attorney in 2015, her request to HR in or around 2016. All these requests were denied. These denials have encouraged her harassers to carry out harassment without fear of being caught.

### 12      Off-campus Harassment by Neighbors

Plaintiff had good relations with her neighbors in general until 2014, when she noticed that some of them used similar tactics to harass her: they use "normal activities" to cover up harassment. In the beginning, Plaintiff was bewildered why they were harassing her because they had no motives, but the similar tactics they used—use "normal activities" as covers-- led her to detect the ties between the  trio (Whalen, Drummond, Badia) and off-campus harassers

John Robert Price family: residence: 7126 Sandyridge Place, Fort Wayne, IN 46835 Example #1:

John R. Price is a science teacher at Bluffton High School.  The Price family lives across from Plaintiff's house.  Plaintiff had normal relation with them until 2014-2015ish; for example, Plaintiff hired Mr. Price to mow her yard for a while. They frequently harass Plaintiff by spying on her, following her to public places, using dogs to threaten her etc. The following are just a few examples:

On August 20, 2021, around 4:10ish p.m. Plaintiff drove out of her garage to go to Menards store in Maysville Rd.  As soon she drove out of her garage, she saw John Price drive out in his gray pick-up truck.  He first followed the Plaintiff to the intersection of Harmon and

Sandyridge, turned left on Harmony, then turned left again on Shady Lane. When the Plaintiff drove on Clubhouse Drive, Price drove into Clubhouse Drive from Lahmeyer Rd.  As he was driving past Plaintiff, he deliberately turned his head and threw hostile looks at the Plaintiff, as he often did. Plaintiff complained about Price's behavior to the Association Board (ExF, Pla, Ex8, email to Board).  Plaintiff also reported Price's problems to Fort Wayne police Dept.

Example #2: Kroger incident

On October 23, 2016, Price followed Plaintiff in his car to Kroger store (6002 St. Joe Rd. Fort Wayne 46835).  When Plaintiff got out of her car, Price walked over and yelled at her fiercely.  When the Plaintiff drove back from Kroger, she saw Price stand on her driveway with threatening look on his face, which greatly frightened the Plaintiff.  Plaintiff entered her house and called Fort Wayne police immediately and reported this incident (ExF, Pla, Ex9, police report).

The Price family used to park their vehicles outside Plaintiff's house, even though city rules and Association bylaws prohibit parking on the city streets for over 24 hours; however, they are no longer doing this (for more examples, see Additional Material Facts, pp12-15).

### 13    Switching to Online Teaching Due to Hostile Work Environment

Hostile work environment forced Plaintiff to switch to online teaching 100% in Fall 2018 to avoid harassment; she has been teaching online since then.

### 14    Early Retirement Due to Hostile Work Environment

Hostile work environment also forced Plaintiff to consider early retirement in Fall 2018. She discussed this initiative with PFW, but because of various constraints, it did not work out, which left her to further harassment and retaliation.

### 15    Work-related Injuries

Plaintiff suffered several work-related injuries due to stressful and hostile work environment: 2014 injury, 2015 injury, 2018 injury, 2020 injury (ExD, Pla Dec, p185; ExF, Pla, Ex11; see also Additional Material Facts pp15-16).

Plaintiff had not suffered any such serious falls as those in 2014, 2018, 2020 prior to 2014.

### 16    Work-related Anxiety, Depression, and Other Medical Conditions

Highly stressful and hostile work and social environment also caused Plaintiff severe medical problems such as anxiety and depression. This lawsuit has been going on for over three

28

years, and it has taken a toll on her life. As a pro se Plaintiff, she has to fight a battle against a powerful institution, and the state actors and their key allies get defended for free The mere thought of this fact is enough to make a reasonable person sick. PFW has made it impossible for Plaintiff to continue employment in a hostile environment, although she originally planned to retire at 70 or later. For records of medical and counseling treatment (ExF, Pla, Ex19).

### 17        Whalen's 2022 Complaint against Plaintiff was Continuing
### Retaliation and Harassment

In April 2022, Whalen filed a formal harassment complaint against Plaintiff with PFW in, in which he alleged baseless complaints and asked PFW to sanction Plaintiff: taking away her faculty rights such as serving on her Department, College, and Campus Promotion and Tenure Committee when he went up for full professor. He also asked PFW to issue a protective order banning Plaintiff from appearing where he was, among other sanctions. This means that, if his wish was granted, Plaintiff would not be allowed to appear wherever he was (ExC, PFW, Ex8, Whalen complaint). He knew, when he took this action, that Plaintiff was Chinese and the only senior faculty in his fields in the Department. Plaintiff wrote a response to his complaint. PFW investigated this case (**see ExC, PFW, Ex8, redacted investigators' report**) and issued a determination in Plaintiff's favor (**see ExC, PFW**, **Ex8, determination**). The investigators, the panelists, and the Chancellor found no basis for his complaint and denied all his allegations. Although Whalen did not win this case, his bold action indicated his continuing racial hostility toward and retaliation against Plaintiff for opposing his hire and for reporting to police his harassment. Whalen's baseless complaint escalated hostile work climate; Plaintiff still feels shocked by his reckless action.

Whalen's complaint bears striking similarities to his 2014 hire: both actions targeted Plaintiff for her race; in both cases, he was not qualified for the position he sought. Other faculty may not support his full professor promotion case, but he did not file complaints against them.

### 18        Conclusion

Plaintiff's discrimination, retaliation, and harassment claims against the Defendants and their key ally Badia are supported both by laws and facts; therefore, their Motion for Summary Judgement should be dismissed in its entirety.

28

To the extent the state actors and their key ally Badia intentionally discriminated and retaliated against and harassed Plaintiff and recklessly disregarded her federally protected civil rights, Plaintiff seeks maximum punitive damages. Plaintiff prays for judgment against the Defendants for compensatory damages, maximum punitive damages (against the individually-named Defendants and their key ally Badia), reasonable attorney's fees and costs, and for all other just and proper relief in the premises.

*Appendix 8*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

LIDAN LIN,

        Plaintiff,

        v.                           CAUSE NO.: 4:20-CV-97-TLS

THE TRUSTEES OF PURDUE
UNIVERSITY, CARL DRUMMOND, and
LACHLAN WHALEN.

        Defendants.

### ORDER

       This matter is before the Court on the pro se Plaintiff Lidan Lin's Motion to Sanction

Defendant Whalen and to Discipline Defense Attorneys [ECF No. 141]. When filing a motion,

"even pro se litigants must expect to file a legal argument and some supporting authority."

*Mathis v. New York Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) (cleaned up). "A litigant

who fails to press a point by supporting it with *pertinent authority*, or by showing why it is sound

despite a lack of supporting authority . . . forfeits the point." *Id.* (emphasis added) (quoting

*Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)). Courts need not do

the research for a party, even for one proceeding pro se. *Id.* Although the Plaintiff quotes

Northern District of Indiana Local Rule 83-6.2, which allows a court to discipline an attorney

who violates the standards of professional conduct, the Plaintiff does not make a legal argument

or cite to any pertinent legal standard or authority in support of her request for sanctions.

Accordingly, the Court hereby DENIES the Plaintiff's motion [ECF No. 141].

       SO ORDERED on April 17, 2024.

                           s/ Theresa L. Springmann
                           JUDGE THERESA L. SPRINGMANN
                           UNITED STATES DISTRICT COURT

Appendix 9                                           1

Dkt141

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

LAFAYETTE DIVISION

| | |
|---|---|
| LIDAN LIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 4:20-CV-00097-TLS-JPK |
| | ) |
| THE TRUSTEES OF PURDUE | ) |
| UNIVERSITY, CARL DRUMMOND, | ) |
| LACHLAN WHALEN, | ) |
| | ) |
| Defendants. | ) |

**Motion to Sanction Defendant Whalen and to Discipline Defense Attorneys**

Dear Judge Springmann,

N. D. Ind Local Rule 83-5, Bar Admission, sets professional standards for attorney practice (p58). N.D. Ind. L.R. 83-6.1 sets the scope and methods for Attorney Discipline concerning attorney misconduct. Civil Rule 83-6.2. N.D. Ind. L.R. 83-6.2 defines the Grounds for Discipline (p62) and the Court's Authority to exercise disciplinary actions on the accursed:

 "The court may discipline an attorney who:

**(1)** engages in misconduct, even if the misconduct occurs outside an attorney-client relationship;

**(2)** is convicted of a serious crime; or

**(3)** is disciplined by any other court in the United States or its territories, commonwealths, or possessions.

**(b) "Misconduct" Defined.** "Misconduct" means a violation of the standards of professional conduct identified in N.D. Ind. L.R. 83-5(e).

   The Seventh Circuit Court of Appeals also sets standards for attorneys' professional conduct requiring that "A Lawyer's conduct **should be characterized at all times by personal courtesy and professional integrity** in the fullest sense of those terms" (p1).

   Based on the above legal authorities, Plaintiff (I) moves the Court to sanction Whalen and to discipline defense counsels for the following series of misconduct:

1   The Court's Protective Order (DKT64) requires that confidential documents disclosed during the Discovery be designated as non-public and "Confidential": "the following may be designated "Confidential," provided the information was maintained as confidential and the party has a legitimate interest in maintaining its confidentiality" (DKT64, p2, paragraph 2). . . any non-public information which would invade the privacy interests of Plaintiff, the individual Defendants or Purdue's current or former employees, officers, directors. . .including documents contained in personnel files of non-parties; personal financial information; personal identifiers such as social security numbers and dates of birth; and non-public and proprietary business information. . .protected health information and related content and communications; and private medical records" (DKT64, Order, p2, paragraph 2). Defense counsels violated this Order because they failed to designate document DEF1000129 -133 (Plaintiff's ExB, Ex1) as "Confidential". Because this document was a confidential document concerning a personnel matter, it was marked "confidential" by PFW. Further, this was almost the only document defense counsels did not mark "Confidential"—they marked all other documents "Confidential" during the Discovery.

2      Defense counsels most likely shared this confidential document (DEF1000129-133) with Defendant Whalen, Badia's partner, because Whalen used this document in his 2022 internal harassment complaint against Plaintiff (Plaintiff's Additional Material Facts (138), ExC, PFW, Ex8, redacted investigators' report, ExC, PFW, Ex8, determination). Because this document was a confidential email communication Plaintiff sent to several academic administrators (Whalen was not a recipient) concerning his 2014 hire initiated and approved by Defendant Drummond, Whalen should not possess this document, plus Whalen did not indicate how he obtained this document. The timing also suggests that defense counsels highly likely shared this document with Whalen: defense counsels released this document to me around April 15, 2022, and Whalen used this document on April 26, 2022. Although Whalen did not win this case, his violation of the Court's Protective Order and his arrogant contempt of the Court are clear.

Based on 1 and 2, both defense counsels and Whalen have jointly violated the Court's Protective Order; their arrogant contempt of this Court is clear. Defense counsels' violation has failed the "professional integrity in the fullest sense" standard set by the Court and, therefore, constitutes a serious misconduct.

3      Defense counsels also violated the Protective Order in other ways. For example, they used multiple documents they marked "confidential" in their Motion for Summary Judgement without asking the Court to seal them: Exhibit 3, Friedman Declaration (DEF 1000770, DEF1000812, DEF1000788-789); 2) Exhibit 4, Whalen Declaration (Exhibits A and B); Exhibit 43, DEF1000268-1000281, Exhibit 76,1000157-1000158 in Plaintiff's Deposition.  They also used Ex1, Plaintiff's entire Deposition, without asking the Court to seal it.  Because Plaintiff's Deposition was taken as part of the Discovery, it is not public information, an opinion widely shared by legal experts: "Courts nationwide recognize a right to inspect and copy public records and documents, including judicial records and documents. However, the U.S. Supreme Court ruled in *Seattle Times Co. v. Rhinehart* that "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law and, in general, they are conducted in private as a matter of modern practice" (https://tinyurl.com/46bkw94w). Many other legal experts share the same opinion, as well (https://tinyurl.com/yxsmncdu). Because Plaintiff's Deposition contains protected information concerning personnel and health-related matters, for example, Exhibit 43, DEF1000268-

1000281, Exhibit 76,1000157-1000158, they should have been filed under seal; I have requested sealing it in my Amended Motion to Seal filed on April 5, 2024 .

**Conclusion:**

Based on the cited legal authorities and on the documented evidence of defense counsels' and Whalen's multiple and intentional violations of the Court's Protective Order, I request that: 1) Whalen be sanctioned for his intentional violation of the Protective Order that prohibits misusing protected materials disclosed in the Discovery; 2) Defense counsels be disciplined, including maximum sanctions, for their serious misconduct—their failure to advise their clients on abiding by the Court's Protective Order and for their other multiple and intentional misconducts/violations documented in this Motion.

Respectfully submitted,

*Lidan Lin*

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

## CERTIFICATE OF SERVICE

The undersigned hereby swears and affirms that a true and correct copy of the above was served by the Clerk's Office (1300 S. Harrison St. Fort Wayne, 46802) to the Court and served electronically to Purdue's counsels of record on April 9, 2024.

Lidan Lin (Plaintiff, pro se)

*Lidan Lin*

7205 Sandyridge Place

Fort Wayne, IN 46835

llin3000@yahoo.com

*Appendix 10*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION AT LAFAYETTE

LIDAN LIN,

        Plaintiff,

        v.

THE TRUSTEES OF PURDUE
UNIVERSITY, CARL DRUMMOND, and
LACHLAN WHALEN,

        Defendants.

CAUSE NO.: 4:20-CV-97-TLS

### OPINION AND ORDER

This matter is before the Court on an Amended Motion to Seal Documents [ECF No. 140], filed by Plaintiff Lidan Lin on April 5, 2024. On January 18, 2024, the Plaintiff filed a Motion to Seal Documents [ECF No. 128], asking the Court to order that document [ECF No. 129] filed on January 18, 2024, be maintained under seal. The Court entered a March 19, 2024 Opinion and Order [ECF No. 139] denying the Plaintiff's Motion to Seal Documents for failing to provide cause for sealing the document, but the Court granted the Plaintiff leave to refile the motion. In the instant amended motion, the Plaintiff again asks the Court to order that document [ECF No. 129] be maintained under seal. The Plaintiff also requests that several other documents be placed under seal. *See* ECF No. 140 ¶¶ 4, 6.

As the Court set forth in its first Opinion and Order, Northern District of Indiana Local Rule 5-3 provides, "The clerk may not maintain a filing under seal unless authorized to do so by statute, court rule, or court order." N.D. Ind. L.R. 5-3(a). "The public has a legitimate interest in the record compiled in a legal proceeding because the public pays for the courts," but this interest may be overridden "if there is good cause for sealing part of the record." *Forst v.*

*Smithkline Beecham Corp.*, 602 F. Supp. 2d 960, 974 (E.D. Wis. 2009) (citing *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944–45 (7th Cir. 1999)). "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification" by the Court. *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). Therefore, "the district court [must] make a determination of good cause before [it] may enter [an] order [to seal]." *Citizens First*, 178 F.3d at 946. Consequently, a litigant must justify the claim of secrecy, analyzing the applicable legal criteria. *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002). The designation of a document as confidential without further justification, such as an analysis of the applicable legal criteria, does not provide good cause for sealing that document. *See id.*; *Citizens First*, 178 F.3d at 945 ("[M]uch too broad is 'other confidential . . . information,' [as] . . . it amounts . . . to giving each party carte blanche to decide what portions of the record shall be kept secret.").

In this amended motion to seal, the Plaintiff argues in a conclusory manner that the documents at issue are designated confidential or should have been, but the Plaintiff again does not explain why the information is sensitive, personal, and should be kept from the public. Though the Plaintiff also refers to her deposition as not being public and containing exhibits with personnel and health matters, she does so in a conclusory manner and provides no legal citations to support keeping this type of information from the public without further justification. "[T]he Seventh Circuit stated that it will deny outright any motion to maintain the confidentiality of information that fails to 'analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.'" *Forst*, 602 F. Supp. 2d at 974 (quoting *Baxter Int'l, Inc.*, 297 F.3d at 548). The Court finds it must again do the same.

2

To the extent that the Plaintiff argues that the Defendants are in violation of the Stipulated Protective Order [ECF No. 64] for not designating as "confidential" a letter by her that contains a personnel decision and the Plaintiff requests that the Court review whether the Defendants' violated the Stipulated Protective Order for not filing under seal documents designated as "confidential," the Court declines to review these issues as outside the scope of the Court's March 19, 2024 Opinion and Order granting the Plaintiff leave to refile her motion to seal documents.

Based on the foregoing, the Court hereby DENIES the Plaintiff's Amended Motion to Seal Document [ECF No. 140] and DIRECTS the Clerk of Court to UNSEAL the document filed under seal [ECF No. 129].

SO ORDERED on April 17, 2024.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

3

*Appendix II*

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| LIDAN LIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.:  4:20-CV-00097-TLS-JPK |
| | ) | |
| THE TRUSTEES OF PURDUE | ) | |
| UNIVERSITY, CARL DRUMMOND, | ) | |
| LACHLAN WHALEN, | ) | |
| | ) | |
| Defendants. | ) | |

**Amended Motion to Seal Documents**

Dear Judge Springmann,

I received your Opinion and Order dated March 19, 2024 (DKT139) and understand your request for me to justify my Motion to Seal some documents. Below I provide this justification.

1     The Court's Stipulated Protective Order (DKT 64) issued on February 24, 2022 allows parties to designate certain documents as "Confidential" in order to protect the privacy interests of parties and those related to this case. These documents include "any non-public information which would invade the privacy interests of Plaintiff, the individual Defendants or Purdue's current or former employees, officers, directors. . .including documents contained in personnel files of non-parties; personal financial information; personal identifiers such as social security numbers and dates of birth; and non-public and proprietary business information. . .protected health information and related content and communications; and private medical records" (DKT64, Order, p2, paragraph 2).

2     Based on the above Protective Order, during the Discovery, all the documents Defendants provided to the Plaintiff (me) are marked "Confidential" with one odd exception, which I will address in this

2

Motion. In Plaintiff's Response Brief (and its Exhibits) to Defendants' Summary Judgement, I used several Defendants' documents in Exhibits B; because these documents (B1, B2, B5, B6) are marked "Confidential" by Defendants, I requested sealing them to protect the privacy interests of parties and those related to this case.

3    Despite this Protective Order, Purdue counsels used a number of documents they designated as "Confidential," as well as Plaintiff's entire Deposition in their Summary Judgement without asking the Court to seal them, which I will further address in 4, 5, 6. Because Plaintiff's Deposition was taken as part of the Discovery, it is not public information, an opinion widely shared by legal experts: "Courts nationwide recognize a right to inspect and copy public records and documents, including judicial records and documents. However, the U.S. Supreme Court ruled in *Seattle Times Co. v. Rhinehart* that "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice" (https://tinyurl.com/46bkw94w). Many other legal experts share the same opinion, as well (https://tinyurl.com/yxsmncdu). Because Plaintiff's Deposition contains protected information concerning personnel and health-related matters, for example, Exhibit 43, DEF1000268-1000281, Exhibit 76,1000157-1000158, I request that the Court remove the Deposition from the public record or have it filed under seal.

4    Based on the above Protective Order and because some exhibits in Plaintiff's Exhibit A, Exhibit C, Exhibit D, Exhibit F, and in Defendants' Exhibit 1, Exhibit 3,  Exhibit 4 contain non-public and protected information concerning personnel and **health-related matters**, I request that these exhibits be sealed: Plaintiff's Exhibits: A11, A12, A13, B3, B4, C2, C6, C7, C9, C19, C12, C17, F6, F12, F7-F10-F19, D1, and Defendants' Exhibits: Exhibit 1 (Plaintiff's Deposition), Exhibit 3 (Exhibit G and Exhibit H), Exhibit 4 (Exhibit A and Exhibit B) to protect the privacy interests of parities and those related to this case. However, I noted that Defendants used some documents they designated "Confidential" as Exhibits in their Summary Judgement: for example, 1) Exhibit 3, Friedman Declaration (DEF 1000770, DEF1000812, DEF1000788-789); 2) Exhibit 4, Whalen Declaration (Exhibits A and B)—Defendants did not ask the Court to seal these documents. Because the fact that Defendants did not ask the Court to seal these documents contradicts their own action—designating these documents as "Confidential," I request that the Court review Defendants' violation of the Court's Protective Order.

5    Based on the above Protective Order, both Defendant Whalen and Purdue's counsels have violated this Protective Order together intentionally. First, one document provided by Defendants in the Discovery

3

is Plaintiff's "minority opinion" letter submitted to several academic administrators (Whalen was not a recipient of this letter) opposing Whalen's hire initiated and approved by Defendant Drummond (Plaintiff's Response Brief, ExB, Defs, DEF1000129-133, Ex1). Because this letter concerns a personnel decision, the native/original document (letter) was marked "Confidential" by PFW. The Protective Order requires that this kind of non-public documents be designated as "Confidential": "The following may be designated "Confidential," provided the information was maintained as confidential and the party has a legitimate interest in maintaining its confidentiality" (DKT64, p2, paragraph 2), but Purdue counsels failed to designate this letter as "Confidential when they released it to me—this is almost the only document they did not mark "confidential". Second, Whalen used this confidential letter in his internal harassment complaint against Plaintiff in April 2022 (Plaintiff's Additional Material Facts, ExC, PFW, Ex8, Whalen complaint). Whalen's action suggests that Purdue counsels most likely shared this letter with Whalen because this confidential letter should never have been in Whalen's possession; if Purdue counsels deny giving this letter to Whalen, Badia's partner, then Whalen must explain how he obtained this letter. Based on these facts, both Purdue counsels and Whalen have jointly violated the Protective Order because the Order clearly prohibits misusing protected materials: "Confidential information shall not be used or disclosed by the parties, counsel for the parities or any other persons for any purpose whatsoever other than in this litigation, including any appeal thereof" (DKT64, Order, p4, paragraph 2). Because Purdue counsels had marked all the other documents disclosed in the Discovery as "Confidential," their failure to mark this particular letter as "Confidential" does not make sense unless the failure was intentional. Such intentional failure clearly shows Purdue counsels' arrogant disrespect of the Court. Plaintiff therefore requests that the Court review Purdue counsels' and Whalen's simultaneous intentional violations of the Court's Protective Order and sanction them for their intentional violation of the Order ("simultaneous" because Purdue counsels released the letter to Plaintiff in April 2022, and Whalen used the same letter in his internal complaint against Plaintiff in April 2022).


6    Based on the Court's Protective Order and on the Plaintiff's justification of complying with this Order, there is "a good cause" for sealing the following documents (DKT 128):


**Plaintiff's exhibits:**
1    Exhibit B5
2    Exhibit F17
3    Exhibit B1
4    Exhibit B2, B3, B4
5    Exhibit B6

4

6    Exhibit D1

7    Exhibit C14

8    Exhibit C9, C12

9    Exhibit A11, Exhibit A12, Exhibit A13

10   Exhibit F6

11   Exhibit C6

12   Exhibit C17

**DKT 129:**

13   Exhibits F19

14   Exhibit C7

15   Exhibit F12

16   Exhibit C2

17   Exhibit C19

**Defendants' exhibits:**

18   Exhibit 1, Plaintiff's Deposition

19   Exhibit 3 (Exhibit G and Exhibit H)

20   Exhibit 4 (Exhibit A and Exhibit B)


Respectfully submitted,

*lidan lin*

Lidan Lin (Plaintiff, pro se)

7205 Sandyridge Place

Fort Wayne, IN 46835

**CERTIFICATE OF SERVICE**

The undersigned hereby swears and affirms that a true and correct copy of the above was served by the Clerk's Office (1300 S. Harrison St. Fort Wayne, 46802) to the Court and served electronically to Purdue's counsels of record on April 5, 2024.

Lidan Lin (Plaintiff, pro se)

*Lidan Lin*

7205 Sandyridge Place

Fort Wayne, IN 46835

llin3000@yahoo.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| LIDAN LIN, | |
| Plaintiff, | |
| v. | CAUSE NO.: 4:20-CV-97-TLS |
| THE TRUSTEES OF PURDUE UNIVERSITY, CARL DRUMMOND, and LACHLAN WHALEN, | |
| Defendants. | |

## OPINION AND ORDER

In February 2019, the Plaintiff Lidan Lin applied for positions as editor-in-chief of *Clio* and acting chair in the English department at Purdue University in Fort Wayne, where the Plaintiff was a tenured professor in the English Department. When she was not offered either position, the Plaintiff filed a Complaint [ECF No. 1] in this Court. She amended her Complaint five times, ultimately alleging in her Fifth Amended Complaint [ECF No. 59] that: (1) the Defendant The Trustees of Purdue University failed to hire her as acting chair based on racial (Asian) and national origin (Chinese) discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Title VII); and (2) Defendants Carl Drummond and Lachlan Whalen violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 (§ 1981) when she was not hired as the acting chair based on racial discrimination, she was not hired as editor-in-chief of *Clio* based on racial discrimination, Whalen was hired based on racial discrimination, Janet Badia was appointed Dean of the College of Liberal Arts (in May 2021) based on retaliation, and they created a hostile work environment. This matter is before the Court on Defendants' Motion

for Summary Judgment [ECF No. 121], which is fully briefed and ripe for ruling. For the reasons set forth below, the Court GRANTS the Defendants' motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

2

## MATERIAL FACTS[1]

### A.    Purdue University in Fort Wayne

Purdue University is a public university that receives funding from the State of Indiana.

Def. Ex. 2, ¶ 5, ECF No. 123-2. Defendant The Trustees of Purdue University (Purdue) is the

governing body of Purdue University. *Id.* In 1964, Purdue opened a combined campus with

Indiana University in Fort Wayne known as Indiana University-Purdue University Fort Wayne.

*Id.* ¶ 6. On July 1, 2018, the University split into two campuses, Purdue University Fort Wayne

and Indiana University Fort Wayne. *Id.* Indiana University Fort Wayne took charge of the health

sciences, while other areas, including English and Linguistics, became a part of Purdue

University Fort Wayne. *Id.*

### B.    Carl Drummond, Vice Chancellor for Academic Affairs

Defendant Carl Drummond began employment with Purdue on August 15, 1994, as an

Assistant Professor of Geology. *Id.* ¶ 3. Drummond assumed the role of Vice Chancellor for

Academic Affairs at Purdue Fort Wayne in February 2014, the position he currently holds. *Id.*

¶ 4. As Vice Chancellor for Academic Affairs, he provides academic leadership and financial

management for academic affairs. *Id.*

### C.    The Plaintiff's Employment at Purdue University Fort Wayne

The Plaintiff identifies as "Asian-American/Chinese." Fifth Am. Compl. ¶ 1, ECF No.

59. She was offered and accepted the position of Assistant Professor of English for Indiana

University-Purdue University Fort Wayne in 2001. Def. Ex. 2, ¶ 9. The Plaintiff received tenure

on July 1, 2006. *Id.* She was promoted to full professor in 2010. Fifth Am. Compl. ¶ 2.

---

[1] The facts offered by the parties are considered only to the extent they are supported by the properly cited evidence of record.

Beginning April 20, 2018, the Plaintiff began teaching exclusively online. Def. Ex. 1, 40:6–11, ECF No. 123-1. When Indiana University-Purdue University Fort Wayne was divided into two campuses, the Plaintiff's employment continued with Purdue University Fort Wayne. Def. Ex. 2, ¶ 10. The Plaintiff remained a tenured Professor of English within the Department of English and Linguistics in the College of Arts and Sciences. *Id.* She continues to teach English Literature in the Department of English and Linguistics. *Id.*

**D.    Hiring Process for the *Clio* Editor-in-Chief Position**

On February 22, 2019, English Professor and Editor-in-Chief of *Clio: A Journal of Literature, History, and the Philosophy of History* (*Clio*), Rachel Hile, emailed full-time faculty in various departments, including English and Linguistics, to announce an opening for her editor-in-chief position. Def. Ex. 4, ¶ 8, ECF No. 123-4. *Clio* is an interdisciplinary journal focusing on literature and historiography published three times per year. *Id.* ¶ 9; Def. Ex. 2, ¶ 14. The editor-in-chief solicits and receives submissions, securing peer reviews for submissions, working with authors on revisions, finalizing articles and book reviews for the publication process, and working as needed with the managing editor to help see issues through the publication process. Def. Ex. 4, ¶ 10; Def. Ex. 2, ¶ 14. Candidates for the position needed to send a letter of interest and curriculum vitae to Hile. Def. Ex. 2, ¶ 15.

Preferences for the next editor-in-chief included that the candidate be a tenured faculty member, that the candidate's research fit the content of *Clio*, and that the candidate have previous editorial experience. Def. Ex. 4, ¶ 12. On March 6, 2019, Defendant Lachlan Whalen, a tenured Associate Professor in the Department of English and Linguistics since the Fall of 2015, applied for this editor-in-chief position. *Id.* ¶¶ 4, 13. The Plaintiff also applied for the editor-in-chief position on March 7, 2019. Def. Ex. 1, 163:14–22.

Hile and Drummond reviewed the applications of the Plaintiff and Whalen and met to discuss their qualifications and credentials. Def. Ex. 2, ¶ 16. Both Whalen and the Plaintiff were tenured faculty members, had interdisciplinary research programs that bring together literature and history, and had some editorial experience. *Id*. ¶ 17. However, Whalen had some other professional experience in addition to peer-reviewing that Hile and Drummond believed would help him communicate with the managing editor and the printer. *Id*. ¶ 18.

Specifically, Whalen had previously served as an editorial board member of *Native Directions*, a Native American-focused magazine housed at the University of North Dakota. *Id*. ¶ 18; Def. Ex. 4, ¶ 15. As an editorial board member, Whalen assisted with every aspect of the periodical, from coming up with issue themes, to soliciting, writing, and editing articles, to creating the actual layout of individual issues. Def. Ex. 4, ¶ 15. Whalen also worked with authors at all stages of the submission and revision process. *Id.* ¶ 15; Def. Ex. 2, ¶ 18. Moreover, Whalen had many years of administrative experience as Director of International Studies that Hile and Drummond believed gave him skills that would transfer in significant ways to the role of editor-in-chief, while the Plaintiff had no administrative experience. Def. Ex. 2, ¶ 18. Because of Whalen's professional and administrative experience, Drummond agreed with Hile that Whalen was more qualified to be editor-in-chief, which is why Whalen was offered the editor-in-chief position. *Id.* ¶ 19.

**E.    Hiring for the Acting Chair Position**

On February 1, 2019, Ronald Friedman, Interim Dean of the College of Arts and Sciences, sent an email intended for English Department faculty announcing that the English Department Chair, Dr. Aasand, would be taking a sabbatical, and therefore, the English Department sought an acting chairperson (acting chair) in his absence. Def. Ex. 3, ¶ 3 ECF No.

5

123-3. The Plaintiff refers to the "acting" chair position as an "interim" chair position. Def. Ex. 1, 105:9. However, a position is filled on an "interim" basis at Purdue when an employee in that position separates employment permanently and Purdue has not yet found a permanent replacement. Def. Ex. 2, ¶ 22. A position is filled on an "acting" basis at Purdue when an employee in that position steps away from his/her job duties temporarily. *Id*. Because Dr. Aasand was taking a temporary sabbatical, the more accurate title for the position Purdue sought to fill temporarily is acting chair. *Id*.

The acting chair was to fill the role and responsibilities of Dr. Aasand while he was on sabbatical. Def. Ex. 3, ¶ 4. In other words, the acting chair position was temporary, effective January 1, 2020, through June 30, 2020. *Id*. ¶ 5. Faculty interested in serving as the acting chair were asked to indicate their interest by emailing Friedman by February 15, 2019. *Id*. ¶ 6. The sole requirement to be qualified to apply for the acting chair position was that the candidate be a tenured member of the faculty. *Id*. ¶ 7. While not listed in the job posting, there were certain skills Friedman considered important in performing the job duties of an acting chair. *Id*. ¶ 8. For example, because the acting chair would be responsible for performing administrative tasks, administrative experience was important. *Id*. While not a requirement, Friedman explained that preference would be given to a full professor. *Id*. ¶ 9.

On February 2, 2019, the Plaintiff emailed Friedman to indicate her interest in the position. *Id*. ¶ 18. She stated, "Being a full professor, I feel obligated to step up to serve as acting chair." Pl. Ex. F, Ex. 18, p. 3, ECF No. 132-5, p. 54 of 106. On February 3, 2019, Friedman confirmed he received that email. *Id*. On February 11, 2019, the Plaintiff emailed Friedman, "I forgot to mention . . . , I held the position of 'Qian Tang Scholar' Chair Professor position from

2011-2018 at Hangzhou Normal University, China. I currently hold a Visiting Professor position

at Southwest Jiaotong University, China . . . ." *Id*. p. 1–2, ECF No. 132-5, p. 52–53 of 106.

On February 12, 2019, Friedman received a request from Professor of Linguistics

Shannon Bischoff asking that the English faculty be allowed to make anonymous nominations

for the position. Def. Ex. 3, ¶¶ 15, 16. On February 13, 2019, Friedman extended the deadline to

March 15, 2019, because there was more time to fill the position than he originally thought (he

originally thought the position was for Fall 2019, but it was for Spring 2020). Pl. Ex. G, p. 16,

ECF No. 132-6.[2] On February 13, 2019, the Plaintiff emailed Friedman, "I just found out you did

say 'Spring 2020' in the original email. I assume the same criteria will apply—candidate must be

tenured and preference is given to full professor. I assume self-nomination is accepted . . . ." *Id*.

p. 5, ECF No. 132-5, p. 56 of 106. On February 13, Friedman responded, "Yes, it is spring 2020

but same criteria apply. Yes, self-nomination is acceptable. Yes, if there is more than one

interested person, there will be a process whereby feedback/input is gathered by me and a

recommendation is made to the VCAA." *Id*. p. 5, ECF No. 132-5, p. 56 of 106.

In the end, Dr. Debrah Huffman, Associate Professor and Director of Writing, received

more than five anonymous nominations for the acting chair position and asked to be considered

for the position on February 25, 2019. Def. Ex. 3, ¶ 19. Dr. Troy Bassett, Professor of English,

received one anonymous nomination and, on March 15, 2019, expressed his desire to be

considered for the acting chair position. *Id*. ¶ 23. The Plaintiff did not receive any anonymous

---

[2] On February 1, 2019, at 2:36 PM, Friedman sent an email to tenured faculty stating that the Chair of the English Department will be on sabbatical for Fall 2019 and the Department will be needing an acting chair in his absence and requesting that those wishing to be considered for the position to email him by February 15, 2019. Def. Ex. 3, Ex. A (DEF1000727), p. 1, ECF No. 123-3, p. 10 of 49. On February 1, 2019, at 17:36, Aasand emailed Friedman stating that his sabbatical was for Spring 2020. *Id*. On February 1, 2019 at 19:38, Friedman sent a revised email to tenured faculty stating Assand's sabbatical was for Spring 2020. Def. Ex. 3, Ex. B (DEF1000810), p. 1, ECF No. 123-3, p. 13 of 49.

nominations. *Id*. ¶ 24. At the time of applying, the Plaintiff, Bassett, and Huffman were all tenured faculty. *Id*. ¶ 27.

Upon closure of the March 15, 2019 deadline for candidate interest statements, Friedman asked the Plaintiff, Huffman, and Bassett to submit, by April 3, 2019, a short statement that included the candidate's experiences and qualifications that they felt made them suitable candidates for the position and how they saw themselves in the position. *Id*. ¶ 28. Specifically, on March 18, 2019, Friedman sent the Plaintiff an email stating that he was "asking each candidate to send [him] a short statement (1 to 3 pages, maximum)[,]" including experiences and qualifications making them a suitable candidate for the acting chair position, plans, and philosophies. Pl. Ex. F, Ex. 18, p. 4, ECF No. 132-5, p. 55 of 106. The Plaintiff, Huffman, and Bassett each submitted a statement that was shared with English Department faculty and staff. Def. Ex. 3, ¶ 29.

On May 6, 2019, Friedman solicited feedback from the English Department faculty, and on May 9, 2019, he solicited feedback from the English Department staff. *Id*. ¶¶ 30, 31. Friedman highly valued the feedback from faculty and staff because of the leadership role the acting chair would hold, requiring the ability to get along with and manage personnel in an effective and positive manner. *Id*. ¶ 32.

Feedback from faculty and staff regarding Huffman was as follows: (1) as the Director of the Writing Center, Huffman had the most administrative experience with regards to supervision, assessment, personnel evaluation, conflict management, and class scheduling; (2) Huffman had excellent rapport with staff, possessed good communication skills, and very positive interactions with English Department faculty; and (3) Huffman was the most organized and detail-oriented of the three candidates. *Id*. ¶ 34.

Feedback from faculty and staff regarding Bassett was as follows: (1) in his role as Interim Director of the English Graduate Program, Bassett had some administrative experience, but it was less than Huffman's experience; and (2) faculty and staff raised concerns about Bassett's decisiveness and responsiveness to emails. *Id*. ¶ 36.

Feedback from faculty and staff regarding the Plaintiff was as follows: (1) the Plaintiff had a lack of administrative leadership roles; and (2) faculty and staff questioned and raised concerns about her organizational skills, rapport with staff, and availability. *Id*. ¶ 35. The Plaintiff also testified that she did not have administrative experience. Def. Ex. 1, 85:13–20.

Additionally, English Department faculty and staff were given a survey and asked to rank the candidates, indicating their first, second, and third preferences. Def. Ex. 3, ¶ 37. The results of the survey ranking were as follows: Huffman received 17 first preference rankings and 3 second preference rankings; Bassett received 3 first preference rankings, 13 second preference rankings, and 1 third preference ranking; Plaintiff received 0 first preference rankings, 1 second preference ranking, and 14 third preference rankings. *Id*. ¶ 38.

On June 10, 2019, Friedman made the recommendation to offer the acting chair position to Huffman. *Id*. ¶ 41. Friedman recommended Huffman for the position because he believed, based on his discussions with faculty and staff, and the results of the survey, that Huffman was the most qualified for the position. *Id*. Friedman averred that the fact that Huffman was not a full professor did not come into play because of the information and feedback received about her that made her the best candidate by a wide margin. *Id*. Drummond supported the recommendation. Def. Ex. 2, ¶ 35. This was because he believed, based on Friedman's recommendation and rationale, that Huffman was the most qualified for the position. *Id*.

9

On June 11, 2019, Friedman emailed faculty and staff in the English and Linguistics Department, stating, "I wish to inform you that, based upon my recommendation and the approval of VCAA Drummond, Dr. Debra Huffman has been selected to serve as the acting chairperson." Def. Ex. A, Dep. Ex. 43, p. 11 (DEF1000279), ECF No. 123-1, p. 140 of 146.

On June 15, 2019, the Plaintiff sent Drummond and Friedman an email asking that they "reconsider the English Dept. interim chair selection decision" because she "strongly believe[s] that [she] [is] the best candidate for this position, all things considered." *Id*. at 12 (DEF 100280), ECF No. 123-1, p. 141 of 146. On June 18, 2019, Drummond responded, "Interim Dean Friedman solicited input from departmental faculty and staff. There was overwhelming support for Professor Huffman and I supported his recommendation. There is nothing further to consider." *Id*.

**F.    Appointment of Janet Badia as Dean of the College of Liberal Arts**

Janet Badia was appointed Dean of the College of Liberal Arts in May 2021. Def. Ex. 2, ¶ 36. The Plaintiff believes that Drummond retaliated against her for filing her EEOC charge and this lawsuit by appointing Badia as Dean. Def. Ex. 1, 114:4–9. The Plaintiff did not apply for the Dean of the College of Liberal Arts position. Def. Ex. 2, ¶ 37. After Badia was appointed, on March 31, 2021, the Curriculum Committee that Badia co-chaired did not approve the Plaintiff's proposed courses, ENGL 10201 and ENGL 44601/54901. Pl. Ex. A, Ex. 7, p. 1–2, ECF No. 132-1, p. 15–16 of 58. Nevertheless, the Plaintiff maintains her employment as a tenured full professor and continues to teach courses that she previously taught. *Id*. ¶ 38.

**G.    Actions the Plaintiff Believes Constitute Harassment**

On March 15, 2017, the Vice President for Ethics and Compliance granted the Plaintiff's appeal of Vice Chancellor David Wesse's decision finding her in violation of Purdue's anti-

harassment policy based on complaints by Jamé Lucas, a staff member in the English

Department, made from May through November 2016 about harassment by the Plaintiff. Pl. Ex.

A, Ex. 23, p. 1, ECF No. 132-1, p. 57 of 58. The related sanctions and remedial measures

imposed against the Plaintiff were nullified. *Id.*

On April 5, 2018, the campus police received a complaint about the Plaintiff causing a

disturbance on campus for being in an area she was not permitted to be in. Pl. Ex. A, Ex. 20, p. 1,

ECF No. 132-1, p. 42 of 58. The Plaintiff told the responding officer that she was allowed to go

wherever she wants because the Purdue campus is a public place. *Id.* However, the responding

officer informed the Plaintiff that was not how it works, and she needs to comply with the rules.

*Id.*

On February 24, 2020, the Plaintiff received a letter denying her request for the

installation of security cameras in the Liberal Arts building on campus. Pl. Ex. C, Ex. 15, p. 1,

ECF No. 132-3, p. 34 of 40.

On April 26, 2022, the Plaintiff received a letter from Chancellor Ronald L. Elsenbaumer

informing her that Whalen had filed a harassment complaint against her. Pl. Ex. C, Ex. 8, p. 1,

ECF No. 132-3, p. 18 of 40. In the complaint, Whalen asserted that the Plaintiff has harassed him

by attempting to discredit him and by damaging his reputation on campus. *Id.*, p. 3, ECF No.

132-3, p. 20 of 40. On June 20, 2022, the Purdue investigators sent a report of their findings to

Chancellor Elsenbaumer. *Id.*, p. 4, ECF No. 132-3, p. 21 of 40. On July 14, 2022, Chancellor

Elsenbaumer sent the Plaintiff a letter informing her that the preponderance of the evidence does

not support a finding of harassment by her. *Id.*, p. 11, ECF No. 132-3, p. 28 of 40. The

Chancellor also found that Whalen's complaint was neither false nor malicious. *Id.*, p. 12, ECF

No 132-2, p. 29 of 40.

**H.    The Plaintiff's EEOC Charge**

The Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on April 2, 2020, alleging race (Asian) and national origin (Chinese) discrimination. Fifth Am. Compl. Ex. 1, ECF No. 59-1. The Plaintiff's EEOC charge concerns one employment decision made in June 2019—the hiring of Huffman, and not the Plaintiff, for the acting chair position. *Id*.

## ANALYSIS

The Defendants move for summary judgment on each of the Plaintiff's claims in her Fifth Amended Complaint. The Court addresses the § 1981 hostile work environment and retaliation claims before turning to the remaining § 1981 and Title VII discrimination claims.

**A.    42 U.S.C. § 1981 Hostile Work Environment and Retaliation Claims**

*1.    Statute of Limitations*

To begin with, the parties dispute whether the statute of limitations bars evidence of events that occurred more than four years before this lawsuit was filed from being used to support the Plaintiff's § 1981 claims. Claims arising under the 1991 amendments to § 1981 are "governed by § 1658's 4-year statute of limitations[.]" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004)). Section 1981 claims based on conduct "that occurred after the formation of an employment contract" arise under the 1991 amendments. *Id.* at 373. Here, the Plaintiff alleges violations under § 1981 for a hostile work environment and retaliation. Thus, these § 1981 claims are subject to § 1658's 4-year statute of limitations because they are based on conduct that took place after the formation of her employment contract with Purdue in 2001. Accordingly, the Court may only consider events four years prior to when the Plaintiff filed her initial complaint in this action in support of her § 1981 claims. *See Dandy v. United Parcel Serv.*,

12

*Inc.*, 388 F.3d 263, 269 (7th Cir. 2004) ("[The plaintiff] filed her complaint on September 14,

2001; therefore, [the court] may consider events which occurred as early as September 14, 1997,

on her [§ 1981] hostile work environment and retaliation claims."). As the Plaintiff filed her

Complaint in this case on December 18, 2020, any § 1981 claim based on conduct that occurred

before December 18, 2016, is time-barred, unless an exception applies.

2.    *Section 1981 Hostile Work Environment*

The Defendants argue that the record does not show that the Plaintiff was subjected to a

hostile work environment. To prevail on her hostile work environment claim under § 1981, the

Plaintiff must point to evidence indicating that she was subject to harassment that was "(1) based

on race; (2) subjectively and objectively hostile; and (3) sufficiently severe *or* pervasive to

interfere with an employee's ability to perform [her] assigned duties." *Dandy*, 388 F.3d at 271.[3]

"To support a hostile work environment claim, the plaintiff need not show that the complained-

of conduct was explicitly racial, but must show it had a racial character or purpose." *Paschall*, 28

F.4th at 814 (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011)).

In support of this claim, the Plaintiff cites twenty-seven pages of her deposition transcript

without explanation. The Court's review of this testimony shows the theory of the Plaintiff's

hostile work environment claim is that she believes that Whalen began stalking her on campus in

2014. *See* Def. Ex. 1, p. 13. The Plaintiff testified that she identifies stalking by Whalen as using

"his body language, his facial expression[.]" *Id*. at 15. She additionally testified that Whalen

"would walk with force in his body" and "look at [her]" with a "very frightening look." *Id*. at 18.

The Plaintiff attributed this to Whalen "most likely planning on applying [for] . . . a tenured track

---

[3] "Claims under Title VII and § 1981 are analyzed in the same manner, and therefore case law addressing one type of claim applies to both types." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022).

position in [her] department" and that she "was perceived as a barrier to Dr. Whalen's plan." *Id.*

at 16–17. She believes Whalen's tenure plan is illegal harassment because "it created a very

intimidating environment for [her]" due to their teaching areas overlapping. *Id.* at 17–18. She

"could not think of any other reason that [Whalen] would express those feelings of hostility

towards [her], other than the fact that [she] [is] Chinese." *Id.* at 24.

In addition, the Plaintiff contends that the following actions—that are within the statutory

period—created a hostile work environment:

- The Plaintiff appealed Vice Chancellor Wesse's decision to give her sanctions and remedial measures based on complaints made in 2016 by a staff member in the English Department about harassment by the Plaintiff, and the decision was reversed (March 2017);
- Drummond showed up at a grocery store at the same time the Plaintiff was there (August 2017, 2018, or 2019);
- Drummond showed up at the entrance to a building on campus to threaten her (March 8, 2018, October 31, 2018, and October 24, 2019);
- the campus police received an anonymous complaint about the Plaintiff (April 6, 2018);
- Whalen was made editor-in-chief of *Clio*, not the Plaintiff (2019);
- the Plaintiff was not hired as acting chair (June 2019);
- Badia sat in a seat directly in front of the Plaintiff on a flight to a convention, and during the convention the Plaintiff observed patterns of harassment by Badia (January 2020);
- the Plaintiff found she had two flat tires because of nail punctures (January 27, 2020);
- the Plaintiff's request for installation of security cameras on campus was denied (February 2020);
- Badia was appointed Dean of the College of Liberal Arts (May 2021);
- a female associate professor walked by the Plaintiff on campus with obvious anger on her face (September 9, 2021);
- Badia walked past the Plaintiff on campus with deliberately hateful/disdainful looks (December 1, 2021);
- a male associate professor deliberately threw nasty/sneering looks at the Plaintiff and two visiting scholars from China on campus (December 1, 2021);
- the Plaintiff saw a white male at the grocery store wearing a mask, so she could not tell if it was Drummond or not (December 4, 2021);
- Badia often threw hateful/disdainful looks at the Plaintiff (January to February 2022); and
- Whalen filed a complaint that the Plaintiff was harassing him (2022).

14

ECF Nos. 130 at 3, 6–11, 21–27, 133 at 1.

First, as for the conduct by Drummond, Badia, and the male associate professor, the Plaintiff either does not cite the record or her citation to the record does not support the proposition asserted.[4] Thus, the Court need not consider these factual allegations.

Second, even if the evidence could potentially support all the listed factual allegations, there is no evidence that any of these actions that the Plaintiff considers harassment was motivated by the Plaintiff's race. This is because the record, including the Plaintiff's testimony on her theory for the hostile environment claim, does not show that the listed "[actions] were 'inherently racial,' that they evidenced 'negative attitudes toward [Asian]-Americans,' or that they had 'racial . . . overtones.'" *Beamon*, 411 F.3d at 863–64 (quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345–46 (7th Cir. 1999)). "While it is true that harassment need not be explicitly racial in order to be probative of a hostile environment, it is equally true that not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Id.* (cleaned up). Rather, the Seventh Circuit has "held that the alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Id.* (cleaned up).[5]

---

[4] For example, for the factual allegations related to harassment by Badia, the Plaintiff cites Exhibit D, but there does not appear to be an Exhibit D attached to her summary judgment brief. *See* ECF No. 132. To the extent that the Plaintiff meant to cite to her declaration in Exhibit E, the declaration does not contain a statement about conduct by Badia. *See* Pl. Ex. E, Ex. 1, ECF No. 132-4. The Plaintiff further cites her deposition transcript; however, the portion cited contains no reference to Badia's conduct either. *See* Def. Ex. A, p. 63, 65. The Plaintiff merely testified that Whalen was good friends with Badia, and then she went on to testify about the conduct of Suzanne LaVere. *Id.*

[5] In her brief and without citation to law, the Plaintiff contends that she "does not need to prove harassers' intent since their actions and the effects of those actions on Plaintiff already speak their intent." Pl. Br. 5, ECF No.1 30. However, the Seventh Circuit has "held that the alleged harassment must be 'sufficiently

In this case, the Plaintiff has identified no evidence of a connection between the unfair treatment she claims to have received and the fact that she is Asian. The Plaintiff asserts that "the harassers used non-verbal conduct, such as body language and facial expressions to express their racial hostility toward the Plaintiff," but her only bases for the assertion are the facts that the "harassment had intimidating and hostile effects" on her, Whalen knew the Plaintiff was Chinese, and the investigators found no basis for Whalen's 2022 complaint. Pl. Br. 5–6, ECF No. 130; Pl. Supp. Br. 1, ECF No. 133. Although non-verbal harassment may be used to support a hostile work environment claim, the Plaintiff must still show that it "had a racial character or purpose." *Paschall*, 28 F.4th at 814. Here, the non-verbal harassment of which the Plaintiff complains "could just as readily have been perpetrated upon a white person without any alteration in its character or purpose." *Beamon*, 411 F.3d at 864. And, the Plaintiff points to no "other evidence [that] supports a reasonable inference tying the harassment to [her] protected status." *Id*. Accordingly, the Court cannot reasonably construe the actions in the evidence or even the other factual allegations that the Plaintiff cites as being motivated by hostility to the Plaintiff's race.

There are several other actions listed by the Plaintiff that also do not create a genuine dispute of fact on her hostile work environment claim. To the extent that the Plaintiff lists actions by her neighbors at her personal off-campus residence that she believes constitute harassment, the Court declines to address these actions because she does not explain how they support a hostile *work* environment, she does not reference legal authority that supports consideration of such actions, and she fails to provide citations to admissible evidence for most. Additionally, to the extent that the Plaintiff asks the Court to consider actions that predate December 18, 2016,

--------------------------------

connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Beamon*, 411 F.3d at 863–64.

16

based on the continuing violation doctrine because they are "logically linked to other claims" or

"a catalyst" for future adverse employment actions, neither reason suffices. *See* Pl. Br. 3.[6] This is

because Plaintiff must "show . . . the use of racially charged [conduct] [occurred] during the

relevant statutory period[.]" *Dandy*, 388 F.3d at 271. As discussed above, the Plaintiff has not

shown racially charged conduct during the statutory period, thus "[she] is barred from relying on

conduct prior to [December 18, 2016], to sustain her hostile work environment claim under the

'continuing violation' doctrine." *Id*. As a result, the Plaintiff has failed to present evidence

sufficient to survive summary judgment on the § 1981 hostile work environment claim alleged in

her Fifth Amended Complaint. *See Beamon*, 411 F.3d at 864.[7]

*3.    Section 1981 Retaliation*

The Defendants argue that the Plaintiff's retaliation claim is not supported by the record.

To survive summary judgment on her claim of retaliation under § 1981, the Plaintiff must offer

enough evidence to permit a reasonable jury to find that she suffered a "materially adverse

action" because she engaged in "protected activity." *Pantoja v. Am. NTN Bearing Mfg. Corp*.,

495 F.3d 840, 848 (7th Cir. 2007). As to conduct within the statute of limitations period, the

---

[6] For her hostile work environment claim, the Plaintiff asks the Court to consider the following actions that predate December 18, 2016: (1) the Plaintiff's objection to the hiring of Whalen for a position in the English department (2014 and 2015); (2) a secretary has been stalking the Plaintiff (since 2014); (3) a female associate professor walked violently past her and threw angry looks at her (November 2014); (4) a female associate professor has used her body to express racial anger whenever she encountered the Plaintiff (since 2014); (5) the Plaintiff's complaint to the campus police department that she was being stalked because she was Asian (2015); (6) the Plaintiff's complaint to Drummond that Whalen was harassing her (2015); (7) Drummond walked past the Plaintiff deliberately twisting his body, clenching his fists, and throwing hateful looks at her (August 21, 2015); (8) placement of the Plaintiff on leave (Fall 2015); (9) the Plaintiff's request for campus security camera installation (2015); (10) Whalen followed the Plaintiff to a coffee shop (January 29, 2016); (11) Lucas' complaints about the Plaintiff to HR (May through November 2016); (12) the investigation of Lucas' complaints, resulting in the investigator recommending three sanctions against the Plaintiff; and (13) Lucas' petition for a protective order against the Plaintiff (November 14, 2016), and the judge's denial of Lucas' petition (December 8, 2016). ECF No. 130 at 3, 6–11, 21–27.
[7] Thus, the Court need not address the parties' additional arguments on the other elements of a hostile work environment claim.

Plaintiff argues that Drummond retaliated against her by appointing Janet Badia as Dean of the College of Liberal Arts in May 2021.[8] In reply, the Defendants argue that this action is not a materially adverse action. For the reasons set forth below, the Court agrees with the Defendants and concludes that summary judgment is appropriate on the Plaintiff's § 1981 retaliation claim.

To be considered a materially adverse action, the Plaintiff must show retaliatory actions "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006). This means that "[a]n employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016) (cleaned up). Here, the Plaintiff appears to identify the appointment of Badia as Dean in 2021 as an adverse action. However, the Plaintiff does not dispute that she did not apply or intend to apply for the Dean position at issue. Also, the Plaintiff does not explain how Badia's appointment was harmful. At most, the Plaintiff shows she was inconvenienced by Badia's appointment because, once she was Dean, Badia did not approve the Plaintiff's two proposed courses. Moreover, after Badia's appointment as Dean, the record shows that the Plaintiff maintained her employment as a tenured full professor, and the Plaintiff continues to teach courses that she previously taught. Thus, the Court concludes that the Plaintiff has not identified a materially adverse action.

To the extent that the Plaintiff contends that Badia has not approved the Plaintiff's application for travel and research funds, the Plaintiff does not support this contention with a citation to admissible evidence as is required at the summary judgment stage; thus, the Court

---

[8] To the extent that the Fifth Amended Complaint alleges a § 1981 claim against Defendant Whalen for retaliation, any such claim is abandoned because the Plaintiff did not address it in her summary judgment brief in response to the Defendants' motion on the claim.

18

disregards it. Also, the Plaintiff neglects to explain how the lack of such an approval is more than an inconvenience. Thus, even if the allegations of the lack of approval were supported by the record, the Plaintiff still has not shown that Badia' appointment as Dean was a materially adverse action.

Additionally, the Plaintiff contends that, under the continuing violation doctrine, the Court should consider Drummond placing her on leave during Fall 2015 for reporting harassment by Whalen and Badia to campus police in 2015 as actionable retaliation. *See* Pl. Br. 8. The Plaintiff also appears to include in her retaliation claim the hiring of Whalen in 2014 and 2015; as, according to the Plaintiff, the hiring of Whalen led to her reporting harassment by him to campus police, which led to placing her on leave and put her employment at risk—as she and Whalen teach similar courses. *See id*. However, hiring decisions and leave placement are discrete acts. *See Lucas v. Chi. Transit Auth*., 367 F.3d 714, 724 (7th Cir. 2004) (finding that suspension is a discrete act); *Jackson v. City of Chicago*, 552 F.3d 619, 623 (7th Cir. 2009) (explaining that hiring decisions are discrete acts). And, "[t]he Supreme Court has explained the continuing violation doctrine . . . 'preclud[es] recovery for discrete acts of . . . retaliation that occur outside the statutory time period.'" *Dandy*, 388 F.3d at 270 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). Consequently, the continuing violation doctrine precludes recovery by the Plaintiff for retaliation based on the hiring of Whalen or placing the Plaintiff on leave, for these are discrete acts, occurring before December 18, 2016, that are barred by the statute of limitations as set forth above.

Accordingly, the Plaintiff's retaliation claim fails.[9] Therefore, the Defendants are entitled to summary judgment on the Plaintiff's § 1981 retaliation claim brought in the Fifth Amended Complaint.

**B.     42 U.S.C. § 1981 and Title VII Discrimination Claims**

*1.     Scope of the EEOC Charge and Title VII Discrimination Claim*

The Defendants argue that, based on the scope of the Plaintiff's EEOC charge, the Plaintiff's Title VII discrimination claim against Purdue only includes a claim for discrimination based on the failure to hire the Plaintiff as acting chair of the English Department.[10] "There are several prerequisites for bringing a Title VII claim. A plaintiff must file a charge with the EEOC detailing the alleged discriminatory conduct within the time allowed by statute, and the EEOC must issue a right-to-sue letter." *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005). "In addition, claims brought in judicial proceedings must be within the scope of the charges filed with the EEOC; [a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Id.* (cleaned up).

"[I]f certain claims are not included in an EEOC charge, a plaintiff can still bring them if they are like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011) (cleaned up).

---

[9] Since the Plaintiff has not shown an adverse action within the statute of limitations, the Court need not address the parties' other arguments on the Plaintiff's retaliation claim.

[10] In her summary judgment response brief, the Plaintiff does not respond to this argument on the scope of her EEOC charge. Thus, she waives any such argument.

20

"To be 'like or reasonably related,' the relevant claim and the EEOC charge 'must, at minimum, describe the same conduct and implicate the same individuals.'" *Id*. at 257.

Here, the Plaintiff's EEOC charge states:

I have been employed by Purdue University for 19 years. I am a tenured full professor in the English Department. In February 2019, I applied for the Interim Chair position for the English Department. I, along with two other tenured associate professors applied for the position. In the posting for the position it stated that tenured full professors would be given preference but [I] was not. On or about June 2019 a decision was made and the position was awarded to tenured Associate Professor, Deborah Huffman (white). I believe that I have been discriminated against based on my race (Asian) and National Origin (Chinese) which are both violations of Title VII of the Civil Rights Act of 1964 as amended.

ECF No. 59-1.[11]

The Plaintiff's claim for discrimination based on the failure of Purdue to hire her for the acting chair position is indeed within the scope of her EEOC charge. And, her "allegation can only be understood to refer to" Purdue's failure to hire her for the acting chair position in June 2019 because of her race and national origin. *Chaidez v. Ford Motor Co*., 937 F.3d 998, 1006 (7th Cir. 2019). Accordingly, the Plaintiff's discrimination claim based on Purdue's failure to hire her for the acting chair position is the only Title VII claim within the scope of the EEOC charge before the Court. To the extent that the Plaintiff may be bringing Title VII claims for retaliation, a hostile work environment, or discrimination based on hiring Whalen in 2014 and 2015, being put on leave for Fall 2015, being given sanctions and remedial measures based on complaints made in 2016 by Jamé Lucas, or not being hired as editor-in-chief of *Clio*, such claims fall outside the scope of the Plaintiff's EEOC charges thus are not considered by the Court.

---

[11] The Plaintiff refers to the "acting" chair position as the "interim" chair position.

21

2.      *Discrimination Claims Under Title VII and § 1981*

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

To succeed on her Title VII discrimination claim, the Plaintiff must prove "(1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Because courts analyze claims of discrimination under § 1981 and Title VII similarly, the Court considers below the Plaintiff's discrimination claims under § 1981 and Title VII. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019) ("[Courts] apply the same standard to discrimination claims under § 1981, Title VII, and the [ADEA].").[12]

The Plaintiff appears to rely on the *McDonell Douglas* burden-shifting framework to survive summary judgment on her discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the Plaintiff must establish a prima facie case of employment discrimination by showing the following: "(1) [she] is a member of a

---

[12] The main difference is that "discrimination claims under Title VII simply require that [the protected characteristic] be a motivating factor in the defendant's challenged employment decision," whereas discrimination claims under § 1981 require the plaintiff to show the protected characteristic "was a but-for cause of [her] injury." *Id.* (cleaned up). However, the difference is not material here because, as set forth in the Court's analysis, there is no evidence of causation.

protected class; (2) [she] applied for and was qualified for an open position; (3) despite [her]

qualifications, [she] was rejected for the position; and (4) a similarly situated person outside

[her] protected class was hired for the position instead, or the position remained open." *Sweatt v.*

*Union Pac. R.R. Co*., 796 F.3d 701, 709 (7th Cir. 2015).

 If the Plaintiff meets each element of her prima facie case, the burden then shifts to the

Defendants "to offer a nondiscriminatory justification for the challenged employment action."

*Groves v. S. Bend Cmty. Sch. Corp*., 51 F.4th 766, 770 (7th Cir. 2022). The burden then shifts

back to the Plaintiff to show the Defendants' "proffered nondiscriminatory reason amounted to

pretext for discrimination." *Id*. Nevertheless, for her discrimination claim to reach a jury, the

Plaintiff has "to identify evidence indicating that the statutorily protected factor[s]"—that her

race of Asian and her national origin of Chinese—"caused" Purdue and/or Drummond not to hire

her. *See Xiong v. Bd. of Regents of Univ. of Wis. Sys*., 62 F.4th 350, 354 (7th Cir. 2023).

 In her response brief, the Plaintiff identifies three discrimination claims: Purdue and

Drummond not hiring her as acting chair of the English Department (Title VII and § 1981),

Drummond not hiring her as editor-in-chief of *Clio* (§ 1981), and Drummond's hiring of Whalen

in 2014 and 2015 (§ 1981). As for the last basis, as argued by the Defendants, the discrimination

claim based on Whalen's hiring is untimely as outside the statutory period for § 1981 claims,

which began to run on December 18, 2016. The Plaintiff nevertheless contends that this evidence

should be considered under the continuing violation doctrine, reasoning that Whalen's hiring

served as a catalyst for later discrimination. However, as discussed above, a hiring decision is a

discrete act. *See Jackson*, 552 F.3d at 623. And, "the continuing violation doctrine . . .

preclud[es] recovery for discrete acts of discrimination . . . that occur outside the statutory time period." *Dandy*, 388 F.3d at 270 (cleaned up).[13]

The Defendants contend that summary judgment should be granted on the Plaintiff's remaining two discrimination claims under Title VII and § 1981 because she has, among other things, (1) failed to establish a prima facia case of discrimination due to her race or national origin under the *McDonnell Douglas* burden-shifting framework, (2) failed to demonstrate nondiscriminatory reasons for Purdue and Drummond not hiring her as acting chair of the English Department and Drummond not hiring her as editor-in-chief of *Clio* were pretextual, and (3) otherwise failed to show that a reasonable jury could find the evidence as a whole supports her claims of discrimination based on race or national origin. As set forth below, the Plaintiff has failed to demonstrate that the nondiscriminatory reasons for Purdue and Drummond not hiring her were a pretext for discrimination based on her race or national origin and has otherwise failed to point to evidence that as a whole shows unlawful discrimination. Thus, the Court need not consider the Defendants' remaining arguments on the prima facie case. The Court first addresses the Plaintiff's discrimination claim based on the Defendants' failure to hire her for the acting chair position and then addresses her discrimination claim based on Drummond's failure to hire her as the editor-in-chief of *Clio*.

a.    Acting Chair Position—Title VII Claim Against Purdue and § 1981 Claim Against Drummond

Assuming, without deciding, that the Plaintiff has established a prima facie case of discrimination based on Purdue not hiring her for the position of acting chair of the English

---

[13] Therefore, the Court need not address the Plaintiff's arguments on how Whalen's hire put her employment at risk, Purdue's spouse hire accommodation policy, or how Whalen's "hire was done so differently from other spouse hires, [the] Plaintiff cannot think of other reasons than racial discrimination for this hire." Pl. Br. 8–9.

Department, the Defendants are still entitled to summary judgment because they have presented legitimate, nondiscriminatory reasons for not hiring the Plaintiff and the Plaintiff has not pointed to evidence showing that those reasons were pretext for unlawful discrimination. The legitimate, nondiscriminatory reasons the Defendants presented for not hiring the Plaintiff for the acting chair position include the following: (1) in a survey of faculty and staff, the Plaintiff received the following ranking preferences compared to the other two candidates: 0 (firsts), 1 (second), and 14 (thirds); (2) she lacked administrative leadership roles; and (3) questions and concerns were raised with regard to the Plaintiff's organizational skills, rapport with staff, and availability. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived.[14] Accordingly, the Court concludes that the Defendants have met their burden of producing nondiscriminatory justifications for not hiring the Plaintiff for the acting chair position. The burden now shifts to the Plaintiff to establish pretext.

In assessing pretext, courts do not "evaluate whether the employer's proffered justification was accurate or even whether it was unfair. [The] sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Id.* (cleaned up); *see Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) ("[P]retext does not exist if the decisionmaker honestly believed the nondiscriminatory reason."). "[T]he only

---

[14] *See Xiong*, 62 F.4th at 354 (finding the plaintiff forfeited his arguments on pretext that were not raised before the district court); *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020) (determining that the plaintiff waived argument on evidence in the record supporting an inference of an improper motive when he did not raise the issue before the district court); *Coleman v. Hardy*, 690 F.3d 811, 819 (7th Cir. 2012) ("[I]f the argument itself was not adequately developed [before the district court], it is . . . waived.").

question is whether the [defendant] *honestly believed* it had [] non-discriminatory reason[s] for [the plaintiff's] [adverse employment action]." *Brooks*, 39 F.4th at 436 (emphasis added).

Additionally, when, as here, the defendants raise more than one reason for an employee plaintiff's termination, the plaintiff "[has] to raise an issue as to pretext for each proffered [reason] to withstand summary judgment." *Simpson v. Beaver Dam Cmty. Hosps., Inc*., 780 F.3d 784, 798 (7th Cir. 2015). Otherwise, the plaintiff must show that the defendants' reasons "are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Fischer v. Avanade, Inc*., 519 F.3d 393, 404 (7th Cir. 2008) (cleaned up).

The Plaintiff argues that the Defendants' legitimate, nondiscriminatory reasons are pretextual because Friedman did the following in hiring the acting chair: (1) extended the application deadline because he did not want the Plaintiff to be the acting chair, lying about his reason for the extension; (2) stated a preference for a full professor but hired an associate professor; and (3) did not use a legitimate procedure when he invited feedback on the candidates from faculty and staff. The Court finds that these actions do not establish pretext.

As to her first argument, although the facts when viewed in the light most favorable to the Plaintiff support a reasonable inference that Friedman extended the deadline so Huffman could also apply for the acting chair position, the Plaintiff does not point to any facts supporting the reasonable inference that Friedman did not want the Plaintiff to be acting chair or extended the deadline because of animus for the Plaintiff's race or national origin. *See Chatman v. Bd. of Educ. of City of Chi*., 5 F.4th 738, 747 (7th Cir. 2021) ("Yet, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext *for the prohibited animus*." (emphasis added) (cleaned up)). As to her second argument, the Plaintiff cites no legal

authority that suggests that an employer's failure to hire an employee with a stated preference is

evidence of pretext when the hired employee does not have the preference but has other relevant

qualifications that the plaintiff does not. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir.

2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal

authority are waived."). For her third argument, the Plaintiff cites a Purdue policy that defines

"voting faculty" and another policy that applies to hiring a new department chair and addresses

voting.[15] However, she cites no evidence that hiring for an acting chair position or eliciting

feedback are governed by this policy. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 507

(7th Cir. 2014) (holding that the plaintiff's pretext argument failed when the defendant did not

violate its own policy by terminating her employment without a prior warning). Thus, the Court

concludes that the Plaintiff has not pointed to evidence showing that the Defendants' legitimate,

nondiscriminatory reasons were a pretext for discrimination.

Even if the Plaintiff had offered evidence to dispute the Defendants' reasons, the Plaintiff

does not say how or even try to show that Friedman or Drummond, the decisionmakers for hiring

the acting chair, did not honestly believe the stated reasons for not hiring her and thus waives any

such argument. Therefore, the Plaintiff has not shown pretext because she has not identified

"such weaknesses, implausibilities, inconsistencies, or contradictions" in the reasons stated by

Purdue, Friedman, and Drummond "that a reasonable person could find them unworthy of

credence and hence infer that [Purdue or Drummond] did not act for the asserted non-

---

[15] The Purdue policy provides, "Voting Faculty shall consist of those full-time member of the faculty . . ."
Pl. Ex. C, Ex. 1, p. 1, ECF No. 132-3, p. 2 of 40. Another Purdue policy provides rules for the
"Appointment of New Chair" when "the incumbent Chair succumbs, resigns, or is unwilling to serve an
additional term[,]" which also includes rules for voting. Pl. Ex. C, Ex. 18, p. 1, ECF No. 132-3, p. 37 of
40.

discriminatory reasons." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Furthermore, even if the Plaintiff had shown that the Defendants' legitimate reasons were lies, the Plaintiff points to no specific examples, whether verbal or non-verbal, from which a jury might infer her Asian race or Chinese ethnicity motivated the Defendants not to hire her. "[I]dentifying an inconsistency (or even a lie) is not necessarily sufficient to prove that the employer's rationale was pretext for discrimination." *Groves*, 51 F.4th at 770. "What ultimately matters is causation: the plaintiff must point to evidence that would allow a jury to find a connection between the statutorily protected factor (here, race [and national origin]) and the adverse action. . . ." *Id*. (cleaned up). "Right to it, the controlling question is whether a reasonable jury could find prohibited discrimination." (cleaned up).

In this case, a reasonable jury could not find prohibited discrimination. Rather than identifying evidence from which a reasonable factfinder could conclude that Purdue, Friedman, or Drummond did not hire the Plaintiff for the acting chair position because she was Asian or Chinese, the Plaintiff contends that "Drummond and Friedman . . . backed down on procedure and on full professor preference" "[b]ecause Plaintiff was a full professor and Chinese," which "can be inferred from the behind-the-scene email exchanges between Huffman, Friedman, and Drummond." Pl. Br. 15 (citing Pl. Ex. F, Ex. 18, p. 1–6, ECF No. 132-5, p. 52–57 of 106). However, the Plaintiff does not point to facts or details in the email communication that show Drummond and Friedman decided not to hire the Plaintiff because she is Asian or Chinese. A review of the referenced series of emails shows most are to or from Friedman or Drummond, are about the interim chair position, and involve these topics: the selection process, the selection results, and reconsideration of the selection results. But there is no indication in any of the emails

that the hiring decision for the position had anything to do with the Plaintiff's race or national origin. Thus, the emails cannot support the Plaintiff's Title VII and § 1981 discrimination claims.

At most, the record contains the Plaintiff's personal belief that she was not hired for the interim chair position due to her race or national origin. Contrary to the Plaintiff's assertion, "these personal beliefs are insufficient to give rise to a genuine factual dispute over whether [the Plaintiff] was the victim of race . . . discrimination." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (cleaned up). Accordingly, the Plaintiff has failed to establish pretext. As a result, Purdue is entitled to summary judgment on her Title VII discrimination claim, and Whalen and Drummond are entitled to summary judgment on her § 1981 discrimination claim. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments on whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901 ("[The court] need not address any of the plaintiffs' arguments with respect to whether they have established a prima facie case because, even if [the court] assume[s] that the plaintiffs have met this burden, [the court] still must hold that they have failed to produce sufficient evidence of pretext."). Therefore, the Court grants summary judgment in favor of Purdue on the Plaintiff's Title VII discrimination claim and in favor of Drummond and Whalen on the Plaintiff's § 1981 discrimination claim based on the Defendants' failure to hire her for the acting chair position.

b.    Editor-in-Chief of *Clio*—§ 1981 Discrimination Claim Against Defendant Drummond and Defendant Whalen

Assuming, without deciding, that the Plaintiff has established a prima facie case, Defendants Drummond and Whalen are still entitled to summary judgment on the Plaintiff's § 1981 discrimination claim against them. To begin with, in her response brief, the Plaintiff only alleges discriminatory conduct within the limitations period on behalf of Defendant Drummond

29

for not hiring her as editor-in-chief. As discussed above, she does not allege any discriminatory conduct by Whalen within the limitations period. Thus, the Plaintiff's claim for discrimination against Defendant Whalen under § 1981 fails.

Defendant Drummond has presented legitimate, nondiscriminatory reasons for not hiring the Plaintiff as editor-in-chief of *Clio*, and the Plaintiff has not pointed to evidence showing that those reasons were a pretext for unlawful discrimination. The legitimate, nondiscriminatory reasons Drummond presented for not hiring the Plaintiff as editor-in-chief are that she (1) she lacked administrative experience; and (2) she had less editorial experience and peer review experience than the candidate selected for the position. The Plaintiff's response brief does not contest that these reasons are nondiscriminatory on their face; thus, the issue is waived.[16] Accordingly, the Court concludes that Defendant Drummond has met his burden of producing nondiscriminatory justifications for not appointing the Plaintiff as editor-in-chief of *Clio*. The burden then shifts to the Plaintiff to establish pretext.

The Plaintiff argues that Drummond's legitimate, nondiscriminatory reasons are pretextual because Drummond should not have been in the position to make the decision on the *Clio* editor-in-chief for the reason that he has no experience.[17] However, the Plaintiff does not point to facts or details establishing animus for the Plaintiff's race was the reason that Drummond was given the authority to make the decision on the *Clio* editor-in-chief. *See Chatman*, 5 F.4th at 747. Therefore, the Court concludes that the Plaintiff has not pointed to evidence showing that Drummond's legitimate, nondiscriminatory reasons were a pretext for unlawful discrimination.

---

[16] *See Xiong*, 62 F.4th at 354; *Tyburski*, 964 F.3d at 600; *Coleman*, 690 F.3d at 819.
[17] To the extent that the Plaintiff also references conduct in 2014–2016 occurring before December 18, 2016, consideration of these events as evidence of pretext is barred by the statute of limitations as set forth above.

Even if the Plaintiff had offered evidence showing Drummond had no experience, the Plaintiff does not say how or even try to show that Drummond, one of the decisionmakers for appointing the *Clio* editor-in-chief, did not honestly believe the stated reasons for not appointing her and thus waives any such argument.[18] Thus, the Plaintiff has not shown pretext because she has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions" in Drummond's stated reasons "that a reasonable person could find them unworthy of credence and hence infer that [Drummond] did not act for the asserted non-discriminatory reasons." *Bates*, 726 F.3d at 956 (quoting *Boumehdi*, 489 F.3d at 792).

At most, the record contains the Plaintiff's personal belief that she was not hired as editor-in-chief because of her race. Again, contrary to the Plaintiff's assertion, "these personal beliefs are insufficient to give rise to a genuine factual dispute over whether [the Plaintiff] was the victim of race . . . discrimination." *Abrego*, 907 F.3d at 1014. Accordingly, the Plaintiff has failed to establish pretext, and Defendants Drummond and Whalen are entitled to summary judgment on her § 1981 discrimination claim. As the Plaintiff has not established pretext, the Court need not address the parties' other arguments on whether the Plaintiff has established a prima facie case under the *McDonnell Douglas* framework. *See Stockwell*, 597 F.3d at 901. Accordingly, the Court grants summary judgment in favor of Defendants Drummond and Whalen on the Plaintiff's § 1981 discrimination claim.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendants' Motion for Summary Judgment [ECF No. 121], and DENIES as moot the Plaintiff's Motion to Expedite

---

[18] Because the Plaintiff does not mention Rachel Hile, another decisionmaker for the editor-in-chief position, and there is no indication that any racial or national origin animus was involved in Hile's decision, the Court need not address her role in the decision making process.

Summary Judgment Ruling [ECF No. 142]. The Court DIRECTS the Clerk of Court to enter

judgment:

1.      in favor of The Defendant Trustees of Purdue University and against the Plaintiff Lidan
        Lin on her claim for discrimination under Title VII;

2.      in favor of Defendants Carl Drummond and Lachlan Whalen and against the Plaintiff
        Lidan Lin on her claims under § 1981 for discrimination, retaliation, and hostile work
        environment.

The Plaintiff takes nothing by her Fifth Amended Complaint. The Clerk of Court is directed to

close this case.

        SO ORDERED on April 17, 2024.

                                        s/ Theresa L. Springmann
                                        JUDGE THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT

AO 450 (Rev. 01/09)    Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
## Northern District of Indiana

LIDAN LIN

          Plaintiff

     v.                               Civil Action No. 4:20-cv-97

CARL DRUMMOND

LACHLAN WHALEN

PURDUE UNIVERSITY

          Defendants

## JUDGMENT IN A CIVIL ACTION

The court has ordered that (*check one*):

☐ the Plaintiff(s),_____recover from the Defendant(s)_____ damages in the amount of _____, plus post-judgment interest at the rate of ____ %

☐ the plaintiff recover nothing, the action is dismissed on the merits, and the defendant recover costs from the plaintiff _____

**X** Other: JUDGMENT IS ENTERED in favor of the Defendant, Trustees of Purdue University and against Plaintiff, Lidan Lin on her claims for discrimination under Title VII. JUDGMENT IS ENTERED in favor of Defendants, Carl Drummond and Lachlan Whalen and against Plaintiff, Lidan Lin on her claims under § 1981 for discrimination, retaliation, and hostile work environment.

This action was (*check one*):

☐ tried to a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

**X** decided by Judge Theresa L. Springmann on Defendants' Motion for Summary Judgment.

DATE: __04/17/2024__         CHANDA J. BERTA, CLERK OF COURT

                       by____ s/J. Barboza _____
                           *Signature of Clerk or Deputy Clerk*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

LIDAN LIN,

        Plaintiff,

        v.                      CAUSE NO.: 4:20-CV-97-TLS

THE TRUSTEES OF PURDUE
UNIVERSITY, CARL DRUMMOND, and
LACHLAN WHALEN,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court on pro se Plaintiff's Amended Motion to Alter and Amend Judgment to Grant Plaintiff's Motions [ECF No. 153], filed on May 16, 2024, which asks the Court to reconsider its April 17, 2024 Opinion and Order [ECF No. 145] granting the Defendants' Motion for Summary Judgment [ECF No. 121] in favor of Defendant The Trustees of Purdue University and against the Plaintiff on her claim for discrimination under Title VII, and in favor of Defendants Carl Drummond and Lachlan Whalen and against the Plaintiff on her claims under § 1981 for discrimination, retaliation, and hostile work environment. The Defendants filed a response [ECF No. 155] on May 23, 2024, and the Plaintiff filed a reply [ECF No. 156] on May 28, 2024. For the reasons set forth below, the Court denies the motion.

The Plaintiff identifies Federal Rules of Civil Procedure 59(e), 60(a), and 60(b) as the basis for this motion for reconsideration. But the Court construes the motion as brought pursuant to Rule 59(e) because she appears to have made arguments for reconsideration based on what she refers to as errors of law and facts. *See Obriecht v. Raemisch*, 517 F.3d 489, 493 (7th Cir. 2008) ("[I]t is the substance, rather than the form, of a post-judgment motion that determines the rule

under which it should be analyzed."). However, the motion is untimely because the Plaintiff did

not file it within 28 days of judgment. *See* Fed. R. Civ. P. 59(e).[1]

Even if the motion was timely, "Rule 59(e) allows a court to alter or amend a judgment

only if the [plaintiff] can demonstrate a manifest error of law or present newly discovered

evidence." *Obriecht*, 517 F.3d at 494. "A 'manifest error' is not demonstrated by the

disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to

recognize controlling precedent.'" *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

"Reconsideration is not an appropriate forum for rehashing previously rejected arguments or

arguing matters that could have been heard during the pendency of the previous motion." *Caisse*

*Nationale de Credit Agricole v. CBI Indus., Inc*., 90 F.3d 1264, 1270 (7th Cir. 1996). "To

support a motion for reconsideration based on newly discovered evidence, the moving party must

show not only that this evidence was newly discovered or unknown to it until after the

[decision], but also that it could not with reasonable diligence have discovered and produced

such evidence [during the pendency of the motion]." *Id*. at 1269 (cleaned up).

In this case, the Plaintiff has not justified reconsideration of the Court's order granting

the Defendants' motion for summary judgment. The Plaintiff does not identify any controlling

precedent that the Court disregarded, misapplied, or failed to recognize in its analysis of the facts

she used in her summary judgment response brief. Notably, the Plaintiff does not cite any

controlling precedent related to her discrimination, hostile environment, or retaliation claims.

Nor does she identify any new evidence that could not have been discovered during the

---

[1] The record indicates that the Clerk of Court entered the judgment in this case on April 17, 2024, and the
Plaintiff filed this motion 29 days later, on May 16, 2024. *See* ECF Nos. 146, 153. Although in her reply,
the Plaintiff cites to Federal Rule of Federal Procedure 15(a)(1)(A) to show that her motion is timely, she
cites to a rule applicable to pleadings, not motions. *See* Fed. R. Civ. P. 15(a)(1)(A). Thus, the Court finds
her argument unavailing.

pendency of the motion for summary judgment. Therefore, the Plaintiff has not provided a basis for reconsideration of the Court's order granting the Defendants' motion for summary judgment.[2]

The Plaintiff also includes requests for reconsideration of two interlocutory orders [ECF Nos. 143, 144]. However, "[m]otions must be filed separately." N.D. Ind. L.R. 7-1(a). As the requests for reconsideration of the two interlocutory orders are separate motions, the Plaintiff has not met the requirements of Local Rule 7-1(a). As a result, the Court denies the Plaintiff's requests for reconsideration of the interlocutory orders.

Accordingly, the Court hereby DENIES the relief requested in the Plaintiff's Amended Motion to Alter and Amend Judgment to Grant Plaintiff's Motions [ECF No. 153]. The Court DENIES as moot the Plaintiff's Motion to Alter and Amend Judgment and Orders [ECF No. 152] based on her filing of ECF No. 153.

SO ORDERED on June 12, 2024.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[2] To the extent that the Plaintiff asserts for the first time in her reply that fraud is a basis for reconsideration, the Court need not address it because she does not develop the argument or cite to any pertinent legal authority in support. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

3